UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order.

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 18-CR-368** |
| | § | **UNDER SEAL** |
| **BRIAN SWIENCINSKI;** | § | |
| **SCOTT BREIMEISTER;** | § | |
| **VLADIMIR REDKO, M.D.;** | § | |
| **CHRISTOPHER INCE, M.D.; and** | § | |
| **RONNIE MCADA, JR.,** | § | |
| | § | |
| **Defendants.** | § | |

United States Courts
Southern District of Texas
FILED

OCT 2 3 2019

David J. Bradley, Clerk of Court

## SUPERSEDING INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Superseding Indictment, unless otherwise specified:

### Compounded Drugs

1.    Compounded pharmaceuticals were drugs that were combined, mixed, or altered from other drugs by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, physicians' assistants, and nurse practitioners ("prescribers"), to meet the specific needs of individual patients.

2.    Although ingredients in compounded medications were generally approved by the United States Food and Drug Administration ("FDA"), the compounded form of those medications were not. That is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

1

## Health Care Benefit Programs

### Commercial Insurance

3.  Commercial insurance companies provided health care benefits for individuals enrolled with their plans, often referred to as "members." These private insurance companies were "health care benefit programs" within the meaning of Title 18, United States Code, Section 24(b), that affected commerce.

4.  Commercial insurance companies, employers, and private entities offered drug plans, which were administered and operated by Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.

5.  A member of a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

6.  Express Scripts, Inc. ("Express Scripts" or "ESI"); Argus (currently known as DST Solutions); Caremark LLC, doing business as ("d/b/a") CVS/Caremark ("CVS/Caremark"); OptumRX, Inc.; Catamaran; and Prime Therapeutics, LLC, among others, were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

### The TRICARE Program

7.  TRICARE was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries." The Defense Health Agency ("DHA"), an agency of

2

DOD, was the military entity responsible for overseeing and administering TRICARE.

8.    TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed medical professional.

9.    In or around May 2015, the DHA implemented a new screening procedure to ensure that TRICARE-covered compounded drugs were safe, clinically necessary, and cost effective, which resulted in a steep decline in TRICARE's reimbursements for compounded drugs.

10.    TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. Once a beneficiary filed a prescription, the pharmacy would collect any applicable copay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to Express Scripts, the PBM that administered TRICARE's prescription drug benefits, which would, in turn, adjudicate the claim and reimburse the pharmacy directly or through a Pharmacy Services Administrative Organization ("PSAO"). To become a network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

11.    TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

*The Medicare Program*

12.    The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were 65 years or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare

3

were commonly referred to as Medicare "beneficiaries."

13. Medicare programs covering different types of benefits were separated into different program "parts." Medicare Part D ("Part D") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.

14. To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies that Medicare approved, often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

15. A pharmacy could participate in Part D by entering into a retail network agreement directly with a plan or with one or more PBMs. A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network. Express Scripts and CVS/Caremark, among others, were Medicare drug plan sponsors.

16. When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan. The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

17. Medicare, through CMS, compensated the Medicare drug plan sponsors. Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans, which was adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases in which a sponsor's expenses for a beneficiary's prescription drugs

4

exceeded that beneficiary's monthly fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

18.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

*The Federal Employees' Compensation Act*

19.     The Federal Employees' Compensation Act ("FECA") pays workers' compensation benefits ("Workers' Compensation") to federal employees who suffer an injury, disease, or death in the performance of duty. An injured federal worker insured under FECA was generally referred to as a "claimant."

20.     FECA paid for, among other things, necessary prescription drugs on behalf of claimants for injuries sustained during the claimants' work for the Federal government.

21.     The Department of Labor Office of Workers' Compensation Program ("DOL-OWCP") administered the benefits under FECA. DOL-OWCP contracted with Affiliated Computer Services ("ACS") to provide medical claims processing and payments. ACS served as the billing administrator for FECA. In this capacity, ACS received provider enrollment forms from prospective FECA providers, assigned provider numbers, and processed and paid claims for benefits under FECA.

