Exhibit A

1    A.    Yes.

2    Q.    What was the basis for that lawsuit again?

3    A.    Breach of contract.

4    Q.    That was based on the lack of sufficient notice on the

5    termination; is that right?

6    A.    Yes.

7    Q.    At some point without just -- at some point was there a

8    trial?

9    A.    Yes.

10    Q.    What was your role at the trial?

11    A.    I was a witness for the company to talk about accounting

12    procedures and co-pay policies.

13    Q.    Did you sit in the courtroom during that full trial?

14    A.    I did not.

15    Q.    Who did?

16    A.    Scott Breimeister was the corporate representative.

17    Q.    When did the trial take place?

18    A.    April 4, 2016.

19    Q.    For how long?

20    A.    A week.

21    Q.    Where was it at?

22    A.    It was in St. Louis.

23    Q.    I want to show just the witness, please,

24    Government's Exhibit 1142.

25    Q.    Do you recognize this e-mail?  I'm sorry.  Go to the

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    next -- going -- I'm sorry.  Do you recognize this cover

2    e-mail?

3    A.    Yes.

4    Q.    If we could go to the next page, please.

5    Q.    Do you recognize this?

6    A.    Yes.

7         MS. REMIS:  Your Honor, I move to admit Exhibit 1142,

8    please.

9         MR. COGDELL:  Objection.  Hearsay, Your Honor.  It has

10   nothing when the e-mail is forwarded.

11        MS. REMIS:  Your Honor, I can withdraw the e-mail

12   itself around just move to admit the attachment if that will

13   resolve the objection?

14        MR. COGDELL:  Still hearsay.

15        THE COURT:  Your objection?

16        MS. GOODMAN:  This is something if we could approach,

17   Your Honor.

18        THE COURT:  Scroll through it, please, Mr. Ahmed.  Blow

19   it up.  Thank you.

20        MS. REMIS:  Just to be clear --

21        THE COURT:  Just a moment.

22            Mr. Ahmed, the next page.

23            Go back, please.

24            Now the next page, please.

25            The objection, I believe, was hearsay at this

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    point?

2           MR. COGDELL:  Yes, sir.

3           THE COURT:  Is there any other legal objection for the

4    record?

5           MS. GOODMAN:  Yes, Your Honor.

6              404, 403(b), relevance.

7           MS. RILEY:  Counsel for Swiencinski also joins the

8    objection.

9           THE COURT:  The objection is sustained.

10          MS. REMIS:  As to the full exhibit, Your Honor?

11          THE COURT:  Yes.

12   **BY MS. REMIS:**

13   Q.   Mr. Carr, during the course of the Express Scripts trial,

14   was there discussion about families whose co-pays were not

15   collected?

16   A.   Yes.

17          MR. COGDELL:  Objection.

18          THE COURT:  Just a moment.

19          MR. COGDELL:  Objection.  Hearsay as to what was

20   discussed at another trial.

21          MS. REMIS:  May I lay a foundation, Your Honor?

22          THE COURT:  You may.

23   **BY MS. REMIS:**

24   Q.   Did you discuss with Mr. Breimeister what was going on in

25   the courtroom while you were both at the trial?

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    A.    Yes.

2    Q.    And on a day during trial, did Mr. Breimeister let you

3    know what kinds of information was being put up at that trial?

4          THE COURT:  Just a moment.

5          MR. COGDELL:  It's double hearsay, and it's 403 as to

6    what's happening in another trial.

7          THE COURT:  Objection is overruled because I think

8    they're just confirming the conversation, not the contents of

9    the conversation at this point.  So --

10         MR. COGDELL:  That's not my understanding, but I accept

11   the Court's ruling.

12         THE COURT:  So my understanding you've asked whether or

13   not this witness and Mr. Breimeister discussed what was going

14   on at the trial.  That's the pending question?

15         MS. REMIS:  Yes.

16   BY MS. REMIS:

17   Q.    Did you discuss that?

18   A.    Yes.

19   Q.    And did Mr. Breimeister tell you about discussions at

20   trial regarding co-payments for families?

21         THE COURT:  Just a moment.

22         MR. COGDELL:  Again, hearsay.

23         THE COURT:  Now you're asking about the content.  This

24   is an excellent point to break for lunch.

25         MS. REMIS:  Yes, Your Honor.

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1          THE COURT:  Ladies and gentlemen of the jury, we've

2     reached our lunch break.  You are reminded not to discuss the

3     case, have it discussed in your presence or do any research

4     while you're out.  We'll return at 1 p.m.

5               You may step down.

6          THE COURTROOM SECURITY OFFICER:  All rise for the jury.

7               (The jury exits the courtroom.)

8          THE COURT:  Mr. Carr, for a moment, please have a seat.

9               Counsel, you may have a seat.

10              Ms. Remis, you're inquiring as to conversations

11    that this witness had with Mr. Breimeister regarding this

12    Express Scripts trial.  There has been a double hearsay

13    objection so to the extent that Mr. Breimeister and this

14    witness were having a conversation about that trial, what is

15    the relevance for the matter before this Court?

