# EXHIBIT 1

K8CHJAIH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                          19 Cr. 59 (PKC)

NIKET JAIN,

                                         Hearing
             Defendant.

------------------------------x

                                         New York, N.Y.
                                         August 12, 2020
                                         11:10 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                         District Judge

                         APPEARANCES

AUDREY STRAUSS
     Acting United States Attorney for the
     Southern District of New York
BRIAN BLAIS
     Assistant United States Attorney

EMMET MARVIN & MARTIN, LLP
     Attorneys for Defendant
BY:  PAUL TERRY WEINSTEIN
     MORDECAI GEISLER

K8CHJAIH

```
 1              (Case called)

 2              THE DEPUTY CLERK:  United States of America against

 3    Niket Jain.

 4              MR. BLAIS:  Good morning, your Honor.  Brian Blais for

 5    the government.

 6              THE COURT:  Good morning, Mr. Blais.

 7              MR. WEINSTEIN:  Paul Weinstein for the defendant.

 8    With me is my colleague Mordecai Geisler, and Mr. Jain is here

 9    as well.

10              THE COURT:  All right.  Good morning to you all.

11              MR. WEINSTEIN:  Good morning.

12              THE COURT:  The purpose of this hearing has been set

13    out in advance.  Just a few preliminaries.  Throughout the

14    proceeding, everyone is to remain face masked with the

15    following exception:  Testifying witnesses will proceed to the

16    seat in the jury box where they will testify from, and they

17    will put on a face shield, leaving the face mask on.  Once the

18    face shield is in place, then they may remove the face mask.

19              If anyone has occasion to show a witness a document or

20    wants to show a witness a document, indicate, and a member of

21    the court staff will retrieve the document from you.  You

22    should be gloved when you hand the document to my law clerk,

23    and the law clerk will place it in front of the witness who

24    will also be gloved and can pick up the document at that point,

25    and a similar process will be used in reverse.  And questioning
```

1    will be from a seated position.

2           All right.  Mr. Weinstein, you may call your first

3    witness.

4           MR. WEINSTEIN:  All right.  Can I just very briefly

5    put something on the record before we start?

6           THE COURT:  Yes.

7           MR. WEINSTEIN:  The first is that we're going to be

8    calling two witnesses today, Agent Boddy and AUSA La Morte, and

9    I wanted to make the Court aware that the decision on which

10   witnesses to call was based upon the disclosures of the

11   government.  We don't know, which is why we're having a

12   hearing, what additional information is going to be disclosed

13   at the hearing.  So I would like to reserve our right to call

14   additional witnesses based upon the information here, and if we

15   do so, I certainly will put the basis for doing that on the

16   record in case there's a government objection to it.  But

17   that's how I intend to proceed, so I just wanted to let the

18   Court know that.

19          Also, and perhaps this goes without saying, I'd like

20   to just make clear that all the prior motion papers and

21   exhibits and affidavits, I respectfully request that they be

22   incorporated in this hearing.

23          THE COURT:  All right.

24          MR. WEINSTEIN:  And items on the docket sheet.  Also,

25   I would respectfully request that we have briefing after the

1  hearing, an additional round of briefing, based upon the

2  information at the hearing.

3       THE COURT:  Mr. Weinstein, I think you're getting way

4  ahead of yourself.  You're asking for a briefing schedule on a

5  hearing that's not concluded.  The first witness hasn't been

6  called.  It may be that a briefing schedule will be critical.

7  It may be that a briefing schedule is not necessary.

8       I have examined the law.  You have briefed it.  I

9  don't understand.  What is it about the testimony that came out

10  today that requires you to brief anything?

11      MR. WEINSTEIN:  Your Honor, respectfully, we haven't

12  heard the testimony yet.

13      THE COURT:  Right, exactly.

14      MR. WEINSTEIN:  Yes.

15      THE COURT:  That's my point.

16      MR. WEINSTEIN:  Right.  I'm not asking for a briefing

17  schedule, just --

18      THE COURT:  Well, then what are you asking for?

19      MR. WEINSTEIN:  I wanted to make the Court aware that

20  I anticipated perhaps requesting a briefing schedule

21  afterwards, but that I -- in my view, given that we're having a

22  hearing and, frankly, given the essentially bare bones

23  disclosures that we've received, the history of this case, the

24  fact that your Honor has alone ordered a hearing so that we can

25  hear live testimony on this indicates that post-hearing

K8CHJAIH

 1    briefing will be appropriate.  So I put the request on the

 2    record.

 3            THE COURT:  Help me out, Mr. Weinstein.  I've been

 4    doing this job a long time.

 5            MR. WEINSTEIN:  Yes.

 6            THE COURT:  I lost your train of logic.  You just

 7    said, if I understood you -- maybe I misheard you, so please

 8    correct me if I'm wrong -- that the very fact that I ordered a

 9    hearing is an indication that post-hearing briefing will be

10    necessary or appropriate.  What's the logic on that?

11            MR. WEINSTEIN:  Not alone, not alone, your Honor.  The

12    whole history of this matter -- here's my thinking on it.

13    We're going to hear testimony from witnesses.  I would like the

14    opportunity, essentially, to do a closing argument on the

15    hearing in writing following the hearing, and I just wanted

16    your Honor to know I was going to be making that request,

17    respectfully, for your Honor's consideration.

18            THE COURT:  All right.  Well, you should consider the

19    distinct possibility that I will ask you to make your closing

20    arguments on the record.  I don't know why I spent the time

21    reading your briefs, then.

22            MR. WEINSTEIN:  There's going to be additional

23    evidence produced at the hearing.

24            THE COURT:  Absolutely.  And while it's fresh in mind,

25    Mr. Weinstein, it would be appropriate to hear your arguments.

K8CHJAIH

1   And if I need additional briefing or there's a point which

2   should be briefed, we'll do that, and then I'll have you come

3   back, if necessary, to deal with this.

4           MR. WEINSTEIN:  Understood.  Thank you.

5           THE COURT:  But you are way ahead of yourself, and I

6   don't get it.  And the same thing with additional witnesses.  I

7   asked you about the witnesses you wanted.  We have a record on

8   that.

9           MR. WEINSTEIN:  Yeah.

10          THE COURT:  Listen, it may be appropriate for you to

11  ask for additional witnesses, but I don't understand your point

12  in bringing this up at the outset of the hearing.  I just don't

13  get it.

14          MR. WEINSTEIN:  OK.  My point was that if it came to

15  pass, that I would request, based upon the evidence adduced at

16  the hearing, that there be additional witnesses.  I was

17  concerned that I would hear the argument, oh, you're raising

18  this for the first time as if, you know, you never mentioned

19  that before.  And I would say:  But it's based upon the

20  testimony; but you never mentioned it.  So I mentioned it so

21  that in case it happened, I won't face the claim of surprise.

22          THE COURT:  Well, you may face that claim, sir,

23  because you had the declarations.  I ordered declarations from

24  all the participants, you'll recall that, from the U.S.

25  Attorney's Office.  How many declarations did we get?  Quite a

K8CHJAIH

1   few.

2            MR. WEINSTEIN:  Yes.

3            THE COURT:  OK.  So if you turn around at the end of

4   today and say I need X, whose declaration you had, I may very

5   well ask you, Mr. Weinstein, why didn't you raise this

6   beforehand?

7            MR. WEINSTEIN:  Right.

8            THE COURT:  So you have not immunized yourself from

9   any claim of surprise.  You say that's why you made the

10  statement, but your statement doesn't do that.

11           MR. WEINSTEIN:  Well, I completely understand, your

12  Honor.  My articulation of the basis, for example,

13  hypothetically if I were to call one of the people who gave a

14  declaration and your Honor would say, well, you had the

15  opportunity, I expect that I would have to articulate a basis,

16  based upon the testimony, that the affidavit didn't disclose

17  information sufficient for me to know that it would be

18  worthwhile to call the witness, and I'll make that argument for

19  your Honor's consideration.

20           That's what I was thinking.  These are bare bones

21  affidavits.  We don't know what we're going to hear.  We don't

22  know -- your Honor ordered declarations.  We don't know whether

23  other people were involved.  We haven't had the hearing yet.

24  If we hear -- and I'm not saying that I expect this, and I'm

25  just -- it's a hypothetical -- but if we hear that there were

K8CHJAIH

1    other people involved that haven't been disclosed, it would be

2    appropriate, but I'm sure your Honor will consider those

3    arguments after the hearing and rule on them.

4         All right.  That's -- I finished on that point.  I

5    have one more, if I may, and that is we're going to have two

6    witnesses, some exhibits.  What I expect the evidence to show,

7    so that when the testimony is elicited and the exhibits are

8    shown, your Honor will know what the purpose of showing them

9    is, and I'm going to state what the -- just a brief opening,

10   and it is this:  That the withholding of the computers and the

11   telephone were intentional, and the reason that it was

12   intentional was because there was a belief by the FBI and, I'll

13   ask the question, the U.S. Attorney's Office, that the

14   computers and the telephone had information about money

15   laundering by members -- or particularly a member, Leon Kaplan,

16   of Russian organized crime.  And the information on the

17   computers and the phone showed that Aberon, the financial

18   institution at issue here, actually was formed by, for the

19   benefit of, Leon Kaplan, a member of Russian organized crime, a

20   known money launderer, and that was never disclosed to the

21   defense.  It's exculpatory, and Niket Jain is an unwitting --

22   was unwittingly used in a money laundering enterprise by the

23   purported victims.

24        So what those computers -- the government believed

25   that there would be information on those computers that would

K8CHJAIH

1    indicate or be evidence of Russian organized crime, money

2    laundering using Aberon.  It was not disclosed, all right?  And

3    it was intentionally not disclosed in order to prevent the

4    defense from discovering that evidence.  So that's what the

5    questioning is going to focus on, and that's what the exhibits

6    will be offered for.

7           So with that, defense calls Agent Boddy, please.

8           MR. BLAIS:  Your Honor, do you wish me to retrieve the

9    witness?

10          THE COURT:  Please.

11          MR. BLAIS:  OK.

12          (Discussion off the record)

13   WAYNE BODDY,

14        called as a witness by the Defendant,

15        having been duly sworn, testified as follows:

16          THE COURT:  All right.  You may inquire.

17          MR. WEINSTEIN:  OK.  Thank you.

18          I think the first thing I'd like to do is rather than,

19   given the current situation, show individual exhibits, we have

20   a stack of exhibits that I'd like to provide to the witness,

21   the government, and your Honor.  It's the exhibits that I

22   anticipate discussing with the witness so that everyone will

23   have them, and then I'll refer to the exhibit number, and the

24   witness and the Court and the government can just look at the

25   exhibits.  They're numbered, and we have a stack for each.

K8CHJAIH                      Boddy – Direct

1   Thank you.

2   DIRECT EXAMINATION

3   BY MR. WEINSTEIN:

4   Q.  OK.  Agent Boddy, good morning.

5   A.  Good morning.

6   Q.  Would you briefly state your education, your educational

7   background.

8   A.  I attended University of California, Berkeley and obtained

9   a dual degree in political science and French, bachelor's

10  degrees.

11  Q.  And when did you become an FBI agent?  When did you begin

12  your training?

13  A.  I started with the FBI in 2008 as a surveillance specialist

14  and then became an agent in 2011.

15  Q.  In 2011?

16  A.  That's correct.

17  Q.  When did you graduate from college with a dual degree?

18  A.  In 2001.

19  Q.  2001?

20  A.  2001, correct.

21  Q.  And just briefly, where did you work between 2001 and 2008?

22  What did you do?

23  A.  For two years I worked as a paralegal.  I spent another

24  year and a half after -- so from 2001 to 2003, I was a

25  paralegal at a law firm.  I attended law school for a couple of

1    years in the Bay Area of California after that and stopped

2    about halfway through.  From there I worked at another law firm

3    from about '05 to '07.  Worked at a startup company from '07

4    to '08, so about a year and a half, and then joined the bureau

5    in October of 2008.

6    Q.  OK.  Where did you attend law school?

7    A.  University of San Francisco.

8    Q.  Did you take criminal law?

9    A.  I did.

10   Q.  Did you take criminal procedure?

11   A.  I did.

12   Q.  All right.  Did you learn about the requirements of *Brady*,

13   for example?

14   A.  I did.

15   Q.  Exculpatory?

16   A.  I did.

17   Q.  The principle of providing exculpatory information to a

18   criminal defendant?

19   A.  I did, correct.

20   Q.  OK.  So you started with the FBI as a surveillance

21   specialist in 2008.  And was it leading up to 2011 that you

22   received your formal training at Quantico?

23   A.  In 2011 I received formal training at Quantico.

24   Q.  Does the training at Quantico also involve training in

25   criminal law, basic criminal law?

K8CHJAIH                         Boddy - Direct

1   A.  We do study criminal law during the training, and we take

2   three exams, three law exams, while we're there as part of our

3   training.

4   Q.  OK.  Does one of them deal with providing discovery in a

5   criminal case as an agent?

6   A.  I would imagine that -- I can't remember the specifics, but

7   I do imagine that that is stuff that we cover in the studies.

8   Q.  All right.  So in 2011 you became an agent?

9   A.  That's correct.

10  Q.  Where were you first assigned?

11  A.  New York is my first office as an agent.

12  Q.  OK.  Are you still in New York?

13  A.  I am still in New York.

14  Q.  OK.  What squad were you assigned to first?

15  A.  So, initially, we do a rotation here in New York where we

16  start off on an applicant squad where we typically do

17  background checks on individuals applying to the FBI or

18  appointments for people that are looking to -- judges, for

19  instance, that get appointed.  We work at the operations

20  center, and then we do surveillance.  So that lasted about ten

21  months before you get your squad assignment.

22  Q.  And you received a squad assignment?

23  A.  I did receive my squad assignment.

24  Q.  What squad was that?

25  A.  I was assigned to C43.  It's a securities fraud/money

K8CHJAIH                    Boddy - Direct

1    laundering squad.

2    Q.  OK.  You stayed on that squad from between what time

3    period?

4    A.  I started on that squad in July of 2012, and I remained

5    there until April of 2019.

6    Q.  Approximately seven years?

7    A.  Approximately.

8    Q.  What are the general subject matters -- perhaps it's

9    self-explanatory, but please explain -- the basic subject

10   matter or the focus, the investigatory focus, for the

11   securities fraud and money laundering squad?

12   A.  So for securities fraud, you could work investment fraud,

13   you could work insider trading, you could work kind of a

14   variety of the cases that fall under that category, and money

15   laundering tends to be broad.  I worked sanctions cases that

16   kind of fell in the money laundering category.

17   Q.  Now, the sanctions cases that fall under money laundering,

18   those are generally having an international focus, correct?

19   A.  That's correct.

20   Q.  All right.  Did most of the cases that you worked on have

21   an international focus?

22   A.  They did not, actually.

23   Q.  OK.

24   A.  There were a few, but not most of them.

25   Q.  OK.  Now, you had -- in college you were a dual major and

1    have a degree in French?

2    A.  That's correct.

3    Q.  You speak Russian?

4    A.  I do not.

5    Q.  All right.  During your time on the securities fraud and

6    money laundering squad, were you the case agent, the lead

7    agent, on any cases?

8    A.  I was.

9    Q.  How many?

10   A.  Be hard to say.  I think at the time that I transferred

11   from the squad, there were maybe five or six squads that I was

12   the lead agent on.

13   Q.  OK.  Five or six cases?

14   A.  Yeah, cases that were active.

15   Q.  Investigations?

16   A.  I'm sorry?

17   Q.  Let me see if I have this right.  So at the time you left

18   in 2019, you were the lead agent at that time?

19   A.  I was the lead agent, yeah.

20   Q.  On five or six investigations?

21   A.  That's correct.

22   Q.  Now, during your time in the securities and money

23   laundering squad, how many other investigations, in addition to

24   those six, were you the case agent?

25   A.  It would be hard to say, but there were not very many cases

K8CHJAIH                          Boddy - Direct

1    where I was not the lead agent on them.  So there weren't too

2    many where I was the secondary agent.

3    Q.   Approximately, additional to the six?

4    A.   Maybe ten or so.

5    Q.   All right.  So approximately for a total of 16?

6    A.   Approximately.

7    Q.   OK.  Generally, what are the duties of the case agent, just

8    generally?

9    A.   They're the lead investigator, so they're trying to

10   determine the facts that are involved in the case.  They're

11   interacting with the prosecutors to update them on whatever

12   evidence has been collected, trying to identify what violations

13   may have been committed by the individuals, trying to identify

14   subjects that either were already known at the time that the

15   case was initiated or you may discover as you collect more

16   evidence.  Working with other agencies if -- for instance, like

17   my sanctions cases, you deal with some state and local agencies

18   to assist with the investigation.

19            So it varies by the case, but, obviously, there's a

20   lot of, you know, reviewing documents, conducting interviews,

21   and interacting with other agencies, maybe conducting parallel

22   investigations.

23   Q.   Now, in those approximately 16 investigations, for how many

24   of those was an Assistant United States Attorney assigned?

25   A.   For all of them.

1    Q.  For all of them?

2    A.  Yes.

3    Q.  Were they all in the Southern District of New York?

4    A.  No.

5    Q.  OK.  What other jurisdictions?

6    A.  Eastern District of New York and D.C. U.S -- District of

7    Columbia U.S. Attorney's Office.

8    Q.  For the Eastern District, how many of your cases for which

9    you were case agent was there an AUSA assigned from the Eastern

10   District of New York?

11   A.  I don't remember -- I mean, for all the cases I was working

12   on, there was an AUSA that was assigned to the case.  I can't

13   remember how many I specifically worked on from that district.

14   Q.  OK.  Were most of the cases that you worked on for which

15   you were case agent, was the AUSA assigned from the Southern

16   District of New York for most of them?

17   A.  I would say yes.

18   Q.  Can you give just an approximate percentage, Southern

19   District of New York?

20           THE COURT:  You mean percentage of 16?  Is that what

21   you're asking for?

22           MR. WEINSTEIN:  Yes, or the number, however.

23   A.  Maybe ten out of the 16 perhaps.

24   Q.  Thank you.

25   A.  That's a guess because I would have to sit and look through

K8CHJAIH                          Boddy - Direct

1    my prior caseload to see exactly how they were assigned, but I

2    can't think of -- have an exact number.

3    Q.  OK.  For how many of those, if any, was Andrew Adams the

4    assigned AUSA?

5    A.  For one.

6    Q.  OK.

7    A.  Prior to the case where I worked with Andrew Adams, I had

8    never worked with his unit, with the money laundering unit.

9    Q.  Now, are you familiar with the term "case file"?

10   A.  I am.

11   Q.  What's a case file?

12   A.  Case file is typically where all of the documents that you

13   collect in the case go to.  It's where your reports based on

14   interviews are uploaded to the case file.  It has a case number

15   that is assigned to that case that's basically where all the

16   documents are kept.

17   Q.  So there's a case number?

18   A.  That's correct.

19   Q.  All right.  Is that case number considered confidential?

20   A.  I would say no.

21   Q.  Now, this, the investigation that gave rise to the present

22   prosecution, it has a case number?

23   A.  That's correct.

24   Q.  What's the last few digits of the case number, just so we

25   have a reference point?

1    A.  I don't recall.  I've not worked on the case in a number --

2    in over a year.

3    Q.  All right.

4    A.  Oftentimes, just because of the number of cases that you're

5    working on, you don't remember the case number.  You just have

6    to look it up each time that you're referencing it.

7    Q.  Now, you said that when relevant -- when a document is to

8    be placed in the case file, it's uploaded?

9    A.  That's correct.

10   Q.  How does it get uploaded, just very briefly?

11   A.  So, for instance, if we're receiving documents from a bank

12   pursuant to a subpoena, the return comes in, we will scan those

13   documents and then upload those to the file, or we'll download

14   documents that were presented to us on a DVD and then we'll

15   upload those to the file.

16   Q.  Are hard copies kept?

17   A.  Sometimes yes, depending on what they are.  Obviously, hard

18   copies of notes are kept, but documents that you receive from a

19   bank, you may scan those documents, upload what you received,

20   and discard the documents afterwards.

21   Q.  OK.  So you started in New York in approximately -- on C43

22   in approximately 2011?

23   A.  On C43 in 2012.  I got started in New York in 2011.

24   Q.  Was the process the same in 2012?

25   A.  I believe so.

K8CHJAIH                    Boddy - Direct

1    Q.  OK.

2    A.  The system that we used, which is called Sentinel, was

3    fairly new at that time, but I still believe it was the system

4    that was used at that time that we continue to use today.

5    Q.  So you use Sentinel?

6    A.  Yes, correct.

7    Q.  Now, Sentinel allows an agent to view a table of contents

8    for the case file.  Is that accurate?

9    A.  It allows you to view basically what's been uploaded into

10   the case, assuming you have permission to do so.  So certain

11   cases could be designated as cases that are restricted.  Grand

12   jury files typically are going to be restricted as a subfile

13   within a case.  So you won't actually be able to see what the

14   contents are of the grand jury, but documents such as 302s or

15   electronic communications, which are basically memos to the

16   file, those you can see.

17   Q.  Now, so what you're saying is you can see the actual

18   document if you want to, correct?

19   A.  Depending on the document, you can see the document.

20   Q.  What I'm asking is can't you view without viewing the

21   contents of every document, as if you're looking at a phone

22   book, but you can actually view just the table of contents of

23   the individual items that have been uploaded?

24   A.  I'm still -- depending on the individual items.  With the

25   grand jury process being a secretive process, that's an item,

K8CHJAIH                          Boddy - Direct

1  even with the table of contents, you would not be able to see

2  what was subpoenaed.

3  Q.  OK.  Does that include subpoenas, subpoena returns?

4  A.  Subpoena returns would fall under that category as well.

5  Q.  Would you see an entry, though, for the subpoena?

6  A.  You would see that something was entered, but literally

7  everything that would identify what was either -- the actual

8  subpoena that you uploaded to the case or the return would be

9  completely blocked out, would be -- there would literally show

10  Xs in place of content.

11  Q.  And an FBI agent, of course, would know if they see that

12  it's grand jury material, correct?

13  A.  That's correct.

14  Q.  And it's likely documents, right?

15  A.  That's correct.

16  Q.  OK.

17  A.  Potentially.

18  Q.  So, actually, skipping a little bit ahead, if you are

19  giving discovery, you particularly look at those types of

20  entries, the grand jury material, to make sure that it could be

21  documents that you need to produce, isn't that right?

22  A.  I'm sorry.  Could you repeat that.

23  Q.  Yes.  You described that on Sentinel, entries for grand

24  jury material are shielded in some way.  They appear blank.

25  You don't know what the material is.

K8CHJAIH                    Boddy - Direct

1   A.  That's correct.

2   Q.  My question to you is when giving discovery in a criminal

3   case, don't you particularly look at those entries because

4   they're likely documents that you'll need to produce?

5   A.  I'm not typically given documents in a discovery case, so

6   that's not something that I would typically do.  But perhaps if

7   I were handing documents over to someone else that needed to

8   see the documents, that might be something that they would take

9   interest in.

10  Q.  Who are you referring to "they"?

11  A.  Well, the discovery process in terms of -- documents

12  typically aren't being given to me in the discovery process

13  because I'm usually the holder of the documents.  So I'm

14  usually probably handing the documents over to another person.

15  Q.  Correct.  Like, for example, an AUSA?

16  A.  Yeah.

17  Q.  So my question to you is when you go into the case file and

18  you're a case agent and you need to give discovery in a

19  criminal case, the AUSA says, we're going to be giving

20  discovery to the defendant in a criminal case, you make sure

21  you look at those entries for grand jury material?

22  A.  I can't say what the AUSA does once I get the

23  documentation.  I just know that if there's a discussion about

24  things being handed over, I provide those items to the AUSA and

25  then they take whatever steps that they need to do.

K8CHJAIH                          Boddy - Direct

1  Q.  OK.  The AUSA doesn't have access to Sentinel, is that
2  right?
3  A.  That's correct.
4  Q.  So the AUSA has to rely on the case agent to look in
5  Sentinel, correct?
6  A.  That's correct.
7  Q.  And the case agent has an obligation, a duty, to look in
8  Sentinel in a criminal case to determine whether there's
9  discoverable material, isn't that right?
10 A.  Yeah, when discussions about discovery occur, you have
11 those discussions and then you present everything that's
12 pursuant to -- that's part of the discovery process.
13 Q.  Now, I'm going to ask a question that I've already asked,
14 but I respectfully don't know that I got an answer.
15        Does Sentinel create a table of contents for each
16 case?
17 A.  I don't know that I would say a table of contents.  There's
18 a timeline and then there's subfiles that show what has been
19 entered into each of those subfiles.  So you could create a
20 subfile for 302 documents, which are the reports that we write,
21 and you could look on there and see what all those reports are.
22 There's a timeline that shows when things get added to the case
23 that often will show the different things that took place, but
24 I don't know that I would characterize it as a table of
25 contents.

1   Q.  OK.  Can you estimate how long it would take to look

2   through -- let me start again.

3        You exited this case in 2019, correct?

4   A.  That's correct.

5   Q.  At the time you exited, how long would it take you to scan,

6   not to look at each, what's downloaded, but to scan the entire

7   case file just to see what the contents were without going into

8   the -- well, looking at the 302, but just seeing that there's a

9   302, just scanning the contents of the case file, how long

10  would it take?

11  A.  That's kind of a complicated question just because there's

12  subfiles.  So if I needed to scan the 302 subfile, I could scan

13  the 302 subfile and see how many entries have been entered into

14  the 302, but the grand jury has its own subfile, and there's

15  subfiles for evidence.  So to say how long it would take,

16  you're looking at various subfiles to see what are the contents

17  within each subfile, and depending on how much contents are

18  there, obviously, that time could vary.

19  Q.  This case, looking at not the contents of the downloaded

20  items but just the description of the downloaded item, not

21  clicking on it to see its contents, just the description of it,

22  looking at all the subfiles, the entire case file, how long

23  would it take, approximately?

24  A.  I still -- I understand what you're asking me.  I just

25  don't necessarily know that Sentinel, in the timeline, which is

1   one of the subfiles that's within Sentinel, I don't -- having

2   not needed to look at that very frequently, because typically

3   if I'm working on a case, I'm aware of the contents that are in

4   that case file, so there's not very many circumstances where

5   I'm reviewing the timeline to see what's occurred in a case

6   that I've spent a significant amount of time working on, even

7   within that timeline, since that's not an area that I've spent

8   a particular amount of time looking at, I don't know if that

9   timeline reflects everything that's been added to the case

10  file.

11  Q.  Let's assume everything was added.

12  A.  Well, I can't assume that not knowing if that's the case.

13  So when we're talking about how much time that would take, if

14  that doesn't include everything, that could be a short amount

15  of time.  If that includes everything, including things that

16  are in all the other subfiles, that could take a much longer

17  period of time, depending on how many things have been added.

18  If you subpoena for a lot of records, if you've done a lot of

19  interviews, and that stuff gets reflected in the timeline, that

20  could be -- that could be a pretty extensive process.

21  Q.  Did you inherit -- during your time in C43, did you inherit

22  any investigations?

23  A.  I inherited this investigation.

24  Q.  So when you started this investigation, when you inherited

25  it, you went through the case file, every piece of it, didn't

K8CHJAIH                    Boddy - Direct

1   you?

2   A.  I did not, no.

3   Q.  What did you leave out?  What did you not look at?

4   A.  There were documents that had been subpoenaed -- at that

5   time that I received the case, there was a theory as to what --

6   the other money laundering investigation that was going on, but

7   it was not yet clear how it was taking place.  At the time I

8   received the investigation, it seemed like there were still

9   quite a few investigative steps to kind of really understand

10  what was taking place.  So I essentially just worked it as my

11  own investigation once I took it over.

12  Q.  You didn't look in the case file?

13  A.  I looked at the case file, but I didn't review everything

14  that was in the case file.