22.     Once enrolled, a provider was given access to the ACS online system. Through this ACS system, a provider could submit claims, among other functions. Providers were required to identify on each claim the services provided. All claims submitted were required to be supported by medical evidence. The submission of a claim and acceptance of payment by a provider signified that the service for which reimbursement was sought was: performed as described, medically necessary and appropriate, and properly billed in accordance with accepted industry standards.

5

DOL-OWCP paid claims for prescriptions on behalf of beneficiaries to the pharmacy's financial institution via wire, check, and electronic transfer.

23. FECA was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

## Claims Adjudication

24. Providers, including pharmacies, entered into contractual relationships with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, or PSAOs, which then contracted with PBMs on behalf of providers. Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

25. For prescription drugs, including compounded medications, to be reimbursed, health care benefit programs required that they be dispensed pursuant to a valid prescription and be medically necessary for the treatment of covered illnesses or conditions.

26. Copayments set by the health care benefit programs were the monetary amounts or percentages paid by beneficiaries and members for health care services and items received.

27. Most, if not all, PBMs required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries and members at the time of billing, and specified that copayments could not be systematically waived or reduced, in part because consistent copayment collection was a fraud prevention measure—copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little to no value to their treatments.

28. Upon receiving prescriptions and dispensing prescription drugs, pharmacies submitted claims to health care benefit programs or PBMs. Health care benefit programs or PBMs

reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

29.     PBMs adjudicated claims submitted electronically in states other than Texas.

**Relevant Entities**

30.     Pharms, LLC ("Pharms"), a Texas Limited Liability Company, was a management company formed in or around June 2013.

31.     OmniPlus Healthcare, L.P.; Alternative Medicine and Pharmacy, Inc., d/b/a OmniPlus Pharmacy ("OmniPlus"); Omni-One-Med Pharmacy Services, LLC ("Omni-One-Med"); Safety and Health Technology, LLC, d/b/a Accu-Care Pharmacy; Healthy Pharmacy Solutions, Inc.; Kremco Pharmacy, LLC, d/b/a Kremco Pharmacy; and JSW Prosperity, LLC, d/b/a 1 Stop Pharmacy (collectively "the Pharmacies") were licensed pharmacies formed, acquired, or purchased between in or around March 2013 and in or around 2016. Many of the Pharmacies were held by holding companies, which were Texas Limited Liability Companies.

32.     Rx Logistics LLC, d/b/a Rx Logistics, a Texas Limited Liability Company, was a wholesale pharmaceutical distributor formed in or around 2015.

**The Defendants**

33.     Defendant **BRIAN SWIENCINSKI** ("**SWIENCINSKI**"), a resident of Dallas, Texas, owned Worth Medical ("Worth"). **SWIENCINSKI** and others owned or controlled Pharms, the Pharmacies, Rx Logistics, and other related business entities located in or around Houston, Texas.

34.     Defendant **SCOTT BREIMEISTER** ("**BREIMEISTER**"), a resident of Houston, Texas, owned or controlled Pharms, the Pharmacies, Rx Logistics, and other related business entities located in or around Houston, Texas with **SWIENCINSKI** and others.

35.     Defendant **VLADIMIR REDKO, M.D.** ("**REDKO**"), a resident of Houston,

Texas, was a physician licensed to practice medicine in the State of Texas. **REDKO**, **SWIENCINSKI**, and others, owned or controlled several of the Pharmacies and related business entities located in or around Houston, Texas.

36.     Defendant **CHRISTOPHER INCE, M.D.** ("INCE"), a resident of Dallas, Texas was a physician licensed to practice medicine in the State of Texas. **INCE** owned or controlled Applied Pain Associates, PLLC, which **INCE** formed in or around 2011.

37.     Defendant **RONNIE MCADA, JR.** ("**MCADA**"), a resident of Sunnyvale, Texas, was a sales representative. **MCADA** owned Elite Health Providers, LLC and Medallion Health Group, L.L.C.