16         MS. REMIS:  Yes, Your Honor.

17              I'm only trying to lay a foundation as to

18    something else that happened in this case relating to

19    co-payments; and I'm using the information from the trial to

20    show why Mr. Breimeister did what he did.

21              The fact -- the truth of what was said at the

22    trial is not -- doesn't matter to this line of questioning,

23    Your Honor.  So it's not being presented for the truth of the

24    matter asserted.

25         THE COURT:  What are you getting at?  I'm not following

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    you.

2              MS. REMIS:  Sure.  I'll give you a little background.

3              So during the Express Scripts trial, there was a

4    summary chart showing different families and the lack of

5    co-payments associated.

6              THE COURT:  That was the exhibit attached to the

7    e-mail?

8              MS. REMIS:  Yes.  And that one said Ronnie M and that's

9    Mr. McAda and the testimony will be from Mr. Carr that after

10   trial on one day when that was shown, Mr. Breimeister said to

11   him, you know, I saw this on the screen.  We need to collect a

12   co-payment for Mr. McAda.  And through a series of

13   conversations and events, which we will get in through some of

14   the evidence, a co-pay check was written by Mr. McAda and

15   backdated and then later presented as if it were a real co-pay

16   check.

17             THE COURT:  I don't practice law from up here, but it

18   seems that you could get to questions regarding what happened

19   back at the office regarding instructions regarding getting a

20   co-payment without getting into the content of the other trial.

21             MS. REMIS:  That's fine, Your Honor.

22             And may I go into the fact that the motivation

23   for getting this co-payment was what had been seen at the

24   trial?

25             THE COURT:  To the extent that there was a conversation

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1    with this witness and one of the codefendants in this case

2    instructing him to act, you can inquire into that conversation.

3              But, again, as to the contents of the other

4    trial, specific content, I don't believe that that's relevant

5    or germane to what's before this Court.

6              So I think so you're trying to get to the

7    information that was contained in the exhibit on the e-mail

8    that you --

9         MS. REMIS:  I'm -- I can skip that, Your Honor.

10        THE COURT:  Okay.  I think you said there were

11   instructions about obtaining a co-payment that you were trying

12   to get to.

13        MS. REMIS:  Correct.

14        THE COURT:  I think you can get to that without

15   reference to the other trial.

16        MS. REMIS:  May I ask the witness, Your Honor, if the

17   co-payment check that was collected was eventually shown at

18   that trial?

19        THE COURT:  What's the relevance of showing that check

20   at the other trial to this trial?

21        MS. REMIS:  I believe, Your Honor, it goes to the

22   intent to defraud.  It is a backdated essentially false

23   co-payment check that was used to make it appear that they were

24   collecting co-payments when they were not.

25        MR. COGDELL:  Judge?

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1      THE COURT:  Mr. Cogdell.

2      MR. COGDELL:  Best case, that's horrible 403 that

3  they're attempting to defraud another court.  So I don't see

4  how anything probative isn't greatly outweighed by the

5  prejudicial aspect of it.

6      MS. GOODMAN:  Your Honor, I would also add that the

7  check that I believe Ms. Remis is trying to introduce by Mr.

8  McAda it factually cannot be part of this indictment because it

9  was written in 2016, which this witness said that the trial was

10  over a breach of contract.

11      Any attempt to defraud the PBM pursuant to the

12  indictment, we were done in September of 2014.  I believe we

13  are constructively amending here; and if not, we're in 404(b)

14  that we did not have notice of.

15      MR. COGDELL:  Better put 404 as well.

16      MS. RILEY:  Counsel for Swiencinski joins for all those

17  reasons; and I believe that some of this testimony we

18  anticipate is going to be triple hearsay that could be elicited

19  more -- it should come in through a different witness.

20      THE COURT:  So, again, in regards to the other trial, I

21  have not heard a sufficient showing as to why it's germane in

22  this court before this jury.

23      To the extent that you have office practices,

24  conversations, actions that relate to the indictment in this

25  case --

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1      MS. REMIS:  Yes.

2      THE COURT:  -- and attempts to defraud, then those are

3  proper questions for this witness.

4              Anything else, Ms. Remis?

5      MS. REMIS:  And so just to be clear, Your Honor, may I

6  proceed down the line of ignoring the trial and the

7  presentation of this check, that is the motivation behind

8  creating this co-pay check that I would like to show?  May I

9  proceed down that path?

10     THE COURT:  You can proceed down the path that he was

11  instructed to obtain a co-pay by one of the defendants in this

12  case, whether or not he acted on that instruction.

13     MS. REMIS:  Okay.

14     THE COURT:  And if that is germane, again, to the

15  indictment and allegations in this case --

16     MS. REMIS:  Okay.

17     THE COURT:  -- then that should be properly considered

18  by the jury.