15  Q.  OK.  What did you decide not to review?

16  A.  There were subpoena returns that had come in that I didn't

17  review.  That might be essentially it.

18  Q.  OK.  How did you know there were subpoena -- were even

19  subpoena returns?  How did you know?

20  A.  Because some of the contents were provided to me by the

21  case agent who gave me the case on a USB to upload to a folder

22  that we held a lot of the documentation in.  So there was a

23  case folder on our system in addition to the things being held

24  in Sentinel.

25  Q.  OK.  So there's a separate case folder?

1    A.   That's correct.

2    Q.   That's separate than Sentinel?

3    A.   That's correct.

4    Q.   OK.  What's in the case folder?

5    A.   The case folder is -- typically, you'll put in subpoena

6    returns because, to a certain extent, you never know if there

7    could be an issue with the Sentinel system, so you don't want

8    to lose things that you've gathered over time as part of the

9    investigation.  So you want to have a separate place for those

10   to be saved.

11   Q.   So Sentinel is unreliable?  You can put things in there,

12   and they can just go away?

13   A.   I wouldn't say it's unreliable, but I say that as a

14   safeguard you want to have things in multiple places.

15   Q.   OK.  So you put certain things in the case file?

16   A.   That's correct.

17   Q.   Is that an official FBI procedure that there's a thing

18   called a case file?  Yes?

19   A.   I would say that's official.

20   Q.   OK.

21   A.   Because in order for you to start doing certain processes,

22   whether it's serve, you know -- get subpoenas, a case has to be

23   open either as an assessment or a full -- preliminary or full

24   investigation before you could take certain steps.

25   Q.   So that's the case file, and that's in Sentinel?

K8CHJAIH                    Boddy - Direct

1   A.  That's correct.

2   Q.  But there's also a case folder?

3   A.  That's correct.

4   Q.  Is a case folder also a standard FBI procedure?

5   A.  A case folder is probably more personal to the case because

6   I know you typically, depending on where you want to save

7   documents, you could add a case folder and put those things in,

8   but I don't -- I wouldn't say that that's a standard because

9   everyone -- from what I understand, people deal with that very

10  differently.

11  Q.  Did you have a case folder for -- well, let me ask you.

12          What did you call the investigation that gave rise to

13  the present prosecution?  What did you call it?

14  A.  Aberon investigation.

15  Q.  Aberon.

16          OK.  Did you have a case folder for Aberon?

17  A.  I did.

18  Q.  More than one?

19  A.  Possibly just one, but the case folder had already been

20  established by the previous agent, and then I just added things

21  to that folder.

22  Q.  The case folder?

23  A.  That's correct.

24  Q.  Were there things in the case folder, evidentiary items,

25  that were never put into Sentinel?

1   A.  I wouldn't say in the case folder, no.

2   Q.  All right.  Were there subfolders in the case folder for

3   the Aberon investigation?

4   A.  There were.

5   Q.  OK.  How many?

6   A.  It's hard to say, but maybe five separate case subfolders,

7   maybe ten.  I would -- you can add -- it's a feature that you

8   can add more subfiles if you want.  So there's kind of the

9   standard number, but you could add some if you'd like to.

10  Q.  Is a case folder similar to -- well, is it accessed the

11  same as a computer filing index, for example?  If you go into

12  the case folder, initially when you go into the case folder, do

13  you see just a list of documents?

14  A.  It's not a standard thing because on our system there's a

15  system that you can say that's only unique to you, meaning it's

16  a system that you could access and only you could access it,

17  and then we have what you call the shared drive, which is a

18  system that other people could access as well.

19          So when you described a case folder, a case folder

20  could be added to the folder -- to the network that you only

21  have access to or it could be added to the shared drive that

22  multiple people have access to, and the shared drive is

23  typically used when there's multiple people that are working on

24  an investigation.

25  Q.  All right.  When did you start with this investigation, the

K8CHJAIH                          Boddy - Direct

1    Aberon investigation?

2    A.  The Aberon investigation, I was assigned it in August of

3    2017.

4    Q.  August of 2017?

5    A.  That's correct.

6    Q.  Had you worked on it prior to that?

7    A.  I had not.

8    Q.  Were you familiar with it prior to that?

9    A.  I was not.

10   Q.  So you were assigned it in August of 2017.  Were you the

11   case agent right away?

12   A.  I was.

13   Q.  You didn't work with the prior case agent in a support role

14   in the Aberon investigation for a period of time before you

15   became the case agent?

16   A.  I did not.  I knew nothing about the investigation before

17   it was assigned to me.

18   Q.  August of 2017.

19           Who was the prior case agent?

20   A.  The prior case agent is -- name is Matthew Taylor, and he

21   assigned the case to me because he got named our supervisor.

22   Q.  OK.  So he became your supervisor?

23   A.  That's correct.

24   Q.  So as of August 2017, your supervisor knew the status of

25   the investigation, correct?

1    A.  That's correct.

2    Q.  All right.  Now, what was the focus of the investigation,

3    the Aberon investigation, in August of 2017?

4    A.  When the case was presented to me, the supervisor told me

5    that he knew that I had an interest in working on money

6    laundering investigations, and he thought that this would be a

7    good money laundering investigation for me to work on.

8    Q.  OK.  So the focus was money laundering?

9    A.  That's correct.

10   Q.  Did it include money laundering from Russia?

11   A.  There were no kind of specifics about what money laundering

12   had taken place.  It was just presented to me as a money

13   laundering investigation.

14   Q.  OK.  He didn't give you any of the background on what the

15   investigation was about?

16   A.  He -- I don't know how much he had determined because he

17   had only worked the case for a few months prior to reassigning

18   it to me.  So I don't know if he knew exactly where -- why it

19   involved money laundering, at least we didn't have that

20   discussion.

21   Q.  He didn't know why it involved money laundering?

22   A.  My understanding is that he had come across a few SARs that

23   had identified Aberon being involved in money laundering, and

24   he was chasing those down, but that was my understanding.  The

25   kind of larger discussion that we had -- and oftentimes when

K8CHJAIH                    Boddy - Direct

1   cases transfer over, there's only discussions about the kind of

2   main issue at a particular time, and the main issue that we

3   were focused on is that an investigator was looking at the case

4   at the same time, and we had -- we had to de-conflict.  So that

5   became my primary issue.

6   Q.  Someone else was looking at it at the same time?

7   A.  That's correct.

8   Q.  Who was looking at it at the same time?

9   A.  It was an investigator that worked with the securities

10  fraud unit here at S.D.N.Y.

11  Q.  OK.  So the Southern District of New York had a parallel

12  investigation going on?

13  A.  I don't know if they had a parallel investigation.  I know

14  that my supervisor got wind that they were looking at the

15  investigation, and he basically wanted us to let them know that

16  we were going to be working it and that they should not

17  continue looking into it.

18  Q.  That they should, the Southern District should not?

19  A.  The investigator at the Southern District should not and

20  that we were going to continue to work our money laundering

21  investigation.

22  Q.  OK.  Was the investigator in the Southern District of New

23  York working with a particular AUSA?

24  A.  He was.

25  Q.  Who was that?

K8CHJAIH                          Boddy - Direct

1    A.  I think it was Christine Magdo, if I'm not mistaken.

2    Q.  I'm sorry.  I couldn't hear you.

3    A.  It was AUSA, Assistant U.S. Attorney, Christine Magdo.

4    Q.  OK.

5    A.  Spelled M-a-g-d-o, last name.

6    Q.  Did she continue on in the Aberon investigation?

7    A.  I don't know what role she had because my understanding is

8    that she had -- the investigator's role was to look for cases

9    for them to potentially pursue.  The investigator had come

10   across this case and had presented it to her, but I don't --

11   other than possibly getting a few subpoena returns, I don't

12   think very many investigative steps had occurred.

13   Q.  When you say "this case," what are you --

14   A.  The Aberon case.

15   Q.  What about Aberon?

16   A.  I -- I never actually discussed with him what he was

17   pursuing.  I just discussed with him that we had opened an

18   investigation and that we were going to continue with our

19   investigation.

20   Q.  And did you continue with the investigation?

21   A.  I did continue with the investigation.

22   Q.  Did there come a time when you found out that the

23   Securities and Exchange Commission, the SEC, was also looking

24   at Aberon?

25   A.  I did.

K8CHJAIH                          Boddy - Direct

1    Q.   When did you find that out?

2    A.   I learned that in about April of 2018.

3    Q.   April of 2018?

4    A.   That's correct.  And if I could add, I learned that because

5    the SEC attorney contacted my supervisor to let him know that

6    they were going to be filing the cease-and-desist order

7    imminently and that was -- and my supervisor relayed that

8    information to me, and that was the first time that I realized

9    that the SEC was involved.

10   Q.   Wasn't there a request by the FBI for documents in 2017

11   from the SEC?

12   A.   Potentially.  But I do know that my supervisor who had

13   worked the case before I did had had discussions with that SEC

14   attorney.  He did not tell me about those discussions when I

15   took over the case for him.

16   Q.   OK.  So let's get this right.  You personally found out

17   about the SEC investigation in 2000- --

18   A.   '18.

19   Q.   In April of 2018?

20   A.   That's correct.

21   Q.   And at some point after you found out about the SEC

22   investigation, your supervisor told you:  Oh, we had asked for

23   records from the SEC a year ago?

24   A.   When I learned about the SEC investigation, because the SEC

25   reached out to my supervisor to let him know that they were

K8CHJAIH                    Boddy - Direct

1    going to be filing the cease-and-desist order and when he was

2    letting me know what they were doing, he also said:  Oh, by the

3    way, we had interacted with them when I first opened this case.

4    And, basically, I did not know where their case was going to

5    go, so I decided not to work with them, and he never informed

6    me of that when I took over the case.

7    Q.  So you had no contact with the SEC at all until April of

8    2018?

9    A.  That's correct.  I personally had no contact with the SEC

10   in this investigation until April of 2018.

11   Q.  But your supervisor had requested documents a year earlier?

12   A.  I don't know the extent of his communications with the SEC,

13   but I do know that he was aware that the SEC was investigating

14   Aberon at the time that -- right around the time that he opened

15   this investigation.

16   Q.  OK.  Did he request documents from the SEC a year before

17   you became case agent?

18   A.  I am not aware of that -- or it wouldn't have been a year

19   because he only opened the investigation three months before I

20   took it over.

21   Q.  And when did you take it over?

22   A.  I took it over in August of 2017, and he opened it in May

23   of 2017.

24   Q.  May, OK, of 2017.

25             All right.  Did you ever get documents from the SEC?

K8CHJAIH                    Boddy - Direct

1    Did they ever give you documents?

2    A.  I got documents from the SEC after I had my contact with

3    them in August -- in April of 2018.

4    Q.  OK.

5    A.  So once I learned that they had a parallel investigation,

6    we started working with them to see what documents they had

7    collected, and we requested those documents.

8    Q.  And you started working with them to get their documents,

9    correct?

10   A.  That's correct.

11   Q.  Who did you work with at the SEC to do that?

12   A.  I do not recall the SEC attorney's name.

13   Q.  Eric Schmidt?

14   A.  Yeah, that's correct.

15   Q.  Did you work with anyone else?

16   A.  No.  He's the only one I can recall speaking with.

17   Q.  Did you meet him in person?

18   A.  I never met him in person.

19   Q.  But you spoke to him on the phone?

20   A.  I talked with him on the phone.

21   Q.  And this was beginning of April 2018?

22   A.  Approximately, yes.

23   Q.  OK.  You got documents from him?

24   A.  That's correct.

25   Q.  Was your document request put in writing?

1  A.  I can't remember if it was put in writing.  I feel that we

2  may have -- there may have been an access letter.  If documents

3  would have been presented prior to me working on the

4  investigation, that would have been something that we still

5  could have used to get documents when I started working

6  directly with Mr. Schmidt.

7  Q.  OK.  So you recall that your supervisor had done an access

8  letter?

9  A.  I recall that my supervisor had communications with the SEC

10 from our discussion in April of 2018, and my understanding is

11 that we had the ability to request documents directly from the

12 SEC, which I would assume meant that there may have been an

13 access letter in place prior to me being involved with the SEC.

14 I don't know that for a fact.

15 Q.  But you believe it because they gave you documents?

16 A.  Correct.

17 Q.  But you never saw the access letter?

18 A.  I don't remember personally seeing the access letter.

19 Q.  OK.  But you did obtain documents from the SEC?

20 A.  That's correct.

21 Q.  What's your understanding of what you requested from the

22 SEC?

23 A.  The SEC basically had depositions that had occurred with

24 Individual 1, with Mr. Niket Jain, with other individuals

25 that -- accountants that were involved with Aberon.  And if I

K8CHJAIH                    Boddy - Direct

1   remember correctly, those were the main documents that we

2   received, as well as possible supporting documents that were

3   presented during the depositions.

4   Q.  I'm going to ask you again.  What's your understanding of

5   what you requested from the SEC?

6   A.  We requested documents that were -- that were related to

7   their investigation.  It would not have been a specific request

8   because we were not part of their investigation.  So since they

9   were investigating Aberon and we were investigating Aberon, we

10  would have requested documents that were specific to their

11  Aberon investigation.

12  Q.  What did you request?

13  A.  Documents that were pertinent to their Aberon

14  investigation.

15  Q.  How did you make that request?

16  A.  I think I made a -- it would have been a request by phone.

17  Q.  With Eric Schmidt?

18  A.  Correct.

19  Q.  You just called up and said:  Please just give me documents

20  on Aberon?

21  A.  I'm -- like, when Eric Schmidt discussed his case that was

22  involved with the cease-and-desist order, he told us about the

23  interviews that had taken place that were -- that were

24  pertinent to that investigation, and I asked him if he could

25  provide us with those documents.

K8CHJAIH                         Boddy - Direct

```
 1   Q.  OK.  Take a step back.  You heard about -- you heard
 2   from -- the SEC contacted your supervisor and said:  We're
 3   going to be doing a cease-and-desist order, right?
 4   A.  That's correct.
 5   Q.  Your supervisor told you?
 6   A.  That's correct.
 7   Q.  You contacted the SEC?
 8   A.  That's correct.
 9   Q.  OK.  Did you have a meeting with the SEC?
10   A.  I did not.
11   Q.  Now, you're describing a conversation with the SEC in which
12   they're describing for you, if I understand correctly, their
13   investigation.  Is that accurate?
14   A.  That's correct.
15   Q.  And you had that a conversation with Eric Schmidt?
16   A.  That's correct.
17   Q.  Was it one or more than one?
18   A.  It would have been more than one because we -- I followed
19   his call with letting AUSA Adams know that the SEC was going to
20   be filing a cease-and-desist order and seeing if there -- if we
21   wanted to potentially see if there was anything in there that
22   was criminal that we could investigate as well.
23   Q.  He asked you to do that?
24   A.  I actually presented it to Assistant U.S. Attorney Adams.
25   Q.  And then you spoke with Eric Schmidt?
```

1   A.  That's correct.

2   Q.  And you discussed with him the case?

3   A.  I didn't discuss -- I discussed with him his case.

4   Q.  His case?

5   A.  Correct.

6   Q.  Yes, his case?

7   A.  That's correct.

8   Q.  And he told you that an affidavit had been filed by one of

9   the purported victims saying that he wasn't really a victim.

10  Didn't he tell you that?

11  A.  He basically said that they had finalized their

12  investigation, and our focus at the time was on whether or not

13  we could catch up to where their investigation was on the SEC

14  investigation.  But he did present to us the fact that he --

15  the focus was going to be on one of the hedge fund managers,

16  co-hedge fund managers, of Aberon.

17  Q.  OK.  You know I asked you about the Semen Kaplan

18  declaration, right?  You know I just asked you about that?

19  A.  I did not.

20  Q.  I'll ask again.  I'm sorry.

21  A.  I don't think you mentioned that name.

22  Q.  Right.  Have you ever heard that name before?

23  A.  I have.

24  Q.  When was the first time?

25  A.  It certainly surfaced during the investigation.

K8CHJAIH                    Boddy - Direct

1    Q.   Did Eric Schmidt say that name to you?

2    A.   I feel like that would have been one of the individuals

3    that -- that name did come up in the deposition.  I don't

4    recall if he was deposed himself, but I do recall that being a

5    name that surfaced during one of the -- during at least one of

6    the depositions.

7    Q.   OK.  Didn't Eric Schmidt tell you the purported victim,

8    Semen Kaplan, presented a declaration, an affidavit, a sworn

9    document, saying that he wasn't the victim?  Didn't Eric

10   Schmidt tell you that?

11   A.   I don't recall Eric Schmidt telling me that.  I recall Eric

12   Schmidt handing me over documentation that reflected how the

13   depositions went, but I don't recall him ever telling me that.

14   Q.   Do you recall him mentioning the name Semen Kaplan?

15   A.   I don't recall us having extensive conversations about his

16   case because our focus was to see if it was possible for us to

17   move on a parallel investigation that would have resulted in us

18   having a criminal case finalized at the same time as their SEC

19   investigation.

20   Q.   OK.

21   A.   So that was the focus of my discussions with -- or my focus

22   at the time was on seeing whether or not we had the ability to

23   catch up to their investigation.

24   Q.   And what did you determine?

25   A.   We determined at the time that it didn't seem possible.

1   Q.  So did Eric Schmidt describe for you in detail what his

2   investigation was?

3   A.  We had discussion.  I don't remember it being presented in

4   any particular detail.  I do remember him sharing the

5   cease-and-desist order with us, and I do remember him telling

6   us as well that he would not be able to postpone the

7   investigation, but I don't remember any extensive discussions.

8   Q.  Did he tell you that the cease-and-desist order -- let me

9   start again.

10          Did he tell you that the amounts for which the SEC

11  settled with Joseph Krigsfeld were low because the purported

12  victim wasn't cooperating?

13  A.  I don't recall that being part of our discussion.

14  Q.  Did he tell you that the purported victim in his securities

15  fraud investigation was not cooperative?

16  A.  I do recall him saying that.

17  Q.  OK.  Who was that person?

18  A.  I believe that was Mr. Kaplan.

19  Q.  What did he say about Mr. Kaplan?

20  A.  I just -- I think he said Mr. Kaplan was not being very

21  cooperative.

22  Q.  Did you follow up on that, say, Who is this person?  Who is

23  Semen Kaplan?  Did you say that to him?

24  A.  I can't recall.

25  Q.  At the time that you spoke with Eric Schmidt, what was your

K8CHJAIH                    Boddy - Direct

1    understanding of who Semen Kaplan was?

2    A.  I don't recall at that specific time if I knew who he was

3    exactly.

4    Q.  Your testimony, just so we're clear, is that Eric Schmidt

5    did not tell you that Semen Kaplan -- let me start again.

6           Your testimony is that Eric Schmidt did not tell you

7    that he possessed a sworn statement of Semen Kaplan saying he

8    did not consider himself a victim of Aberon?

9    A.  I don't --

10   Q.  He didn't tell you?

11   A.  I don't recall that being said to me.  I just don't recall

12   that.

13   Q.  Excuse me for having to follow up in this manner, but is

14   that something you would remember if it was said?

15   A.  It's hard to say because, obviously, this was an

16   investigation that was two years ago, and at the time that I

17   received this information, it was a bit of a surprise that

18   this -- at the time that I had those discussions with

19   Mr. Schmidt, the fact that there was even an SEC investigation

20   was a surprise at the time.  So trying to understand that

21   investigation, what that investigation entailed, was all coming

22   very quickly, and trying to figure out what we could do with

23   that information was something I was trying to process at the

24   time.

25   Q.  Did there come a time when you got documents from the SEC?

K8CHJAIH                    Boddy - Direct

1   A.  There did come a time.

2   Q.  Did you go to the SEC to collect the documents yourself?

3   A.  I think the documents were sent to me via email.

4   Q.  OK.  They were sent by email?

5   A.  If I remember correctly.

6   Q.  Do you still have that email?

7   A.  It's possible.

8   Q.  In preparation for your testimony today, did you look at

9   that email?

10  A.  I did not.

11  Q.  When's the last time you looked at the email?

12  A.  Probably when I forwarded the emails to the U.S. Attorney's

13  Office.

14  Q.  All right.  Did you review the documents that you received

15  from the SEC in the email before you sent them to the U.S.

16  Attorney's Office?

17  A.  I believe so.

18  Q.  Was the affidavit, declaration of Semen Kaplan, one of

19  those documents?

20  A.  That likely would have been included.  I can't remember

21  specifically, but that likely would have been included.

22  Q.  So you believe that you sent the declaration of Semen

23  Kaplan to the Southern District of New York?

24  A.  I believe so.

25  Q.  OK.  All right.  Just one moment.

K8CHJAIH                        Boddy - Direct

1            And that was by email?

2    A.   That probably would have been by email.

3    Q.   OK.  You still have that email?

4    A.   It's possible.  I have not looked at it in a very long

5    time, so I don't know that for a fact.

6    Q.   Did you review any documents in preparation for testifying

7    here today?

8    A.   I did.

9    Q.   What did you review?

10   A.   I reviewed some of my old 302s for this investigation.

11   Q.   Which ones?

12   A.   I reviewed the 302s involving Individual 1.

13   Q.   And it hasn't been in briefing, but that's Joseph

14   Krigsfeld, correct?

15   A.   That's correct.

16   Q.   How many 302s did you review?

17   A.   Four 302s.

18   Q.   What dates, if you recall?

19   A.   The dates of the interviews -- what dates did I review the

20   302s?

21   Q.   No, the dates of the investigation, sir, the dates of the

22   302s.  Why don't we do this:  When we discuss -- and we're

23   going to discuss 302s -- we'll refer to the date, the

24   investigation on date, as the date of the 302.  Is that fair?

25   A.   You mean the date that the interview took place?

1    Q.  Yes.

2              OK.  Now, on a 302, the investigation on date is the

3    date of the interview, correct?

4    A.  That's correct.

5    Q.  What's the usual procedure for when you go -- when you're

6    an FBI agent, you're the case agent, and you go to an

7    interview, you take notes, of course, correct?

8    A.  That's correct.

9    Q.  And then you create a 302?

10   A.  That's correct.

11   Q.  How long do you usually take between taking the notes and

12   creating the 302?

13   A.  It would vary, obviously, depending on the time that I have

14   and the length of the -- how many notes I've taken during the

15   interview.

16   Q.  OK.  So what's a usual time frame?

17   A.  I don't know if there's a usual time frame because if it's

18   an interview that took an hour, there's not going to be a lot

19   of notes.  If it's an interview that took 12 hours, there's

20   going to be a lot of notes that follow.  So if it's a

21   multiple-day interview, there's going to be even more notes.

22   Q.  Now, there's also an entry on a 302 for date drafted,

23   correct?

24   A.  That's correct.

25   Q.  Now, the date drafted, is that the date when an FBI agent

K8CHJAIH                    Boddy - Direct

1  commences drafting the 302?

2  A.  That's correct.

3  Q.  OK.  So if you take two months to draft a 302, the date

4  drafted will still be the first date, correct?

5  A.  The date drafted will show, yes, when you started working

6  on that 302.

7  Q.  OK.  So it's not the date completed, it's the date started?

8  A.  That's correct.

9  Q.  All right.  Then the date of entry, what is that?

10  A.  The date of entry is typically the date your supervisor

11  signs off on a 302.

12  Q.  OK.  Can a supervisor change a 302?

13  A.  I don't know if a supervisor could change it.  Typically,

14  if they have changes, they'll print it out, show you what -- if

15  there's a typo or something and present that to you, and then

16  you make corrections.

17  Q.  Do you have a policy of not recording in a 302 of an

18  interview of an individual references to electronic devices

19  that that individual has?

20  A.  I'm sorry.  Could you rephrase that.

21  Q.  Yeah.  Do you as a matter of course when taking notes,

22  doing a 302, and an individual mentions there might be

23  information on an electronic device, do you intentionally leave

24  that out of a 302?

25  A.  No.  There would be no reason to intentionally leave

K8CHJAIH                    Boddy - Direct

1   pertinent information out of a 302.

2   Q.  So it's something that should be recorded in the 302.  If

3   an individual says, Yeah, well, information on what we're

4   discussing here, I have on my computer, you would record that

5   in the 302?

6   A.  If pertinent information surfaces in an interview, that

7   would likely be included in the 302.

8   Q.  The existence of information on an electronic device is

9   pertinent information?

10  A.  I would consider that pertinent information.

11  Q.  OK.  In the 302s that you reviewed in preparation for your

12  testimony here today, do you see any reference to the two

13  computers and telephone of Joseph Krigsfeld?

14  A.  I do -- I did.

15  Q.  You did?

16  A.  Yes.

17  Q.  Which ones?

18  A.  The first 302.

19  Q.  The first one.  September 28?

20  A.  That's correct.

21  Q.  How about October 3?

22  A.  Also, yes.

23  Q.  It did?

24  A.  Yes.

25  Q.  All right.  Why don't we do this:  Why don't you turn to

1   Exhibit 6.  We're going to go back to it in a minute, but since
2   we're on this subject, we have them numbered.  The numbers are
3   at the top of the page.
4   A.  OK.
5   Q.  Exhibit 6?
6   A.  I have it.
7   Q.  OK.  Thanks.
8           Could you just point out, please, where the reference
9   to the Krigsfeld -- why don't we call the two -- well, let me
10  ask you.
11          What devices did you seize from Joseph Krigsfeld on
12  October 10, 2018?
13  A.  The devices that we took into possession were two computers
14  and a mobile phone.
15  Q.  OK.  I'm going to refer to those as the Krigsfeld devices,
16  OK?
17          Can you just please point out where the Krigsfeld
18  devices are referenced in Exhibit 6, please.
19  A.  Well, those devices -- when those devices came up, we were
20  not specifically told of all the devices that Krigsfeld had in
21  his possession.  I didn't learn about all of the devices until
22  I actually met with Mr. Krigsfeld.
23  Q.  Well, Exhibit 6 is a meeting with Krigsfeld, correct?
24  A.  That's correct.
25  Q.  OK.  And I believe I asked you in the 302s -- well, what

1    did you review for your testimony?  You said, 302s.  I said,

2    Which ones?  Were there references to devices?  You said in the

3    first two, including the October 3.  So now you have the

4    October 3, and I just ask you to please reference the -- point

5    out the reference to the Krigsfeld devices.

6    A.  I'm sorry.  That -- I don't believe that -- actually, I

7    should review because I don't recall specifically.

8            So in this 302, Mr. Krigsfeld makes reference to

9    communicating with Mr. Jain on page 7 in the first paragraph.

10   Krigsfeld typically communicated with Jain through text or

11   instant messenger application, which is a reference to his

12   telephone, his mobile telephone, which was one of the devices

13   that we took into possession on October 10.

14   Q.  OK.  So he was saying he had relevant evidence on a

15   telephone?

16   A.  That's correct.

17   Q.  Any reference to the computers?

18   A.  I did not see reference to the computer on -- in this 302,

19   but we kind of lumped the devices as one thing when we got

20   them.  So we did not -- I wasn't making reference to each

21   specific device being mentioned.

22   Q.  Excuse me.  Other than reviewing the 302s in preparation

23   for testifying here today, did you review anything else?

24   A.  I reviewed some old emails.

25   Q.  What old emails did you review?

K8CHJAIH                    Boddy - Direct

1   A.  I reviewed emails to remind me of the dates that we took

2   possession of the items, of the electronic devices, the two

3   computers and the phone.

4   Q.  How many emails did you review?

5   A.  Maybe 15 or 20 emails.

6   Q.  Who were they with?

7   A.  Variety of people.  There were some emails that were to

8   Mr. Gourevitch, who was Mr. Krigsfeld's attorney.  There were

9   emails between myself and AUSA La Morte.  There were emails

10  between myself and AUSA Adams.

11  Q.  OK.  So you had emails directly with Tara La Morte?

12  A.  That's correct.

13  Q.  And you reviewed them in preparation for your testimony

14  today?