**Relevant Individuals**

38.     Leonard Carr ("Carr"), a resident of Houston, Texas, was the Vice President of Operations at Pharms beginning in or around October 2014, and was the part-owner of Pharms, some of the Pharmacies, and Rx Logistics.

39.     James Buckingham ("Buckingham"), a resident of North Royalton, Ohio, was a sales representative. Buckingham owned Innovations in Medicine, LLC.

40.     Terry Brickman ("Brickman"), a resident of Birmingham, Michigan, was a sales representative. Brickman owned LBHB Medical Technologies, LLC.

41.     Physician 1, a resident of Plano, Texas, was a physician licensed to practice medicine in the State of Texas.

42.     Employee 1, a resident of Park City, Utah, was at some point Pharms' Vice President of Sales.

43.     Employee 2, a resident of Tomball, Texas, was, at various points, Pharms' Vice President of Information Technology ("I.T.") and an I.T. consultant for Pharms.

## The Fraudulent Scheme

*Overview of the Scheme*

44.     The Defendants and their coconspirators engaged in a scheme and artifice to defraud government and private health care benefit programs, generally administered through the PBMs, by submitting and causing to be submitted, through the Pharmacies, false and fraudulent claims for compounded drugs, "kits," "patches," and other prescription drugs. These prescriptions were often medically unnecessary, not provided or not provided as billed, based on an invalid prescriber–patient relationship, induced by kickbacks or bribes, dispensed in violation of state licensing requirements, or copayments were not properly collected.

45.     Over the course of the scheme, which began no later than 2013 and continued at least through 2017, with actions to conceal the scheme or obstruct the investigation continuing at least through 2018, the Pharmacies were paid over $140 million for compounded and other drugs. From their participation in the scheme, the Defendants each personally profited between hundreds of thousands of dollars and tens of millions of dollars through their ownership stakes in the Pharmacies, Pharms, and other related entities; bonuses; sales commissions; consulting fees; kickbacks and bribes; or other forms of payment.

*Object and Purpose of the Scheme*

46.     It was an object and purpose of the scheme for the Defendants **BRIAN SWIENCINSKI; SCOTT BREIMEISTER; VLADIMIR REDKO, M.D.; CHRISTOPHER INCE, M.D.; RONNIE MCADA, JR.**, and their coconspirators known and unknown to unlawfully enrich themselves by, among other things, submitting or causing the submission of false and fraudulent claims to health care benefit programs, that is, Medicare, TRICARE, Workers' Compensation, and other government and private health care benefit programs, generally

9

administered by PBMs, for compounded and other drugs that were often medically unnecessary, not provided or not provided as billed, based on an invalid prescriber–patient relationship, induced by kickbacks or bribes, dispensed in violation of state licensing requirements, or for which copayments were not properly collected.

*Executions of the Scheme*

47. Beginning no later than 2013 and continuing through in or around 2018, **SWIENCINSKI** partnered with **REDKO, BREIMEISTER,** Carr and others to found, own, and operate the Pharmacies. The Pharmacies contracted with several PBMs to file claims for reimbursement for compounded and other pharmaceutical drugs.

48. The Pharmacies formulated, mixed, and dispensed compounded drugs, "kits," "patches," and other drugs (collectively "compounded and other drugs") not based on individualized patient need, but instead based on formulas designed to maximize reimbursements from government and private health care benefit programs.

49. In or around late 2015, **SWIENCINSKI, BREIMEISTER,** and Carr formed Rx Logistics, a wholesale purchaser and seller of pharmaceutical products that were sold to the Pharmacies. By purchasing wholesale drugs from Rx Logistics, **SWIENCINSKI, BREIMEISTER,** Carr, and other owners increased their own profits.

50. To increase reimbursements, **SWIENCINSKI,** who was himself a sales representative, oversaw a national network of hundreds of other sales representatives, including **MCADA,** Buckingham, Brickman, and others who marketed compounded and other drugs.