19     MS. REMIS:  Thank you, Your Honor.

20     THE COURT:  Anything else?

21     MS. REMIS:  No, and I am almost done, Your Honor.

22     THE COURT:  What does that mean?

23     MS. REMIS:  Which part?

24     THE COURT:  Almost done.

25     MS. REMIS:  I was going to finish up this part.  I will

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    have 20 minutes.  15 minutes.

2         THE COURT:  All right.  Because earlier, it was a

3    couple of hours --

4         MS. REMIS:  I know I messed up.

5         THE COURT:  -- then it was by lunch, and now we're

6    another 20 minutes into it.

7         MS. RILEY:  I know, Your Honor.  I'm truly sorry.  This

8    is a very important witness for us.  I will wrap it up.  I just

9    don't want to miss out on some important evidence.

10        THE COURT:  Yes, ma'am?

11        MS. GOODMAN:  Your Honor, I apologize.  I may be

12   confused.

13             But our position is these co-pay checks written

14   in 2016 are outside of the indictment.  Is the Court saying if

15   the line of questioning proves otherwise --

16        THE COURT:  I don't know the date of the co-payment

17   checks so that's not information I have yet heard so I can not

18   make a determination.  I guess you have more information as to

19   where she's going than I do right now.

20        MS. GOODMAN:  Okay.  Thank you, Your Honor.

21        THE COURT:  Yes.  So once I find out that the

22   co-payment check relates to the allegations in this trial

23   regarding the allegations here, I can deem that relevant.

24             To the extent that you believe a specific check

25   is outside of the scope of the indictment, I assume you will

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    rise and object.

2         MR. COGDELL:  To be clear, that's where we're going.

3         THE COURT:  I understand.  But, again, every counsel in

4    this room is ten times more aware of the details of this case

5    than I am --

6         MR. COGDELL:  Don't be so sure, Your Honor.

7         THE COURT:  -- as to where she may be going.

8              So we've been talking about co-payments.  We've

9    been talking about actions and instructions received within the

10   offices of these pharmacies and this back business, all that

11   has been germane, that I can see, to the indictment in the

12   case.

13             You're talking now about a specific check and I

14   haven't seen it, don't know the context of it.  So if the

15   context is as you suggest, that's going to be an objection that

16   I'll entertain.

17        MR. COGDELL:  Yes, sir.

18        MS. GOODMAN:  Thank you, Your Honor.

19        THE COURT:  Anything else?

20        MS. REMIS:  One thing just for context while the jury

21   is out, Your Honor.

22        THE COURT:  Yes.

23        MS. REMIS:  It is our contention that this check

24   relates back to the prescriptions that were obtained during the

25   course of Mr. McAda's receipt of prescriptions in 2013 and

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    2014.

2              THE COURT:  If you have evidence and a witness that

3    testifies as such, I will listen to that.

4              MS. REMIS:  Yes, Your Honor.

5              THE COURT:  But have I have not heard that.

6              MS. REMIS:  Yes, Your Honor.

7              THE COURT:  Anything else?

8              MR. COGDELL:  No, sir.

9              THE COURT:  Enjoy your lunch.  1:00.  I'm sorry,

10   Mr. Carr.  You may step down, sir.  I thought we were going to

11   have to elicit testimony.  That's why I kept you there.

12             THE WITNESS:  No problem, Your Honor.

13             THE COURT:  Counsel, I forgot.  You did see the e-mail

14   from Mr. Khalil regarding the documents he has now turned over

15   to you.  Check your e-mail.  I was checking my messages.  What

16   he was here about this morning, the thumb drive and the

17   information contained thereon, he has forwarded to you.

18             MR. COGDELL:  Thank you, Your Honor.

19             THE COURT:  You now have that information.

20                       (Court is in recess.)

21             THE COURT:  Thank you.  Please have a seat.  There's no

22   such thing as a quiet lunch with this group.

23             MR. SCHAFFER:  Judge, can I return here; or do you

24   still want me back there?

25             THE COURT:  So tell me what's going on with you

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1   medically.

2          MR. SCHAFFER:  Well, I tested negative this morning.  I

3   wouldn't have come down here had I not gotten a negative test.

4   I'm feeling a little better, but, you know, the last thing I

5   wanted to do was spread any bad stuff that would create bigger

6   problems.

7          THE COURT:  You're asking me.  I would be asking my

8   seatmates back there.

9          MR. SCHAFFER:  He wants me here.

10          MR. COGDELL:  I've got stuff that will make COVID run

11   and hide.  I'm not worried about that.

12          THE COURT:  Well, it may not be COVID.  There's a

13   strain of the flu running around.  So that may be potentially

14   what it is.

15          MR. COGDELL:  I've had my flu shoot.

16          THE COURT:  But, you know, there's a lot of people

17   sitting around you and I appreciate the fact that you're masked

18   up.