15  A.  That's correct.

16  Q.  What did they say -- well, let me take a step back.

17          How many were there?

18  A.  I don't recall the exact number.

19  Q.  How about approximately?

20  A.  There may have been a couple dozen.

21  Q.  A couple dozen?

22  A.  Or maybe -- no, maybe 15 or so emails.  I don't recall the

23  exact number.

24  Q.  OK.  So are you talking about emails that you had with --

25  between you and Tara La MorteLa Morte during your entire time

K8CHJAIH                      Boddy - Direct

1   as case agent or are you talking about just taking possession

2   of the devices on October 10?

3   A.  I was --

4   Q.  Which are you talking about?

5   A.  I was looking at emails that were specific to kind of the

6   time period of October to January.

7   Q.  October?

8   A.  October 2018 to January of 2019.

9   Q.  OK.  I'm going to ask you just about the time period when

10  you were taking possession of the devices because I understood

11  your testimony to be that the emails that you reviewed were

12  just those -- to remind you of the date you took possession of

13  the devices.

14  A.  There would not have been any direct emails between me and

15  Ms. La Morte regarding the devices at the time that we

16  took possession of the devices.

17  Q.  OK.

18  A.  At that particular time, AUSA Adams was the primary

19  prosecutor handling the case.  And so there were emails where

20  AUSA La Morte was copied on emails, but the primary

21  communication would have been with AUSA Adams or with David

22  Gourevitch, the attorney.

23  Q.  Of those emails that you reviewed -- well, let me ask you a

24  different question.

25                Did you review all of your communications in

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                     Boddy - Direct

1    preparation -- let me start again.

2              In preparation for your testimony today, did you

3    review all your emails between you, Andrew Adams, and Tara

4    La Morte?

5    A.  I did not review all of them.  I reviewed emails within a

6    specific time frame.

7    Q.  What was that time frame?

8    A.  That time frame was October 2018 to January 2019.

9    Q.  OK.  Now, Mr. Jain was arrested in January 2019, correct?

10   A.  That's correct.

11   Q.  You didn't review emails after that in preparation for your

12   testimony today?

13   A.  I did.  I may have reviewed a few in April, but the primary

14   focus was the time period between taking possession of the

15   items and the time that -- until the point that Mr. Jain was

16   arrested.

17   Q.  Why did you pick those to review?

18   A.  Because that period was the period I was trying to make --

19   you know, trying to see exactly what the communications were

20   that took place.  There was a lot of confusion as to taking the

21   devices and there was a lot of confusion surrounding the emails

22   that were reviewed during that time, and I was just trying to

23   remind myself because it was a particularly busy time for me.

24   So I had a foggy memory about that time period, and I was

25   trying to give myself a reminder.

K8CHJAIH                    Boddy – Direct

1    Q.  When you say there was confusion, what are you referring

2    to?

3    A.  There was confusion about how to get access to the emails

4    that we were -- that we had consent to review because we had a

5    hard time accessing them at the very beginning.

6    Q.  OK.  How many of those emails that you reviewed in

7    preparation for your testimony today pertained to the Krigsfeld

8    devices?

9    A.  I don't remember the specific number, but it was a handful.

10   Maybe four or five.

11   Q.  What were the exact dates, if you remember, or the

12   approximate dates?

13   A.  There was an October 9, 2018, email received from

14   Mr. Gourevitch that I reviewed that detailed privilege -- how

15   privileged information would be handled.  There was the

16   discussion about when I would show up to review the devices.

17   Q.  OK.  Discussion with whom?

18   A.  There was discussion with Mr. Gourevitch about when I would

19   show up to Mr. Krigsfeld's residence to pick up the devices.

20   Q.  OK.  Because I believe you said "to review the devices."

21   A.  I'm sorry.  To pick up the devices.

22   Q.  OK.

23   A.  There was an email reflecting -- or there was an email that

24   came in asking when we would be done downloading the contents

25   of the phone and when the phone would be returned, and then

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                    Boddy - Direct

1   there was, I think, a separate email of when the computers

2   would be returned, and then there was a few emails maybe that

3   were -- that dealt with the email issues of us not being able

4   to get authentication to access the emails, the Gmail accounts.

5   Q.  How was that related to the devices?

6   A.  Well, we got access to all that information at the same

7   time, so for me, I kind of lumped those all together.  Because

8   at the time that we took possession of the devices, that was

9   the same day that Mr. Krigsfeld gave us the passwords to gain

10  access to his two email accounts.

11  Q.  OK.

12  A.  So all of those were all kept on one consent form and kept

13  together.

14  Q.  OK.  Did you review any other emails that involved or

15  concerned the Krigsfeld devices in preparation for testifying

16  today?

17  A.  I don't know -- I mean, I don't know that there were that

18  many more emails that involved the devices that I had.

19  Q.  Now, when did you first learn of the existence of the

20  devices?

21  A.  It would have been during probably the first proffer that

22  took place on September 28, 2018.

23  Q.  Then you've testified also that they were discussed in some

24  form on October 3, another proffer session, correct?

25  A.  On October 3 we -- definitely the focus was on the

K8CHJAIH                         Boddy - Direct

1    telephone, but obviously the telephone we also -- I also
2    considered to be one of the devices.
3    Q.  A decision, a determination was made for the FBI to take
4    possession of Joseph Krigsfeld's computers and the telephone,
5    correct?
6    A.  Mr. Krigsfeld provided us with consent, and then we, with
7    his consent, took possession of those items.
8    Q.  Now, someone decided, let's take possession as law
9    enforcement of these devices, correct?  A decision was made to
10   take possession of them?
11   A.  Yes, once we were given permission to take possession of
12   them, we went ahead and took possession of them.
13   Q.  You asked, didn't you?
14   A.  Possibly.  I don't remember exactly how that was presented,
15   but apparently -- I mean, we got consent, so we took possession
16   of them.
17   Q.  Did you want them?
18   A.  Yeah, I did.
19   Q.  OK.
20   A.  But I don't remember if that would have been a request that
21   came from me or request that came from the AUSAs or something
22   that would have been presented to us voluntarily.
23   Q.  Well, let me ask you.  Which was it?
24   A.  I just said I don't recall.  In the three seconds that I
25   said that, I still don't recall.

1   Q.  You don't recall?

2   A.  I don't recall.

3   Q.  You don't recall whether you made the request, whether AUSA

4   Adams made the request, or whether Joseph Krigsfeld or his

5   attorney just said, do you want these?

6   A.  I don't recall.  I do know that at the time that that

7   discussion occurred, they were being very cooperative, but I

8   don't exactly remember how it became decided that we would

9   get -- we would be able to take possession of the devices.

10  Q.  All right.  As case agent is it your decision whether to go

11  ahead and -- even if offered to you, well, here, take a

12  computer, take a phone -- even if they're offered to you, as

13  case agent is it one of your duties to decide, yes, we're going

14  to go take possession of them and we're going to ask you for

15  your consent, and if you consent, we'll take possession?  Is

16  that one of your duties?

17  A.  I don't know if it would be one of my duties, but

18  obviously, as a case team, the case team involves the agent and

19  the prosecutors, and depending on what's in the best interest

20  of the case, that's a joint decision.  If it's something that

21  occurs at the time that you're on an arrest or a search and

22  there's no time to have that discussion, that may be something

23  that you decide unilaterally.

24  Q.  You mentioned that.  Was Joseph Krigsfeld arrested at his

25  house?

K8CHJAIH                    Boddy - Direct

1    A.  He was.

2    Q.  Did you participate in the arrest?

3    A.  I led the arrest.

4    Q.  OK.  Did you see the computers and the phone at the time?

5    A.  I don't recall seeing the computers and the phone at the

6    time.

7    Q.  But, in any event, you did not seize them at that time?

8    A.  They were not seized at the time of the arrest.

9    Q.  OK.  Did you have a search warrant?

10   A.  No.

11   Q.  All right.  Because you mentioned that it would be a joint

12   decision between case agent, the AUSA whether to take

13   possession of the Krigsfeld device, I'm going to ask you again.

14   I know you said you don't remember, but having thought about it

15   for a moment, do you recall any interactions with Andrew Adams

16   or Tara La Morte about the seizures of the -- excuse me, about

17   taking possession of the devices prior to you taking

18   possession?

19   A.  I don't recall.  It would have been with -- if that

20   discussion happened at all, it would have been with Mr. Adams,

21   but I don't recall any such discussion.  It obviously had to

22   have occurred because we would not have taken possession of the

23   items if it did not, but I just don't recall the discussion.

24   Q.  Did you have discussions directly with Joseph Krigsfeld

25   about taking possession of the devices?

K8CHJAIH                    Boddy - Direct

1   A.  No.  I'm pretty certain that that would have been

2   discussions between his -- that would have involved his

3   attorney.

4   Q.  You recall your conversations with David Gourevitch on

5   taking possession of the devices?

6   A.  No.  I think the only communication that I had directly

7   with Gourevitch, that might have been when he emailed me a list

8   of items that were kind of involved with the privilege process

9   in the lead up to us taking possession of those items.

10  Q.  OK.  Is it your understanding that Andrew Adams was the

11  person who primarily dealt with David Gourevitch on taking

12  possession of the items?

13  A.  That was my understanding.

14  Q.  OK.  Were you on emails between Andrew Adams and David

15  Gourevitch?

16  A.  I was on some, but my understanding is that they had

17  communications that I was not involved in.

18  Q.  OK.  But Andrew Adams clearly, your understanding, wanted

19  those devices, correct?

20  A.  That was my understanding.  I mean, like I said, it was

21  kind of a joint decision.  So once we knew that there was an

22  opportunity to get devices, I believe that that probably would

23  have been mentioned to me, and then we would have agreed.

24  Q.  OK.  You took steps to do that?

25  A.  That's correct.

K8CHJAIH                    Boddy - Direct

1   Q.  All right.  What did you do?

2   A.  So once we finalized a date as to when that would take

3   place that fit my schedule and that fit Mr. Krigsfeld's

4   schedule, I made arrangements to meet Mr. Krigsfeld at his

5   residence with another agent, and then we brought consent forms

6   and grabbed -- took the three items.

7   Q.  OK.  Was David Gourevitch there?

8   A.  He was not.

9   Q.  Just Joseph Krigsfeld?

10  A.  Just Joseph Krigsfeld and the agent that accompanied me.

11  Q.  And you took possession of the items, right?

12  A.  That's correct.

13  Q.  Did you let AUSA Adams and -- well, did you let AUSA Adams

14  know you had the devices?

15  A.  There was an email exchanged that they were copied on that

16  showed when we were going to be heading to the location, to the

17  residence, to get possession of the devices.

18  Q.  OK.  Who was copied on that?

19  A.  It would have been -- if I'm not mistaken, it might have

20  been a direct email between myself and Mr. Gourevitch and AUSA

21  Adams, and AUSA La Morte would have been on, was copied on,

22  that email.

23  Q.  How about afterwards, after you took possession of them?

24  Did you confirm, I have the devices?

25  A.  I believe so.

K8CHJAIH                              Boddy - Direct

1    Q.  To who?

2    A.  I think that would have been other email exchanges that

3    would have -- you know what, I don't recall specifically.  I

4    don't know -- I don't know if there was an email about when I

5    took possession of them, but there would have been an email

6    about when I was going to be providing them, giving them

7    back --

8    Q.  OK.

9    A.  -- which would have suggested --

10   Q.  Email about giving them back?

11   A.  I'm sorry?

12   Q.  There was an email about giving them back?

13   A.  That's correct.

14   Q.  Do you recall the date?

15   A.  It might have been October 16, but I don't recall

16   specifically.

17   Q.  Who was on that email?

18   A.  For sure would have had -- I believe Andrew Adams would

19   have been on that email, and it's possible AUSA La Morte would

20   have been on that email as well.

21   Q.  You reviewed it in preparation for your testimony today?

22   A.  I did review it.  I didn't review it yesterday, but I did

23   review it in preparation for my testimony.

24   Q.  What did it say?

25   A.  I think it said the date that I would be bringing the items

1    back to Mr. Krigsfeld.

2    Q.  OK.  Did you receive any response?

3    A.  I don't recall receiving a response.

4    Q.  After you took possession of the devices, what did you do

5    with them?

6    A.  So the moment that the devices were taken into my

7    possession, I brought them to our Computer Analysis Review

8    Team, which is known as CART, and CART imaged all three devices

9    on a system at the FBI.  They documented their review of those,

10   of that search essentially that took place, and then they

11   uploaded the contents of those devices to a review platform at

12   the FBI.

13   Q.  OK.  Including the computers?

14   A.  All three devices, so both computers and the phone.

15   Q.  OK.  So it was uploaded to a review platform?

16   A.  That's correct.

17   Q.  What's the review platform called?

18   A.  I believe it's called the case -- the acronym is CAIR,

19   C-A-I-R.

20   Q.  OK.  Now, is there a link between Sentinel and CAIR?

21   A.  There's not a link between them, but when the forensic team

22   that normally images those items images them, they will write a

23   302 to the case file.  They usually first request whatever

24   legal authority you have for those items.  So in this case they

25   requested that they see the consent forms, then they proceeded

K8CHJAIH                    Boddy - Direct

1    with the imaging.  They documented when they conducted their

2    search and that was uploaded to the case file, and then they

3    subsequently added documentation in the evidence log that

4    showed that -- that reflected when it was uploaded to the

5    platform, when those three items were uploaded to the review

6    platform.

7    Q.  OK.  The review platform CAIR, is that C-A-R-E?

8    A.  C-A-I-R.

9    Q.  Thank you.

10          Now, when you inherit a case and you become the case

11   agent, in reviewing the materials, is one of the things you do

12   to look at what's on CAIR?

13   A.  I've never personally done that.

14   Q.  Did you let -- when you were replaced by Agent Polonitza as

15   case agent in the Aberon investigation, did you tell him there

16   was material on CAIR?

17   A.  I did not.

18   Q.  Why not?

19   A.  At the time that Polonitza -- I had already actually

20   transferred from the squad and learned Polonitza had become the

21   case agent after I had already been off of the squad.  At the

22   time he came on, there were issues involving the production

23   related to the emails that was kind of the highest priority.

24   So I was helping guide him through the process and assisting

25   with the email process at that time.

1    Q.  And that's the reason you didn't tell him about the

2    information on the computers on CAIR?

3    A.  Often when you take over a case, you -- if you have the

4    opportunity to talk to the agent that worked the case before

5    you did, which is not often the case, but in this case it was,

6    you're typically dealing with the most important issue at that

7    time.  And given how there were issues with the email that we

8    had turned over but there were certain technical issues that we

9    were experiencing, there was -- that was the more pressing

10   matter and that became the main focus of the investigation at

11   that time and the focus of our discussions.

12   Q.  So you just never told him about the investigation on CAIR?

13   A.  I never mentioned it.

14   Q.  Did he ever look, as far as you know, on CAIR at all?

15   A.  I'm not certain.  I don't know one way or the other.

16   Q.  Is information on CAIR reflected in the case file?

17   A.  The information in the evidence log would reflect that

18   there was a kind of forensic exam that took place, and it might

19   require -- it might not specifically let you realize that

20   information was uploaded to CAIR, but you would have to reach

21   out to the forensic team to get that information.

22   Q.  What's an evidence log?

23   A.  An evidence log is one of the subfiles within the case

24   file.

25   Q.  It's an important file, isn't it?

1   A.  I would say they're all important files, but, yes, it's an

2   important file as well.

3   Q.  It's the evidence?

4   A.  That's correct.  It's part of the evidence.  I mean,

5   there's other parts of the evidence as well.

6   Q.  All right.  What's an evidence log?

7   A.  An evidence log is -- typically things that you take in

8   your possession are going to be reflected in that evidence log.

9   Q.  For Aberon in this investigation, how many things were in

10  the evidence log?

11  A.  At the time that I transferred, there may have been two

12  things in the evidence log.

13  Q.  What were they?

14  A.  It would have been the fact that this information was

15  uploaded to the review platform; that the three items, the

16  three electronic devices, were uploaded through the review

17  platform; and there might have been a consensual recording that

18  was the second item that was the -- the fact that that took

19  place would have been in that evidence log as well.

20  Q.  OK.  So there was a consensual recording?

21  A.  That's correct.

22  Q.  Were you part of the obtaining of that consensual

23  recording?

24  A.  I was.

25  Q.  Was it with Niket Jain?

1    A.  No.

2    Q.  OK.

3    A.  It was unrelated to Niket Jain.

4    Q.  It was unrelated?

5    A.  It was unrelated.

6    Q.  Did it involve money laundering?

7    A.  That's correct.

8    Q.  Did it involve Aberon?

9    A.  That's correct.

10   Q.  Did you ever produce it in this case?

11   A.  I don't know if it was produced in this case.  It was not

12   produced while I was still assigned to the investigation.

13   Q.  But it involved Aberon?

14   A.  That's correct.

15   Q.  I'm not trying to --

16            THE COURT:  Just ask questions, sir, please.

17            MR. WEINSTEIN:  Thank you.

18   Q.  Has it ever been disclosed, as far as you know, this

19   consensual recording?

20   A.  I don't know.  Once I -- aside from the things that I

21   assisted on the investigation, after I transferred, I have not

22   followed the case very closely.

23   Q.  Was the consensual recording with Semen Kaplan?

24   A.  No.

25   Q.  Was it with Leon Kaplan?

K8CHJAIH                         Boddy - Direct

1   A.  No.

2   Q.  Victoria Crane?

3   A.  No.

4   Q.  Did you contact any of these people, by the way, during

5   your investigation?

6   A.  I did not, no.

7   Q.  Did you try?

8   A.  My understanding is that all of them lived abroad, and

9   there are difficulties trying to -- legal challenges when it

10  comes to trying to contact people that are located in foreign

11  countries.

12  Q.  Did you ask for legal assistance to do so?

13  A.  My understanding is that some of the individuals were

14  located in Russia, and we're not going to get permission to

15  contact a person located in Russia.

16  Q.  So you didn't try?

17  A.  Well, it was kind of -- to try something that I already

18  knew what the conclusion of that would be ahead of time did not

19  really seem like it was a good use of time.

20  Q.  Your understanding, where was Semen Kaplan?

21  A.  My understanding is he was -- he resided in Israel but

22  often would travel between Israel and Russia.

23  Q.  Did you try to contact him?

24  A.  I did not.

25  Q.  Do you know if anyone did?

K8CHJAIH                         Boddy - Direct

1   A.  I'm not aware of anyone trying to contact him.

2   Q.  OK.  When's the first time you read the Semen Kaplan

3   declaration/affidavit?  When did you read it the first time?

4   A.  For whatever reason that one -- I'm aware of there being a

5   deposition.  I just don't recall the specifics of that

6   deposition.  I think my focus was on the depositions of

7   Mr. Krigsfeld and Mr. Jain.

8   Q.  I'm asking about an affidavit.

9   A.  I don't know if I recall reading an affidavit involving

10  Mr. Kaplan.

11  Q.  OK.  What's your understanding of -- well, I'm sorry.

12  Strike that.

13          When is the first time you became aware of the person

14  Leon Kaplan?

15  A.  I definitely knew about Leon Kaplan before Mr. Krigsfeld

16  was arrested.

17  Q.  You knew about him before?

18  A.  I did know about him before.

19  Q.  As part of the Aberon investigation?

20  A.  I don't remember exactly how he surfaced, but I do think I

21  had connected him to the money laundering investigation.

22  Q.  OK.  He was a target of the money laundering investigation,

23  correct?

24  A.  I don't know that he was a target, but the fact that he had

25  a criminal history made me feel that -- you know, when you're

K8CHJAIH                         Boddy - Direct

1   conducting an investigation and you're collecting evidence, you

2   don't necessarily know where that evidence is going to take

3   you.  If the evidence leads you to a person that has been

4   involved in similar activity, that tends to let you believe

5   that you're on the right track of that investigation, but you

6   don't necessarily know where the individuals that surface, how

7   their roles are, where they fit, whether they're subjects,

8   whether they're witnesses, whether they're victims.  I don't

9   remember exactly where I -- where Leon Kaplan fell in that

10  investigation.

11  Q.  You don't recall?

12  A.  I don't recall.

13  Q.  Did you review anything in preparation for your testimony

14  here today that would refresh your recollection on that?

15  A.  Not on that topic.

16  Q.  Not on that topic?

17  A.  Not on that topic.

18  Q.  You don't recall -- well, I believe that you've testified

19  that you reviewed the October 3, 2018, 302 that's Exhibit 6?

20  A.  That is correct.

21  Q.  Doesn't that say that Leon Kaplan is a member of Russian

22  organized crime?

23  A.  That's correct.

24  Q.  It does, right?

25          And that his businesses are protected by a *kryshka*?

K8CHJAIH                          Boddy - Direct

1    A.  That's correct.

2    Q.  What's a *kryshka*?

3    A.  My understanding is it's like an organization -- or kind of

4    a -- it's an organization in Russia.  I guess a criminal

5    organization.

6    Q.  Often with governmental ties?

7                MR. BLAIS:  Your Honor, I'm going to object to this

8    line of questioning.  We're getting quite far afield from the

9    non-production of the devices which is the issue in this

10   hearing.

11   Q.  The information in that 302 says that the investment -- the

12   money that funded Aberon was from Leon Kaplan's illegal

13   activities?

14               THE COURT:  Are you offering the document into

15   evidence?

16               MR. WEINSTEIN:  Yes, your Honor, please.

17               THE COURT:  You haven't yet.

18               MR. WEINSTEIN:  Defendant's Exhibit-- defendant offers

19   Defendant's Exhibit 6.

20               THE COURT:  Any objection?

21               MR. BLAIS:  Your Honor, the document's hearsay.

22               THE COURT:  Are you offering it for the truth of its

23   contents?

24               MR. WEINSTEIN:  I'm offering it for the fact that

25   Joseph Krigsfeld said it, so the answer to that is no.

K8CHJAIH                    Boddy - Direct

1    THE COURT:  OK.

2    MR. WEINSTEIN:  I'm offering it for the purpose of

3    showing that that knowledge was within the purview of the FBI

4    and that Joseph Krigsfeld said it, yes.

5    MR. BLAIS:  So a relevance objection, your Honor.

6    THE COURT:  All right.  I'll take it for what it's

7    worth.  Go ahead.

8    MR. WEINSTEIN:  Thank you.

9    (Defendant's Exhibit 6 received in evidence)

10   BY MR. WEINSTEIN:

11   Q.  Anyway, in October 3, 2018, Joseph Krigsfeld told you that

12   Leon Kaplan, member of Russian organized crime, provided the

13   funds that were invested in Aberon, correct?

14   A.  Provided some of the funds, a majority of the funds.

15   Q.  OK.  That's the same day he told you he had computers,

16   correct?

17   A.  Can't say I recall the specific day that he told us he had

18   computers, but at some point, obviously, we learned that he had

19   computers.

20   Q.  All right.  And you took possession of those computers,

21   correct?

22   A.  That's correct.

23   Q.  It was part of the Aberon investigation, right?

24   A.  That's correct.

25   Q.  Because you felt it had evidence relevant to the Aberon

1   investigation, correct?

2   A.  The one thing I could say is that the -- calling it the

3   Aberon investigation is kind of complicated because there were

4   basically two concurrent investigations that were taking place

5   at the same time.  Obviously, Aberon was involved in both of

6   them, but there was completely different activity and different

7   time frames that had occurred at that time.

8           Up until the SEC contacts my office in April of 2018,

9   my investigation revolved around money laundering that kind of

10  started in 2016 and continued during the time of the

11  investigation.  The investigation that involved Mr. Jain is

12  investigation -- is an investigation that took place at a

13  different time period.

14  Q.  The investigation into Mr. Jain began -- or the time period

15  you're talking about beginning in approximately 2009, correct?

16  A.  That is correct.

17  Q.  With the inception of Aberon, correct?

18  A.  That is correct.

19  Q.  And in the October 3, 2018, 302 that's Exhibit 6, Joseph

20  Krigsfeld told you that the investment of funds at that time,

21  2009, came from Leon Kaplan, correct?

22  A.  If I remember correctly, he said that those funds came from

23  real estate -- real estate deals involving his mother.

24  Q.  That's what he said in the October 3, 2018, 302?

25  A.  I don't remember which of those 302s, but I do remember

K8CHJAIH                              Boddy - Direct

1   having -- being -- having information stating that the money
2   that went towards those investments involved money that came
3   from his mom because of real estate deals that she had in
4   Russia.
5   Q.  On October 3 --
6             THE COURT:  Excuse me.  Came from whose mom?
7             THE WITNESS:  From Krigsfeld's mom.
8             THE COURT:  Thank you.
9   Q.  Well, let's take a look at Exhibit 6.  Going to refer you
10  to -- let's start -- all right.  I'm going to refer you to
11  page 5 of 10, the fourth paragraph down.
12            Are you there?
13  A.  I am there.
14  Q.  OK.  On October 3, 2018, did Joseph Krigsfeld tell you that
15  Semen handled a lot of Leon's business affairs while Leon was
16  on the run?  Did he tell you that?
17  A.  That's correct.
18  Q.  And Leon was on the run, your understanding, from what?
19  A.  He had been charged in an investigation in California and
20  left, fled, before he could serve -- start serving his time.
21  Q.  That was in the 1990s, correct?
22  A.  That's correct.
23  Q.  Doesn't this refer to, actually, an arrest for money
24  laundering in Russia in which Leon Kaplan was extradited to
25  Spain?

1    A.  That is, yes.

2    Q.  And that happened in approximately 2009, right?

3    A.  That's correct, somewhere.

4    Q.  So this says in substance, your understanding, Semen

5    handled a lot of Leon's business affairs while Leon was on the

6    run.  That was in regard to the arrest in approximately 2009?

7    A.  That -- no, because my understanding from the arrest in

8    2009 is that he served time in Spain and was subsequently

9    extradited to Israel, and from my understanding, that was not a

10   case that Spain was pursuing any further, once he was

11   extradited to Israel.

12   Q.  Let me ask you your understanding.  Is this timeline

13   approximately accurate that between 2007 and 2008,

14   approximately, Leon Kaplan was "on the run," believing he was

15   going to be arrested for the crime in Spain, was arrested in

16   Russia in approximately 2009, held in Russia for a period of

17   time, and then extradited to Spain for prosecution for money

18   laundering?  Is that --

19   A.  That's correct.

20   Q.  OK.  Then subsequently, in approximately 2011, expelled to

21   Israel.  Does that sound right?

22   A.  That's correct.

23   Q.  Now, second sentence -- let me read the first one again for

24   context:  "Semen handled a lot of Leon's business affairs while

25   Leon was on the run."  Talked about that.  "This included

K8CHJAIH                          Boddy - Direct

1    Leon's real estate portfolio and his casino business."

2              Joseph Krigsfeld tell you that?

3    A.  Uh-huh.

4    Q.  One of the real estate projects that Semen oversaw was the

5    construction and development of land just outside Moscow near

6    Russian president Vladimir Putin's residence.  Did he tell you

7    that?

8    A.  Yes.

9    Q.  Continues:  "Other projects included developing house" --

10             THE COURT:  Basically, this line of questioning now is

11   to have this witness confirm that the statements in the 302

12   were, in fact, made to him?  Is that it?

13             MR. WEINSTEIN:  Yes.

14             THE COURT:  Is that what you're doing?

15             MR. WEINSTEIN:  Yes.  But also the last sentence says

16   that it's Leon Kaplan's money from the real estate and casino

17   deals, not the mother.

18             THE COURT:  Do you recall what happened here?  So

19   there was an objection.

20             MR. WEINSTEIN:  Yes.

21             THE COURT:  I asked you whether you were offering it

22   for the truth of its content, and you said no.

23             MR. WEINSTEIN:  Correct.

24             THE COURT:  And it's been received.

25             MR. WEINSTEIN:  Yes.

K8CHJAIH                    Boddy – Direct

1          THE COURT:  So that's what I'm not grasping here.

2     What are you trying to do other than to confirm with this

3     witness that when he wrote the 302, he put down what he was

4     told?