51. Sales representatives, including **SWIENCINSKI, MCADA,** Buckingham, and Brickman, were financially incentivized through kickbacks and bribes, often disguised commission payments that were usually based on the reimbursements from government and

private health care benefit programs, administered by the PBMs, to the Pharmacies for compounded and other drugs.

52.     To further increase reimbursements, **SWIENCINSKI, BREIMEISTER**, and their coconspirators, including **MCADA** and other sales representatives, often directed prescribers, including **REDKO, INCE**, Physician 1, to prescribe and sign off on prescriptions for compounded and other drugs that were often medically unnecessary, not eligible for reimbursement, or not provided.

53.     Also to maximize reimbursements, **SWIENCINSKI, MCADA**, Buckingham, Brickman, and other employees and sales representatives signed up themselves, their families, and others to receive compounded and other drugs that were often medically unnecessary, not eligible for reimbursement, sometimes not provided, or for which copayments were rarely paid. **REDKO, INCE**, Physician 1, and others signed or purportedly signed these prescriptions, many times without seeing or treating the recipient.

54.     **SWIENCINSKI, BREIMEISTER**, and their coconspirators often paid prescribers including **REDKO, INCE**, and others, kickbacks and bribes, in exchange for medically unnecessary prescriptions for compounded and other drugs.

55.     Some prescribers were also financially incentivized to invest in one of the Pharmacies in exchange for returns on those investments. Those payments were often inducements to write prescriptions concealed as returns on investment.

56.     Many times, the Pharmacies waived copayments, even though Medicare, TRICARE, and other government and private health care benefit programs, and the PBMs that administered them, required the Pharmacies to collect copayments.

57.     Once filled, the Pharmacies sometimes mailed the compounded and other drugs to

recipients who resided in states in which the Pharmacies or the prescribers were not properly licensed. The Pharmacies attempted to evade detection by employing fraudulent shipping practices, including by using **SWIENCINSKI**'s home address or **REDKO**'s office address as a false recipient address.

58.     The PBMs occasionally audited or investigated the Pharmacies, the prescribers, and the recipients who had purportedly been prescribed compounded or other drugs. At various times, **SWIENCINSKI, BREIMEISTER, REDKO, MCADA,** Buckingham, Physician 1, and others conspired to and did provide false information in response to these audits and investigations.

59.     When a PBM terminated one of the Pharmacies in or around 2014, **SWIENCINSKI, BREIMEISTER,** Carr, and others conspired to buy and sell other Pharmacies, using Pharms employees, including Employee 1 and Employee 2, as straw owners, with the intent to deceive the PBMs to ensure that the Pharmacies could continue billing for compounded and other drugs.

60.     To execute their scheme to defraud, **SWIENCINSKI, BREIMEISTER, REDKO, INCE, MCADA,** Carr, Buckingham, Brickman, and others transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, including e-mails, text messages and other communications, wire transfers and electronic payments, and claims for reimbursement.

61.     The Pharmacies submitted claims electronically to government and private health care benefit programs, generally through PBMs, seeking reimbursement for the compounded and other drugs they purportedly dispensed. Those health care benefit programs, including the PBMs, in turn, reimbursed the Pharmacies' claims in reliance on representations that the drugs dispensed were medically necessary, provided as billed, based on valid prescriptions and prescriber-patient

relationships, not induced by kickbacks or bribes, dispensed in accordance with state licensing requirements, and that copayments were properly collected.

62. Between in or around 2013 and in or around 2017, government and private health care benefit programs paid the Pharmacies, generally through the PBMs, over approximately $140 million, mostly for compounded and other drugs that were medically unnecessary, not provided or not provided as billed, based on an invalid prescriber–patient relationship, induced by kickbacks or bribes, dispensed in violation of state licensing requirements, or for which copayments were not properly collected.

63. The proceeds were disbursed to the Defendants, their coconspirators, and others, *and the Defendants each personally profited between hundreds of thousands of dollars and tens of millions of dollars from the scheme.*

64. Once the investigation into the Pharmacies became overt, **SWIENCINSKI** sought to obstruct the investigation into his criminal conduct, including by instructing Brickman by phone, that, if asked, Brickman and his wife wanted and received the prescriptions from the Pharmacies.