19          MR. SCHAFFER:  Right.

20          THE COURT:  I don't think you're going to be needed for

21   the first hour so maybe until you're needed.  Then we can

22   revisit it.  Let's be safe for everybody.

23              Counsel, did you have something quickly for me?

24          MS. REMIS:  Yes, Your Honor.

25              Mr. Newton raised an objection yesterday to

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    Government's Exhibit 1037, which was the e-mail about the Prime

2    Therapeutics audit.  The argument that he made was about a

3    constructive amendment.  We just wanted to discuss that in

4    advance so that I could show it to Mr. Carr if I can.

5          THE COURT:  Quickly.

6          MS. RAUT:  Thank you, Your Honor.

7          The Exhibit 1037 references lying to the pharmacy

8    benefit manager in an audit.  The pharmacist in charge sends an

9    e-mail to management, Defendant Breimeister responds:  "Great

10   save" about covering up the fact of the retail nature or lack

11   thereof of the pharmacy and then Defendant Swiencinski forwards

12   it to someone else and says:  "This is what we have to do to

13   keep our contracts."

14         So you had asked where specifically in the

15   indictment and this is in a couple of places in the indictment.

16         This aspect of the scheme, lying to the pharmacy

17   benefit managers is, laid out specifically in Paragraph 58 of

18   the execution of the scheme, the manner and means, and is

19   incorporated within Count 1 in the charging language in

20   Paragraph 68.

21         And with respect specifically to the charging

22   language in Paragraph 66, that language, the mail fraud, wire

23   fraud, health care fraud is the statutory language and so it

24   cannot be that it must be contained in that statutory language.

25   Of course it is within the other parts, the manner and means,

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1   which is referenced in Paragraph 68 incorporating Paragraphs 47

2   through 64.

3         THE COURT:  What are you specifically alleging that

4   they did in this exhibit that the jury is going to be asked to

5   determine renders them guilty of a particular count?

6               What is it in that exhibit that reveals that?

7         MS. RAUT:  So this exhibit is part and parcel of the

8   scheme.  It's intrinsic.  This is an exhibit where the

9   pharmacist in charge says:  "Here are the things that the

10  auditor came into the pharmacy and asked me about.

11              And we're saying that of the ways that they

12  maximized profits and deceived the pharmacy benefit managers

13  was this.  This is one of ways, as laid out in Paragraph 58,

14  that they deceived the pharmacy benefit managers to maximize

15  profits and to continue seeking reimbursement through the

16  pharmacies through deception of the pharmacy benefit managers.

17        THE COURT:  Very well.

18        MR. NEWTON:  Your Honor, if I could share with you what

19  I've marked with as Defense Redko 1503.  This is an e-mail that

20  I provided to the government previously.  Leo Carr actually is

21  the person who sent this e-mail.  This concerns the very audit

22  that isn't mentioned in the e-mail.  I have underlined the word

23  "house audit."

24              This was not an audit like the other ones we're

25  going to hear about in this case.  This had nothing to do with

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1   a particular prescription for compound cream or supplements or

2   families or any of that.  This was just the PBM deciding after,

3   you know, for whatever reason, period of time, they were going

4   to audit and just show up an audit the place.

5            THE COURT:  An internal audit?  What is what's a house

6   audit?

7            MR. NEWTON:  Going on-site and going through the entire

8   pharmacy to audit.  This was not specific to compound cream,

9   the allegations in the indictment.  This is just a general

10  audit.

11               So it is so far afield from Paragraph 58.

12           THE COURT:  I wouldn't say so far afield, but --

13           MR. NEWTON:  Your Honor, it's a general audit.  It's

14  not of the medical necessity of compound creams and the stuff

15  that -- what is the gravamen of this superseding indictment.

16           THE COURT:  Can I have the exhibit again?

17           MS. RAUT:  1037?

18           THE COURT:  Yes.

19           MR. NEWTON:  I would take the position that this is not

20  intrinsic and we got no 404(b) notice about this so it should

21  not come in --

22           THE COURT:  This was not on the government's exhibit

23  list?

24           MR. NEWTON:  It was -- but quite recently.  It was not

25  something that we got advanced notice this was 404(b).

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1          MS. RAUT:  Your Honor, this has been on the exhibit

2     list.  This is something that the first PBM witness that we've

3     heard from has testified to that this is -- among the types of

4     audits that they do, that the PBMs do, this is the kind of

5     thing that they have said is material to them when it is

6     prevented falsely.

7          MR. NEWTON:  But that's not alleged in the indictment.

8     They allege a very specific kind of fraud in the indictment,

9     prescriptions that are not medically necessary, that kind of

10    thing.  This is a much more general kind of audit.

11         THE COURT:  Let me review the material.  I'm going to

12    get the jury in so we can get this witness off the stand.

13              And if I have additional questions, I'll allot

14    time for that.

15         MS. RAUT:  Can I just add two things, Your Honor?

16              One, we would like to be able to speak to this

17    witness about the document.