5          MR. WEINSTEIN:  This is what I'm doing.  I'm

6     highlighting -- this witness testified, oh, his recollection is

7     that it's the mother's money.  I'm highlighting in the

8     transcript and in the record for your Honor that in the

9     interview on October 3, 2018, with Joseph Krigsfeld, Joseph

10    Krigsfeld stated that the money in Aberon was from Leon Kaplan

11    who was a member of Russian organized crime.

12         THE COURT:  OK.  Now, Mr. Weinstein, the record of

13    this hearing --

14         MR. WEINSTEIN:  Yes.

15         THE COURT:  -- consists of and will consist of the

16    transcript and the exhibits.

17         MR. WEINSTEIN:  OK.  Yes.  And I --

18         THE COURT:  Therefore, it is in the record.

19         MR. WEINSTEIN:  I appreciate that.

20         THE COURT:  When and if I give you an opportunity to

21    sum up or argue or highlight what you think the testimony has

22    established, you're welcome to point out things you want me to

23    focus on.

24         MR. WEINSTEIN:  Thank you.

25         THE COURT:  Let's move on with useful testimony.

K8CHJAIH                     Boddy - Direct

1           MR. WEINSTEIN:  OK.

2           THE COURT:  I'm asking you -- what you want to find

3    out from this witness is did he, in fact, endeavor to write

4    down accurately what he heard?  Is that what you're asking, and

5    you want to do this as to each thing he heard?

6           MR. WEINSTEIN:  No, just this is a critical part,

7    actually.  This is exculpatory.  This is core exculpatory

8    material in this case as to Niket Jain.  It's just

9    fundamentally exculpatory material.  I've linked it already to

10   the computers.  The computers were withheld from Niket Jain.

11   It was the withholding of fundamental exculpatory material

12   along with the affidavit of Semen Kaplan.

13          THE COURT:  Ask your next question.

14          MR. WEINSTEIN:  OK.  And may I say just one word very

15   respectfully?  This is one of the reasons that I wanted to have

16   post-hearing briefing so that I wouldn't have to do this, so

17   that I wouldn't be worried that there would be a decision right

18   afterwards.  I'd be able to, OK.  It's in evidence, pull it

19   out, put it in writing, and present it.

20          THE COURT:  I'll give you an opportunity to sum up if

21   you want an opportunity to sum up.

22          MR. WEINSTEIN:  OK.  Thank you.

23   BY MR. WEINSTEIN:

24   Q.  All right.  I'm going to refer you to Exhibit 3, please.

25   A.  OK.

K8CHJAIH                    Boddy - Direct

1    Q.  You have that?

2    A.  I do.

3    Q.  What's Exhibit 3?

4    A.  Exhibit 3 looks like it's some email exchanges.  Starts

5    off -- oh, it's an email that occurred on October 9, 2018.

6    Q.  All right.  It includes an email from David Gourevitch to

7    you on October 9, 2018, at 11:28 a.m.?

8    A.  That is correct.

9           MR. WEINSTEIN:  Defendant offers Defendant's

10   Exhibit 3.

11          THE COURT:  Any objection?

12          MR. BLAIS:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 3 received in evidence)

15   BY MR. WEINSTEIN:

16   Q.  All right.  Exhibit 3 is an email of a purported agreement

17   with Joseph Krigsfeld, correct?

18   A.  Well, with Joseph Krigsfeld's attorney.

19   Q.  OK.  His attorney.

20          And it has certain provisions in it on purportedly

21   privileged material?

22   A.  That's correct.

23   Q.  Who negotiated this?  Did you negotiate this, this

24   agreement?

25   A.  No.

K8CHJAIH                    Boddy - Direct

1    Q.  Who did?

2    A.  I -- when this information was emailed to me was the first

3    time that I was aware that we were presented with something

4    like this.

5    Q.  All right.  So were you expecting the email?

6    A.  I was not.

7    Q.  After you received the email, what did you do?

8    A.  I don't recall if I did anything at the time that we

9    received the email because the email had information about

10   things that we had not yet received.

11   Q.  All right.  Well, this agreement says that the FBI agrees

12   to something, correct?

13   A.  That's what he's claiming.

14   Q.  Right.

15   A.  But I think, since you have these documents, you would see

16   that there was nothing that was provided on the other end of

17   this.  There was no acknowledgment of this email, I don't

18   think.

19   Q.  Oh, you never agreed to it?

20   A.  Well, I should take that back.  This information came to

21   us, and it was reflective of a review process that we do

22   anyway.  So it was something that was agreed to when we

23   received this information, but it was merely acknowledging

24   something that the FBI does anyway.  We conduct a privilege

25   review when we take possession of things that could have

1    privileged information in them.

2    Q.  OK.  By the way, this -- well, let me take a step back.

3           The FBI procedure is to do its own privilege review

4    and to determine whether the attorney-client privilege exists

5    in something that it seizes?

6    A.  We do a -- there's a separate taint team that will be

7    assigned to review documents to conduct a privilege review.

8    And then with the agent who is part of that process, there will

9    often be a prosecutor who's a part of that process, and they

10   determine whether or not the items that have been flagged as

11   potentially privileged are, in fact, privileged.

12   Q.  OK.

13   A.  Essentially, this email coming in was an email that was

14   kind of highlighting something that we do as a matter of

15   practice anyway.

16   Q.  This email says that the now-defendant, because as of

17   October 10, 2018, Joseph Krigsfeld had been arrested --

18   A.  Correct.  That's correct.

19   Q.  -- as a criminal defendant, this says that the criminal

20   defendant can just segregate any materials he wants?

21          MR. BLAIS:  Your Honor, I'm going to object to this

22   line of questioning.  This is a hearing on Mr. Weinstein's

23   motion to dismiss the indictment which is based on the

24   non-production of the devices.  The review of the privilege --

25   there's a separate government clawback motion which I do not

K8CHJAIH                    Boddy - Direct

1    understand to be the subject of this hearing, and that is being

2    addressed by a taint team process that has been put in place

3    and that is supervised by the Court.  So I don't know that we

4    need to get into all the ins and outs of the claims of

5    privilege that took place when these materials were seized.

6              THE COURT:  Let me hear from Mr. Weinstein.

7              MR. WEINSTEIN:  Yes.  It had been represented by the

8    government in that motion that the FBI had agreed to this.  The

9    case agent is saying, I never agreed to it.

10             THE WITNESS:  No.

11             THE COURT:  Listen, I'm going to excuse the witness.

12   We'll pick up at 2 o'clock.  OK.

13             THE WITNESS:  Yes, your Honor.

14             THE COURT:  Leave the face shield.  No, no, no.

15             THE WITNESS:  I'm sorry.

16             (Witness excused temporarily)

17             THE COURT:  Now, the reason we have a hearing is to

18   test credibility and test propositions, but what I heard you

19   just say doesn't comport with my recollection of what I've

20   reviewed.  And that is, you said the government has said that

21   the FBI agreed, and now he's saying they didn't agree.

22             That's in substance what you just said, right?

23             MR. WEINSTEIN:  I think that his testimony is

24   indicating that, yes.

25             THE COURT:  OK.  No, but you're saying to me,

K8CHJAIH                    Boddy - Direct

1    basically, the government has said that the FBI agreed, and now
2    we learn they didn't.  What I read -- and, again, it may be a
3    lie; that's why we're having a hearing -- is that Gourevitch
4    wrote in his email that the FBI had agreed, and the fact of the
5    matter is the FBI didn't agree until after it got back to him,
6    and getting back to him, they agreed.
7           Now, if your insinuation is that the government lied
8    in this proceeding by telling me that they had agreed when, in
9    fact, they didn't, that doesn't comport with what I was told in
10   the briefing, and I assume you've read it too.
11          MR. WEINSTEIN:  May I state my position?
12          THE COURT:  Have you read the briefing?
13          MR. WEINSTEIN:  I responded in detail to the briefing.
14   Of course.
15          THE COURT:  OK.  Go ahead.
16          MR. WEINSTEIN:  In the briefing, my recollection is
17   that the government represented that this was an agreement that
18   the FBI had with Gourevitch.  And my recollection -- and,
19   again, all right, this is in the middle of testimony.  I'm just
20   letting you know my recollection is that your Honor went into
21   detail with the government on -- this was over the telephone
22   during the pandemic.  Because the agreement just says the FBI,
23   doesn't say the U.S. Attorney's Office, and we had a debate
24   about that --
25          THE COURT:  And then the government said, of course it

K8CHJAIH                    Boddy - Direct

1    binds us.

2            MR. WEINSTEIN:  We had a debate about that.  The

3    government was representing, at least it was the FBI, and the

4    question on the table was whether it was the Southern District

5    as well, and your Honor was questioning that.  But there was no

6    question that based upon this that the FBI had agreed.

7            THE COURT:  No, no, no, no, no.  I think you're

8    confusing things, sir.  The email reflected past tense

9    agreement.  I don't have the email in front of me.

10           MR. WEINSTEIN:  Yes.

11           THE COURT:  I've read it many times.

12           MR. WEINSTEIN:  It's in the packet.  It's Exhibit 3.

13           THE COURT:  OK.

14           MR. WEINSTEIN:  Your Honor has it.

15           THE COURT:  And in truth and in fact, the email, the

16   government has said all along, was, at least I recall this,

17   inaccurate in that respect.  That the FBI had not agreed, but

18   did agree.

19           You look perplexed.  It's not a difficult concept.

20   The email says they had agreed, and they had not yet agreed.

21           MR. WEINSTEIN:  OK.

22           THE COURT:  Then they said what you propose is fine.

23   But it did not reflect an actual agreement that had been made

24   at the time the lawyer hit the send button.

25           MR. WEINSTEIN:  OK.

K8CHJAIH                    Boddy - Direct

1           THE COURT:  You do not recall this?

2           MR. WEINSTEIN:  If that's -- if that's your Honor's

3    recollection, I stand corrected.  As long as there's no

4    agreement, I'm --

5           THE COURT:  No, no, that's not what I said.  That's

6    not what I said at all.  We're not communicating,

7    Mr. Weinstein.

8           My recollection is that the government has taken the

9    position -- again, maybe it's untruthful -- that upon receipt

10   of that email, the FBI manifested its intent to be bound by

11   what the lawyer was describing was an in-place agreement but

12   was not yet an in-place agreement.

13          So do you understand, or am I mistaken?  You know the

14   record.  Am I mistaken?

15          MR. WEINSTEIN:  I think, let me say this:  My

16   understanding of the government's position on this email

17   certainly is that it manifests an agreement that was in place.

18   I agree with your Honor that it doesn't, and this witness is

19   corroborating that.

20          THE COURT:  All right.

21          MR. WEINSTEIN:  But that said --

22          THE COURT:  Mr. Blais, are you familiar with the

23   record on this point?

24          MR. BLAIS:  I am familiar with the record, your Honor.

25          THE COURT:  What's the record?

1          MR. BLAIS:  My understanding, and this is reflected in

2     Agent Boddy's declaration, is that at the time he received this

3     email, there had been no prior discussions about any sort of

4     privilege arrangement or agreement to honor the privilege; that

5     following Agent Boddy's review of this email, he agreed on

6     behalf of the FBI that the FBI would be bound.  That's my

7     understanding of the record.

8          I continue to maintain the objection that this is --

9     to the extent that this is impeachment, it's impeachment on a

10    collateral matter because the privilege issue is being dealt

11    with in a separate manner in this case through the taint review

12    process and that it's not a subject of the motion to dismiss or

13    really relevant to the motion to dismiss in any way.

14         THE COURT:  I think Mr. Weinstein thinks this is just

15    general impeachment because, I guess in his view, the witness

16    has contradicted myself.  My recollection is the same as

17    Mr. Blais'.  I don't know whether anybody has a copy of the

18    document or can find where it was said, but I had the same

19    recollection with regard to this email, and that it was the

20    subject of considerable focus and attention.

21         MR. WEINSTEIN:  May I say two things about this?  One

22    is that I believe we stopped his testimony -- well, two things:

23    One, it just happened to come up.  Of course, we have to talk

24    about -- we're talking about the devices, what the government's

25    knowledge was.  Of course I have to cross-examine him on this

1    email.  It's one of the only emails that the government gave

2    us, so we have to cross-examine on it.

3              And the main point of this, what my main point of this

4    to sum up just a little bit on it, is that this was a very

5    memorable thing.  It was an unusual thing.  It involved Tara

6    La Morte.  It involved Andrew Adams.  It involved a case agent

7    where he's -- where it appears that the defense lawyer is

8    representing that the criminal defendant here can segregate

9    anything he wants, and the government is agreeing to never look

10   at it, an agreement that the government claims actually is in

11   place here, which is, respectfully, inappropriate because it

12   allows a criminal defendant to just insulate exculpatory

13   material.  And to sum up a little bit, it actually happened

14   here.  Joseph Krigsfeld segregated the Semen Kaplan affidavit.

15   It's in the privilege log.  So he took up, Joseph Krigsfeld and

16   Gourevitch took up, the government on its offer and segregated

17   the exculpatory evidence.  So it's very -- it's critical here.

18             Now, it happened to come up just because he testified

19   about it.  Now counsel for the government says that in the

20   affidavit, his affidavit, the agent said that he later agreed.

21   We stopped the testimony.  I believe the agent was about to say

22   he didn't later agree and that --

23             THE COURT:  Well, that's why I excused the witness, so

24   his testimony wouldn't be tainted, Mr. Weinstein.  We didn't

25   stop.  I excused the witness.

K8CHJAIH                         Boddy – Direct

1         MR. WEINSTEIN:  OK.  I don't know.  OK.  Fair.

2         THE COURT:  Good.  See you at 2 o'clock.

3         MR. WEINSTEIN:  OK.  Thank you very much.

4         THE COURT:  You're quite welcome.

5         (Lunch recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K8CHJAIH                          Boddy - Direct

                          AFTERNOON SESSION

1                              2:15 p.m.

2

3              (Hearing resumed)

4              THE COURT:  All right.  Bring in the witness, please.

5         OK.  Whenever you're ready, Mr. Weinstein.

6              MR. WEINSTEIN:  Thank you.

7    WAYNE BODDY, resumed.

8    DIRECT EXAMINATION CONTINUED

9    BY MR. WEINSTEIN:

10   Q.  I'll wait for the witness to put gloves on.  Ready to

11   proceed?

12   A.  Sure.  I can put these on and talk at the same time.

13   Q.  OK.  Good afternoon, Agent Boddy.

14   A.  Good afternoon.

15   Q.  I'm going to ask you a couple more questions about

16   Exhibit 3, the October 9, 2018, email.

17   A.  Sure.

18   Q.  All right.  Did the FBI agree to the arrangement that's

19   reflected in Exhibit 3?

20   A.  The FBI did agree to that arrangement.

21   Q.  OK.  How was that done?

22   A.  I believe I agreed -- there might have been email response

23   back, but there were email discussions as we were trying to

24   gain access to the email account to where I spoke directly with

25   Mr. Gourevitch and let him know that we were agreeing to what

K8CHJAIH                    Boddy - Direct

1    he had written in the email.

2    Q.   Excuse me.  I'm sorry.  I didn't hear you.

3    A.   I'm sorry?

4    Q.   I didn't hear the last response.

5    A.   I had -- I had email discussions with Mr. Gourevitch where

6    we were discussing how to gain access to Mr. Krigsfeld's emails

7    where I was letting him know that I had acknowledged receipt of

8    the email, and we were honoring what was in the email.

9    Q.   Do you have emails that say that?

10   A.   I believe there was one email where we said we would

11   conduct a privilege review.

12   Q.   And were you referring to the computers?

13   A.   I was referring to everything that we were getting

14   possession of.

15   Q.   OK.  You were referring to the computers and you were

16   referring to the telephone?

17   A.   And the emails, the email accounts.

18   Q.   And the email accounts.  All of that?

19   A.   All of that stuff.

20   Q.   Do you still have that email?

21   A.   I believe so, yes.

22   Q.   OK.  Did you look at it in preparation for your testimony

23   today?

24   A.   I did.

25   Q.   Was Tara La Morte on that email?

K8CHJAIH                    Boddy - Direct

1   A.  I don't think so.  I think it might have just been emailed

2   directly between Mr. Gourevitch and myself.

3   Q.  Did you conduct a privilege review?

4   A.  We did not.  I never reviewed the electronic devices, so

5   that process never got started.  And then in my discussions

6   with Mr. Gourevitch, we had made -- we agreed, in terms of

7   trying to speed up the time, that I would avoid accessing the

8   files that were in the folders that he set aside that were

9   labeled "privileged" and then just access files directly from

10  the pertinent folders that were not labeled "privileged," which

11  we agreed to.

12  Q.  You did that?

13  A.  I'm sorry?

14  Q.  And you did do that?

15  A.  I did.  I did an overall download of all the emails, but my

16  review consisted of only accessing emails that were in the

17  accounts that were not privileged.

18  Q.  Now, I believe what you're testifying to -- let me take a

19  step back.

20          There are two computers, correct?

21  A.  That's correct.

22  Q.  There's a telephone?

23  A.  That's correct.

24  Q.  You were also given access to email accounts?

25  A.  That's correct.

K8CHJAIH                          Boddy - Direct

1    Q.   Which email accounts?

2    A.   There was an email account for Mr. Krigsfeld's personal

3    Gmail account, and then there was an email account for his

4    Aberon emails specific to the company.

5    Q.   Is it your testimony that within those email accounts, when

6    you directly accessed them, some emails had been removed and

7    put in a privileged folder?

8    A.   Emails were -- I don't know if emails were removed, but

9    there were folders that were within those email accounts that

10   were -- some were considered -- some were called privileged.

11   They were given certain titles, the folders within the email

12   account.

13   Q.   And this is in the email account that you -- that you just

14   gave the email addresses for that you directly accessed using

15   Joseph Krigsfeld's password?

16   A.   That's correct.

17   Q.   Did you do a privilege review of what had been segregated?

18   A.   At that time, the privilege review did not occur.

19   Privilege review occurred separately with Mr. Polonitza, but

20   when we -- when I first accessed the emails, I did not conduct

21   a privilege review.

22   Q.   So you believe that Agent Polonitza actually did a

23   privilege review of the segregated email?

24   A.   That was -- I don't know that he did the review, but I

25   think he oversaw the process.  Typically, the privilege review

K8CHJAIH                    Boddy - Direct

1    is not going to involve the agents that are working on the

2    investigation.

3          THE COURT:  Excuse me one second.

4          Because this is a public proceeding and because of

5    difficulties in access to the courthouse, the proceedings are

6    available to the public on the public access line.

7          Go ahead.

8    A.  So my understanding is that Agent Polonitza oversaw a

9    privilege review, and I assisted with the pertinence review of

10   emails at a later date.  But at that time that we took

11   possession of the emails and immediately after, a privilege

12   review was not conducted.

13   Q.  OK.  Now, were there segregated files on the computers as

14   well?

15         MR. BLAIS:  Your Honor, I'm going to continue -- I'm

16   going to renew my objection to this line of questioning

17   regarding the privilege determinations and the privileged

18   nature of various materials.  It's my understanding that's not

19   the subject of the motion to dismiss and that's not the subject

20   of this evidentiary hearing.

21         MR. WEINSTEIN:  And the reason -- if I may, the reason

22   I'm asking that is because the agent went through a

23   conversation that he had with Agent Polonitza about how to do

24   the privilege review for the email.  I was about to ask the

25   agent, signaling what I'm about to ask, whether he did the same

K8CHJAIH                          Boddy - Direct

1   thing for the devices, which would have alerted Agent Polonitza

2   to the devices, which is a critical part of this -- or I should

3   say a part of this hearing.  That's where I was going with

4   that.

5            THE COURT:  Overruled.  Go ahead.

6            MR. WEINSTEIN:  All right.

7   A.  To date, from October 10, 2018, to present, I have never

8   reviewed the computer -- either of the two computers.  So no

9   privilege review that I'm aware of while I was involved with

10  the case ever occurred on the computers.

11  Q.  Did anyone review the computers?

12  A.  From the -- from my understanding, the only individual --

13  the only review would have taken place when the computers were

14  imaged and uploaded to the review system, which would have

15  occurred in October of 2018.

16  Q.  And who did that review?

17  A.  That was the CART team that I had mentioned previously.

18  Q.  So from that time until you left this investigation in

19  2019, you never looked?

20  A.  No.

21  Q.  Did anyone ever look?

22  A.  Not that I'm aware of.

23  Q.  Were the data on the computers provided, as far as you

24  know, to any other agent or law enforcement agency?

25  A.  No, not that I'm aware of.

K8CHJAIH                        Boddy - Direct

1   Q.  So they were downloaded on a review platform and never

2   touched?

3   A.  That's correct.

4   Q.  Did you make the decision to not touch them?

5   A.  At the time that they were downloaded, I had already

6   started reviewing the emails, and my understanding from the

7   time that we received the electronic devices is that the

8   electronic devices would have evidence that was consistent with

9   the money laundering investigation that was separate and that I

10  would resume looking into -- or I would start to look into the

11  electronic devices once we had resolved the securities fraud

12  investigation.

13  Q.  OK.  So you were going to wait to look at the devices until

14  this case was over?

15  A.  Correct.

16  Q.  Because it only had information on money laundering?

17  A.  That was my understanding.

18  Q.  OK.  Was part of your investigation on the money laundering

19  that Leon Kaplan was involved with the money laundering?

20  A.  No.  The individual that I had identified as the main

21  subject of the money laundering was an individual that lived in

22  Brooklyn previously but was residing in Switzerland, and that

23  individual had processed credit card transactions and bank

24  account information illegally and had moved money from a bank

25  account through Aberon to foreign accounts.  That information,

1   as I saw it, did not -- was not originated in the same way that

2   funds that went through Aberon as part of their securities

3   scheme had occurred earlier.  Those two things presented

4   themselves completely separately.

5   Q.  OK.  As part of your investigation on the money laundering

6   including the person in Brooklyn, did it involve Autumn Leaf?

7   A.  That's correct.

8   Q.  OK.  Wasn't Autumn Leaf created by Leon Kaplan?

9   A.  He was involved with the company, that's correct.

10  Q.  So the money laundering investigation, I'll ask you again,

11  did it involve Leon Kaplan?

12  A.  Yes.

13  Q.  OK.  Thank you.

14          But you were going to wait to look at the

15  computers -- strike that.  You answered that.

16          All right.  Mr. Jain was arrested in January of 2019,

17  correct?

18  A.  That's correct.

19  Q.  There came a time when you compiled documents, data, for

20  production to Mr. Jain in discovery, correct?

21  A.  That's correct.

22  Q.  Start at the beginning.  What was your process?  What did

23  you do?

24  A.  There was a request for the emails that we had compiled for

25  Mr. Krigsfeld that AUSA La Morte requested, and so I provided

K8CHJAIH                          Boddy - Direct

1    those emails to her.  And then a separate request came in for

2    the emails that we had obtained for Mr. Jain via search warrant

3    that was requested, and I provided those emails to AUSA

4    La Morte.

5    Q.  How did AUSA La Morte communicate those requests to you?

6    A.  I believe those were communicated through email.

7    Q.  Did you review those emails in preparation for your

8    testimony today?

9    A.  Yes.

10   Q.  Did those emails say:  Please review the case file for

11   discovery?

12   A.  I don't recall that being the request.

13   Q.  Well, how long did you review those emails?

14   A.  I think I reviewed them prior to the declaration.  Yeah,

15   prior to the declaration that went in.  And then, obviously --

16   Q.  You're talking about your -- you did a declaration and a

17   supplemental declaration that are Exhibits 1 and 2 before you

18   respectively, correct?

19   A.  That's correct.

20   Q.  By the way, who drafted those?  Did you draft them

21   yourself, type them out?

22   A.  I didn't type them out, no.  The declarations?

23   Q.  Yes.

24   A.  No, I didn't type those out.

25   Q.  Did you dictate them to an AUSA?

K8CHJAIH                         Boddy - Direct

1    A.  I had -- the AUSA and I spoke about what had occurred.  He

2    typed those out and then provided me with drafts of those

3    statements that I signed off on.

4    Q.  Which AUSA?

5    A.  Samuel Raymond.

6    Q.  Did you tell Samuel Raymond when you were preparing your

7    declaration:  "I also understand that the email" -- this is the

8    October 9 email -- "bound the U.S. Attorney's Office no less

9    than it bound the FBI"?  Did you say that to him?

10   A.  That's correct.

11   Q.  You said that to him?

12   A.  That's correct.

13   Q.  OK.  What was the basis of your understanding?

14   A.  My understanding of what?

15   Q.  That the -- well, the October 9 email that is Exhibit 3

16   only mentions the FBI as being bound, is that correct?

17   A.  It does mention that.

18   Q.  OK.  Fair enough.  What's the basis for your understanding

19   that it bound the U.S. Attorney's Office?

20   A.  I typically view the case team as a team, and obviously

21   they were -- AUSA Adams was copied on that communication.  So

22   my understanding -- when I received that, like I said, it was a

23   bit of a surprise to receive.  I understood that as that might

24   have been a discussion that AUSA Adams had with Mr. Gourevitch

25   and then they were relaying their discussion through email to

K8CHJAIH                    Boddy - Direct

1    me, but I understood that to be something that AUSA Adams and

2    AUSA La Morte and myself were all in agreement with.

3    Q.  It was your understanding that the October 9, 2018,

4    agreement that's Exhibit 3 bound the FBI?

5    A.  Yes.

6    Q.  OK.  So you made sure that that agreement was documented by

7    putting it in the case file to make sure that after you weren't

8    the case agent anymore, the FBI would know that there was such

9    an agreement for these devices?

10   A.  I did not document that in the case file.

11   Q.  How would others at the FBI even know of the existence of

12   the October 9, 2018, email?

13   A.  They would not have been aware of it without me documenting

14   it.

15   Q.  Did you document it?

16   A.  No, I did not.  But to add to that, the email outlined

17   information that is something that we typically do, which is a

18   privilege review when we gain access to emails and other

19   documents that may have privileged information.  So,

20   essentially, the email was asking us to agree to something that

21   as a matter of practice we do in the -- during the course of

22   the investigation anyway.

23   Q.  OK.  Now, does the October 9, 2018, email that's Exhibit 3

24   state that neither the documents or -- yeah, the documents or

25   data on the Krigsfeld devices that are designated as privileged

K8CHJAIH                    Boddy - Direct

1   cannot be reviewed by a taint team?

2   A.  I don't recall that being in there.

3   Q.  It's not your -- that's not your understanding?

4   A.  Well, my follow-up to that email was that a taint team

5   would review that information.

6   Q.  Even the documents designated as privileged?

7   A.  That's correct.  It would be a taint team that's separate

8   from the investigative team that would review the documents

9   that are privileged, which is standard procedure.

10  Q.  OK.  Because the FBI doesn't let a target of a criminal

11  investigation or a defendant alone decide what's privileged and

12  preclude the review of the FBI, correct?

13  A.  I mean, typically those discussions don't take place.  So

14  that is correct that you're not going to have someone tell you

15  those things, but at the same time, like I said, this was an

16  agreed-upon -- I felt like they were agreeing upon something

17  that we typically do, and I did not find any issues with it.

18  Q.  So let's go back to compiling the evidence.

19          When you were compiling the evidence, did you

20  interact, communicate primarily with AUSA La Morte?

21  A.  At the time that I compiled the evidence, I predominantly

22  interacted with AUSA Adams.  La Morte didn't really get

23  involved in the investigation kind of full-time until the lead

24  up to the arrest of Mr. Jain.

25  Q.  Let me be more clear.  After the arrest of Mr. Jain and you

1    were compiling the evidence for discovery, did you primarily

2    communicate with AUSA La Morte?

3    A.  That's correct.

4    Q.  You've reviewed the emails in which AUSA La Morte requests

5    you to provide items for discovery?