## COUNT ONE
### Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud
### (18 U.S.C. § 1349)

65. Paragraphs 1 through 43 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

66. Beginning no later than 2013 and continuing through in or around 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants,

**BRIAN SWIENCINSKI;**
**SCOTT BREIMEISTER;**
**VLADIMIR REDKO M.D.;**
**CHRISTOPHER INCE, M.D.; and**
**RONNIE MCADA, JR.**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, including Leonard Carr, James Buckingham, and Terry Brickman, to commit certain offenses against the United States, that is:

   a.   to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly deliver and cause to be delivered, certain mail matter by the U.S. Postal Service and any private and commercial interstate carrier according to the directions thereon, in violation of Title 18, United States Code, Section 1341;

   b.   to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

   c.   to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, TRICARE, Workers' Compensation, and other government and private health care benefit programs, generally administered by PBMs, and to obtain, by means of materially false and fraudulent pretenses, representations, and

promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Object and Purpose of the Conspiracy

67.     The object and purpose of the conspiracy is described in Paragraph 46, and is realleged and incorporated by reference as though set forth fully herein.

### Manner and Means of the Conspiracy

68.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in Paragraphs 47 through 64, and are realleged and incorporated by reference as though set forth fully herein.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS TWO–FOUR
### Wire Fraud
### (18 U.S.C. §§ 1343 and 2)

69.     Paragraphs 1 through 64 of this Superseding Indictment are realleged and incorporated by reference as though set forth fully herein.

70.     Beginning no later than 2013 and continuing through in or around 2017, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants did knowingly, and with intent to defraud, devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds.

71.     On or about the dates specified below, in the Houston Division of the Southern

15

District of Texas, and elsewhere, the Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted certain interstate wire communications, with each transmission set forth below forming a separate count:

| Count | Defendant(s) Charged | Approx. Date | Description |
|---|---|---|---|
| 2 | **SWIENCINSKI BREIMEISTER** | 1/16/15 | Interstate ADP Direct Deposit of Supplemental Bonus in the amount of approximately $109,156.07 wired from Pharms LLC to account ending *9341 for Employee 1. |
| 3 | **SWIENCINSKI BREIMEISTER** | 1/16/15 | Interstate ADP Direct Deposit of Supplemental Bonus in the amount of approximately $99,270.23 wired from Pharms LLC to account ending *4446 for Employee 2. |
| 4 | **SWIENCINSKI BREIMEISTER MCADA** | 11/18/14 | Interstate wire email communication including **MCADA, BREIMEISTER**, and **SWIENCINSKI** with subject "Re: FW: CVS/Caremark Suspension." |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS FIVE–TEN
### Healthcare Fraud
### (18 U.S.C. §§ 1347 and 2)

72.     Paragraphs 1 through 64 and of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

73.     Beginning in or around 2013 and continuing through in or around 2017, in the Houston Division of the Southern District of Texas and elsewhere, in connection with the delivery of, and payment for, health care benefits, items, and services, the Defendants did knowingly and willfully execute, and attempt to execute, the aforementioned scheme and artifice to defraud, and to obtain by means of materially false and fraudulent pretenses, representations, and promises,

money and property owned by and under the custody and control of a health care benefit program as defined in 18 U.S.C. § 24(b), that is, Medicare, TRICARE, Workers' Compensation, and other government and private health care benefit programs, generally administered by PBMs,.