18              And two --

19         THE COURT:  It would have been nice had you brought

20    this up first thing this morning or a little bit earlier as

21    opposed to at 1:55 -- 12:55 before the jury comes in.

22              You know my position on that.

23         MS. RAUT:  Yes, Your Honor.  I apologize for that.

24              If it's something we can take up in the afternoon

25    break potentially as well.  I would just note that Paragraph 52

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1   is what Mr. Newton is describing and trying to limit the

2   indictment to as opposed to including Paragraph 58.

3           THE COURT:  Very well.  Let's get the jury in.

4           MS. RAUT: Thank you, Your Honor.

5           THE COURT:  All rise for the jury.

6                   (The jury entered the courtroom.)

7           THE COURT:  Thank you.  Please be seated.

8               You may resume your examination.

9           MS. REMIS:  Thank you, Your Honor.

10  BY MS. REMIS:

11  Q.    Mr. Carr, did we talk earlier about Mr. McAda's role with

12  respect to the pharmacies?

13  A.    Yes.

14  Q.    What was his role?

15  A.    He was a sales representative.

16  Q.    Did Mr. McAda and his family also receive prescriptions?

17  A.    Yes, they did.

18  Q.    At the time that they received prescriptions was the

19  pharmacy regularly collecting co-pays?

20  A.    No.

21  Q.    Had the pharmacies collected Mr. McAda's co-pay for his

22  own and his family's prescriptions?

23  A.    No.

24  Q.    During the course of the Express Scripts trial was there

25  an effort to collect a co-payment for prescriptions from years

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    prior?

2    A.    Yes.

3    Q.    For what patient?

4          MR. COGDELL:  Excuse me.

5          THE COURT:  Just a moment.

6          MR. COGDELL:  Objection.  Relevancy to what happened at

7    a civil trial.

8          THE COURT:  Counsel, this is what we were talking about

9    earlier.  So in regards to the contents of that trial, the

10   objection is sustained.

11              Ask your next question.

12         MS. REMIS:  Yes, Your Honor.  The question was just

13   about the timing, not the contents of the trial, during the

14   course of.  Is that the time frame we're talking about?

15         THE COURT:  Okay.

16         MS. REMIS:  May I ask that question again, Your Honor.

17         THE COURT:  Why don't you just use the date?

18         MS. REMIS:  Okay.

19   BY MS. REMIS:

20   Q.    Around April 6th of 2016, was there an effort to collect a

21   co-payment that had not been previously collected?

22   A.    Yes.

23   Q.    For what patient?

24   A.    For Ronnie McAda and his family.

25         MS. GOODMAN:  Objection, Your Honor.

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1          THE COURT:  Just a moment.

2          MS. GOODMAN:  403, 404(b) notice.  I'm sorry.  404(b)

3    and improper notice and relevance.

4          THE COURT:  Overruled.

5    BY MS. REMIS:

6    Q.    For which patient were you attempting to collect an old

7    co-pay?

8    A.    For Ronnie McAda and some family members of

9    Ronnie McAda's.

10   Q.    Who told you to begin the process of collecting this

11   co-payment?

12   A.    Scott Breimeister.

13   Q.    What did he tell you was the purpose of getting this

14   co-payment?

15         MS. GOODMAN:  Objection, Your Honor.  Hearsay.  I don't

16   believe this is appropriate 801(d)(2)(E).

17         THE COURT:  Counsel your response?

18         MS. REMIS:  This shows why Mr. Breimeister did what he

19   did.  It provides context for the collection of this co-payment

20   for prescriptions from 2013 and 2014 for which they had not

21   previously collected a co-payment.

22         THE COURT:  Come up, counsel.

23            (Conference at the bench, as follows:)

24         THE COURT:  Why is it that you believe that you don't

25   have proper notice that they trying to collect co-payments from

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    Mr. McAda.

2         MS. GOODMAN:  Your Honor, these are co-payments trying

3    to be collected in 2016, which could not have been used to

4    misrepresent anything to the PBMs since we had been terminated

5    in 2014.

6              Also as to the notice, we did receive 404(b)

7    notice generally as to backdated documents.  We were

8    specifically told there was no 404(b) as it came to Mr. McAda.

9    We had no idea that this was the intent of how it was going to

10   be offered until openings.

11        MS. REMIS:  Your Honor, first of all, the defendants

12   have known about these checks and they have reports relating to

13   how these checks were going to be used from long ago.  We have

14   discussed it together with each other in advance of the trial.

15             Additionally this is not 404(b) evidence,

16   Your Honor.  This is part and parcel of the fraud -- part of

17   the fraud was that they failed to collect the co-payments.

18        THE COURT:  What about the timing of 2016 that she's

19   referencing.

20        MS. REMIS:  The timing for 2016 shows that they did not

21   ever collect the co-payments from 2013 and 2014, which is the

22   relevant timing in this case.