6    A.  That's correct.

7    Q.  Did she, AUSA La Morte, make a request for all evidence

8    from the case file?

9    A.  If I remember correctly, there were specific requests, and

10   there were -- specific requests were for the emails.  First the

11   emails, Mr. Krigsfeld's emails, and then Mr. Jain's emails.

12   Q.  Just those?

13   A.  Those were -- yeah, those were the items that were

14   requested, and those were the items that were given.

15   Q.  Anything else?

16   A.  That's all I recall.

17   Q.  So the only thing that you produced from the case file was

18   email?

19   A.  Was those two batches of emails.  There were -- 302s had

20   not been produced.  Subpoena returns had not been produced.

21   There were other items that had not been produced at that point

22   in time.

23   Q.  Did you have any conversations about this over the

24   telephone with AUSA La Morte?

25   A.  Not that I could recall.  We -- typically, communication

1    with her was via email.

2    Q.  Prior to -- this is January 2018, correct?

3    A.  2019.

4    Q.  2019.

5            You had been on squad C43 for approximately seven

6    years?

7    A.  Seven years at the time that I left the squad.  So this

8    would have been --

9    Q.  Have you ever before that time compiled discovery in a

10   pending criminal case as case agent?

11   A.  I had once before, the year prior, and all of those came in

12   as individual requests for items.  All of the remaining cases

13   resulted in guilty pleas, so we never finalized the discovery

14   process.

15   Q.  So is your testimony you had no conversations with AUSA

16   La Morte about what was in the case file and what should be

17   produced?

18   A.  I do not recall any such conversations.

19   Q.  And you just waited for a request from AUSA La Morte on

20   what was necessary to be produced?

21   A.  That's correct.

22   Q.  Your testimony, though, is that AUSA La Morte was not the

23   primary prosecutor during much of the investigation of the

24   Aberon case up to the arrest of Niket Jain, isn't that right?

25   A.  That's correct.

1  Q.  So you knew that AUSA La Morte may not be aware of all the

2  information that had been gathered in the case file, isn't that

3  right?

4  A.  I wouldn't say that.  I mean, obviously, there's

5  communications that are taking place with sometimes AUSA

6  La Morte there with AUSA Adams.  There's emails that are

7  reflecting some of the communications that are taking place.

8  So I can't speak for what she was aware of or not aware of

9  because, obviously, we didn't have those conversations.

10  Q.  OK.  Was AUSA La Morte aware that you had reviewed

11  information on Krigsfeld's telephone?  Was she aware of that?

12  A.  I don't recall because that -- I don't know if -- I don't

13  recall us having discussions about that, because at that time

14  it was still predominantly AUSA Adams that was involved in the

15  case.

16  Q.  Did you consider whether the Krigsfeld devices might have

17  exculpatory material as to Niket Jain?

18  A.  That was not something I ever considered.

19  Q.  You did not consider that?

20  A.  It was not -- it was not a conscious thought that I had at

21  that time or at any time.

22  Q.  OK.

23  A.  What I can say, though, is that obviously in reviewing the

24  emails, there was quite a few emails that were reviewed, and

25  any such material might have presented themselves there.  But I

K8CHJAIH                      Boddy - Direct

1   don't recall thinking that there were items specific to

2   Mr. Jain, exculpatory or not, on the devices.

3   Q.   Because you didn't know what was on the devices?

4   A.   I didn't know what was on the two computers.

5   Q.   All right.  I'm going to refer you to -- well, I'm going to

6   refer you to Exhibit 8.  You have that in front of you?

7   A.   Just a second.  Yes.

8   Q.   Have you ever seen this before?

9   A.   I do not think so, no.

10  Q.   All right.  Take a look at it.  It indicates on the front

11  that it is a transcript of the February 14, 2019, arraignment

12  of Niket Jain in this case, and it's already part of an

13  affidavit.

14       It's part of the motion in this case, but I'll offer

15  it, Exhibit 8.

16              THE COURT:  Any objection?

17              MR. BLAIS:  No objection.

18              THE COURT:  Received.

19         (Defendant's Exhibit 8 received in evidence)

20  BY MR. WEINSTEIN:

21  Q.   I'm going to ask you to turn to page 3, please.

22  A.   OK.

23  Q.   Take a look at from the top of the page as the Court is

24  speaking through the following statement of Ms. La Morte.

25  A.   Uh-huh.

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                    Boddy - Direct

1    Q.  You see that?  Tell me when you're done, please.

2    A.  I'm done.

3    Q.  So Ms. La Morte states a number of -- is it fair to say

4    Ms. La Morte is asked what discovery is being produced in this

5    case, and Ms. La Morte gives a list of things?

6    A.  That's correct.

7    Q.  Do you recognize that entire list?

8    A.  Yeah, I'm familiar with the list.

9    Q.  Did she ask -- did AUSA La Morte ask you for all those

10   things?

11   A.  I don't recall being asked for those things.  Yeah, I don't

12   recall being asked for those things.

13   Q.  OK.

14   A.  Certainly not at the time that this hearing took place.

15   Q.  When?

16   A.  What's that?

17   Q.  When, then?

18   A.  I don't recall.  I could specifically say that I don't

19   recall it being at that time, but I don't recall being asked

20   for these things.

21   Q.  Do you recall having any conversation -- well, I guess

22   you've asked.

23         You don't remember being asked about any of these

24   items?

25   A.  I don't.

1    Q.  Did you have any conversation after this statement of

2    Ms. La Morte with Ms. La Morte and say:  Is there anything else

3    you need?  Do you want me to look through the file?

4    A.  I did not.  No, like I said, my prior experience was

5    typically we would have that discussion or things would be

6    requested.  It was kind of a compartmentalized process just

7    because you're often working on other investigations in

8    addition to the one that you're currently working on.  And so,

9    typically, requests would come in, and when those requests came

10   in, you provided those items.

11   Q.  Did Ms. La Morte know that you had never reviewed the

12   Krigsfeld computers, that you had never done it?  Did she know

13   that?

14   A.  I have no idea because I never discussed the computers with

15   Ms. La Morte.

16   Q.  OK.  So you didn't tell her, AUSA La Morte:  I haven't

17   gotten to the computers yet?

18   A.  Having never discussed them with her, that would not

19   have -- that would not have been stated.

20   Q.  So you also didn't say to her, of course:  I'm not going to

21   review them until later.  I've made the decision because I've

22   made the decision that the only relevant evidence on these

23   devices is to a money laundering investigation?  Did you tell

24   her that?

25   A.  I had no such discussion with her.

K8CHJAIH                          Boddy - Direct

1   Q.   Did you tell anyone that?

2   A.   No.

3   Q.   You just -- but you made the decision yourself?

4   A.   There was a communication in November of 2018 when it

5   appeared that discussions had taken place that indicated that

6   Mr. Jain was more involved with the scheme than we had

7   previously realized, and there's a communication between

8   Mr. Adams and I where Mr. Adams says:  I know that you are

9   chasing other leads, but we're thinking that we may indict

10  Jain.  Can you start to gather the hot emails involving

11  Mr. Jain?  And it's at that time that the stuff that I had

12  prior, was looking at before involving the money laundering

13  investigation, that that gets set aside to start focusing on

14  the investigation, seeing if there's an -- if the facts will,

15  in fact, implicate Mr. Jain, and the evidence was overwhelming.

16              THE COURT:  And when you say "the evidence," is this

17  from the Gmail accounts of Mr. Krigsfeld.

18              THE WITNESS:  That's correct, your Honor.  From that

19  point on I started looking at the email accounts for

20  Mr. Krigsfeld, both the Aberon Gmail account and his personal

21  account, because at one point they are using just their Aberon

22  account and then the information shifts over to personal email

23  accounts.  And I start that review process pretty heavily.

24              THE COURT:  All right.  Is that information that

25  Ms. La Morte asked you for at or about the time of Mr. Jain's

1  arrest, somewhere between Mr. Jain's arrest and this conference

2  on February 14?

3          THE WITNESS:  That's correct.  When she asked for

4  those emails, those are the emails that I had reviewed in the

5  lead up to Mr. Jain's arrest that I provided to her.

6          THE COURT:  All right.  Was it all emails on

7  Krigsfeld's and the business' account or just, as you described

8  it, somebody described it, as hot documents?

9          THE WITNESS:  It was all emails.  So Gmail -- part of

10 why I could not separate the emails that I was looking at is,

11 ideally, I was only going to download emails that were in the

12 files that did not include the files that I told Mr. Gourevitch

13 I would not look at, and then I realized that wasn't possible.

14 So I downloaded the entire email box as an inbox file, and that

15 was what was turned over to Ms. La Morte.

16         THE COURT:  OK.  So what you turned over to her also

17 would have had the privilege folder?

18         THE WITNESS:  That's correct.

19         THE COURT:  Labeled as privileged?

20         THE WITNESS:  That's correct.

21         THE COURT:  OK.

22 BY MR. WEINSTEIN:

23 Q.  Is that the same privilege folder that is on the computers?

24 A.  I don't know how the computers were configured because I

25 never reviewed them.

1    Q.  Now, you stated that the reason that you didn't look in the

2    computers is because AUSA Adams told you, we're now focusing on

3    Jain?

4    A.  It -- that email from AUSA Adams did shift the focus for

5    the investigation at that time.

6    Q.  OK.  I asked you the reason that you didn't look in the

7    computers was -- and I believe you testified it was because you

8    had been told by AUSA Adams that the focus had shifted to Jain?

9    A.  Well, the focus had picked up on the SEC investigation, so

10   the money laundering investigation got set aside, meaning that

11   the electronics which involved the money laundering

12   investigation got set aside so that I could focus on the

13   securities fraud investigation.

14   Q.  What is your basis for the conclusion that the computers

15   were only relevant to a money laundering investigation?

16   A.  When -- I kind of associated the electronics together, and

17   during the October 3 proffer that we had with Mr. Krigsfeld,

18   Mr. Krigsfeld had shown me communications between an individual

19   that was involved in the money laundering investigation.  And I

20   think at that time, because of that evidence being shown to us,

21   I just kind of lumped those three as being involved in that

22   money laundering investigation all together, but that was kind

23   of my basis.

24   Q.  OK.  So because Joseph Krigsfeld showed you information on

25   a money laundering investigation involving Autumn Leaf on a

1    telephone, you decided not to look at two computers because you

2    thought that the computers would only have money laundering

3    information?

4    A.  I did associate the computers with the money laundering

5    investigation, but I also started looking at other items

6    that -- for the securities fraud investigation.  At that point

7    the securities fraud investigation was still ongoing where

8    Mr. Krigsfeld had not yet entered a guilty plea, nor had we

9    figured out who were other subjects that were involved in the

10   investigation.  So I had to set aside what I thought was a

11   money laundering -- a separate money laundering investigation

12   to continue to investigate the securities fraud investigation.

13   Q.  Now, what's the basis for your belief that the computers,

14   apart from the phone, were only associated with the Autumn Leaf

15   money laundering investigation?  What's the basis for that?

16   A.  It was just how I understood the information that I got

17   from Krigsfeld.  Without knowing what's on the devices and

18   without having specific discussions about the devices, I just

19   kind of concluded in my head that the investigation that was

20   current, meaning the one that was still ongoing, which was the

21   money laundering investigation, that there was evidence of that

22   on the devices that he was going to make -- that he was making

23   available to us.

24   Q.  Did Joseph Krigsfeld tell you that?

25   A.  He did not tell me specifically, but like I said, the

1  devices that he provided to us were devices where we had

2  explicitly discussed the money laundering, and I associated

3  those three devices together.

4  Q.  OK.  Now, I believe your testimony -- and correct me if I'm

5  wrong, please -- is that you only discussed with Joseph

6  Krigsfeld that there was information on the money laundering on

7  the telephone, not the computers?

8  A.  He -- that information came up because he discussed

9  receiving money from an individual and then provided the actual

10  app communications that he had with that individual.  So

11  certainly that was a lead and a lead that I started to chase

12  down, but that was how that phone even came up.  Prior to that,

13  there were not really any in-depth discussions about the

14  devices.

15  Q.  I'm asking about the computers.  Did you discuss with

16  Joseph Krigsfeld whether there was information about Aberon on

17  the computers?

18  A.  I did not.

19  Q.  Did you believe there was information about Aberon on the

20  computers?

21  A.  At that time I didn't -- I did not kind of connect those

22  two things.

23  Q.  It was an Aberon investigation, correct?

24  A.  It is.

25  Q.  You seized -- excuse me, you consensually took possession

1   of two computers in the Aberon investigation, isn't that

2   correct?

3   A.   That's correct.

4   Q.   Because you believed that there was evidence regarding

5   Aberon on the computers, correct?

6   A.   Like I said, in my -- whether rightly or wrongly, I had

7   associated it as a separate money laundering investigation and

8   kind of proceeded as much.  When you're juggling several

9   investigations at once, you tend to compartmentalize how you do

10  things to keep things straight, and my way of

11  compartmentalizing this case which started out as what I

12  believed to be a separate money laundering investigation with

13  certain subjects, had then turned into an SEC investigation

14  with different subjects, those -- I had separated those cases

15  in my head and worked them as such.

16  Q.   OK.  Did you pursue a money laundering investigation --

17  well, strike that.

18          I'm going to refer you to your supplemental

19  declaration, which is Exhibit 2.

20          I'll offer the declarations 1 and 2.

21          THE COURT:  Any objection?

22          MR. BLAIS:  No objection, your Honor.

23          THE COURT:  Received.

24          (Defendant's Exhibits 1 and 2 received in evidence)

25  BY MR. WEINSTEIN:

1    Q.   Do you have 2 in front of you?

2    A.   I do.

3    Q.   Paragraph 7 at the bottom of page 2 reads -- are you there?

4    A.   I am.

5    Q.   "Part of the reason why I did not remind AUSA La Morte of

6    the devices during our conversation about discovery in the

7    prosecution of Jain is that I considered the devices to be

8    almost wholly related to the money laundering investigation

9    connected to Krigsfeld, not the securities and wire fraud

10   charges against Jain."

11        You see that?

12   A.   Yes.

13   Q.   All right.  And you state "Part of the reason why I did not

14   remind"?

15   A.   Yes.

16   Q.   What was the other part?

17   A.   The other part was I obviously didn't know that she had

18   forgotten -- or wasn't aware of such information.  So I just

19   didn't -- the reason why I didn't bring it up is I didn't know

20   there was something that was necessarily forgotten because, as

21   I said before, the discovery process had not completed while I

22   was still involved with the case.  So with there still being

23   outstanding items that were requested, I didn't know that there

24   were any representations that the discovery process was done.

25   Q.   All right.  So you were thinking you might hand it over

K8CHJAIH                          Boddy - Direct

1   later?

2   A.  Well, I was thinking we'd probably have a discussion

3   because the weird thing about this case, I had never worked a

4   case where there were concurrent crimes that were being

5   investigated involving what -- with some overlap.  So I

6   remember just being confused.  How do we handle that from a

7   pertinence standpoint or from, you know, didn't -- I'm like,

8   when that topic comes up, we'll probably have that discussion

9   as to how to handle this, but I'll wait until that topic comes

10  up.

11  Q.  Did you make a decision not to mention the computer and the

12  phone, the Krigsfeld devices, because you did not want to

13  produce evidence of an ongoing investigation?

14  A.  No.  The fact that I documented when I took possession of

15  the computers, I documented or copied on emails prosecutors

16  when I went to go retrieve the computers, and the fact that the

17  team that conducted the forensic analysis documented all those

18  things in a case file which is typically turned over suggested

19  that I made every -- took every step necessary to make -- to

20  have those cases available -- or have the fact that we took

21  possession of those available.  There was no decision that I

22  made to consciously not turn anything over.

23  Q.  But you did make a conscious decision not even to review

24  it?

25  A.  I did make a conscious decision because, unlike when we are

1    getting something pursuant to a search warrant, you're not

2    under the same time constraints as to whether or not that

3    search warrant is going to become stale when you take something

4    by consent.  So when you're trying to decide what you're going

5    to prioritize in the amount of time that you have to review

6    something, you can't often review it all at once, so you have

7    to make a decision.  What's the top priority?  How much time do

8    I have to get over that?  Something that is going to still be

9    ongoing that I could get back to, I'll get to that at a

10   different time.

11   Q.  And that decision is usually made with the AUSA, correct?

12   A.  I don't know if it's made with the AUSA, but obviously the

13   AUSA, just like I was, was focused on continuing to look into

14   the securities fraud investigation.

15              MR. WEINSTEIN:  Just one minute, please.

16              I have nothing further at this time for this witness.

17   Thank you.

18              THE COURT:  All right.

19              MR. BLAIS:  Thank you, your Honor.

20              THE COURT:  Cross-examination.

21              MR. BLAIS:  Yes, your Honor.  Thank you.

22   CROSS-EXAMINATION

23   BY MR. BLAIS:

24   Q.  Agent Boddy, you were the primary FBI case on the Aberon

25   matter from August 2017 through April 2019, correct?

K8CHJAIH                              Boddy - Cross

1    A.  That's correct.

2    Q.  And the person we're referring to as Individual 1 was

3    charged in connection with that investigation in September of

4    2018, correct?

5    A.  That's correct.

6    Q.  He began cooperating, essentially, immediately?

7    A.  That's correct.

8    Q.  And as part of that cooperation, he agreed to provide three

9    electronic devices to the FBI?

10   A.  That's correct.

11   Q.  Two computers and a cell phone?

12   A.  That's correct.

13   Q.  And you retrieved those devices from Individual 1 on

14   October 10, 2018, correct?

15   A.  That's correct.

16   Q.  Before that happened, you exchanged emails with Individual

17   1's counsel about the retrieval of those devices, correct?

18   A.  That's correct.

19   Q.  AUSA Adams and AUSA La Morte were copied on those emails,

20   correct?

21   A.  That's correct.

22   Q.  And after you retrieved the devices, you asked the FBI's

23   technical folks, this CART team that you're referencing, to

24   make images of the devices, correct?

25   A.  That's correct.

1    Q.  And once the images were made, you returned the original

2    devices back to Individual 1, correct?

3    A.  That's correct.

4    Q.  And the CDs, or whatever media those images were placed on,

5    were logged into evidence at the FBI, correct?

6    A.  Yeah.  They weren't on CDs, but the platform that they were

7    imaged onto, all of that, those steps were logged into the case

8    file.

9    Q.  That logging was done by the FBI's CART team that you

10   referenced, correct?

11   A.  That's correct.

12   Q.  And you wrote a report about your retrieval of the devices,

13   correct?

14   A.  That's correct.

15   Q.  And you put that report in the electronic case file for the

16   case, correct?

17   A.  That's correct.

18   Q.  You didn't try to hide the existence of these devices in

19   any way, did you?

20   A.  I did not.  The devices were logged in the case file in

21   multiple ways by both me and the CART team.

22   Q.  Now, in addition to the three devices that we just

23   discussed, Individual 1 also gave the FBI access to two of his

24   email accounts, correct?

25   A.  That's correct.

1   Q.  And he did that by giving his login credentials, correct?

2   A.  That's correct.

3   Q.  Now, is it fair to say that there were multiple threads of

4   the Aberon investigation?

5   A.  That's correct.

6   Q.  There was an investigation involving false statements made

7   by Individual 1 and Mr. Jain to Aberon investors, correct?

8   A.  That's correct.

9   Q.  And that was the investigation that led to the existing

10  charges against Mr. Jain, correct?

11  A.  That's correct.

12  Q.  There was also an investigation into suspicious financial

13  transactions involving Aberon that might constitute money

14  laundering?

15  A.  That's correct.

16  Q.  And is it fair to say that the transactions that were at

17  issue in the money laundering investigation took place after

18  Mr. Jain had stopped working at Aberon?

19  A.  That's correct.

20  Q.  Now, because of that, it was your view, was it not, that

21  materials relevant to the money laundering investigation were

22  not likely to be relevant to the Jain matter, is that right?

23  A.  That's correct.

24  Q.  And at some point in late 2018, you'd agree that the

25  prosecutorial focus of the Aberon investigation shifted to

1    Mr. Jain, correct?

2    A.   That's correct.

3    Q.   And after that it's true, is it not, that your

4    investigative focus was on reviewing Individual 1's email, not

5    the content of the three devices?

6    A.   That's correct.

7    Q.   That's because Individual 1 had stated in his proffers, had

8    he not, that his primary method of communicating with Mr. Jain

9    was through email, right?

10   A.   That's correct.

11   Q.   Now, I believe you testified on direct -- and I just want

12   to clarify this for the record -- I think you testified on

13   direct that you never reviewed any of the three devices.  Was

14   that an accurate statement?

15   A.   I never reviewed the computers.  The phone had been -- had

16   been reviewed.

17   Q.   OK.  So, just to be clear, in 2008 you did do some review

18   of Individual 1's phone?

19   A.   In 2018, I did do some review.

20   Q.   That review was in connection with the money laundering

21   investigation, right?

22   A.   That's correct.

23   Q.   And you stopped the phone review when the prosecutorial

24   focus shifted to Mr. Jain, is that right?

25   A.   That's correct.

```
 1   Q.  Now --

 2              THE COURT:  I'm sorry.

 3              (Discussion off the record)

 4   BY MR. BLAIS:

 5   Q.  And you never reviewed the two computers that were provided

 6   by Individual 1, correct?

 7   A.  That's correct, they were never reviewed by me.

 8   Q.  And just to be clear, you stopped reviewing the devices

 9   because you believed, in your own mind, based on Individual 1's

10   proffer statements, that they were unlikely to contain

11   materials relevant to Mr. Jain?

12              MR. WEINSTEIN:  I object to the leading on that one.

13              MR. BLAIS:  Your Honor, I'm on cross-examination.

14              THE COURT:  I understand.  I understand.  Overruled.

15   A.  That is correct.

16   Q.  Now, Mr. Jain was indicted in January of 2019, correct?

17   A.  That's correct.

18   Q.  And after the indictment, you worked with AUSA La Morte to

19   prepare discovery for production to Mr. Jain, correct?

20   A.  That's correct.

21   Q.  And you gave AUSA La Morte all the materials that she

22   specifically asked for, is that right?

23   A.  That's correct.

24   Q.  Now, you didn't give her the entire case file, did you?

25   A.  I did not.
```

1  Q.  And she never asked for it, is that right?

2  A.  Did not.

3  Q.  And to be clear, you didn't give her the three devices, did

4  you?

5  A.  I did not.

6  Q.  And she never asked for them?

7  A.  She never asked for those.

8  Q.  Now, you didn't have a specific discussion with her about

9  the three devices and whether they should be produced, did you?

10  A.  Never talked to, discussed with her, the three devices.

11  Q.  And at the time that discovery was being prepared and

12  produced, you were aware that the FBI had retrieved three

13  devices from Individual 1, correct?

14  A.  Yes, because I had retrieved them.

15  Q.  You hadn't forgotten that fact at the time of discovery?

16  A.  No, not at all.

17  Q.  Now, during the discovery process, you didn't remind AUSA

18  La Morte about the devices, right?

19  A.  I never mentioned them to her, no.

20  Q.  She had been on the earlier emails about the devices,

21  correct?

22  A.  That's correct.

23  Q.  Is it fair to say that, in your own mind, she didn't need

24  to be reminded about the devices?

25  A.  Yeah.  At that -- obviously, my view was that she would

1   request whatever additional things she needed, including the

2   devices.

3   Q.   Is it fair to say that you also believed that the devices

4   were not likely to be material relevant to Mr. Jain's case?

5   A.   That's correct.

6   Q.   That was, again, based in part on Individual 1's proffer

7   statements about what was on the devices versus what was in his

8   emails?

9   A.   That's correct.

10  Q.   So, to be clear, during the discovery process, you weren't

11  trying to hide the existence of the devices from Mr. Jain, were

12  you?

13  A.   No.

14  Q.   You weren't -- I'm sorry.

15  A.   Like I previously stated, the fact that the devices had

16  been logged in multiple ways I don't think are consistent with

17  someone who's looking to hide or obscure the existence of those

18  devices.

19  Q.   And just to be clear, you weren't trying to prevent

20  information that might be helpful to Mr. Jain from getting to

21  Mr. Jain?

22  A.   Not at all.

23  Q.   Now, did you and AUSA La Morte ever specifically discuss

24  not producing to Mr. Jain the three electronic devices that had

25  been provided by Individual 1?

1    A.  Never.

2    Q.  Do you recall ever having a conversation with AUSA La Morte

3    about the devices?

4    A.  No.

5            MR. BLAIS:  Your Honor, I have no further questions.

6            THE COURT:  All right.  I have a question just to

7    clarify your prior testimony.  I may be misremembering it, and

8    so I appreciate if you could help me with this.

9            THE WITNESS:  Yes, your Honor.

10           THE COURT:  But I recall your being asked about or

11   testifying that you would return to reviewing the -- or turn

12   to, not return, but turn to viewing the other devices, I guess

13   continuing with the telephone and the other two devices, when

14   the investigation was over.

15           THE WITNESS:  Yes, when the securities fraud

16   investigation.

17           THE COURT:  Securities fraud investigation was over?

18           THE WITNESS:  Had concluded, correct.

19           THE COURT:  And my recollection was the next question

20   you were asked was so that you would defer review until the

21   case was over, and I think you said yes.

22           THE WITNESS:  Yeah, I think that's -- if I did say

23   that, I think it's partly still in my mind I kind of viewed

24   them as two separate cases.  So if I said that the case was

25   over, when the securities fraud case had concluded, then we

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                          Boddy - Redirect

 1    would resume the money laundering investigation.

 2              THE COURT:  Well, this is what I'm trying to

 3    understand.  When you say the securities case is concluded, do

 4    you mean the FBI's investigation or do you mean the conclusion

 5    of the trial?

 6              THE WITNESS:  Well, whenever we had -- however the --

 7    yeah, when the trial concluded because, essentially, that would

 8    be kind of when the case is concluded.

 9              THE COURT:  I see.  OK.  Thank you.

10              THE WITNESS:  Yes, your Honor.

11              MR. WEINSTEIN:  Your Honor, I have brief redirect.

12              THE COURT:  Yes.

13              MR. WEINSTEIN:  OK.

14    REDIRECT EXAMINATION

15    BY MR. WEINSTEIN:

16    Q.  I'm going to ask you to pick up Defendant's Exhibit 6

17    again, please.

18    A.  OK.

19    Q.  You have it?

20              Now, your testimony is that you didn't look in the

21    devices because it was a separate money laundering

22    investigation having nothing to do with Jain?

23    A.  That's correct.

24    Q.  OK.  Going to ask you to take a look at page 7 of 10 of

25    Defendant's Exhibit 6, OK, 7 of 10.

1    A.  OK.

2    Q.  Second full paragraph.  All right.  Take a look at that.

3    A.  OK.

4    Q.  Was a part of your money laundering investigation that Leon

5    Kaplan was sending wires to launder money through Aberon in

6    2016?

7    A.  No.

8    Q.  It was not?

9    A.  It was not.  The money -- the transactions that were going

10   through Aberon that were coming from Autumn Leaf and Oriental

11   Commerce were not, in my understanding at that time, connected

12   to Leon Kaplan because I had identified the individual that was

13   involved in those investigations.

14   Q.  OK.  A Hasidic male?

15   A.  That's correct.

16   Q.  I'm going to ask you to turn to page 9 of 10.

17             THE COURT:  What was the other entity you mentioned,

18   Oriental what?

19             THE WITNESS:  Commerce.

20             THE COURT:  Thank you.

21   Q.  Defendant's Exhibit 6, page 9 of 10, first full paragraph.

22   A.  Uh-huh.  That's not the same male that was involved in

23   these transactions.

24   Q.  OK.

25   A.  The transactions that were going through Aberon, this

1    Hasidic male was not the same one that was involved in those

2    transactions.

3    Q.  OK.  So we did see from page 7 of 10 that Leon Kaplan is

4    sending wires which are being transacted through Aberon in

5    2016, but that's not part of your money laundering

6    investigation?