74.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, submitted or caused to be submitted the following false and fraudulent claims to the aforementioned health care benefit programs, for compounded and other drugs that were often medically unnecessary, not provided or not provided as billed, based on an invalid prescriber–patient relationship, induced by kickbacks or bribes, dispensed in violation of state licensing requirements, or for which copayments were not properly collected, in an attempt to execute, and in execution of the aforementioned scheme, as described in Paragraphs 47 through 64, with each execution set forth below forming a separate count:

| Count | Defendant(s) Charged | Approx. Fill Date | "Pt." | Pharmacy | PBM | Claim ID (last 6) | Prescriber | Approx. Amount Paid |
|---|---|---|---|---|---|---|---|---|
| 5 | SWIENCINSKI BREIMEISTER REDKO | 10/29/14 | A.B. | Omni-One-Med | ESI | 671940 | REDKO | $16,833.87 |
| 6 | SWIENCINSKI BREIMEISTER REDKO | 12/18/14 | M.V. | Omni-One-Med | ESI | 340050 | REDKO | $14,998.98 |
| 7 | SWIENCINSKI BREIMEISTER REDKO | 12/19/14 | C.C. | Omni-One-Med | ESI | 160050 | REDKO | $2,439.26 |
| 8 | SWIENCINSKI BREIMEISTER INCE | 8/31/15 | C.A. | OmniPlus | Prime | 389003 | INCE | $4,360.95 |
| 9 | SWIENCINSKI BREIMEISTER INCE | 2/3/16 | S.K. | Omni-One-Med | ESI | 951750 | INCE | $1,245.86 |

| 10 | SWIENCINSKI BREIMEISTER INCE | 8/26/16 | T.B. | Kremco | ESI | 607060 | INCE | $1,127.94 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT ELEVEN
### Conspiracy to Make False Statements Relating to Healthcare Matters
### (18 U.S.C. § 371)

75.     Paragraphs 1 through 64 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

76.     From in or around February 2015 through in or around July 2016, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants,

### BRIAN SWIENCINSKI;
### SCOTT BREIMEISTER; and
### VLADIMIR REDKO, M.D.

did knowingly and willfully combine, conspire, confederate and agree with each other and others, known and unknown to the Grand Jury, including James Buckingham, to commit certain offenses against the United States, that is, to knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically Express Scripts, a PBM administering a prescription drug plan for commercial insurance, in violation of Title 18, United States Code, Section 1035.

### Purpose of the Conspiracy

77.     It was a purpose of the conspiracy for the Defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER, VLADIMIR REDKO M.D.**, and their coconspirators to avoid

detection of their scheme and to obtain and retain reimbursements from a health care benefit program by providing false information in response to Express Script's audits and investigations.

**Manner and Means**

78.     The manner and means by which the Defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.**, and their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

79.     In or around late 2013 or early 2014, **SWIENCINSKI** hired Buckingham, who resided in Ohio, as a sales representative for **SWIENCINSKI** and the Pharmacies. **SWIENCINSKI** received commission payments on reimbursed prescriptions Buckingham obtained for the Pharmacies, and, in turn, paid Buckingham.

80.     To maximize commissions, Buckingham signed up himself, his family, and others in Ohio to receive compounded and other drugs from the Pharmacies. Buckingham paid many of these individuals in exchange for agreeing to receive those drugs.

81.     During 2014 and 2015, Express Scripts paid the Pharmacies over $5 million for prescriptions **REDKO** signed off on in the name of Buckingham, his family, and others Buckingham referred in Ohio.

82.     **REDKO** was not licensed to practice medicine in Ohio, nor did he see or treat any of the recipients of those prescriptions. Similarly, for a time, the Pharmacies were not licensed to dispense in Ohio.

83.     In or around February 2015, Express Scripts sent a letter to Buckingham's family listing prescriptions submitted on their behalf to Omni-One-Med Pharmacy, and requesting that the recipient review the claims for accuracy and note whether or not the recipient actually received the listed prescriptions.

19

84.     After communications between Buckingham, **SWIENCINSKI**, **BREIMEISTER**, **REDKO**, and others, Buckingham falsified his responses to the February 2015 letter from Express Scripts to make it appear as if his family had paid a copay and received treatment from **REDKO**, among other false statements.

### Overt Acts

85.     In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas and elsewhere, the following overt acts:

86.     On or about February 27, 2015, Buckingham forwarded to **SWIENCINSKI** a questionnaire that Express Scripts sent to Buckingham's wife regarding prescriptions purportedly received from Omni-One-Med.