23        THE COURT:  Co-payments are from '13 and '14?

24        MS. REMIS:  Yes, Your Honor.

25        THE COURT:  Counsel, your response?

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1          MS. GOODMAN:  Yes, Your Honor.  I'm sorry.  I just went

2     blank.  I just went completely blank.

3          THE COURT:  So they were attempting to collect

4     co-payments from 2013, 2014 and 2016.

5          MS. REMIS:  Just from 2013 and 2014, but the collection

6     was -- the collection effort occurred in 2016 simply because of

7     the Express Scripts trial, but I will try and stay away from

8     that.

9          MR. COGDELL:  But that's --

10          THE COURT:  Just a moment.

11               Your response?

12          MS. GOODMAN:  The testimony already came in that they

13     did not collect co-payments from Mr. McAda, period.

14               Also there is no witness that can say that these

15     co-payments were ever sent to a PBM or used to defraud a PBM.

16          THE COURT:  Mr. Cogdell?

17          MR. COGDELL:  My problem is the only vehicle by which

18     they want to show the relevance -- meaning the why -- is to

19     introduce them in the civil trial, which is a whole other

20     offense.  That's obstruction of justice in a civil trial.

21          THE COURT:  Is that correct?

22          MS. REMIS:  I am not going to say that this is

23     obstruction of justice in any way way.  I will note that there

24     was a motion in limine relating --

25          THE COURT:  What's the relevance of collecting the

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    payments in 2016 for purposes of this trial?

2         MS. REMIS:  The purpose is to show that the only reason

3    that they collected the $6,030 payment from Mr. McAda was

4    because that they -- just like with what we showed with the

5    ALS Marketing and the MAAD Marketing yesterday was that they

6    knew somebody was watching and that they weren't doing it

7    otherwise.

8         THE COURT:  Okay.  For that limited purpose, framed

9    that way, the objection is overruled.

10             Go no further, and let's move on.

11        MS. REMIS:  Yes, Your Honor.

12        THE COURT:  The witness has been on the stand quite

13   some time.  Let's get to the conclusion of this.

14        MS. REMIS:  This is the end, Your Honor.

15        MR. COGDELL:  To be clear, though, you're not going to

16   try to reference the trial?

17        THE COURT:  Yes, I already said that.

18        MR. COGDELL:  I know you said it.  I just want to make

19   sure she heard it.

20   BY MS. REMIS:

21   Q.   Okay, Mr. Carr, we were talking about collecting a

22   co-payment from old prescriptions in 2016; is that right?

23   A.   Yes.

24   Q.   Did you in fact work together with some of your colleagues

25   to collect that prescription? Excuse me.  To collect that

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1    co-pay check?

2    A.    Yes.

3    Q.    I want to go to government Exhibit 659 a, please, just for

4    the witness?

5    Q.    Do you recognize this, Mr. Carr?  Could you recognize

6    this?

7    A.    Yes.

8    Q.    Is this part of the same group of text messages that you

9    provided that we discussed earlier?

10   A.    Yes.

11         MS. REMIS:  Your Honor, I move to admit 659(a)?

12         THE COURT:  A little bit more background, foundational.

13         MS. REMIS:  Sure.

14   BY MS. REMIS:

15   Q.    What is the date of this text message?

16   A.    April 6, 2016.

17   Q.    And was this during the course of this effort to collect

18   the co-payments we have been discussing?

19   A.    Yes.

20   Q.    Is it communications pertaining to that co-payment check?

21         MS. REMIS:  Move to admit.

22         THE COURT:  Any objection?

23         MS. GOODMAN:  Hearsay and not a proper 1006,

24   Your Honor.

25         THE COURT:  Very well.

**—ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT—**

1          659(a), the objection is overruled and 659(a) --

2    Government's 659(a) is admitted.

3          MS. REMIS:  If we can publish it.  Thank you, Your

4    Honor.

5    Q.    Mr. Carr, who is Stacy mayor?

6    A.    She was a pharmacy technician in charge of audit

7    coordination and co-pay collection.

8    Q.    What did you text her?

9    A.    The amounts of the co-pays by patient that were expected

10   to be collected that morning.

11   Q.    And what's the date of this text message?

12   A.    April 6, 2016.

13   Q.    What time?

14   A.    8:02 in the morning.

15   Q.    What family are Ronnie, III; Max M. ; Ronnie; Alice and

16   Laura from?

17   A.    That's Ronnie McAda's family.

18          MS. REMIS:  And if we could look at

19   Government's Exhibit 1113, which is not yet in evidence as well

20   as 1114, please.

21          And there's an attachment if we could show

22   Mr. Carr, please, as well.  And if we could look at 11  14 as

23   well, please, too.  And the attachment, too, please.

24   BY MS. REMIS:

25   Q.    Do you recognize these e-mails, Mr. Carr?

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1   A.    Yes.

2   Q.    Do you recognize the attachments as well?

3   A.    Yes.

4   Q.    And do they pertain to the text messages that we were just

5   looking at and the effort to collect co-payments?

6   A.    Yes.

7         MS. REMIS:  Your Honor, I move to admit 1113 and 1114.

8         THE COURT:  Any objection?

9         MS. GOODMAN:  Yes, Your Honor.  President 403 and

10   404(b).

11        THE COURT:  Any other objections?  Those objections are

12   overruled l overruled.  Government's Exhibit 1113 and 1114 are

13   admitted.

14        MS. REMIS:  Let's look at 1113, please.

15   Q.    Who is this e-mail from and to and at what time?

16   A.    Brian Swiencinski on April 6th at 1:20 p.m.  It was to

17   Stacey Mayeur, Scott Breimeister and myself.

18   Q.    Down below there's an e-mail from

19   scanner@medallionmedical.com?

20   A.    Yes.

21   Q.    Whose company is Medallion Medical?

22   A.    Broken any ma e' McAda.

23   Q.    Who is the e-mail to?

24   A.    Brian Swiencinski.

25   Q.    What time is it at?

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    A.    806 that morning.

2    Q.    Is that just a few minutes after the text message we just

3    saw between you a and Ms. Mayor?

4    A.    Yes.

5    Q.    If we could go to the attachment, please and put it side

6    by side, please, with 659(a)?

7    Q.    How much is the check for on the right?

8    A.    $10,900.

9    Q.    Is that the same amount listed in your text message to

10   Medallion Medical?

11   A.    Yes.

12   Q.    What's the dates of your text message to Ms. Mayor?

13   A.    April 6, 2016.

14   Q.    What's the date listed on the check?

15   A.    March 22nd, 2016.

16   Q.    And what was what does it say under the memo line?

17   A.    Co-pays.

18   Q.    Why was that check dated a few weeks before -- do you know

19   why that check was dated a few weeks before the April 6, 2016,

20   date?

21   A.    Yes.

22         THE COURT:  Just a moment.  The question was do you

23   know.  The answer is yes.

24         MR. COGDELL:  I'm just anticipating the next question.

25         THE COURT:  Yes, sir.

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1   Q.   Do you know the answer?

2   A.   Yes.

3   Q.   Who told you about why this check was dated a certain

4   date?

5   A.   Scott asked that it be -- dated back.

6        MR. COGDELL:  Excuse me.  Nonresponsive.  The question

7   was who.

8   Q.   Who?

9   A.   Scott Breimeister.

10  Q.   What did Mr. Breimeister tell you or ask you?

11       THE COURT:  Just a moment.

12       MR. COGDELL:  Hearsay and 403, Your Honor.  The same

13  issue we addressed at the bench.

14       MS. GOODMAN:  Same, Your Honor.

15       THE COURT:  Objections are overruled.

16  Q.   Thank you, Your Honor.

17       THE COURT:  Let's tie this up, Counselor.

18       MS. REMIS:  Yes, Your Honor.

19  Q.   Was the second second co-pay check also collected on the

20  same day?  Let me take a step back.  Can I show you

21  Government's Exhibit 1114, please.

22       Is this another e-mail we just looked at?

23  A.   Yes.

24  Q.   Down below is there a Medallion medical scanner?

25  A.   Yes.

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1    Q.    What's the time?

2    A.    9:21 in the morning.

3    Q.    Okay.  And if we could go to the attachment, please, what

4    is this check for?

5    A.    $6,030.

6    Q.    Is it also dated March 22nd, 2016?

7    A.    Yes.

8    Q.    For what?

9    A.    Co-pays.

10   Q.    If we could go to Government Exhibit 659(c), Page 8,

11   please.

12         What was going on behind the scenes here in terms of

13   receiving these checks and getting multiple checks?

14         MR. COGDELL:  Excuse me, Your Honor.  That's going to

15   invade the subject we the discussion we had.  I object to this

16   as 403.

17         THE COURT:  Ask a better question.

18         MS. REMIS:  I can rephrase.

19   BY MS. REMIS:

20   Q.    We saw is a text message earlier with -- let me step bark.

21         Who suggested that this co-payment be collected?

22   A.    Scott.

23   Q.    And how was that collection done?

24   A.    Brian Swiencinski was to go.

25         THE COURT:  Just a moment.

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1       MS. RILEY:  Objection.  Speculation.

2       THE COURT:  Overruled.

3  A.   I was told by Scott that Brian Swiencinski was going to

4  Ronnie McAda's office to pick up the check, take the check to

5  the bank and deposit it.

6  Q.   What date was Mr. Swiencinski picking up the check?

7  A.   This was all April 6th of 2016.

8  Q.   And we saw earlier that the check was dated March 22nd

9  and, 2016.  Did somebody instruct you or Mr. McAda to date that

10  check that day?

11      THE COURT:  Just a moment.

12      MS. GOODMAN:  Objection.  Speculation.  Lack of

13  foundation --

14      THE COURT:  As to his -- did someone instruct him.

15  Q.   Did someone instruct you about back dating the check?

16  A.   No.

17  Q.   Do you know whether or not there was any instruction about

18  back dating the check?

19      THE COURT:  Just a moment.

20      MS. GOODMAN:  Hearsay, lack of personal knowledge.

21      THE COURT:  Sir, do you personally know if someone

22  instructed that check to be backdated?  Do you personally know?

23      THE WITNESS:  No.

24      THE COURT:  Next question.

25      MS. REMIS:  Okay.

**ROUGH DRAFT ROUGH DRAFT ROUGH DRAFT**

1    Q.    At some point was that 6030-dollar check we just looked at

2    deposited?

3    A.    Yes.

4    Q.    Who deposited it?

5    A.    Brian Swiencinski.

6    Q.    On what date?

7    Q.

8    A.    April 6th.

9    Q.    And you texted him at 462016 at 926.  Was that a few

10   minutes after thes second check we looked at?

11   A.    Yes.

12   Q.    What did you say?

13   A.    Got it.  Now go do the rest.

14   Q.    What was his response?

15   A.    Done.

16   Q.    What were you referring to when you said got it.  Now go

17   do the rest?

18   A.    I got the copy of the check.  Now you have to deposit it.

19   So it's, quote, bone find collection.  So go to the bank and

20   deposit it was what we were talking about.

21   Q.    Okay.  What did Mr. Swiencinski respond?

22   A.    Done.

23   Q.    What did you respond?

24   A.    Thank you.

25   Q.    And what is the picture he sent you there?

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1    A.    The deposit receipt.

2    Q.    Were these?

3    A.    From chase.

4    Q.    I'm so sorry.  Sorry.  Say again?

5    A.    The deposit receipt from chase.

6    Q.    For how much money?

7    A.    $6030.

8    Q.    Was the check that was deposited if we can go to 1114 at

9    two, please, was the check that was deposited for $6030 from

10   Mr. McAda for co-payments for prescriptions for earlier years?

11   A.    Yes.

12   Q.    Was it for co-payments that had never been collected up

13   until that point?

14   A.    Yes.

15   Q.    Mr. Carr we talked yesterday about MAAD Marketing.  Do you

16   recall that?

17   A.    Yes.

18   Q.    And clawing back the money from Madelaine Beckett that she

19   received for her husband's prescriptions.  Do you remember

20   that?

21   A.    Yes.

22   Q.    Why did you claw back that money?

23        MR. COGDELL:  Asked and answered, Your Honor.  It was

24   covered yesterday.

25        THE COURT:  Counsel.

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

1          MS. REMIS:  Sure, Your Honor.  I'll move on.

2     Q.   Was it common practice for the pharmacy to take certain,

3     when somebody was looking, when somebody was watching?

4     A.   Yes.

5          MR. LOUIS:  Objection.  Vague.  "Looking".

6          THE COURT:  Sustained alleges to vague.

7     Q.   Without giving detail, would the pharmacies have collected

8     the co-payment on April 6, 2016, had nobody been

9     double-checking that they were collecting?

10         MR. LOUIS:  Objection asked and answered amount

11    cumulative.

12         MS. GOODMAN:  Also facts not in evidence 403.

13         THE COURT:  Sustained.  Counsel, let's find an ending

14    point for this.

15         MS. REMIS:  I am five questions away, Your Honor.

16    We've talked a lot over the last day and we've talked about

17    different aspects of the pharmacies and your experience there.

18    And you've talked about pleading guilty; is that right?

19    A.   Yes.

20    Q.   Did you join the pharmacies knowing that a crime was

21    occurring?

22    A.   Absolutely not.

23    Q.   After you started did you begin to realize that some

24    things were not right?

25    A.   I did.

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**

```
 1   A.    No.
 2   Q.    And we saw that Mr. McAda did write co-pay checks?
 3   A.    Yes.
 4   Q.    One was deposited?
 5   A.    Yes.
 6   Q.    And you testified that it related to prescriptions that he
 7   and his family received?
 8   A.    Yes.
 9   Q.    You're not aware of any earlier time when Mr. McAda was
10   asked to pay a co-pay?
11   A.    No.  No.
12   Q.    And the co-pay check -- the co-pay check that we saw was
13   not submitted for an ongoing audit, correct?
14   A.    Correct.
15   Q.    Not a CVS Caremark audit?
16   A.    No.
17   Q.    And not an ESI audit?
18   A.    No.
19   Q.    Okay.  Now we talked you pleading guilty.  I believe you
20   spoke to maybe Mr. Newton bit.  You pled guilty because you
21   believe what you did was wrong, right?
22   A.    Yes.
23   Q.    And that was due in large part to a lot of the things that
24   you saw going on at the pharmacy?
25   A.    Yes.
```

**ROUGH  DRAFT  ROUGH  DRAFT  ROUGH  DRAFT**