7    A.  The money laundering -- his -- the stuff that I had

8    identified as being the proceeds of it were coming from an

9    individual that was sending money through Aberon who my

10   understanding was -- I did not know if the individuals that

11   were on the other end of those transactions were aware of it

12   being criminal proceeds that were making its way through

13   Aberon.  That was part of why the investigation in money

14   laundering needed to continue was because, from my

15   understanding, Mr. Krigsfeld wasn't aware of the individual

16   that was sending transactions through Aberon at the time.  So

17   the individuals who received that money after it went through

18   Aberon, I wasn't aware of what they -- if they knew of the

19   sources of those funds as well.

20   Q.  But your money laundering investigation did involve Autumn

21   Leaf, correct?

22   A.  That's correct.

23   Q.  OK.  I'm going to ask you to turn back to page 7 of 10,

24   second full paragraph, last sentence.

25            Did Joseph Krigsfeld tell you that Krigsfeld

1   understood that both Autumn Leaf and Oriental Commerce were

2   entities that were based in Asia, and the wires he received

3   were connected to Leon?  Did he tell you that?

4   A.  That's correct.

5   Q.  All right.  So Leon Kaplan was part of your money

6   laundering investigation, correct?

7   A.  Like I said, Leon -- he certainly was part of the money

8   laundering investigation, that is correct.

9   Q.  OK.  Now I'm going to ask you to turn back to page 5 of 10.

10  One, two, three -- four, four paragraphs down.

11  A.  Uh-huh.

12  Q.  Now, the last sentence of that paragraph says:  "Money from

13  those properties was invested in Akros"?

14  A.  That's correct.

15  Q.  Doesn't that paragraph also state that those funds

16  originated as well with Leon Kaplan?

17  A.  That's correct.

18  Q.  And didn't -- at the same meeting with Joseph Krigsfeld,

19  weren't you told that Leon Kaplan is a Russian organized crime

20  figure?

21  A.  That's -- I knew that prior, but, yes, I was aware of that.

22          MR. WEINSTEIN:  OK.  Thank you.  I have nothing

23  further.

24          THE COURT:  All right.  Thank you, Special Agent

25  Boddy.  You can leave the papers and leave your face mask

K8CHJAIH                    La Morte - Direct

1   behind.

2           THE WITNESS:  Thank you, your Honor.

3           THE COURT:  You may call your next witness,

4   Mr. Weinstein, but we'll take a ten-minute recess for our court

5   reporter and to get things set up.  Thank you.

6           MR. WEINSTEIN:  Thank you.

7           (Witness excused)

8           (Recess)

9           THE COURT:  All right.  You may call your next

10  witness.

11          MR. WEINSTEIN:  Thank you.

12          THE COURT:  Mr. Weinstein.

13          MR. WEINSTEIN:  Yes, the defendant calls Tara

14  La Morte, AUSA Tara La Morte.

15          THE COURT:  Please remain seated for the oath.

16  TARA LA MORTE,

17       called as a witness by the Defendant,

18       having been duly sworn, testified as follows:

19          THE COURT:  Thank you.  You may inquire.

20          MR. WEINSTEIN:  Thank you.

21  DIRECT EXAMINATION

22  BY MR. WEINSTEIN:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  Please briefly provide your education and your employment

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                        La Morte - Direct

1    after law school.

2    A.   Education after law school?  I'm sorry.

3    Q.   Education and then your employment after law school?

4           THE COURT:  Ms. La Morte, if you could -- do you have

5    a glove there?  Yes.  Pick up the microphone and use that to

6    aid in audibility, please.

7    A.   Yes.  I went to Stanford University.  I graduated with a BS

8    in biology in 2000, then I went to NYU School of Law, and I

9    graduated in 2003.  I clerked for two years, one in the Eastern

10   District of Pennsylvania and the other one, Third Circuit.  I

11   then spent three years at the Department of Justice in D.C. in

12   the Civil Division, Federal Programs Branch.  That was from

13   2005 to 2008.  In the fall of 2008, I joined the U.S.

14   Attorney's Office here in New York.  I am in the Civil Division

15   from fall 2008 until about March 2017, and then I came to the

16   Criminal Division in March of 2017.

17   Q.   All right.  So when you started at the Department of

18   Justice, you started in the programs branch?

19   A.   It's called the Federal Programs Branch.

20   Q.   What were your -- where were you assigned within the

21   branch?

22   A.   There's no particular assignment within the branch.  You

23   work on all variety of cases throughout the country

24   representing the United States and various agencies of the

25   United States.

```
 1    Q.  In civil cases?

 2    A.  Yes, in civil cases.

 3            THE COURT:  Mr. Weinstein, can you bring the

 4    microphone closer to you, please.

 5            MR. WEINSTEIN:  Certainly.  All right.

 6    Q.  All right.  It goes without saying that you're an expert in

 7    civil discovery, fair to say to?

 8    A.  I'm very experienced in civil discovery.

 9    Q.  So you understand, obviously, in the civil case the

10    importance of providing discovery -- let me ask that, in

11    providing discovery?

12    A.  Yes.

13    Q.  Perhaps what would you consider, in the programs branch,

14    the largest case you worked on?

15    A.  I worked on an -- I represented the Social Security

16    Administration in a nationwide class action where SSA, Social

17    Security, was charged with violating the Rehabilitation Act for

18    the failure to provide materials in print -- I'm sorry, in

19    large print and braille to be accessible to people with

20    disabilities.

21    Q.  That was in litigation?

22    A.  Yes, although I had left the branch, I believe, in the

23    midst of discovery towards when summary judgment was being

24    briefed.  I'm not exactly sure, but I did not -- I was not

25    there for the entirety of that case.
```

K8CHJAIH                        La Morte - Direct

1   Q.  But you were there for a fair amount of the production of
2   discovery?
3   A.  Yes, I was there for at least some production of the
4   discovery.
5   Q.  OK.  Given the description of the case, the discovery had
6   to be extremely voluminous, is that correct?
7   A.  Yes, it was very voluminous.
8   Q.  And involved huge amounts, fair to say, of digital
9   information?
10  A.  I don't recollect the volume, but I would say it would be
11  large.  I don't know if it would be humongous.  I don't
12  recollect.  This is over -- this was a long time ago.
13  Q.  OK.  Fair to say that it was a complicated organizational
14  project to keep track of huge amounts of discovery and that you
15  were in charge?
16  A.  Can you repeat that.
17  Q.  Is it fair to say that in the case that you're describing
18  involving the Social Security Administration, that it involved
19  a huge amount of discovery which was a sophisticated --
20  required a sophisticated plan to organize?
21  A.  It was a large amount of discovery.  I worked with the
22  agency together with agency counsel to keep track of it.  I
23  don't know if it would qualify as a sophisticated plan, but,
24  yes, certainly it was an organizational effort to keep track of
25  the discovery.

K8CHJAIH                          La Morte - Direct

1   Q.  From the government side, you were in charge?

2   A.  Yes.

3   Q.  Upwards of hundreds of thousands of documents?

4   A.  I don't recall.

5   Q.  How long were you in the programs branch?  I'm sorry,

6   remind me.

7   A.  That's fine.  Three years.

8   Q.  Then where'd you go?

9   A.  To the U.S. Attorney's Office Civil Division.

10  Q.  In the Southern District?

11  A.  Yes.

12  Q.  And --

13          THE COURT:  This is not a deposition.

14          MR. WEINSTEIN:  Yeah, I --

15          THE COURT:  Let's move it to something relevant.

16          MR. WEINSTEIN:  Yes.  Thank you.  I understand.

17  BY MR. WEINSTEIN:

18  Q.  You had many cases -- well, you had a number of large civil

19  cases while in the Civil Division of the U.S. Attorney's Office

20  in the Southern District, correct?

21  A.  Yes.

22  Q.  So you had to keep track of very large amounts of

23  discovery?

24  A.  Yes.  Certain cases, there were large amounts of discovery.

25  I worked on a number of large Freedom of Information Act cases,

K8CHJAIH                        La Morte - Direct

```
 1   which is not exactly discovery but large amounts of information
 2   that had to be produced.
 3   Q.  And as an AUSA in the U.S. Attorney's Office, the discovery
 4   in many cases had to be obtained from agencies of the United
 5   States, correct?
 6   A.  Yes.
 7   Q.  When did you first get involved in the Aberon
 8   investigation?
 9   A.  I was put on that case in approximately February of 2018.
10   Q.  OK.  What was your understanding of the investigation at
11   that time?  What was its focus?
12   A.  We were investigating -- we were investigating securities
13   charges against individual -- the person named as Individual 1
14   in the indictment.  I recall that.  I also recall that
15   during -- not exactly February 2018, but in the months
16   following that, we were investigating money flows through
17   Aberon.
18   Q.  When's the first time you heard the name Leon Kaplan in
19   reference to Aberon?
20   A.  My best recollection is that the first time I heard that
21   name is when we were initially proffering Individual 1
22   following his arrest.
23   Q.  Now, the criminal complaint against Joseph Krigsfeld which
24   is dated September 11, 2018, do you recall that?
25   A.  Yes.
```

K8CHJAIH                    La Morte - Direct

1    Q.  Did you draft that?

2    A.  No.

3    Q.  Who drafted that?

4    A.  AUSA Andrew Adams.

5    Q.  Did you participate in drafting it?

6    A.  I likely reviewed it, but I don't believe I participated in

7    drafting it.

8    Q.  All right.  So there came a time when Joseph Krigsfeld is

9    arrested pursuant to the complaint.

10           THE COURT:  Keep your voice up, please.

11   Q.  There came a time when Joseph Krigsfeld is arrested

12   pursuant to the complaint, correct?

13   A.  Yes.

14   Q.  And he engages in meetings with the government?

15   A.  Yes.

16   Q.  During the -- well, do you recall a meeting -- let me take

17   a step back.

18           Did you review documents in preparation for your

19   testimony here --

20   A.  Yes.

21   Q.  -- today?

22           What did you review?

23   A.  I reviewed my declaration that I submitted in this case,

24   and I reviewed the briefs associated with the motion to dismiss

25   that you had filed.

K8CHJAIH                    La Morte - Direct

1    Q.  OK.  Did you review the 302s of Joseph Krigsfeld?

2    A.  No.

3    Q.  Did you review your email?

4    A.  No.

5    Q.  You've reviewed your email in the past?

6    A.  Yes.

7    Q.  Now, I'm going to hand you what was offered into evidence

8    with the previous witness as Defendant's Exhibit 6.  Not sure

9    where it is.  If you could take a look at that.  It says

10   Exhibit 6 at the top.

11   A.  Yes, I see it now.

12   Q.  OK.  Take a look at that, please.

13           Now, do you recall this meeting with Joseph Krigsfeld?

14   A.  Yes.

15   Q.  And you've reviewed this 302, correct?

16   A.  In the past, yes.

17   Q.  Yes, in the past.

18           All right.  Did Joseph Krigsfeld mention having

19   computers and a telephone during this meeting?

20   A.  I don't recollect.  I would have to review the proffer

21   notes.  I know I do recollect that we met with him in September

22   and October.  I do recollect in one of those meetings he

23   referenced a computer, but I don't recollect specifically what

24   you're asking.

25   Q.  OK.  You recall that during either September or October at

1   the proffer meetings, he referenced a computer?

2   A.   He referenced that he had worked on his work -- he had done

3   work on his work computer in connection with what he was

4   telling us about, something to that effect.

5   Q.   Was a decision made by the prosecutorial team to take

6   possession of the work computer?

7   A.   Obviously there was because we ended up taking possession

8   of two computers and the phone, but I don't recall the

9   discussion about that.  But obviously, yes, a decision was

10  made.

11  Q.   Who made the decision?

12  A.   I don't know.

13  Q.   When did you first become aware that such a decision had

14  been made?

15  A.   I don't recollect.  I know, as I state in my declaration, I

16  am on emails in October of 2018 that's referencing the

17  collection of the computers and the phone.  I probably knew

18  before that, but sitting here, I don't recollect that.

19  Q.   So sitting here, what's your first recollection of the --

20  of knowledge of the existence of the computers and the phone?

21  A.   In those October 5, 2018, emails.

22  Q.   So sitting here today, you recall the October emails?

23  A.   Sitting here today, yes, having reviewed them.

24  Q.   The subject of the email that you're referring to in

25  October, two computers and a telephone, correct?

1    A.  Yes.

2    Q.  I'm going -- I'm going to refer to them as we did in the

3    briefing, as the Krigsfeld devices.  OK.

4         The Krigsfeld devices are two computers and a

5    telephone, obviously, right?

6    A.  (Nods head.)

7    Q.  In this matter, are there any other computers involved, as

8    far as you know?

9    A.  That we collected, no.

10   Q.  Any other telephone?

11   A.  No.

12   Q.  So it was the only computers and the only telephone taken,

13   correct?

14   A.  Yes.

15   Q.  In October of 2018, did you believe that information

16   regarding Aberon was present on the computers and the

17   telephone?

18   A.  I don't recollect.

19   Q.  Well, all right.  So your testimony is you don't remember.

20   Even though you were aware computers were seized or taken

21   consensually, you don't recall whether you thought that

22   there -- that there would be any relevant evidence on them?

23   A.  I'm sure I would have thought that there was some relevant

24   evidence on them.  That would be why we would take them.  I

25   just don't recollect the conversations about that either now or

1   at the time is what I'm saying.  But, yes, we took the

2   computers for a reason.

3   Q.  And what was the reason?

4   A.  Again, sitting here I don't recollect.  But, again, just as

5   a matter of logic, we would have taken them because we thought

6   they would have had evidence on them that's relevant to the

7   investigation.

8   Q.  OK.  Do you see a distinction in the Aberon investigation

9   between a money laundering investigation and a securities fraud

10  investigation, that there's a line there?  Do you see that?

11  A.  I would say that they were separate yet related

12  investigations.

13  Q.  They're separate yet related?

14  A.  Yes.

15  Q.  How are they related?

16  A.  Well, they involve Aberon, and that's in common with them.

17  They involve Joseph Krigsfeld, and that's in common with them.

18  And Aberon is also the company that's involved in the

19  indictment with the securities fraud and wire fraud charges,

20  and so in that way, yes, they are related.

21  Q.  Does the money laundering investigation involve Leon

22  Kaplan?

23  A.  Yes.

24  Q.  Now, how many times, approximately, do you believe you met

25  with Joseph Krigsfeld after the arrest of Niket Jain?

1   A.  Roughly ten, maybe a little less, but around that number.

2   Q.  Is it your testimony that the computers and the telephone

3   never came up?

4   A.  Yes.  Not until when I met with him on the end of January

5   of 2020.

6   Q.  How about Semen Kaplan?  Did he come up during these

7   meetings?

8   A.  Yes.

9   Q.  Did you discuss with Joseph Krigsfeld the fact that Semen

10  Kaplan had provided an affidavit to the SEC?

11  A.  No.

12  Q.  It never came up?

13  A.  No.

14  Q.  Did David Gourevitch ever mention that to you?

15  A.  No.

16  Q.  Have you seen that affidavit?

17  A.  Yes.

18  Q.  When's the first time?

19  A.  In connection with this litigation after the devices were

20  turned over.

21  Q.  Were you aware of it at any time before that?

22  A.  No.

23  Q.  Did you review the materials that the U.S. Attorney's

24  Office received from -- let me ask a different question.

25          Did the U.S. Attorney's Office, for discovery in the

1  Niket Jain case, receive information from the Securities and

2  Exchange Commission?

3  A.  Yes.

4  Q.  When was that?

5  A.  At the time that I was assigned to the case back in

6  February 2018, I think that information had already been

7  received.  So I'm not sure when, actually, the U.S. Attorney's

8  Office received it.

9  Q.  How did you become aware that it had been received?

10  A.  It was in our shared drive pertaining to the case.

11  Q.  All right.  Who put it in the shared drive?

12  A.  I don't know.

13  Q.  Was the Semen Kaplan declaration in the shared drive?

14  A.  I don't believe so, no.

15  Q.  Have you looked?

16  A.  Yes.

17  Q.  And did you see it?

18  A.  No.

19  Q.  After you became aware of the Semen Kaplan declaration, did

20  you contact the SEC?

21  A.  Yes.

22  Q.  Did you ask the SEC:  Did you give that to us?

23  A.  I asked the SEC words to the effect if they had -- if this

24  declaration had been submitted to them, if they had it.

25  Q.  And they, of course, said yes?

K8CHJAIH                    La Morte - Direct

1    A.  Yes.

2    Q.  Did you ask the question:  Did you withhold that from us?

3    Did you give that to us?  Did you ask that question?

4    A.  I asked questions to the effect of why wouldn't it have

5    been included in that initial production, and they -- I don't

6    remember the exact details, but I believe that that declaration

7    was kept in a separate filing system where they normally keep

8    most of their files.  I don't know why that is, but that was

9    the explanation given to me as to why it was not included with

10   the production.

11   Q.  But they told you it had not been included with the

12   production?

13   A.  Yes -- no, they said that it was kept separately, and

14   that's why it wouldn't have been included.  I'm assuming --

15   they didn't say the exact words, "it was not included in your

16   production," but I know that I looked through the production,

17   it wasn't there, and then they explained that it was kept

18   separately from other SEC files that they produced to us.

19   Q.  But you did look at the -- you're saying you did look at

20   the production?

21   A.  Yes.

22   Q.  What was the form of the production?

23   A.  I don't remember what form it was given in.  In our shared

24   drive, I think it was -- I'm trying to remember.  It was PDF

25   documents, TIFFs and load files, if that's what you mean by

K8CHJAIH                          La Morte - Direct

1   your question.

2   Q.  What I'm really asking is did the production come in an

3   email from the FBI?

4   A.  Oh, that I don't know because the first time I saw the

5   production was in our shared drive.  So someone had already

6   taken the production and put it in the shared.  So I don't know

7   how it originally came to us.

8   Q.  But, again, your testimony is that the ten times you met

9   with Joseph Krigsfeld and the times you met with David

10  Gourevitch, they never told you that there was such an

11  affidavit?

12  A.  That's correct.

13  Q.  Now, the arrest of Niket Jain, that was pursuant to an

14  arrest warrant on an indictment?

15  A.  Yes.

16  Q.  At what point did you compile discovery following the

17  arrest of Niket Jain?

18  A.  I believe we probably started gathering it fairly quickly

19  after the arrest.  So, I mean, certainly we started

20  January-February time frame to gather discovery.

21  Q.  What's the first thing you did?

22  A.  I can tell you what I did.  I don't remember the first

23  thing I did, but one of the initial things I did, I know, is I

24  went through our shared drive which has the files that are

25  relevant to the case to determine what we had and what would

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                              La Morte - Direct

1    need to be produced in discovery.

2    Q.  OK.  What'd you do then?

3    A.  I had several conversations with Agent Boddy about

4    discovery, and I had several requests for Agent Boddy for

5    particular -- for certain -- we discussed generally what we

6    produce in discovery, and then I asked specifically about

7    certain materials.

8    Q.  OK.  So you say that you discussed generally what we

9    produce in discovery?

10   A.  Yes.

11   Q.  What did you tell him?  What do you generally produce?

12   A.  I mean, that I have SEC files.  I have subpoena returns.

13   Here's what I have that I -- so I had this stuff to produce in

14   discovery, then there was certain information that I requested

15   from him that I knew we would need to produce.  And the main

16   thing that I remember was emails.

17   Q.  OK.  Now, you had --

18              THE COURT:  Please use the mic.

19   Q.  Now, you came into this investigation midway, prior to the

20   arrest of Niket Jain but after the beginning of the

21   investigation, correct?

22   A.  Yes.

23   Q.  So fair to say you would know -- you may not know

24   everything that the FBI has, correct?

25   A.  That's true, yes.

K8CHJAIH                     La Morte - Direct

1   Q.  Didn't you ask Agent Boddy:  What do you have in this

2   investigation?  Go through with me the chronology of what

3   occurred in this case.  What do you have?

4   A.  I don't recall asking him that.  That's probably something

5   I should have asked him, but I don't recall asking it.

6   Q.  OK.  When you say you don't recall, do you mean you didn't

7   do it?

8   A.  I don't believe I did.  I don't recall doing that.

9   Q.  OK.  Did you ask him:  Do you have any recordings?

10  A.  No.

11  Q.  Did you ask him:  Do you have any photographs?

12  A.  No.

13  Q.  Did you ask him:  Let's go through what occurred here.

14  Let's start at the beginning.  OK.  You came on at this time.

15  What do you have?  Did you send out -- are there subpoenas

16  reflected?  You got items from the SEC.  What else do you have?

17  Did you say that?

18  A.  I don't believe I said:  What else do you have?  I know

19  that I specifically talked about emails.  I know that I -- I

20  recall I specifically talked about subpoena returns.  I thought

21  that if there's any significant or even less significant

22  category of relevant information that I was missing that the

23  agent would have brought it to my attention.  I should not have

24  assumed that, but that's what I thought.  I did not do an

25  exhaustive "tell me everything in your file so I can make an

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                    La Morte - Direct

1   assessment."

2   Q.  And you have a good recollection of that, these

3   conversations, so you can be certain here today that in January

4   of 2019, approximately, you made no specific -- no general

5   request, tell me what you have?  You recall that?

6   A.  I -- yes, I did not ask -- I did not say, you know, tell me

7   everything that you have in your file, or words to that effect.

8   Q.  OK.  You have a good recollection of all those

9   conversations?

10  A.  I don't recall -- I honestly do not recall the details of

11  all those conversations.  I just -- I'm just fairly certain I

12  didn't ask that.

13  Q.  OK.  He never said anything to you about the Krigsfeld

14  devices?

15  A.  Correct.

16  Q.  He never said to you:  I haven't reviewed them?

17  A.  No.

18  Q.  OK.

19  A.  Sorry.  I thought your question was done.

20  Q.  He never told you:  I haven't reviewed them?

21  A.  Correct, because he didn't -- he didn't say anything that

22  he had them.  So he didn't say, I didn't -- I have them, but I

23  didn't review them, or anything like that.

24  Q.  He didn't say:  I'm going to get to the devices later.  I

25  think they only have to do with money laundering?

1   A.  Correct.

2   Q.  He never said that?

3   A.  That's right.

4   Q.  You never asked him to wait?

5   A.  No, I never asked him to wait.

6   Q.  Have you discussed this with Andrew Adams?

7   A.  Discussed what with Andrew Adams?

8   Q.  Whether -- fair question -- whether Andrew Adams asked

9   Agent Boddy to wait to review the devices until later?

10  A.  I have not specifically discussed that with Andrew Adams,

11  no.

12  Q.  OK.  Did you generally discuss?

13  A.  What I generally discussed with Andrew Adams was discovery.

14  I remember having a question for him about what we were going

15  to produce in discovery because I had never had a case

16  involving the SEC before.  This is my first one, and so I

17  wanted to make sure that I was properly producing the SEC

18  files.  So I spoke with Andrew Adams about discovery.  I

19  remember speaking about the SEC files, but in my conversations

20  with Andrew Adams, it was one conversation that I recall with

21  Andrew Adams, the devices did not come up.

22  Q.  OK.  Did the money laundering investigation continue during

23  the progress of this prosecution, the prosecution of Niket

24  Jain?

25  A.  In fits and starts, yeah, but my focus was more on the

K8CHJAIH                        La Morte - Direct

1  prosecution of Mr. Jain.

2  Q.  But you're aware that the investigation, the money

3  laundering investigation, actually did continue?

4  A.  Yes, for some period of time, yes.

5  Q.  Who was the case agent on that?

6  A.  It was the same case agent.

7  Q.  Agent Boddy?

8  A.  Agent Boddy until Agent Polonitza took over.

9  Q.  So even during the progress of the prosecution of Niket

10  Jain, the money laundering investigation continued by

11  Agent Boddy?

12  A.  Yes.

13  Q.  Then it continued with Agent Polonitza?

14  A.  Yes.  Again, in fits and starts.  I don't want to suggest

15  that it was like a continuous thing.  There would be points

16  where there would be some activity on that file and then other

17  points when there would be no activity.

18  Q.  Now, let's take a look at what -- let's see.  Take a look

19  at Exhibit 3, please.

20  A.  OK.

21  Q.  All right.  Do you recall -- you do recall, as you sit

22  here, receiving this email?

23  A.  Yes.

24  Q.  At the time did you consider this an unusual email?

25  A.  At the time I initially received it, you mean?

K8CHJAIH                        La Morte - Direct

1    Q.  Yeah.

2    A.  Yes, because I had never had a case before that involved a

3    taint review, so it was unusual for me.  This was the first

4    case that I had that involved something like this.

5    Q.  So that was unusual.  Was it unusual that it appeared to

6    permit the defendant, Krigsfeld, to designate things as

7    privileged that the U.S. Attorney's Office would be precluded

8    from looking at?

9              MR. BLAIS:  Your Honor, I'm going to renew my

10   objection on relevance grounds to the privilege issue.

11             MR. WEINSTEIN:  The basis for my question is that this

12   was memorable.  The claim here is that it was then forgotten

13   for a year.  The two computers, the only computers in the case,

14   were then forgotten for a year.  My point being that this was a

15   very memorable thing and would have been remembered.  That's

16   why I'm questioning.

17             THE COURT:  Overruled.

18             MR. WEINSTEIN:  All right.

19   Q.  Did that strike you as unusual, the provision in Exhibit 3

20   that would permit the defendant, a criminal defendant, to

21   preclude the U.S. Attorney's Office -- excuse me, preclude the

22   FBI from looking at information designated by the defendant?

23             THE COURT:  Just so I understand your question, you're

24   not asking does it strike you as unusual -- you're asking the

25   witness:  Sitting on the stand today, do you recall that at the

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                    La Morte - Direct

1   time you first read the email on or about the date it bears,

2   did it then strike you as unusual?  That's the question?

3             MR. WEINSTEIN:  Exactly.  Thank you.  Exactly.

4             THE COURT:  OK.

5   A.  No.

6   Q.  It didn't strike you as unusual?

7   A.  No.

8   Q.  And you recall that that didn't strike you as unusual?

9   A.  I recall that because I had -- like I said before, I hadn't

10  had experience with this.  Andrew Adams was still the lead

11  prosecutor on the case at that time.  I felt that if there was

12  anything that was wrong about this, that it would have been

13  flagged by Andrew Adams.  And in addition, my understanding was

14  that the U.S. Attorney's Office respects privilege; it doesn't

15  ask defendants to waive privilege.  And so, no, it didn't

16  strike me as unusual.

17  Q.  OK.  Anything else about the October 9, 2018, email that's

18  Exhibit 3 strike you as unusual at the time?

19            THE COURT:  Well, I'm going to sustain it as to form,

20  anything else strike you as unusual.  So far we haven't heard

21  the witness say that something struck her as unusual.  So

22  rephrase your question, please.

23            MR. WEINSTEIN:  Fair.

24  Q.  Memorable?

25            THE COURT:  Well, no, my problem is with the words

1    "anything else," the words "anything else."

2    Q.  Anything?

3            THE COURT:  So put a complete question to the witness.

4    Q.  Sitting here today, recollecting your thoughts on

5    October 9, did anything in the October 9 email that's Exhibit 3

6    strike you as unusual?

7    A.  No.

8    Q.  But you do recall the provision about taint being the first

9    time you'd ever seen anything like that, a taint team?

10   A.  Meaning -- yes, meaning the first time where I ever

11   received a device in a case that was going to require -- that

12   had some sort of privilege component to it.  I had not had a

13   case with that before, so this is my first time experiencing

14   something like this.

15   Q.  Are you the AUSA assigned to the money laundering

16   investigation as well?

17   A.  Yes, although AUSA Adams has done more on that than I have.

18   Q.  But you're assigned?

19   A.  I am assigned.

20   Q.  I'm going to refer you to, let's see, Exhibit 8, please.

21   Do you have that in front of you?

22   A.  Not yet.  Hold on.  Yes, I have it.

23   Q.  All right.  Going to ask you to turn to page 3.

24   A.  I am there.

25   Q.  OK.  Now, you've reviewed this as part of the motion

1   practice around the Krigsfeld devices, correct?

2   A.  Yes.

3   Q.  And you were asked by the Court what discovery you have to

4   provide?

5   A.  Yes.

6   Q.  And Agent Boddy is there?

7   A.  I'm not -- give me one moment.

8   Q.  Of course.

9   A.  Yes.

10  Q.  And you list the discovery to be provided?

11  A.  Yes.

12  Q.  In response to a question by the Court?

13  A.  Yes.

14  Q.  You also state, and this is the middle of the page:  "In

15  terms of volume, I'm prepared to produce at least 90 percent of

16  it today, which I have with me, and the portion is

17  approximately a little bit over 10,000 pages, but is the

18  overwhelming portion of discovery," correct?

19  A.  Yes.

20  Q.  It did not include the Krigsfeld devices, correct?

21  A.  Correct.

22  Q.  And it's your testimony you forgot?

23  A.  Yes.

24  Q.  You do recall now Agent Boddy being there, correct?

25  A.  I went back to page -- the first page of the transcript,

1    and I introduce Agent Boddy, so he was there.

2    Q.  OK.  But you're saying you don't -- you have no

3    recollection of him being there?

4    A.  I knew he was at some of the conferences.  Do I recollect

5    that he was at this particular one?  No.

6    Q.  OK.  So he was at more than one?

7    A.  Yes, I believe so.

8    Q.  Another conference in which you made representations about

9    the completion of discovery?

10   A.  I don't know.

11   Q.  OK.  But fair to say Agent Boddy didn't say anything to you

12   after you said this is all the discovery --

13   A.  Correct.

14   Q.  -- essentially?

15        You've reviewed, as part of motion practice, three or

16   more conferences that you had with the Court where you

17   represented what discovery -- that either discovery was

18   complete or that there were only a few things remaining, and

19   you named them, correct?

20   A.  Yes, there were several conferences where that happened,

21   yes.

22   Q.  Now, each time -- the first conference was February 14, and

23   each time after that when you made that representation, did you

24   think to yourself, What else is there that would need to be

25   produced in this case before I make this representation?  Did

K8CHJAIH                          La Morte - Direct

1    you do that each time?

2    A.  Each time I made that representation, I had in good faith

3    believed that we had produced everything in our possession,

4    custody, and control that was relevant under Rule 16 or in the

5    case.  For example, when we had known that there were emails

6    that were not produced, that I was in the process of doing so.

7    I had had, like I testified, conversations with Agent Boddy

8    about this, and I had no reason to believe that there were

9    additional things in our possession that we had not produced.

10   Q.  OK.  Now you're referencing you've had conversations with

11   Agent Boddy and you had no reason to believe there was anything

12   else to be produced?

13   A.  Correct.

14   Q.  What's the basis of that?  What happened in those

15   conversations that lead you to conclude you had no basis?

16   A.  Just that Agent Boddy and I had several conversations about

17   discovery, as I testified before, and what would be produced,

18   so Agent Boddy was aware of what I was going to produce in

19   discovery.  I thought if there was something that the FBI had

20   that I was missing when I was speaking with Agent Boddy that

21   would be relevant to produce, or at least look at to see if

22   there was information to produce, that that would have been

23   raised to my attention, and it wasn't.

24   Q.  But you never asked for it?

25   A.  I didn't ask for what I didn't know.  I don't understand.

1    I'm sorry.

2    Q.  Your testimony is if there had been something else, I would

3    have expected him to raise it?

4    A.  Yes.  Yes, in the course of discussing discovery and what

5    we needed to produce and what I had already in my possession

6    and asking him for certain categories, if there was a category

7    that I had missed that was relevant to produce that was in the

8    FBI's possession that I had not stated that I had, I thought

9    Agent Boddy would raise that.

10          I think I said before that were I to do this all over

11   again, learning what I know now, that I would ask for more.  I

12   wouldn't just leave it at that.  But I had no reason at that

13   time to believe that there was more that I hadn't produced.

14   Q.  So you had no reason to believe that there was more?

15   A.  Correct.

16   Q.  Yet, as you sit here today, you have a good recollection of

17   the October 9 email?

18   A.  So, you know, I had not remembered the October 9 email.  As

19   I explain my declaration, at the end of January, I had an

20   interview session with Individual 1, and he references a

21   recording on a phone that he had provided to the FBI.  I had no

22   recollection of producing a recording in discovery, let alone a

23   phone.  So I went to Agent Polonitza -- so at that meeting it

24   was myself, it was Individual 1, it was Individual 1's counsel,

25   and a different FBI agent that was sitting in for Agent

K8CHJAIH                     La Morte - Direct

1    Polonitza because Agent Polonitza was unavailable.  Mr. Raymond

2    wasn't there either.

3              THE COURT:  Mr.?

4              THE WITNESS:  I'm sorry, AUSA Raymond, your Honor, my

5    colleague on the case.

6              THE COURT:  Thank you.

7    A.  I didn't -- so Individual 1 references a recording.  In my

8    mind, I'm like, I don't remember producing a recording in

9    discovery.  So the first thing I did after the meeting

10   concluded is I went through our discovery files, and I verified

11   that I had not produced a recording in discovery.  I then went

12   to Agent Polonitza and I said:  Can you find and see if you

13   have a recording in a phone from Individual 1?  He then came

14   back -- that was at the end of January.  Early February he came

15   back and said:  We have a phone and we have two computers.  I

16   still did not remember that the FBI collected those devices,

17   but I knew something was wrong, that the FBI had two computers

18   and a phone and I didn't remember that.

19             So it was at that point that I went through all of my

20   emails, literally all of my emails on the case, which were like

21   a couple thousand emails, and I came across these October 2018

22   emails.  And for some reason when I read the October 9, 2018,

23   email the light bulb went off and I remember it, and I said,

24   Oh, yeah, now I remember.  So that's -- I mean, that's sort of

25   how it happened.  That's how I remember.  For whatever reason,

1   that email jogged my memory.

2   Q.  Now, what was the purpose of -- or did you have a

3   purpose -- take a step back.

4           The meeting with Joseph Krigsfeld that you're

5   referring to was January 28, 2020, correct?

6   A.  Yes.

7   Q.  Correct?

8   A.  Yes.

9   Q.  It was after the filing of a motion by the defense that

10  included a request for an instruction that the government

11  produce *Brady* material, isn't that right?

12  A.  I don't recall the timing, but if that's -- I'm sure that's

13  reflected in the docket.

14  Q.  OK.  Before -- this meeting, January 28, 2020, was before

15  the government's response was due, isn't that right?

16  A.  I don't recollect.

17  Q.  OK.  But you do recollect that during that meeting you

18  discussed that there was a recording with Niket Jain that was

19  on one of the Krigsfeld devices?

20  A.  Yes, I recollect that in response to a question that was

21  asked, Individual 1 referenced a recording in his answer with

22  Niket Jain that was on a phone that he had provided to the FBI.

23  Q.  I'm going to hand you, or have handed to you, what -- we'll

24  call it Exhibit 9.  I don't have gloves here.

25  A.  Thank you.

1    Q.  If you could take a look at that.

2           THE COURT:  This has been marked as?

3           MR. WEINSTEIN:  Exhibit 9, your Honor.

4           THE COURT:  OK.

5    Q.  Do you recognize that?

6    A.  Yes.

7    Q.  What is it?

8    A.  This is a 302 that reflects a meeting with Joseph Krigsfeld

9    on January 28, 2020.

10   Q.  That's the meeting you're referring to?

11   A.  Yes.

12          MR. WEINSTEIN:  I'm going to offer this 302.

13          THE COURT:  All right.

14          MR. WEINSTEIN:  Exhibit 9.

15          THE COURT:  Not for the truth of its content but for

16   the fact that the statements were said, correct?

17          MR. WEINSTEIN:  Yes.

18          THE COURT:  OK.  Any objection?

19          MR. BLAIS:  In light of that, your Honor, no

20   objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 9 received in evidence)

23   BY MR. WEINSTEIN:

24   Q.  It's actually an additional purpose, which I'll ask now

25   after you've had a chance to review it.

K8CHJAIH                    La Morte - Direct

1    A.  Do you want me to read this?

2    Q.  Read it.  If you could point out where it reflects that

3    Joseph Krigsfeld stated that there was a recording that was on

4    a device.

5          MR. BLAIS:  Your Honor, I object to this line of

6    questioning because I think it -- Ms. La Morte testified that

7    Mr. Krigsfeld mentioned the recording at a January 28, 2020,

8    proffer, and I believe that this -- I apologize.  I withdraw.

9    I apologize, your Honor.  Misread the date.

10         THE COURT:  Go ahead.

11         MR. BLAIS:  Sorry about that.  I apologize.

12   A.  I don't see a reference to -- I'm not seeing a reference to

13   a recording in here.

14   Q.  OK.  There is no reference to the recording, correct?

15   A.  I skimmed this.  I'm not seeing it.

16   Q.  Or any reference to him bringing up a recording?

17   A.  I didn't see it, no.

18   Q.  OK.

19   A.  I don't know if it matters, but mine isn't marked.

20         THE COURT:  I'm sorry.  Say that again.

21         THE WITNESS:  I'm sorry, your Honor.  I don't know if

22   it matters, but mine isn't marked as Exhibit 9.

23         THE COURT:  Thank you.

24         MR. WEINSTEIN:  Actually, I think it does matter, so

25   we'll mark that as Exhibit 9.  Thank you.

K8CHJAIH                           La Morte - Direct

1   BY MR. WEINSTEIN:

2   Q.  How many discovery letters prior to January 28, 2020, do

3   you think you sent in this case?

4   A.  I don't recall.

5   Q.  Do you recall what number discovery letter you're up to?

6   A.  In the 20s.

7   Q.  In the 20s?

8   A.  Yes.

9   Q.  So do you recall just approximately how many of those

10  predated January 28, 2020?

11  A.  No.

12  Q.  Fair to say at least 20?

13  A.  I don't recall.

14  Q.  How about this, most of them?

15  A.  I don't recall.  I mean, some number of them, yes.  I'm not

16  trying -- I really don't recall.

17  Q.  OK.  How about at least ten?

18  A.  That's probably fair.

19  Q.  How about 15?

20  A.  I don't recall.

21  Q.  OK.  Let's call it at least ten.

22          Each time you wrote a discovery letter, did you think

23  to yourself, Do I have anything else to disclose?

24  A.  Yes, generally, yes.  But, again, I believed that I had

25  disclosed everything in our possession during our initial

SOUTHERN DISTRICT REPORTERS, P.C.

K8CHJAIH                      La Morte - Direct

1   discovery.  And then in May of 2019, I learned about additional

2   emails that needed to be disclosed, and I disclosed that.  Each

3   time that I drafted a discovery letter based on new information

4   we received, or what have you, I didn't -- I did think, is

5   there any other information we received that had not been

6   produced yet, yes.

7   Q.  When you say "in our possession," are you including in the

8   FBI's possession?

9   A.  Yes.

10  Q.  But is your testimony that from the arrest of Niket Jain in

11  January of 2019 to January of 2020, a year period, you never

12  asked any agent of the FBI:  What else do you have?  Do you

13  have anything I haven't produced, I haven't asked you for?

14  A.  No.  All I remember is I had specific conversations with

15  Agent Polonitza about emails because I wanted to make sure that

16  we had produced all the emails because I had thought we had

17  produced all the emails, and it turned out we hadn't.  So I had

18  specific conversations about that, but I did not say -- I do

19  not recall saying words to the effect of, "Is there anything

20  else in your file that we hadn't produced?"

21  Q.  When was the event where you had to speak with Agent

22  Polonitza about the emails?

23  A.  I believe it was sometime in May of 2019.  Yes, May 2019.

24  Q.  May 2019?

25  A.  Yes.

K8CHJAIH                    La Morte - Direct

1   Q.  OK.  What was the issue with the email?  How come it wasn't
2   produced?
3   A.  I don't recall.  I don't recall why it wasn't produced,
4   actually.  All I recall is that we had discovered that there
5   was a significant volume of emails that hadn't been produced.
6   Q.  And at that time did you ask him:  Oh, this is significant
7   amount of discovery which I didn't know about.  What else do
8   you have?
9   A.  Well, I did know that we had a number of relevant emails.
10  I had thought we had produced all of our relevant emails, and
11  it turns out that we hadn't.  So I did know we had emails.  I
12  was under the impression we had produced all of them and that
13  impression was not correct.  I just don't remember -- I don't
14  remember how -- what caused me to learn that, but once I did
15  learn that and I talked to Agent Polonitza, we drilled down on
16  why that was the case to ensure that my production of emails in
17  May and June were complete productions.
18  Q.  OK.  But you have a recollection that it did not move you
19  to ask, huh, do you have anything else?
20  A.  Correct.
21  Q.  OK.  Now, do you recall there came a time where you
22  produced subpoena returns for maybe six different entities?
23  A.  Can you be more specific?
24  Q.  Yeah, I can.  Bear with me.
25          Going to mark this one as Exhibit 10.

K8CHJAIH                    La Morte - Direct

1            (Discussion off the record)

2   Q.  All right.  Do you have Exhibit 10 in front of you?

3   A.  Yes.

4   Q.  You recognize that?

5   A.  Yes.

6   Q.  What do you recognize it to be?

7   A.  This is an email -- I'm sorry.  This is a letter that I

8   wrote that encloses supplemental discovery.

9            MR. WEINSTEIN:  OK.  Defendant offers Defendant's

10  Exhibit 10.

11           THE COURT:  Any objection?

12           MR. BLAIS:  Your Honor, I object on relevance grounds.

13  The government's late disclosure of materials that are not the

14  subject of the motion to dismiss seems to me to be irrelevant.

15           THE COURT:  I have a feeling that's not why it's being

16  offered.

17           MR. WEINSTEIN:  Correct, yes.  OK.

18           THE COURT:  Received.  Go ahead.

19           (Defendant's Exhibit 10 received in evidence)

20  BY MR. WEINSTEIN:

21  Q.  Now, the letter that is Defendant's Exhibit 10 is dated

22  December 17, 2019, correct?

23  A.  Yes.

24  Q.  That's six weeks before the January 28, 2020, meeting?

25  A.  Yes.

K8CHJAIH                      La Morte - Direct

1    Q.  Where the recording, you state, was mentioned?

2    A.  Yes.

3    Q.  So this is before?

4    A.  Yes.

5    Q.  OK.  And you produced December 17, 2019, six separate

6    items, correct?

7    A.  Yes.

8    Q.  Some over a thousand pages, or close to it, yeah, close to

9    a thousand pages, some?

10   A.  The emails, there's an email category that's --

11            THE COURT:  The Bates range is in the document.  The

12   document is in evidence.  What do we need a calculation or a

13   confirmation of what's on the page for?

14            MR. WEINSTEIN:  Fair enough.  Thank you, your Honor.

15   Q.  It reflects returns from at least four grand jury

16   subpoenas?

17   A.  I'm not sure about that.

18   Q.  OK.  What are they, then?

19   A.  I don't know.  I'd have to go back and look at the

20   documents to see if we obtained these from grand jury subpoenas

21   or from some other way.  I don't know, unless I'm missing

22   something in the letter.

23   Q.  Where were these documents?

24   A.  I don't recall.

25   Q.  OK.  Were they -- did you think:  Did I get these from the

1  FBI?  Did the FBI have them in their case file?  What's the

2  answer to that?

3  A.  I don't recall.  I don't recall where I got these documents

4  from.  I'd have to go back and look at -- I'd have to go back

5  and look at stuff to refresh my memory on that.

6  Q.  It's financial spreadsheets.  What do you recall about

7  those?

8  A.  I don't have a recollection.

9  Q.  Now, Mr. Jain was arrested in January of 2018, correct?

10  A.  January 2019.

11  Q.  Thank you.

12         January 2019?

13  A.  Yes.

14  Q.  OK.  So this letter is December 17, 2019, it's almost a

15  year later?

16  A.  Yes.

17  Q.  And by this time you had represented to the Court a number

18  of times that discovery was already complete?

19  A.  Yes.

20  Q.  Is that right?

21         All right.  So this letter, a substantial amount of

22  discovery after those representations, right?

23  A.  Yes, although I don't recollect whether these were things

24  in our file that were not produced for one reason or another or

25  if I had received them later.  Sitting here, I don't recollect.

1   For example, could be that I represented discovery was complete

2   and then subsequently received material, right?  That happens

3   all the time.  I just don't recollect here what the situation

4   was.

5   Q.  Were any of these items from the FBI?

6   A.  I don't recall.  I don't recall if these were.  I don't

7   recall.  They could have been in our shared drive and

8   overlooked.  They could have been from the FBI.  They could

9   have been subpoena returns coming in.  I just don't recollect

10  here.

11  Q.  Does the fact that you found additional discovery, even

12  though you cannot recollect it here where it came from, just

13  the fact that you discovered substantial additional discovery

14  that needed to be produced a year after the arrest of the

15  defendant, didn't it move you to call the FBI and say:  Do you

16  have anything else?  I need to complete discovery.  I need to

17  know whether you have anything else because I need to be done

18  here?  Did you do that?

19  A.  That assumes that those materials existed prior to when I

20  made representations or prior to when the FBI gave me

21  materials.  I don't know that sitting here, so I'm having a

22  hard time answering the question.

23  Q.  Did you review your discovery letters in preparation for

24  your testimony here today?

25  A.  No.

 1              MR. WEINSTEIN:  I'm going to have marked, please, 11,

 2    Defendant's Exhibit 11.

 3    Q.  OK.  Do you have that in front of you?

 4    A.  Yes.

 5    Q.  Do you recognize that?

 6    A.  Yes.

 7    Q.  What do you recognize it to be?

 8    A.  This is a discovery cover letter dated December 18, 2019,

 9    from me to the defense.

10    Q.  Thank you.

11              And that's just a day after Defendant's Exhibit 10;

12    it's the very next day?

13    A.  Yes.

14              MR. WEINSTEIN:  Offer Defendant's Exhibit 11.

15              MR. BLAIS:  Your Honor, I object on the same relevance

16    grounds.

17              THE COURT:  Yes, how is this relevant?

18              MR. WEINSTEIN:  It's another example that additional

19    discovery -- that the AUSA determined that there was

20    substantial additional discovery that needed to be produced

21    that would have moved the AUSA to ask the FBI:  Do you have

22    anything else?  Because yesterday I just sent out thousands of

23    pages.  Here's more emails.  I'm sending a discovery letter the

24    very next day.

25              THE COURT:  You asked that question repeatedly and --

1          MR. WEINSTEIN:  This is a new letter, your Honor.

2          THE COURT:  I understand that.  So ask the question.

3    You don't need the letter in evidence.  What does the letter

4    make more likely as a result of its receipt into evidence?

5          MR. WEINSTEIN:  I'm using it to ask the question so

6    that the witness has in front of her the letter so that I can

7    ask about the letter.  That's all, just to remind her and for

8    context on my questions.  That's all.

9          THE COURT:  You could ask:  Did you discover --

10   produce any discovery after December 17?  And if the witness

11   says, I don't remember, you could use the document to refresh

12   her recollection.

13   BY MR. WEINSTEIN:

14   Q.  Do you recall on -- thank you.

15        Do you recall on December 18, 2019, just a day later,

16   you produced additional discovery emails?

17   A.  I don't recall that, but reading this letter, it states at

18   the bottom:  "Please note that the government is in possession

19   of additional emails that are corrupted and must be reformatted

20   before production."  I remember that there was an issue with

21   one of our grand jury subpoena returns.  I don't remember -- I

22   actually don't remember what entity it was, but they had given

23   us a production.  And part of the emails we tried for a while,

24   and tried with IT, to work with because they were corrupted,

25   and we were unable to resolve that issue.  And so what we ended

1   up doing was making a partial production and then going back to

2   the entity and asking if they had uncorrupted versions of the

3   emails.  So I remember that issue, and I think that these

4   letters, in part at least, relate to that issue.

5           THE COURT:  All right.  Since the witness read from

6   the letter, I'm going to receive it into evidence, Exhibit 11

7   is received.  Go ahead.

8           (Defendant's Exhibit 11 received in evidence)

9   BY MR. WEINSTEIN:

10  Q.  All right.  So there was an issue with email?

11  A.  Yes.

12  Q.  All right.  Did that move you to ask the FBI:  Do you have

13  any other electronic information that I should be producing?

14  A.  No, because these materials came directly to our office.

15  Q.  OK.  They didn't go through the FBI?

16  A.  Correct.

17  Q.  OK.  Now -- excuse me.

18          And this number's going to be 12.  I'm going to hand

19  you what we're going to mark for identification as Defendant's

20  Exhibit 12.

21          Do you have that in front of you?

22  A.  Yes.

23  Q.  All right.  Is that an affidavit that you swore under oath

24  and submitted to the New York State Supreme Court?

25  A.  Yes.

K8CHJAIH                          La Morte - Direct

1          MR. WEINSTEIN:  All right.  Offer Defendant's

2     Exhibit 12.

3          THE COURT:  Any objection?

4          MR. BLAIS:  No, your Honor.

5          THE COURT:  Received.

6          (Defendant's Exhibit 12 received in evidence)

7     BY MR. WEINSTEIN:

8     Q.  All right.  Did you draft this yourself?

9     A.  Yes.

10    Q.  All right.  And you drafted this because you were concerned

11    that your discovery in the criminal case was being given to the

12    defendant Niket Jain's civil attorney, correct?

13    A.  Yes.  Let me just look at this one second.  That certainly

14    in part motivated it.

15          I was -- that certainly in part motivated it.  What

16    I'm trying to figure out is whether -- I'm trying to recollect

17    whether we also wanted to stay the civil case because discovery

18    in the civil case might interfere with the criminal case.  It

19    was what we generally do.  Yes, it was also in part motivated

20    by what you had said.

21    Q.  Now, so it was motivated by two things: One, you were

22    concerned that there was a disclosure of the discovery material

23    from the criminal case to a civil lawyer?

24    A.  Yes.

25    Q.  And you just wanted to stay the state case pending the

K8CHJAIH                          La Morte - Direct

1   criminal case to prevent discovery in the civil case?

2   A.  Right, with the thought that discovery and depositions, and

3   the like, would interfere with the criminal case.

4   Q.  Now, obviously, as of the date of Exhibit 12, which

5   was September 12, 2019, you had not produced the Krigsfeld

6   devices, correct?

7   A.  Correct.

8   Q.  Were you concerned that they could be produced in the state

9   case unless you stayed?

10  A.  No, I had forgotten about them.  They were not in my mind.

11  Q.  Now, Exhibit 12, you represent to the state court,

12  paragraph 2:  I am one of the AUSAs in charge of the federal

13  criminal case, United States v. Niket Jain, give the citation,

14  and you state:  I have personal knowledge --

15         THE COURT:  Look, Mr. Weinstein, this is never come to

16  an end if you're going to read from documents that are in

17  evidence.

18         MR. WEINSTEIN:  OK.  I'll stop.

19         THE COURT:  Can your question.

20         MR. WEINSTEIN:  I'll stop.

21  Q.  You moved to intervene, correct?

22  A.  Yes.

23  Q.  You're a federal law officer, correct?

24  A.  Yes.

25  Q.  Was one of the bases of your -- well, one of the

1    representations under oath to the state court that discovery

2    was complete in the federal criminal case?

3    A.  Yes.

4    Q.  So you represented to the state court that discovery was

5    complete.  This is September 12, 2019, a year ago?

6    A.  Yes.

7    Q.  OK.  Before you did that under oath, did you think:  Is

8    discovery complete?  I better make sure it's complete because

9    I'm now going to state court intervening, staying a case, and

10   representing discovery is complete under oath.  Is it complete?

11   Did you think that?

12   A.  I had thought it was complete at the time I made that

13   representation, yes.

14   Q.  Did you consult with the FBI agent to say:  Look, I'm going

15   to be staying a state case, going to be making representations

16   under oath.  Do we have anything else?

17   A.  No.  I had -- based on my discovery conversations with the

18   agent, first with Agent Boddy and then with Agent Polonitza,

19   with respect to the emails, I had thought that we were in

20   compliance with our discovery obligations.  So at this time I

21   did not go back and specifically ask the FBI if there was

22   anything else.

23   Q.  Your motion was granted to intervene, correct?

24   A.  Yes.

25   Q.  Your motion was granted to stay, right?

K8CHJAIH                     La Morte - Direct

1    A.  Yes.

2    Q.  But your representation that discovery was complete was not

3    accurate, correct?

4    A.  Correct.

5    Q.  Did you go back to the state court to correct your

6    inaccurate statement?

7    A.  I have not, but that's an oversight.

8    Q.  What was an oversight?

9    A.  Not going back to the state court.  But, no, I have not

10   gone back to the state court to correct that.

11   Q.  In this proceeding, when was the -- well, was your

12   affirmation to the state court referenced in part of the motion

13   practice that brings us here today?

14   A.  I believe it was referenced in your brief.  I don't

15   remember reading it.  I don't remember reading this actual

16   affirmation, but I believe you did reference it in one of your

17   briefs.

18   Q.  But you didn't go back to the state court?

19   A.  No.

20          THE COURT:  All right.  You had asked that question

21   previously.

22          MR. WEINSTEIN:  Yes.

23          THE COURT:  You got an answer to it, and then you're

24   asking it a second time.

25          MR. WEINSTEIN:  I will refrain from doing so.

 1              THE COURT:  Appreciate that.

 2              MR. WEINSTEIN:  Thank you.

 3     BY MR. WEINSTEIN:

 4     Q.  Now, Mr. Jain's previous counsel, Mr. Varghese, expressed

 5     to you a concern about the authenticity and completeness of the

 6     discovery productions in this case.  Is that accurate?

 7     A.  I don't recall.  I remember he had some issues.  I think it

 8     was mostly technical issues with the emails regarding

 9     encryption and not being able to open them.  I don't know -- I

10     don't recall that he raised issues about completeness.

11     Q.  OK.  Going to hand you what we're going to mark as 13.

12              You have that in front of you?

13     A.  Yes.

14     Q.  OK.  Now, take a look at the first paragraph.

15     A.  You mean the one labeled "1"?

16     Q.  No, actually, the one that begins "This letter is

17     submitted."

18     A.  OK.  Yes.

19     Q.  Does this refresh your recollection that on October 10,

20     2019, Mr. Varghese wrote to you that the defense is still

21     waiting on answers from the government on the authenticity and

22     completeness of its discovery productions?

23     A.  That's what the letter says.  It doesn't refresh my

24     recollection that he had issues with the completeness of the

25     discovery productions.

K8CHJAIH                    La Morte - Direct

1   Q.  OK.  All right.  Well, do you recall this letter?

2   A.  Yes, I recall the letter.

3          MR. WEINSTEIN:  Going to offer 13, Defendant's

4   Exhibit 13.

5          THE COURT:  Any objection?

6          MR. BLAIS:  No, your Honor.

7          THE COURT:  Received.

8          (Defendant's Exhibit 13 received in evidence)

9   BY MR. WEINSTEIN:

10  Q.  Does it not say the defense is still waiting on answers

11  from the government on the authenticity and completeness of its

12  discovery productions?

13  A.  No, and that's what I said, that's what the letter says.

14  Q.  All right.  Did this letter that raised questions on the

15  completeness and authenticity of discovery move you to contact

16  the FBI and say:  Is it complete?  Is discovery complete?

17  A.  I would need to know -- I would need to refresh on what he

18  meant by the completeness of the discovery productions.  That

19  is not my recollection of his issues with the emails that we

20  had been -- that we had provided them, so I would need to know

21  more about what he means, what Mr. Varghese meant by the

22  completeness of the discovery productions.

23  Q.  Wasn't --

24  A.  I do not recollect that he thought that there were

25  categories of documents or particular types of emails that were

K8CHJAIH                        La Morte - Direct

1    missing from the production.  I don't recall that.  My

2    recollection was that there were a number of technical issues

3    concerning the CDs or hard drives that we had given him that

4    contained the emails, and I think -- I believe that we had

5    worked -- ultimately worked through those issues.  But I don't

6    recollect something to the effect of we believe these types of

7    emails exist out there, and you're not providing them to us.  I

8    don't recollect that.

9    Q.  Do you recall him being concerned and asking you whether

10   emails had been deleted and he hadn't received them?

11   A.  I don't recollect.

12   Q.  You don't recall that?

13   A.  No.

14   Q.  Take a look at page 6 -- I'm sorry.  Paragraph 6 on page 2.

15   A.  Yes.

16   Q.  Does that refresh your recollection that Mr. Varghese was

17   concerned on what the source of the emails that were produced

18   were because he was concerned that some might be deleted?

19   A.  I don't know if he was concerned that some might be

20   deleted, but he was concerned about the source of the emails

21   because he -- reading the letter, he states that he had thought

22   that those particular emails were not obtained pursuant to a

23   search warrant.  And I know -- I also recall once I saw this, I

24   don't recall who the defense counsel was at the time, but I

25   believe I sent an email clarifying this.

K8CHJAIH                          La Morte - Direct

1  Q.  And these emails that were of concern in paragraph 6 on

2  page 2 of Exhibit 13, they were obtained directly by the FBI

3  using Joseph Krigsfeld's password, correct?

4  A.  Yes.

5  Q.  Now, the FBI received the passwords and the Krigsfeld

6  devices at the same time, isn't that right?

7  A.  I wasn't there, but that's my understanding.

8  Q.  Wasn't the subject of the Krigsfeld devices and access to

9  the email part of the debriefing on October 3, 2018?

10 A.  Can you repeat that.

11 Q.  Yes.  Weren't the Krigsfeld devices, the existence of the

12 Krigsfeld devices, and that Krigsfeld had email addresses which

13 he would provide the password to the FBI part of the same

14 discussion on October 3, 2018?

15 A.  I don't recall.

16 Q.  But in any event, the problem and questions about email did

17 not move you to think:  Oh, we have two computers and a

18 telephone?

19 A.  No, because the emails were accessed entirely separate from

20 the devices.  So every single time that we had discussions

21 about emails, these were Gmail emails that -- my understanding

22 was that the FBI had downloaded the Gmail -- it's called an

23 inbox -- onto their own systems.  So every time we had to go

24 look for emails, that's where we would -- that's where you

25 would go to find them.

K8CHJAIH                    La Morte - Cross

1           And I actually believe that we only needed to use the

2     password once to initially get into the emails and then

3     download the inbox.  I don't think it was a situation where you

4     repeatedly go back to the password, but that's what I

5     discovered subsequently.  But I know, though, at the time the

6     issue with only needing the password once was something I

7     discovered subsequently.  What I do remember at the time,

8     though, was that the agent had downloaded the inbox, which is

9     the entire Gmail inbox, entire Gmail account, I should say,

10    onto their own system.  So every time we had to go back to

11    emails, that's what they would go back to.

12    Q.  But you didn't think, oh, the computers might show

13    additional emails than what the government has produced?

14    A.  No, I did not remember that we had gotten computers.

15           MR. WEINSTEIN:  Let me see if I have anything else.

16           I have nothing further for this witness, your Honor,

17    at this time.

18           THE COURT:  All right.  Cross.

19           MR. BLAIS:  May I inquire?  Thank you, your Honor.

20    CROSS-EXAMINATION

21    BY MR. BLAIS:

22    Q.  Good afternoon, Ms. La Morte.

23    A.  Good afternoon.

24    Q.  Ms. La Morte, you joined the Criminal Division of the U.S.

25    Attorney's Office in March of 2017, correct?

1   A.  Correct.

2   Q.  And you first joined the Aberon investigation in February

3   of 2018, correct?

4   A.  Yes.

5   Q.  And you were in the general crimes unit of the U.S.

6   Attorney's Office at the time, is that right?

7   A.  Yes.

8   Q.  And that's the unit where all Criminal Division prosecutors

9   spend their first year, is that right?

10  A.  Yes.

11  Q.  And at the time that you joined the Aberon investigation in

12  February of 2018, you were not the lead AUSA on the matter, is

13  that right?

14  A.  That's right.

15  Q.  In fact, the lead AUSA was Andrew Adams, right?

16  A.  Correct.

17  Q.  And in addition to being the lead AUSA on the matter,

18  Mr. Adams was also a supervisor in the U.S. Attorney's Office,

19  correct?

20  A.  Yes.

21  Q.  And is it fair to say that Aberon was your first securities

22  fraud investigation?

23  A.  Yes.

24  Q.  Now, there came a point in time, correct, you've testified

25  about it on direct, where the FBI received three electronic

K8CHJAIH                    La Morte - Cross

1    devices from the person designated as Individual 1 in the

2    indictment, correct?

3    A.  Yes.

4    Q.  It's correct that Mr. Adams was the lead AUSA on the Aberon

5    investigation at the time the FBI received those devices?

6    A.  Yes.

7    Q.  Now, you'd agree that you were copied on five or so emails

8    that were sent by Agent Boddy in early October 2018 about the

9    retrieval of the devices from Individual 1, is that right?

10   A.  Yes.

11   Q.  And you don't recall having any conversations with

12   Mr. Adams in 2018 about the devices?

13   A.  Correct.

14           MR. WEINSTEIN:  I'm going to object to the leading.  I

15   understand it's cross.  I respectfully submit it shouldn't be

16   considered cross.  It's actually a government witness.

17   Respectfully submitted.

18           THE COURT:  All right.  Overruled.

19           Go ahead.

20   Q.  So do you want to --

21   A.  I'm sorry.  Can you repeat.

22   Q.  Sure.  You don't recall having any conversations with

23   Mr. Adams in 2018 about the devices?

24   A.  Correct.

25   Q.  Same question as to Agent Boddy.  Do you recall having any

K8CHJAIH                    La Morte - Cross

1   conversations with him in 2018 about the devices?

2   A.  No.

3   Q.  You didn't participate in any discussions back in 2018

4   regarding a plan to review the devices, did you?

5   A.  Correct, we didn't have that discussion.

6   Q.  And you personally didn't review any of the contents of the

7   devices in 2018, is that fair?

8   A.  Correct.

9   Q.  It's also true that in addition -- you testified about this

10  on direct as well -- it's also true that in addition to

11  providing the three devices, Individual 1 also provided the

12  login credentials for his email account?

13  A.  Yes.

14  Q.  Or email accounts?

15  A.  Yes.

16  Q.  And it's fair to say that the investigative focus in late

17  2018 was on reviewing Individual 1's email?

18  A.  Yes.

19  Q.  Now, at some point in December of 2018, you became the lead

20  AUSA on the Aberon matter, correct?

21  A.  Roughly in that time period, yes.

22  Q.  Mr. Adams had gotten promoted?

23  A.  Yes.

24          THE COURT:  What time period in 2018?

25          THE WITNESS:  Roughly December, your Honor.

K8CHJAIH                    La Morte – Cross

1          THE COURT:  Thank you.

2          THE WITNESS:  I would say roughly December 2018.

3          THE COURT:  Thank you.

4   BY MR. BLAIS:

5   Q.  After that point you became responsible for shepherding the

6   indictment of Mr. Jain through the grand jury, correct?

7   A.  Yes.

8   Q.  And that indictment happened in January of 2019?

9   A.  Yes.

10  Q.  And you were responsible for the discovery production that

11  followed Mr. Jain's indictment, correct?

12  A.  Yes.

13  Q.  And you worked with Agent Boddy in preparing that discovery

14  production, correct?

15  A.  Yes.

16  Q.  You had conversations with Agent Boddy about what materials

17  should be produced, correct?

18  A.  Yes.

19  Q.  At the time that you had those conversations with

20  Agent Boddy, you had forgotten about the three devices that had

21  been collected from Individual 1, is it fair to say?

22  A.  Yes.

23  Q.  In all the discussions that you had with Agent Boddy about

24  discovery, he never brought up the existence of the devices

25  that had been collected from Individual 1, correct?

K8CHJAIH                        La Morte - Cross

1   A.  Correct.

2   Q.  You never specifically asked him to turn over those

3   devices, did you?

4   A.  Correct.

5   Q.  And you didn't review your emails before the discovery

6   production to determine whether they referenced any

7   discoverable material, correct?

8   A.  Correct.

9   Q.  Is it fair to say that you believed that Agent Boddy had

10  given you, for production to Mr. Jain, all of the relevant

11  evidence that was in the FBI's possession?

12  A.  Yes.

13  Q.  Did you and Agent Boddy ever specifically discuss not

14  producing to Mr. Jain the three electronic devices that had

15  been provided by Individual 1?

16  A.  No, we didn't discuss that.

17  Q.  Now, you'd agree that there were several instances where

18  you informed the Court that discovery in this matter was

19  complete or close to complete, correct?

20  A.  Yes.

21  Q.  You'd also agree that those statements were not correct

22  because at the time that they were made, the three electronic

23  devices had not been produced, correct?

24  A.  That's correct.

25  Q.  At the time that you made those statements about discovery

K8CHJAIH                    La Morte - Cross

1   being complete, you believed them to be true, correct?

2   A.  Yes.

3   Q.  That was because you had forgotten about the existence of

4   the three devices at the time?

5           MR. WEINSTEIN:  Asked and answered.  Objection.

6           THE COURT:  Overruled.

7           Go ahead.

8   Q.  And that was because you had forgotten about the existence

9   of the three devices at the time you made those statements,

10  correct?

11  A.  Correct.

12  Q.  And it's true, is it not, that during all of 2019, you

13  never had a conversation with an FBI agent about the devices?

14  A.  Correct.

15  Q.  It's also true during 2019 you never had a conversation

16  with any of your AUSA colleagues about the devices?

17  A.  Correct.

18  Q.  Is it also true that during 2019 you never had a

19  conversation with Individual 1 about the devices?

20  A.  Correct.

21  Q.  Now, Ms. La Morte, you participated in a trial preparation

22  session with Individual 1 in January of 2020, correct?

23  A.  Correct.

24  Q.  During that session, Individual 1 referred to the existence

25  of some recordings, correct?

K8CHJAIH                    La Morte – Cross

1    A.  A recording, yes.

2    Q.  And Individual 1 suggested that he had turned over that

3    recording to the government, correct?

4    A.  Yes, to the FBI, to the agent.

5    Q.  Right.  By the time of that meeting, Agent Polonitza had

6    taken over from Agent Boddy as the case agent on the Aberon

7    matter, right?

8    A.  Yes.

9    Q.  But Agent Polonitza was not at the meeting with Individual

10   1 where Individual 1 mentioned the recording, correct?

11   A.  Correct.

12   Q.  Now, after that meeting with Individual 1, you contacted

13   Agent Polonitza and asked him to investigate whether there were

14   any unproduced recordings, isn't that right?

15   A.  Yes.

16   Q.  And in response to that request, he told you that the FBI

17   had obtained the three devices from Individual 1, correct?

18   A.  Yes.

19   Q.  And after that you went back and reviewed your old emails,

20   right?

21   A.  Correct.

22   Q.  You discovered the correspondence from October of 2018

23   about the devices, isn't that right?

24   A.  Yes.

25   Q.  And that conversation with Agent Polonitza and your review

1    of your emails refreshed your recollection that Individual 1

2    had provided the three devices to the government, correct?

3    A.  Yes, it was a specific October 9 email that refreshed my

4    recollection.

5    Q.  And you realized that those devices had never been

6    produced, right?

7    A.  Correct.

8    Q.  You therefore emailed AUSA Raymond and Agent Polonitza and

9    told them that the devices would need to be produced, isn't

10   that right?

11   A.  Yes.  I said -- in emails and orally I said that we need to

12   retrieve the devices, figure it out, alert the Court and

13   defense counsel, and produce them.

14   Q.  So, just to be clear, it was you who informed AUSA Raymond

15   about the non-production of the devices, correct?

16   A.  Yes.  AUSA Raymond was not at that meeting with that prep

17   session with Individual 1, so I'm the one that tasked Agent

18   Polonitza with retrieving or looking to see if we had a device.

19   I'm the one that looked at the emails, and then once Agent

20   Polonitza reported back to me that the FBI had three devices,

21   it was I that directed -- I that told the team that we needed

22   to do those things, and I also told my supervisor.

23   Q.  All right.  And it was you who first provided instruction

24   that these devices needed to be produced as quickly as

25   possible, correct?

K8CHJAIH                           La Morte - Cross

1   A.  Yes.

2   Q.  And you directed these items to be produced because you

3   understood they might have discoverable material on them, is

4   that right?

5   A.  Yes.

6   Q.  Now, was your production decision in any way motivated by a

7   concern that the existence of the devices would have been

8   discovered in Individual 1's 3500 material?

9   A.  No.

10  Q.  Was your production decision in any way motivated by a

11  concern that Individual 1 might testify about these devices on

12  the stand during a trial?

13  A.  No.

14  Q.  Was the failure to produce these devices anything other

15  than a mistake?

16  A.  No.

17  Q.  Did you make a conscious decision not to produce these

18  devices?

19  A.  No.

20  Q.  Did you make a deliberate decision not to produce them?

21  A.  No.

22          MR. BLAIS:  I have no further questions, your Honor.

23          THE COURT:  All right.  Any redirect?

24          MR. WEINSTEIN:  Yes.  Thank you.

25  REDIRECT EXAMINATION

K8CHJAIH                    La Morte - Redirect

1   BY MR. WEINSTEIN:

2   Q.  Agent Boddy was part of the prosecutorial team of the

3   Aberon investigation?

4   A.  Yes.

5   Q.  OK.  So on cross-examination you were asked, didn't you

6   tell AUSA Raymond that you discovered your October 9 email?

7   A.  Can you repeat that.

8   Q.  Yes.  Were you asked on cross-examination -- let me ask it

9   a different way.

10          When you discovered your October 9 email --

11  A.  Yes.

12  Q.  -- did you tell AUSA Raymond?

13  A.  Yes, I forwarded him the email and told -- I forwarded him

14  that October 9 email and I forwarded it to Agent Polonitza.

15  Q.  So AUSA Raymond knew that you were aware of the Krigsfeld

16  devices back in October -- on October 9, 2018; he knew that?

17  A.  Yes, because I forwarded him an email from October

18  including me that -- that referenced the devices, if that makes

19  sense.

20  Q.  Yes.  Going to hand you what we're going to mark as

21  Exhibit 14.

22          You have that in front of you?

23  A.  Yes.

24  Q.  You recognize Exhibit 14?

25  A.  Yes.

```
 1   Q.  What is it?
 2   A.  This is a letter that was written to the Court from the
 3   government.
 4   Q.  OK.  Did you participate in drafting this?
 5   A.  AUSA Raymond drafted this.  I don't -- I'm not sure if I
 6   reviewed it.  I probably did, but I'm just not entirely sure,
 7   but I probably did.
 8           MR. WEINSTEIN:  Even though it's publicly filed and is
 9   part of the docket, offer Exhibit 14.
10           THE COURT:  Any objection?
11           MR. BLAIS:  No objection, your Honor.
12           THE COURT:  Received.
13           (Defendant's Exhibit 14 received in evidence)
14   BY MR. WEINSTEIN:
15   Q.  Now, second paragraph, it says -- I'm not going to read it,
16   but does it indicate that returns from grand jury subpoenas had
17   been newly discovered and provided to the defense?
18   A.  Yes.
19   Q.  Aren't those the production -- does that refresh your
20   recollection that that is the December 17, 2019, production?
21   A.  I don't think it is.
22   Q.  OK.  When was that produced, then, the grand jury -- the
23   returns from the grand jury subpoena?
24   A.  I don't recall, but I believe it was in February.  I'm not
25   entirely sure, though, but recent to this letter.
```

1    Q.  Recent to the letter.

2              After the -- after you remembered the Krigsfeld

3    devices?

4    A.  I don't recall.

5    Q.  OK.

6    A.  You know what?  I actually think it was after.  I think it

7    was after.

8    Q.  Second paragraph, do you recall reading Samuel Raymond --

9    well, let's take a look at page 2.

10   A.  Page 2?

11   Q.  Yes.

12             Does page 2 indicate that the letter's from you also?

13   A.  Yes.

14   Q.  Now, this was an important letter, correct?  I mean, you

15   were disclosing -- the government was disclosing to the Court,

16   that it had discovered -- or that there was a substantial issue

17   with discovery that would likely cause the movement of the

18   trial date?

19   A.  Yes, it was -- yes, we were disclosing to the Court the

20   devices.

21   Q.  And prior to the drafting of this letter, AUSA -- or

22   supervisory AUSA Andrew Adams had been informed of the issue?

23   A.  Yes.

24   Q.  Right.  Had other supervisors at the U.S. Attorney's Office

25   been made aware?

1    A.  Yes.

2    Q.  How far up the chain?

3    A.  I don't know.  All I know is that I told my two

4    supervisors.  I don't know if they raised it further or not.

5    Q.  So it was a significant issue, fair to say?

6    A.  Yes.

7    Q.  So this was -- you were going to inform the Court.  It was

8    an important letter to review, correct?

9    A.  It was an important letter, yes.

10   Q.  Do you recall reading the portion of this letter prior to

11   its filing that states:  "Second, the government also learned

12   recently that the FBI has in its possession certain electronic

13   devices belonging to Individual 1, but the government has not

14   produced material from these devices"?

15            Do you recall reading that?

16   A.  No, I don't recall reading that.

17   Q.  Do you concede that it says that?

18   A.  Yes, absolutely.

19   Q.  That's not true, correct?

20   A.  Well, not in the sense that I had known about it in October

21   and then forgot and then rediscovered it in February.

22   Q.  Can you explain what you mean by that?

23   A.  Yes.  So I had, obviously, knew that we had the devices in

24   October of 2018 because I was on the emails.  I then forgot

25   that we had the devices and then for over a year did not recall

K8CHJAIH                        La Morte - Redirect

1   that we had these devices until what I had testified about what

2   happened at the end of January of 2020 in the prep session with

3   Joseph Krigsfeld.  So I had known, I'd forgotten, and then I

4   discovered that I had forgotten.

5   Q.  Isn't this a representation to the Court that the Southern

6   District of New York had not known about the devices?

7   A.  I'm not sure.  I don't know -- I'm not sure what AUSA

8   Raymond meant here.

9   Q.  But as soon as you discovered the October 9, 2018, email,

10  you forwarded it?

11  A.  Yes, it was forwarded to AUSA Raymond prior to the

12  submission of this letter, yes.

13  Q.  Now, you were the AUSA on the money laundering

14  investigation too, correct?

15  A.  Yes.  I testified previously I did much less work on that.

16  AUSA Adams did much more of the work on the money laundering

17  part of the investigation.

18  Q.  OK.  Have you discussed with AUSA Adams whether he

19  instructed Agent Boddy to not review the Krigsfeld devices?

20  A.  I did not discuss that with AUSA Adams.

21  Q.  Now, you were asked on cross-examination -- weren't you in

22  general crimes, so you were new, correct?

23  A.  Well, on cross-examination I think the question was -- or

24  the -- yes, the question was I was in general crimes at the

25  time I was assigned to the investigation.

K8CHJAIH                    La Morte - Redirect

1  Q.  Did you understand the point of that question that you --

2  A.  Yes, and I was -- I'm sorry.  Go ahead.

3  Q.  -- that you were an inexperienced prosecutor?

4  A.  Yes.

5  Q.  Isn't it a fact that you're actually a highly experienced

6  AUSA?

7  A.  I'm a highly experienced civil attorney, yes.

8  Q.  OK.  Are the obligations to know what materials you have

9  for discovery less in a criminal case than in a civil case?

10 A.  Absolutely not.

11 Q.  They're actually more, correct?

12 A.  It's very important in civil and criminal cases, yes.  It

13 is important to know and be on top of discovery, yes.

14 Q.  Now, Agent Boddy being part of the prosecutorial team never

15 told you:  I'm not giving you the devices because I consider

16 them to be only money laundering evidence, and I'm not going to

17 review that till later?  He never told you that?

18 A.  Correct, he never told me that.

19 Q.  Now, you were also asked, and you stated just recently,

20 AUSA Adams was primary -- the primary AUSA the beginning of the

21 Aberon investigation, then you took over.  And did you

22 understand the point of that question on cross-examination to

23 be, well, then you wouldn't be familiar with as much of this

24 case as Andrew Adams?

25          THE COURT:  Just ask your question.  We're not going

K8CHJAIH                    La Morte - Redirect

1  to have questions about what was the meaning of a question you

2  asked.

3            MR. WEINSTEIN:  Fair enough.

4  Q.  Wouldn't the fact that you became the lead AUSA partially

5  through the investigation lead you to discuss with Andrew Adams

6  and the agent exactly what had occurred before you became the

7  lead?

8  A.  I'm sure we certainly had conversations about what had

9  occurred before I became the lead.  I don't remember the

10 particulars of the conversation, but of course, it's not like I

11 started and nothing has happened in the past.  Yes, there are

12 conversations.

13 Q.  OK.  But you don't recall them?

14 A.  I generally don't recall them.

15 Q.  If you don't recall them, couldn't they have been regarding

16 the devices?

17 A.  No.  I was assigned to this investigation in February of

18 2018, right?  I was still in general crimes.  In March of 2018,

19 I moved to narcotics.  I spent six months in narcotics.  I did

20 not move to the money laundering unit until September of 2018

21 when Joseph Krigsfeld was arrested.  So it was at that point,

22 presumably at some point between September and October of 2018,

23 when the devices first came up, and then I was obviously made

24 aware of that in the October 2018 emails.  Conversations what

25 occurred prior wouldn't involve the devices because they didn't

K8CHJAIH                    La Morte - Redirect

1    come into existence until September or October of 2018.

2    Q.  You weren't lead at the time of the taking possession of

3    the devices, correct?

4    A.  Correct.

5    Q.  You weren't concerned you didn't know everything because

6    you weren't the lead, isn't that right?

7    A.  I'm sorry?  Can you repeat that.

8    Q.  Weren't you concerned that you didn't know everything

9    because you weren't the lead AUSA?

10   A.  I was concerned that I didn't know everything because you

11   want to know as much as possible that you -- about a case.  It

12   was a big -- again, I had just gotten out of narcotics.  It was

13   a heavy caseload.  I had narcotics cases, my money laundering

14   cases, and this case.  So at that point between September of

15   2018 -- I'm sorry, yeah, September 2018 when I move into the

16   unit until I became a lead in December of 2018-ish, I tried to

17   learn as much as I can about the case.  I had to -- like I had

18   testified on cross-examination, I had to get the materials

19   ready for the indictment and shepherd that through.  I had to

20   get the cooperation paperwork ready for Individual 1 and

21   shepherd that through.  So I was doing all those things, and I

22   was doing my best to get caught up to speed while I was doing

23   them.

24   Q.  Individual 1 pled guilty to securities fraud, correct?

25   A.  Yes.  I have to look at the paperwork to remind myself the

K8CHJAIH                          La Morte - Redirect

1   exact charges, but, yes, securities fraud.

2   Q.  Involving Aberon?

3   A.  Yes, yes.

4   Q.  Your testimony is that he never told you that the purported

5   beneficial owner of Akros which provided 99 percent of the

6   funds had stated he wasn't a victim?  He never told you?

7            MR. BLAIS:  Objection.  This is beyond the scope of

8   the cross.

9            THE COURT:  Yes.  Sustained.  And it also -- I'll

10  leave it at that.

11           MR. WEINSTEIN:  OK.  Nothing further for this witness.

12  Thank you.

13           THE COURT:  All right.  Do you have any other

14  witnesses?

15           MR. WEINSTEIN:  No, your Honor.

16           THE COURT:  OK.  Does the government have a rebuttal

17  case?

18           MR. BLAIS:  No, your Honor.

19           THE COURT:  OK.  So you may step down.  Thank you,

20  Ms. La Morte.  Just leave the papers there.  Somebody else will

21  take care of it.  Yes, thank you.

22           (Witness excused)

23           THE COURT:  So the record is closed on this hearing.

24  Mr. Weinstein, do you want to return for argument, or do you

25  want to put in -- this morning you made a pitch before the

1   first witness was called that you may want to put in briefing

2   on this.

3            MR. WEINSTEIN:  Yes.

4            THE COURT:  So I'm asking you now, what do you want to

5   do?

6            MR. WEINSTEIN:  Yes, I would like -- I would like to

7   make a supplemental submission based upon the testimony, yes.

8            THE COURT:  All right.  When can you get that in?

9   When do you want to get that in?  And what are you doing?  Are

10  you going to do -- is it going to repeat the briefing that

11  you've already put in on this motion?

12           MR. WEINSTEIN:  No.

13           THE COURT:  Repeat the case law, the standards, the

14  chronology, or what are you going to do in this briefing?

15           MR. WEINSTEIN:  No, I'm going to deal with the --

16  particularly with the testimony of Agent Boddy and supplement

17  the case law on the case agent and integrate the facts from

18  today into that on the case agent being part of the

19  prosecutorial team.  The prosecutorial team --

20           THE COURT:  I think that's agreed to, right,

21  Mr. Blais?

22           MR. BLAIS:  We don't dispute that the FBI's part of

23  the prosecutorial team.

24           THE COURT:  Stipulated.  OK.

25           MR. WEINSTEIN:  OK.  I --

1        THE COURT:  Maybe there are other things you can

2    stipulate to also.

3        MR. WEINSTEIN:  Perhaps.

4        THE COURT:  Yes.

5        MR. WEINSTEIN:  I would like to put in supplemental

6    briefing.  I think that's the responsible thing to do in this

7    circumstance.  So I would like to get the transcript, and then

8    a week after I get the transcript, then I'll order the

9    transcript quickly.  Maybe two weeks, your Honor?

10        THE COURT:  So you want to get it in in two weeks.

11        And how much time does the government need to respond?

12        MR. BLAIS:  I think the same, your Honor, two weeks.

13        THE COURT:  All right.  That's what we'll do.

14        MR. WEINSTEIN:  Thank you very much.

15        THE COURT:  You're quite welcome, sir.

16        With thanks to our court reporter for her patience,

17    unless there's anything further -- is there anything further

18    from the government?

19        MR. BLAIS:  Not from the government, your Honor.

20        THE COURT:  From the defendant?

21        MR. WEINSTEIN:  No.  Thank you very much.

22        THE COURT:  All right.  We're adjourned.

23        (Adjourned)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

```
 1                        INDEX OF EXAMINATION

 2   Examination  of:                              Page

 3   WAYNE BODDY

 4   Direct By Mr. Weinstein  . . . . . . . . . . .10

 5   Cross By Mr. Blais . . . . . . . . . . . . . 113

 6   Redirect By Mr. Weinstein  . . . . . . . . . 122

 7   TARA LA MORTE

 8   Direct By Mr. Weinstein  . . . . . . . . . . 126

 9   Cross By Mr. Blais . . . . . . . . . . . . . 175

10   Redirect By Mr. Weinstein  . . . . . . . . . 185

11                       DEFENDANT EXHIBITS

12   Exhibit No.                               Received

13    6    . . . . . . . . . . . . . . . . . . . .70

14    3    . . . . . . . . . . . . . . . . . . . .77

15    8    . . . . . . . . . . . . . . . . . . . 102

16    1 and 2  . . . . . . . . . . . . . . . . . 110

17    9    . . . . . . . . . . . . . . . . . . . 155

18    10   . . . . . . . . . . . . . . . . . . . 160

19    11   . . . . . . . . . . . . . . . . . . . 166

20    12   . . . . . . . . . . . . . . . . . . . 167

21    13   . . . . . . . . . . . . . . . . . . . 172

22    14   . . . . . . . . . . . . . . . . . . . 186

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.