87.     On or about February 27, 2015, **SWIENCINSKI** forwarded the same questionnaire to **BREIMEISTER**.

88.     On or about March 2, 2015, **BREIMEISTER** forwarded the same questionnaire to **REDKO**, the prescribing physician on the claims under review, requesting advice on how the patients should respond to Express Scripts.

89.     **SWIENCINSKI**, **BREIMEISTER**, or one of their coconspirators instructed Buckingham on how to respond. Buckingham, in turn, falsely notified Express Scripts that his wife and children: paid copays for the compounded drugs they purportedly received from Omni-One-Med; obtained the prescriptions by mail in Dallas; and received treatment from **REDKO**, who was the prescriber. The questionnaire was signed and dated on or about March 2, 2015.

90.     In or around July 2016, **REDKO** provided false information to Express Scripts in response to an inquiry regarding compounded drugs he purportedly prescribed to several

recipients, including Buckingham's wife and children. Specifically, **REDKO** falsely responded to Express Scripts that he had seen the "patients" under review and that he authorized prescriptions for compounded drugs for those individuals, among other false statements. **REDKO** signed and dated the questionnaires on or about July 5, 2016.

All in violation of 18 U.S.C. § 371.

**COUNTS TWELVE–FOURTEEN**
**False Statements Relating to Healthcare Matters**
**(18 U.S.C. §§ 1035 and 2)**

91.     Paragraphs 1 through 64 and 79 through 84 of this Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

92.     On or about July 5, 2016, in the Houston Division of the Southern District of Texas and elsewhere, the Defendant,

**VLADIMIR REDKO, M.D.**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically Express Scripts, a PBM administering a prescription drug plan for commercial insurance:

| Count | "Patient" | Description of False Statement |
|:-----:|:---------:|:-------------------------------|
| 12 | A.B. | Response to ESI Questionnaire Regarding Compound Drug Prescriptions Prescribed to A.B. on or about October 23, 2014 |
| 13 | T.D. | Response to ESI Questionnaire Regarding Compound Drug Prescriptions Prescribed to T.D. on or about October 31, 2014 |

| 14 | R.D. | Response to ESI Questionnaire Regarding Compound Drug Prescriptions Prescribed to R.D. on or about October 31, 2014 |

All in violation of Title 18, United States Code, Sections 1035 and 2.

## COUNT FIFTEEN
### Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity
### (18 U.S.C. §§ 1957 and 2)

93.     Paragraphs 1 through 64 and 79 through 84 of this Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

94.     On or about December 9, 2014, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant

### BRIAN SWIENCINSKI

aided and abetted by others, known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud, in violation of 18 U.S.C. § 1349, as follows:

| Account Name | Payer Account | Debit | Payee(s) | Payee Account |
|---|---|---|---|---|
| Worth Medical Company | JPMorgan Chase *9708 | $100,000 | Brian SWIENCINSKI or N.M. | JPMorgan Chase *6280 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

95.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the Defendants **BRIAN SWIENCINSKI**; **SCOTT BREIMEISTER**; **VLADIMIR REDKO, M.D.**; **CHRISTOPHER INCE, M.D.**; and **RONNIE MCADA, JR.**,

that, upon conviction of Counts One through Fourteen, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(1))

96.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States of America gives notice to Defendant **BRIAN SWIENCINSKI** that, upon conviction of Count Fifteen, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

(continued on next page)

23

## Money Judgment and Substitute Assets

97.     Defendants **BRIAN SWIENCINSKI; SCOTT BREIMEISTER; VLADIMIR REDKO, M.D.; CHRISTOPHER INCE, M.D.;** and **RONNIE MCADA, JR.**, are notified that upon conviction, a money judgment may be imposed against each Defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING DEPUTY CHIEF, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALEZA REMIS
ASSISTANT DEPUTY CHIEF
DEVON HELFMEYER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE