# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 18-CR-368** |
| | § | |
| **BRIAN SWIENCINSKI,** | § | |
| **SCOTT BREIMEISTER,** | § | |
| **CHRISTOPHER INCE, MD, and** | § | |
| **RONNIE MCADA, JR.,** | § | |
| | § | |
| **Defendants.** | § | |

## UNITED STATES' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS SWIENCINSKI, BREIMEISTER, AND MCADA'S MOTIONS TO DISMISS

The United States files this omnibus response in opposition to Defendants Swiencinski, Breimeister, and McAda's Motions to Dismiss.[1]  *See* Dkt. Nos. 428, 439, 444. All three motions to dismiss provide two distinct bases for the request: (1) double jeopardy and (2) "outrageous government misconduct."  *See* Dkt. Nos. 428 at 8, 439 at 1, 444 at 2.  With respect to double jeopardy, this Court denied the Motions to Dismiss on that basis at the Status Conference on April 4, 2023 ("April 4 Hearing").  *See* Rough Hrg. Trans. 4/4/23 at 93:1–3 ("As to the motions to dismiss the superseding indictment and to bar a retrial based upon double jeopardy, those motions are denied.").[2]

---

[1] At this Court's April 4, 2023, hearing, counsel for Ince "move[d] the Court to dismiss the indictment with prejudice, based on prior arguments that are on record, based on the record today," and he adopted the arguments presented by Defendants McAda and Breimeister.  Rough Hrg. Trans. 4/4/23 at 72:5–9.  Because the government understands that Ince's motion essentially adopts the arguments previously made by the other defendants, this Response in Opposition also applies equally to any pending Motion to Dismiss on behalf of Ince.

[2] The government notes Defendant Breimeister recently filed a Motion to Withdraw the Order Denying the Double Jeopardy Motion. The government intends to file a response in opposition to that motion.

1

Accordingly, this response focuses on the defendants' claim that the superseding indictment should be dismissed based on "outrageous government misconduct." The government responds substantively, but first reiterates: the government takes responsibility for the discovery and disclosure issues that arose in this case. This Court recently stated that "DOJ must be perfect in these types of cases because the results, the consequences, can be devastating if they're not perfect." Rough Hrg. Trans. 4/4/23 at 47:13–15. The government understands its duties and takes seriously its obligations.

While the government acknowledges and owns up to its errors in this case, it is important to note that this Court has made no findings regarding the nature of these errors and certainly has not found "outrageous government misconduct," as argued by the defendants. As discussed more fully during the April 4 Hearing, the trial team had no nefarious intent and did not operate in bad faith. Nevertheless, the defendants continue to act as if it has been established the government committed misconduct and did so intentionally. Yet in all of their filings and oral argument on these issues, the defendants have never explained with the specificity required how any of the disclosures the government made between December 7 and December 13, 2022, were material to them or how the defendants were prejudiced as a result.

Because this is not one of those "rarest circumstances" in which government conduct was "so outrageous" that it violated "fundamental fairness," and because the defendants have not and cannot show "actual prejudice," binding authority does *not* support dismissal of the superseding indictment. *See United States v. Swenson*, 894 F.3d 677, 684 (5th Cir. 2018); *United States v. Mauskar*, 557 F.3d 219, 231 (5th Cir. 2009). Accordingly, the government respectfully requests that this Court DENY the Defendants' Motions to Dismiss the Superseding Indictment, as well as any other relief requested, and set this case for trial.

## PROCEDURAL BACKGROUND

On June 27, 2018, a grand jury returned a nine-count indictment charging Brian Swiencinski, Scott Breimeister, and Vladimir Redko with fraud-related crimes arising out of their operation of several pharmacies in the Houston area. *See* Dkt. No. 1. On October 23, 2019, a grand jury returned a fourteen-count superseding indictment adding charges against Christopher Ince and Ronnie McAda, Jr. *See* Dkt. No. 111.

This case proceeded to trial on November 8, 2022. During trial, on December 7, 2022, this Court ordered the government to "make sure all appropriate notes/transcripts have been turned over to the defense." Tr. Trans. 12/7/22 at 292:1–3. Immediately following the Court's order, the government began its review. The government produced nine additional interview reports. Applying the broadest lens to the Court's order, the government also turned over agent rough notes for all testifying and non-testifying witness interview reports, totaling over 260 sets of rough notes. In reviewing and producing these rough notes, the trial team became aware for the first time of discrepancies between certain interview memoranda and the related rough notes, and disclosed those discrepancies to defense counsel. One such discrepancy from an interview of cooperator Leonard Carr related to Dr. Redko's prescriptions and appeared to relate to Dr. Redko's defense at trial. For this and other reasons stated on the record, the government moved to dismiss all counts against Dr. Redko.

On December 13, 2022, this Court declared a mistrial *sua sponte*. None of the parties objected timely and explicitly, despite the Court offering the parties an opportunity to do so. *See* Tr. Trans. 12/13/22 at 12–13; 14:4–10. The Court reasoned that had the late-disclosed information been turned over sooner, as to witnesses who had already testified, the defense might have cross-examined those witnesses differently or perhaps would have objected to different exhibits that

came in through those witnesses.  As a result, the Court would have to either allow recall of certain witnesses or strike their testimony in part or in full; either option creating too great a burden on the jury.  *Id.*  at 9:2–11:14.  The Court specifically made no finding regarding the government's intent.  *Id.* at 10:7–10.

On January 17, 2023, this Court held a "Brady hearing," ("January 17 Hearing") during which the government's review team explained its ongoing review process and preliminary findings.  The Court ordered the government to complete its review, which it did.

On April 4, 2023, this Court held a Status Conference ("April 4 Hearing"). The government presented on its completed review and findings.  After interviewing the three trial attorneys; Special Agents Derek Harmon (DCIS), Amel Khirieh (IRS), Steven Sandh (FBI), and Ashley Tucker (FBI); Sergeants Patricia Garcia (formerly of MFCU) and Dino Vergara (MFCU); and witness William Chan, the review team found there was no bad faith or nefarious intent.

## LAW AND ARGUMENT

The Fifth Circuit "has stressed that even in the case of the most egregious prosecutorial misconduct, an indictment may be dismissed only upon a showing of actual prejudice to the accused." *Swenson*, 894 F.3d at 684 (internal quotation marks and alterations omitted); *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) ("Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment."). "[W]hether the court is acting under its supervisory authority or its duty to protect the constitutional rights of defendants, an indictment may be dismissed only where the defendants' case has been unfairly prejudiced." *Swenson*, 894 F.3d at 684.

The remedy of dismissal with prejudice is extremely rare, therefore, because "[t]he supervisory powers of the district court allow it to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations . . . where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant." *United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983); *see Johnson*, 68 F.3d at 902 (explaining that a violation of the principle of "fundamental fairness" . . . will only be found in the rarest circumstances"). "Dismissal of an indictment with prejudice is a rare result because, even in the face of prosecutorial misconduct, there is a public interest in having indictments prosecuted." *Swenson*, 894 F.3d at 685 (internal quotation marks and citations omitted).

And while the Fifth Circuit "has expressly declined to foreclose the possibility that governmental ineptitude and carelessness could be so abhorrent as to warrant a dismissal with prejudice," *Swenson*, 894 F.3d at 685 (internal quotation marks and citations omitted), the Fifth Circuit does not appear to have affirmed the dismissal of an indictment with prejudice on those grounds recently, if ever.[3]

---

[3] The case law bears out that dismissal of an indictment with prejudice for failures to disclose certain information or *Brady* violations is rare. As the court in *United States v. Lashley* explained: "The Court is aware of only one case in which a federal appellate court affirmed the dismissal of an indictment for a Brady violation." 2011 WL 5237291, at *4 (E.D. Pa. Nov. 3, 2011) (citing *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008). In *Chapman*, the Ninth Circuit found that the district court did not clearly err when it found the government recklessly violated its discovery obligations and made flagrant misrepresentations to the court. *Chapman*, 524 F.3d at 1085 ("Here, the district court specifically found that the AUSA acted 'flagrantly, willfully, and in bad faith.'"). Since *Lashley* was decided in 2011, it appears that the Ninth Circuit affirmed the dismissal of an indictment with prejudice for the government's *Brady* violations in *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). A court within the Seventh Circuit made a similar observation regarding the rarity of dismissals with prejudice for misconduct: "[W]hile dismissal of an indictment is in theory available to sanction outrageous government misconduct, to this Court's knowledge the Seventh Circuit has never seen a case that warrants such an extreme step." *United States v. Kinger*, 2012 WL 175398 at *3 (N.D. Ind. Jan. 20, 2012) (citing *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006) (acknowledging that while the Supreme Court left open the possibility of dismissal when conduct is so outrageous that due process would bar the

This is not one of those "rarest circumstances" in which dismissal of the indictment is appropriate. The government again acknowledges that it should have disclosed certain material earlier, but this was not born out of any nefarious intent. Indeed, when the trial team learned of failures to disclose interview reports or discrepancies between notes and reports, they immediately produced the information and attempted to highlight pertinent discrepancies. Regardless, the government unhesitatingly takes responsibility for these shortcomings, and reaffirms that none of these missteps were intentional, grossly negligent, or malicious.

Although this Court has never described the government's actions in this case using the word "misconduct," *see* Tr. Trans. 12/13/22 at 13:7–10 (explaining that whether there was "nefarious intent behind the failure to disclose" was "not a finding for today"), the defendants' motions to dismiss rely, in part, on alleged "outrageous government misconduct." *See* Dkt. No. 428 at 8–9 (Breimeister); Dkt. No. 444 at 2–4 (McAda). And while the defendants' motions hurl accusations of intentionality, outrageousness, and deception, none of the motions allege with any specificity what exactly they rely on to support their charges.[4] *See Mauskar*, 557 F.3d at 231 (noting the court could not determine whether documents were "material" within the meaning of *Brady* because the defendant failed on appeal to identify the documents he claimed were *Brady* "with any specificity, or to explain to which charges the documents were relevant"); *see also*

---

government "from invoking judicial processes to obtain a conviction," the Seventh Circuit had "never taken what we see to be an extreme step of dismissing criminal charges against a defendant because of government misconduct.")).

[4] While the Court's consideration of these matters is ongoing, there is no reason why the defendants have not now (or previously) laid out the *legal* basis for their complaints with specificity. The defendants have the information that was disclosed (and have since December), and are positioned to explain how that information was material to them and how they were prejudiced as a result of its disclosure. Nevertheless, the defendants' Motions contain nothing more than conclusory statements unsupported by specific facts or legal argument.

*United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016) (to prevail on any *Brady*/*Giglio* claim, "a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material.").

For example, Defendant Breimeister broadly alleges that "multiple law enforcement agents intentionally omitted favorable information obtained during multiple interviews with multiple witnesses from the typewritten summaries of those interviews," that this was "pervasive among multiple agents and multiple witnesses throughout the entire investigation," which "impacted the entire trial," and that "the trial prosecutors were present for and participated in all or most of these witness interviews." Dkt. No. 428 at 9.  Similarly, Defendant McAda's Motion focuses on three categories: "(1) the government committed systemic Brady violations; (2) it coached a witness and attempted to cover up its witness coaching; and (3) it presented false evidence and failed to correct false testimony." Dkt. No. 444 at 4.  And while Defendant McAda incorporates by reference his arguments from Dkt. Nos. 385 and 412, both of those documents were filed *ex parte* and Defendant McAda identifies no actual evidence that can be considered *Brady* as to Defendant McAda, nor does he provide any facts or law to support his other claims.  Rather, Defendant McAda simply states that the "government's misconduct caused Mr. McAda actual prejudice," and that the "actual prejudice to Mr. McAda is obvious," without including factual or legal explanation to support his conclusory statements (other than noting that he has been "drained" of his financial resources). *See* Dkt. No. 444 at 4.  Finally, Defendant Swiencinski's Motion contains no argument at all pertaining to dismissal based on alleged misconduct, other than requesting an opportunity to supplement.

None of the defendants explain with any specificity which *material* information they claim was suppressed and how *they*, individually, were prejudiced by it, as they are required to do. *See Johnson*, 68 F.3d at 902 ("A defendant must show prejudice to his ability to receive a fair trial before charges will be dismissed."); *Fulmer*, 722 F.2d at 1195 ("[A] court may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant.").

Even so, any possible prejudice to the defendants has been cured by the Court's declaration of a mistrial, an extreme remedy that provides a "way to avoid injustice generally and to avoid a jury verdict for which one has compromised confidence specifically." *See United States v. Poole*, 735 F.3d 269, 278 (5th Cir. 2013). Indeed, the Fifth Circuit has held that even if a *Brady* violation had occurred, "the usual remedy is a new trial, not dismissal with prejudice."[5] *Swenson*, 894 F.3d at 684.

---

[5] Other circuits have similarly held that the general remedy for a *Brady* violation is a new trial. *See, e.g.*, *United States v. Scarfo*, 41 F.4th 136, 226 n.117 (3d Cir. 2022) ("[T]he remedy for a *Brady* or *Giglio* violation is a new trial, not dismissal."); *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) ("[T]he remedy for a *Brady* violation is *vacatur* of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her."); *United States v. Pettiford*, 627 F.3d 1223, 1228 (D.C. Cir. 2010) ("If we find a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion.") (internal citations and quotation marks omitted); *United States v. Babiar*, 390 F.3d 598, 600 (8th Cir. 2004) ("[T]o the extent the prosecution violated *Brady* by failing to disclose evidence favorable [to the defendant], the district court properly remedied any *Brady* error before the second trial. As the district court stated, 'Defendant received a full and adequate remedy when he was granted a new trial.'"); *United States v. Presser*, 844 F.2d 1275, 1286 (6th Cir. 1988); *see also United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995) (allowing for a new trial for a discovery violation only if "the remedy offered by the district court was inadequate to provide [the defendant] with a fair trial"). Even in a capital case, in which the court found on habeas review certain information critical to conviction and punishment had been suppressed, the remedy was release unless the state opted to retry the defendant. *See, e.g.*, *Lindsey v. King*, 769 F.2d 1034, 1043 (5th Cir. 1985) (reversing district court's decision on habeas claim in capital murder prosecution that no *Brady* violation occurred when prosecution failed to turn over eyewitness statement that the witness did not see perpetrator's face, and remanding the case to the district court with directions to issue a writ of habeas corpus unless the state commenced a new trial within 90 days of the mandate).

In an effort to provide this Court the facts and the law necessary to deny the defendants' Motions, the government endeavors to lay out why the issues the defendants have previously raised (though they do not clearly raise them in their instant Motions to Dismiss) relating to (1) the financial summary witness, (2) disclosure of additional interview reports and rough notes, (3) purported false testimony, and (4) claims data in GEX 1, do not rise to the level of "outrageous government misconduct," (or misconduct at all) that actually prejudiced the defendants.

## I.     Financial Summary Witness

Though not specified in their Motions to Dismiss, the defendants have previously raised several issues with the testimony of the government's summary financial witness, William Chan. The government called Mr. Chan as a summary witness; Mr. Chan was not an expert witness, as he offered no opinions at all.  Accordingly, Rule 16(a)(1)(G), requiring the government to provide a summary of an expert witness's testimony, as well as the "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications," was not triggered in Mr. Chan's case.

One of the defendants' arguments related to Mr. Chan centered on the sources he listed on summary charts, specifically on government exhibit ("GEX") 36, "Payments from Brian Swiencinski and Worth Medical Company LLC to Individuals and Entities on the Commission Sheets," in which Mr. Chan linked certain individuals with their associated business entities.  *See* Exhibit A.  The defendants have claimed that the sourcing on some of the summary exhibits did not encompass every document Mr. Chan reviewed, and therefore his testimony on that issue was somehow false.[6]  First, Mr. Chan did not testify falsely; as the review team relayed during the

---

[6] The government understands the concern the Court raised at the April 4 Hearing, that once a summary chart contains sourcing, it should include all sourcing, and the government recognizes that it would have been better practice to list all sources for the summary on the face of the exhibit (in addition to disclosing that information to counsel prior to testimony, as it did).  Even so, Rule 1006 does not require a summary to include the source of information, but instead only provides

April 4 Hearing, "Mr. Chan was very adamant, very clear that he was never instructed to provide false testimony. He was never instructed to lie, absolutely never instructed to do that." Rough Hrg. Trans. 4/4/23 at 22:5–8.

Critically, the defendants *were* provided with the information they complained was omitted from the charts *in advance of* Mr. Chan's testimony regarding any of those summaries: on December 5, 2022, the government provided the defense with two redacted documents Mr. Chan created, one of which contained the following information (unredacted) about the entities and individuals listed on GEX 36:



Further, the night before Mr. Chan got into the substance of his testimony, the defense was provided with an additional document Mr. Chan created called: "Reference – Names and Entities on Exhibit 1 Share Program & 9 Commission sheets.pdf," attached as Exhibit B, which contained a key to GEX 36, laying out the sources and documents Mr. Chan used to confirm connections between the individuals and entities on GEX 36 (all of which had been provided previously in discovery). Mr. Chan's reference to additional information was elicited on direct examination

---

that a summary chart may be used to "prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court."

when he was asked: Q: "And did you also review records showing entity associations between individuals and entities that the individuals were associated with?" A: "Yes.  I was – I asked for that, too."  *See* Tr. Trans. 12/6/22 at 144:21–24.

The following day, counsel for Defendant Swiencinski elicited similar information on cross-examination when counsel inquired regarding the sources and documents Mr. Chan "looked at" in preparing GEX 36.[7]  Counsel asked: "Was there any other document that you looked at in addition that should have been listed there?"  Mr. Chan responded:

> If you're referring to the way that the entity names are tied together, there was a separate e-mail in addition to these documents . . . There was an e-mail from Scott Breimeister to Brian Swiencinski where the subject stated: "Sales rep by state" and it was an Excel file.  Within that e-mail, there was an Excel file that consisted of the relationship between the names of the people on this list and the entities.  So the names of the people or the entities were either – they were all sourced from these four exhibits; but in terms of tying the relationships together, I did have to refer to other sources, but all of these people or entities did come from those four exhibits.

*See* Tr. Trans. 12/7/22 at 20:21–21:11.  While these additional materials were not identified as sources on the summary exhibit, the documents Mr. Chan "looked at" were disclosed to the defendants before his testimony, and his use of those other materials to make the necessary connections in GEX 36 was made clear on both direct and cross-examination.  The government therefore neither suppressed any information, *see United States v. Brown*, 628 F.2d 471, 473 (5th

---

[7] At the April 4 Hearing, this Court seemed to allude to this portion of the cross examination while questioning counsel for the government.  This Court stated: "Well, what I am suggesting is that we have a witness on the stand. There is a chart that is being displayed in front -- in front of the jury. He is being -- well, it's really a two part. He has been questioned -- and, again, my memory may not be as clear as yours now. He's been questioned about the footnotes, the sourcing, subject to cross-examination, and he said that's it. Nothing else. That's what he said. And it turns out that that was not completely truthful. There were other items that he looked at that were not disclosed. Am I remembering that correctly?"  Rough Hrg. Trans. 4/4/23 at 23:17–24:3.  As described above, Mr. Chan responded during cross-examination that he *did*, in fact, look at other documents, which he then described consistent with the materials turned over to the defendants prior to that testimony.

Cir. 1980) ("In no way can information known and available to the defendant be said to have been suppressed by the government."), nor did it fail to correct testimony, as Mr. Chan's testimony was neither false nor inaccurate.

The defendants have also complained that Mr. Chan's notes were provided in redacted form prior to his testimony and only provided unredacted following a request by counsel for Defendant Swiencinski. The government did not redact Mr. Chan's notes with any bad faith or nefarious intent to hide information from the defense. Rather, the government explained that it made the redactions following a *Jencks* analysis. *See* Tr. Trans. 12/6/22 at 211:3–4, 214:19–24. Specifically, the trial team analyzed whether Mr. Chan's personal trial preparation notes qualified as a "statement," that Mr. Chan made and signed, or otherwise adopted or approved, and whether they related to the subject matter of his testimony. *See* Fed. R. Crim. P. 26.2(a), (f)(1). The government acknowledges that in retrospect, it should have provided the notes unredacted in the first instance or sought Court approval to provide the notes redacted. Nevertheless, as explained at the April 4 Hearing:

> No bad faith on the redactions. We know from reviewing internal communications, we know from speaking to the prosecutors that research was done, that as I reference in the bench memorandum that consultation with supervisors were had, and a decision was made, and a decision was based on a *Jencks* analysis.
> My issue is -- and I believe Your Honor pointed this out -- you know, if it is innocent, which we believe everything in here was innocent, and done in good faith, why not just produce it unredacted? But that is a judgment call. If the question is good faith/bad faith, and your question is -- I kind of hear it differently, would I have done something differently? I would not have redacted those documents. But they did. The team did.
> But what ended up happening was they redacted and they did so because their understanding is, if there was a concern about it, counsel would object, which they did, and they would go forward and allow cross-examination to occur.

Rough Hrg. Trans. 4/4/23 at 3–22.

The redactions were clear on the face of the documents, and the trial attorneys turned them over as such knowing they could be unredacted at any moment.[8]  And that is exactly what happened: at Defendant Swiencinski's request, the Court ordered the government to provide Mr. Chan's unredacted notes.  To afford the defense additional time to review the unredacted notes, as well as earlier iterations of similar notes, the government suggested taking a witness out of order. *Id.* at 214:25–215:7. The following day, each of the defendants (including counsel for Defendant Swiencinski, who was afforded a second opportunity to cross examine Mr. Chan) cross-examined Mr. Chan at length with unredacted versions of his notes.

Because the defendants "received the material in time to put it to effective use at trial," it was not suppressed. *Swenson*, 894 F.3d at 683 ("Under [Fifth Circuit] case law, evidence that is turned over to the defense *during* trial, let alone *before* trial, has never been considered suppressed.").  Nor can the defendants show any actual prejudice. *See id.* ("[W]hen a defendant challenges 'the late production of impeachment evidence,' the analysis 'turns on whether the defendant was prejudiced by the tardy disclosure.'"); *United States v. Senegal*, 371 F. App'x 494 (5th Cir. 2010) (government did not "suppress" information concerning witness's status as a paid

---

[8] Much attention has been paid to the "Grace Hinton files."  As the government has explained on several occasions, *see, e.g.*, Tr. Trans. 12/7/22 at 219:7–220:16 (redirect examination of Mr. Chan); Hrg. Trans. 1/17/23 at 46:23–25 (January 17 Hearing), the purported "Grace Hinton files" were nothing more than five PDFs that were made up of two unique documents: (1) an email and its attachment, which were admitted as GEX 1068, and (2) an attachment to a different email. Contrary to defendants' baseless accusations, the government never coached Mr. Chan to lie or provide false testimony.  When asked by counsel for Swiencinski on cross examination about his notes regarding the Grace Hinton files whether he was instructed not to "refer to the Grace Hinton files,"  Mr. Chan responded, "I was not instructed of – of that answer or providing that answer when asked by the defense counsel.  I was not instructed to do that.  It was more so to not cite the Grace Hinton files in my exhibits." *See* Tr. Trans. 12/7/22 at 25:10–16. Mr. Chan informed the undersigned that during his witness preparations, the trial attorney told him to be honest and truthful in answering questions.

informant when it was disclosed during direct testimony, because the defendants received the information  "with enough time to impeach him during cross-examination").

The government operated in good faith with respect to Mr. Chan.  While it should have admittedly made a different decision respecting the redactions, there are no facts to support that the government committed misconduct of any kind, let alone "outrageous" misconduct.  This, combined with the fact that the defendants cannot show they suffered any "actual prejudice," demonstrates that dismissal of the indictment with prejudice would be unsupportable.

## II.       Disclosure of Additional Reports of Interviews and Rough Notes

One of the two bases for dismissal Defendant Breimeister includes in his Motion to Dismiss relates to the alleged omissions of "favorable information obtained during multiple interviews with multiple witnesses from the typewritten summary of those interviews."  *See* Dkt. No. 428 at 9. The government has taken ownership of its inadvertent failure to timely produce nine interview reports and its disclosure of discrepancies between rough notes and accompanying interview reports in the middle of trial.  Nevertheless, following its review, the government has found no evidence of any bad faith or nefarious intent that gave rise to these disclosure issues.   The defendants have alleged that these disclosures impacted several witnesses and have relied on the purported volume of disclosures to support an argument for cumulative error.  When the facts are drilled down, however, it is evident that the government did not suppress information, that much of the information contained in the nine reports produced during trial or in the rough notes was neither material nor was the late disclosure prejudicial to the remaining defendants, and that the defendants indeed had access to—or were provided in discovery—much of the same information they complain was suppressed.

14

### a.   The Nine Reports Produced During Trial

At both the January 17 Hearing and the April 4 Hearing, counsel for the government explained that in this "very complex case, an investigation that occurred over the course of several years, 250 plus reports that were done in this case, and ultimately . . . about nine that ended up not being produced in a timely way."  *See* Rough Hrg. Trans. 4/4/23 at 34:19–24; Hrg. Trans. 1/17/23 at 19:1–3 ("But what stands out to me is in the course of this case – again, several years, 260 interview reports that went out the door; and for instance, the nine that didn't.").   And while counsel for Defendant Breimeister stated that he "couldn't disagree with that any stronger," *see* Rough Hrg. Trans. 4/4/23 at 8:21–23, the fact is that there *were* a total of nine reports that the government produced between December 9 and 13, 2022.  They are:

1.  July 20, 2022 Leonard Carr Report (produced 12/9/22)
2.  August 22, 2022 Stacey Mayeur Report (produced 12/9/22)
3.  November 1, 2022 Leonard Carr Report (produced 12/10/22 at 1:19 AM)
4.  August 25, 2022 Aimee Bartis Report (produced 12/12/22)
5.  August 25, 2022 Ryan Bartis Report (produced 12/12/22)
6.  November 2, 2022 Patrick Cotter Report (produced 12/12/22)
7.  October 31, 2022 Forest Statham Report (produced 12/12/22)
8.  July 29, 2022 Ted Blanchard Report (produced 12/13/22 at 12:50 AM)
9.  August 16, 2022 Irma Johnston Report (12/13/22 at 12:50 AM)

Of the nine reports, two simply stated that the witnesses provided no new information on that date (Cotter and Statham).  This is most certainly immaterial.  Further, five of the witnesses interviewed were not called as witnesses (A. Bartis, R. Bartis, Statham, Blanchard, Johnston).  Of the remaining reports related to Mr. Carr and Ms. Mayeur, to the extent information in those reports overlapped with their testimony, it was materially consistent.  *See United States v. Montgomery*, 210 F.3d 446, 451 (5th Cir. 2000) ("The government's failure to produce *Jencks* Act material at trial is harmless error where there was no substantial deviation between the statements and the

witness' trial testimony.").[9]   And while the defendants have not laid out how these late reports were material to them or how they were prejudiced from their disclosure, "[m]ere speculation that a trial might have gone differently is insufficient to show the requisite prejudice from a tardy disclosure."  *Swenson*, 894 F.3d at 683.

The government explained at the April 4 Hearing that these disclosures mid-trial were not the result of bad faith or a decision *not* to disclose, but rather the result of an inadvertent failure of process—some of these reports were sent to the trial prosecutors without copying the paralegal, whose task is usually to keep track of receiving reports and moving them into a folder for production, while others simply fell through the cracks.  *See id.* at 44:21–45:11.  "Mere error or oversight is neither gross negligence nor intentional misconduct."  *Fulmer*, 722 F.2d at 1195 (quoting *United States v. Westoff*, 653 F.2d 1047, 1050 (5th Cir. 1981)).  And while the government would have provided these reports earlier based on its practice of providing reports of interviews although Rule 16 does not require it,[10] these reports cannot be said to have been suppressed.  *See United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985) ("If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been.").

---

[9] While the report is not a statement of the interviewed witness ("Jencks" material) pursuant to Federal Rule of Criminal Procedure 26.2, *see United States v. Muckenstrum*, 515 F.2d 568, 570 (5th Cir. 1975) (finding that an FBI report was not the witness's statement under Jencks when it did not quote directly from the witness, was not signed by the witness, and had not been seen by the witness), similar reasoning should apply when the witness's testimony was consistent with the report, and no other obligation (*Brady*, *Giglio*, or Rule 16) required disclosure of the report in the first instance.

[10] *See* Fed. R. Crim. P. 16(a)(2)("Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.").

Accordingly, the mid-trial disclosure of these nine reports does not support the remedy the defendants' request.

### b. Rough Notes

A related issue pertains to discrepancies between an agent's rough notes and the accompanying interview reports that were disclosed to the defendants.

As the government noted in the January 17 Hearing, there is no policy or practice that requires the government to review agent rough notes as a matter of course.[11]  *See* Hrg. Trans. 1/17/23 at 39:6–9.  Rather, the Justice Manual instructs that agent notes "should be reviewed if there is a reason to believe that the notes are materially different from the memorandum, if a written memorandum was not prepared, if the precise words used by the witness are significant, or if the witness disputes the agent's account of the interview."  *See* Justice Manual 9-5.002 ¶ B(8)(c).  And until this Court's December 7, 2022 order ("December 7 Order") directing the government to "redouble its efforts" and to produce "all appropriate notes/transcripts" for witnesses to come and to "then secondly for witnesses that ha[d] already testified," Tr. Trans. 12/7/22 at 292:1–7, the trial attorneys had not reviewed the agents' rough notes because they did not have reason to do so under the Justice Manual's guidance.

Following this Court's December 7 Order, the government reviewed the rough notes. When they identified certain discrepancies, they immediately produced the information, highlighting pertinent information.  For example, in its email on December 10, 2022, at 1:19 AM, the government specifically called out two discrepancies when it disclosed notes relating to Mr.

---

[11] Indeed, counsel for Defendant Ince conceded as much in the April 4 Hearing.  *See* Rough Hrg. Trans. 4/4/23 at 67:14–22 ("Government attorneys, whether AUSAs or DOJ trial attorneys, have no obligation, at least at the time I was there, I was not aware, have no obligation to review the agent's rough notes and cross check them with the 302s.  That is very true.").

Carr: "We wanted to draw your attention to a sentence in the middle of the first page of the agent's notes of Mr. Carr's October 30, 2022, interview. The notes appear to say 'Milosevic [u/i] Rx brought in scripts signed by Redko – occurred over a weekend.' Additionally, we are providing the memorandum of interview for November 1, 2022, which we just received. Please note that the rough notes for 11/1/22 state: 'The specialty business was a 100% legit.'"

The government took these discrepancies seriously.  Indeed, the government took one of these discrepancies into account when it moved to dismiss the charges against Vladimir Redko, the most drastic remedy available.  *See* Dkt. No. 384.  The government explained that the dismissal "pertains to the strength of the evidence, knowing what we know now and reflecting upon the evidence at trial as well as proffered statements between myself and counsel for the defendant." Tr. Trans. 12/13/22 at 3:18–21.  This Court granted the government's motion and dismissed Redko.  *Id.* at 3:22–23; Dkt. No. 452.

The remaining defendants have alluded that they deserve similar treatment to Redko, *see, e.g.*, Dkt. No. 424 at 5, but, among other reasons they are differently situated, none of the other defendants have shown how either of the discrepancies in Mr. Carr's notes—relating to Milosevic bringing prescriptions on the weekend or the specialty business—were material to *them* and how they suffered actual prejudice as a result of their mid-trial disclosure.  *See United States v. Sipe*, 388 F.3d 471, 477 (5th Cir. 2004) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.") (internal citation and quotation marks omitted).  That is because they cannot: whether or not Milosevic brought in prescriptions signed by Redko on the weekend (if that is indeed what Mr. Carr said) does not materially bear on the guilt of any of the remaining defendants. Moreover, the disclosed information was in line with other information about Mr. Milosevic's role.  *See id.* ("[W]hen the

18

undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs.") (internal citation and quotation marks omitted).

As to Mr. Carr's views on the legitimacy of the specialty business, Mr. Carr testified consistently on cross examination with the later-disclosed rough note.   When counsel for Defendant Breimeister cross examined Mr. Carr about the "legality" of the pharmacies' other lines of business, Mr. Carr agreed that "there was no question about the legality of any of the noncompound prescriptions," and that "there was no question about the legality of the Harvoni or Sovaldi prescriptions."   *See* Tr. Trans. 11/21/22 at 63:16–23, 64:5–7. (Harvoni and Sovaldi were two of the pharmacies' most lucrative specialty drugs.)   Related to materiality, these questions from Defendant Breimeister's counsel about specialty drugs were the first time the pharmacies' specialty business was raised at trial. Aside from this short exchange, there was essentially no substantive testimony regarding the pharmacies' specialty business, other than from PBM witnesses who testified about the pharmacies' (false) representations on contracts and certifications regarding the percent of the pharmacies' business devoted to mail order, specialty medications, compounds, etc. *See, eg.*, Tr. Trans. 12/5/22 at 120:10–12.

While the government did not *concede* that specialty drugs were exempted from the indictment's language—or that they would not be under consideration as relevant conduct if the parties were to get to sentencing—it made clear that it was the *defense* that brought up specialty drugs at trial, not the government, and that the government's "focus has been and throughout trial will remain on these compounded and compound-like drugs," which were listed in the indictment as "compounds, patches, kits, and other drugs."  Tr. Trans. 12/6/22 at 13:12–14:2.  Indeed, given the immateriality of this fact, the government offered to stipulate that the specialty drugs were legitimately dispensed and that the Court so instruct the jury. *See* Dkt. No. 386 at 2 (United States'

Supplemental Response to Defendants' Joint Motion for Provisional Relief).  Because Mr. Carr's testimony regarding specialty drugs was both immaterial and was in line with the rough note, the defendants cannot show they suffered any actual prejudice.

### c.  The Purported "Cumulative Effect"

In total, the government provided the defendants with over 260 sets of rough notes from interviews of testifying and non-testifying witnesses.  Rough notes are just that—often incomplete, truncated, shorthand that an agent can use, *in concert with his or her memory*, to formulate a final report.  It is for that reason that rough notes are often not considered the notetakers' "statements" under the *Jencks* Act.  *United States v. Ramirez*, 954 F.2d 1035, 1038 (5th Cir. 1992) (holding that "scattered notes" that an agent took "over the course of the investigation" did not fit within the purview of the *Jencks* Act); *United States v. Cole*, 634 F.2d 866, 867 (5th Cir. 1981) ("The district court correctly understood the law of this circuit to hold that even though an investigator's notes may contain 'occasional verbatim recitations of phrases used by the person interviewed,' this does not necessarily make such notes a 'statement' for Jencks Act purposes."); *United States v. Spencer*, 618 F.2d 605, 606 (9th Cir. 1980) (explaining that some rough notes "will not be statements . . . when the notes are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigators' selections, interpretations, and interpolations").

Even so, the defendants claim that law enforcement agents "intentionally omitted favorable information obtained during multiple interviews with multiple witnesses from the typewritten summaries of those interviews," and that this was "pervasive among multiple agents and multiple witnesses throughout the entire investigation," and "impacted the entire trial."  *See* Dkt. No. 428 at 9.  Further, in briefing and during oral argument during the January 17 Hearing and the April 4 Hearing, the defendants noted that the government attorneys were present for several of the witness

20

interviews for which the rough notes contain information not included in the agent's report, and therefore the attorneys should have made the proper disclosures. The defendants rely on these alleged discrepancies to argue that the cumulative effect of the disclosures supports the drastic remedy they now request.

First, the review team interviewed the agents responsible for taking these notes and drafting interview reports. Every single agent stated that they were never instructed by any prosecutor to omit or change any information in any reports. Further, agents routinely noted that prosecutors would highlight or point out that information obtained in an interview was new and needed to be recorded in an interview report. The review team also interviewed the trial team regarding these discrepancies. While acknowledging that there was certain information that the attorneys did not appreciate had not been included in the typed reports (noting attorneys do not "approve" agent reports) at the time, the trial team was not aware of these discrepancies. The review team found no bad faith or nefarious intent in any of the discrepancies between rough notes and interview reports.

Second, the defendants overplay their hand—in many instances, the information the defendants complain was suppressed was, in fact, disclosed in other reports and recorded interviews, or was otherwise available to them from other sources. Critically, "evidence is not 'suppressed' if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it . . . .'" *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002). To demonstrate, the table below compares several of the defendants' complained-of discrepancies[12] with earlier-disclosed material that encompassed the same or similar information:

---

[12] None of the defendants include any of these discrepancies in their Motions to Dismiss, nor do they describe with any specificity which discrepancies—if any—materially impacted their defense

| Issue Raised by Defendants | Information Previously Disclosed and Date of Disclosure |
|---|---|
| **July 20, 2022 Leonard Carr Report** (disclosed December 9, 2022) stated, with respect to a screenshot of Swiencinski's bank account that Swiencinski sent to Carr: "Carr noticed all the INCE outgoing transfer amounts. CARR went to BREIMEISTER about what he saw. BREIMEISTER stated that BRIAN has invested in INCE's business and has been loaning him money." *See* Dkt. No. 385. | **February 19, 2019 Leonard Carr Report** (disclosed November 4, 2019) stated: "During a purchase audit, SWIENCINSKI sent Carr a screenshot of his personal bank account showing medicine he bought from a pharmacy in Alabama. On the screenshot, Carr saw payments to Ince. Carr informed Breimeister about the payments. Breimeister said SWIENCINSKI told him it was a loan to Ince, so that Ince could start a practice. Breimeister told Carr that SWIENCINSKI also had a condo with Dr. Randhawa." |
| **August 22, 2022 Stacey Mayeur Report** (disclosed December 9, 2022) stated: "BAILEY was in the room right next to MAYEUR and there were no ceilings. All conversations could be heard at all times. MAYEUR would overhear BAILEY and the Pharmacist. Also, MAYEUR would overhear BAILEY, Leo Carr (CARR) and BREIMEISTER with the Pharmacist saying let's try this formula to see what it pays." | **September 26, 2018 Stacey Mayeur Recorded Interview** (disclosed April 20, 2020) stated[13]: <br> MAYEUR: Because where I sat, I sat here, like against this wall, and this billing department was here, so I heard everything. <br> AGENT SANDH:  Okay. <br> MAYEUR: There was no – I mean, it was just -- I don't know if you have been to the pharmacy – <br> AGENT SANDH:  I have. <br> AGENT SANDH:  I've seen pictures. <br> MAYEUR:  Giant open area. <br> SERGEANT GARCIA:  Uh-huh. <br> MAYEUR:  I mean, even the PIC, who sat right next to me, didn't have a ceiling.  See -- I mean, closing his door was pointless, cause it all just came up. <br> SERGEANT GARCIA:  Say -- what's the acronym name? <br> MAYEUR:  Pharmacist in <br> charge. <br> SERGEANT GARCIA:  Right. <br> MAYEUR:  And then it went to the -- once he moved upstairs, it went to the <br> billing manager.  So whenever she's in her meetings, we heard everything. <br> SERGEANT GARCIA:  And -- well, who was the billing manager? <br> MAYEUR:  Pam Bailey. |

---

and prejudiced them.  Rather, their Motions contain only conclusory allegations about the cumulative impact of the alleged errors.

[13] The transcript of the recorded interview was provided by counsel for the defendants during Ms. Mayeur's testimony.

| | |
|---|---|
| **August 22, 2022 Stacey Mayeur Rough Notes** apparently state that Mayeur "was not told to tell patient it would not go to collections.  Instructed to try to collect co-pays," while the Report states that Pharms told Mayeur to tell patients that co-pays would not go to collections. | **September 26, 2018 Stacey Mayeur Recorded Interview** (disclosed April 20, 2020) stated:<br>MAYEUR: According to PBM's provider manual, you were supposed to collect co-pay at the time of service . . . We did not have that policy . . . We did do collections when necessary, meaning that when we got audited, if we didn't collect a co-pay, we went and called the patient – call the patients, sent bills.<br><br>**July 14, 2022 Leonard Carr Report** (disclosed Aug. 1, 2022): "If there were patient complaints, it would be easier to talk them down from cancelling, telling them the copays would be reversed and not placed into collections.  The reality was the only time they tried to collect copays as the result of an audit." |
| **August 3, 2022 Maries Laurel Rough Notes** apparently include the following information not included in the report: (1) Dr. Kennedy's medical assistants had authority to sign for Dr. Kennedy; and (2) Laurel believed some of the prescriptions were signed by Dr. Kennedy, others signed by her or other medical assistants. | **May 25, 2018 Maries Laurel Report** (disclosed Nov. 4, 2019) states: "[Regarding KENNEDY's delegation of signature authority,] LAUREL never saw ROBIE [DICKERSON] sign KENNEDY's name on documents. However, it was LAUREL's impression that ROBIE and other MAs would sign prescriptions [like refills] for KENNEDY—that this was the process in the office." (brackets in original).<br><br>**May 17, 2018 Colleen Kennedy Report** (disclosed Nov. 4, 2019) states: "ROBIE DICKERSON [had authorization to use] KENNEDY's signature for post-op vitamin [prescriptions]. Also, "KIM" . . . [had authorization to do] sleep study orders.  There were times when KENNEDY allowed them [DICKERSON, KIM, and/or others at the office] to sign for labs and non-narcotic prescriptions—like "these" [pain and scar compound prescriptions]—for post-op patients.  KENNEDY had told DICKERSON that these [post-op] patients could have pain and scar creams.  Though she did not specifically tell DICKERSON so, KENNEDY meant by this instruction that DICKERSON had KENNEDY's authority to sign for KENNEDY on these prescriptions." (brackets in original).<br><br>**May 23, 2018 Robie Dickerson Report** (disclosed Nov. 4, 2019) states: "DICKERSON did sign KENNEDY's name on prescriptions for [compounded] creams.  KENNEDY said that DICKERSON could do so." |
| **November 20, 2022 Maries Laurel Rough Notes** apparently include the following | **May 25, 2018 Maries Laurel Report** (disclosed Nov. 4, 2019) states: "LAUREL did not even know "we" [at KENNEDY's office] were doing these [prescriptions] until |

| | |
|---|---|
| information not included in the report: Dr. Kennedy's pre-op patients were asked about scar creams. | LAUREL's patients asked her about them.  The patients would receive these creams in the mail and [then] ask LAUREL what they were for." (bracket in original).<br><br>**August 3, 2022 Maries Laurel Report** (disclosed Aug. 18, 2022) states: "LAUREL found out about the creams whenever pre or post-op patients would ask her how to use them."<br><br>**January 4, 2018 Robie Dickerson Report** (disclosed Nov. 4, 2019) states: "DICKERSON fills out the information on the prescription from the patient's file.  (Typically, DICKERSON would fill out these prescriptions when a patient came in for their pre-op visit.)" |
| **August 19, 2022 Tony Clark Rough Notes** apparently state: Clark "never spoke to Ronnie about compounds."<br><br>**November 20, 2022 Tony Clark Rough Notes** apparently state: Clark "never spoke to McAda about it." | **June 21, 2018 Tony Clark Recorded Interview** (disclosed Apr. 20, 2020) beginning at minute 3:40**:**<br>Q: Did you ever have contact with any of the other people at Medallion?<br>A: Very little. I had gone there a couple times when we had meetings but I didn't really know, know anybody, I mean I knew 'em, but I didn't really know them. We weren't close, didn't talk much, just an occasional in and out to get some information to try and go sell it.  I wasn't successful, I don't think I sold anything.  So I quit." |
| **November 20, 2022 Tony Clark Rough Notes** apparently state: Clark "did agree to become a sales agreement for Medallion." And that his understanding "was to find doctors to refer prescriptions for Medallion. Was never successful to get doctor to refer.  Recalled contacting . . . 3 doctors." | **June 21, 2018 Tony Clark Report** (accompanying recorded interview) (disclosed July 31, 2019): "CLARK was never able to convince a doctor to write prescriptions for the compounded drugs. DR. HAROLD GRAND and DR. GLEN HECKMAN were the only doctors CLARK approached about using the compounded prescriptions."<br><br>**June 21, 2018 Tony Clark Recorded Interview** (disclosed Apr. 20, 2020) beginning at minute 12:00: "For some reason the doctors that I talked to, they . . . I didn't get one single doctor that was interested." |
| **November 20, 2022 Tony Clark Rough Notes** apparently state: Clark was "never asked to pay a copay to receive the meds . . . Brown never mentioned a copayment.  Never received an invoice from pharmacy for copay." | **June 21, 2018 Tony Clark Recorded Interview** (disclosed Apr. 20, 2020) beginning at minute 9:30:<br>Q: What about as far as copays, do you remember if you guys had to pay copays?<br>A: I don't think we did.<br>Q: Do you remember any discussion about that at all with Josh [Brown] or anyone else?<br>A: I don't.<br>Q: The insurance claims wrote down that your share of the copays for your family would have been around $4,000.<br>A: Oh yeah, I never heard that.  We never paid that. |

As this chart makes clear, none of these alleged discrepancies were "suppressed," because the defendants were in possession of the same or similar information months (and, in some cases, years) before the witnesses testified.  *See United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980) ("In no way can information known and available to the defendant be said to have been suppressed by the government.").  Accordingly, the defendants overstate their argument that the entirety of the trial was infected by the government's disclosures, and their request for dismissal on that basis should be examined closely and denied.

## III.     Purported False or Uncorrected Testimony

Defendants Swiencinski and Breimeister have claimed (again, not in the instant Motions to Dismiss, but in prior argument) that the government violated *Napue v. Illinois*, 360 U.S. 264 (1959), based on the testimony of two witnesses, Terry Brickman and Stacey Mayeur.  A *Napue* violation involves the knowing use of false testimony by the government "to obtain a tainted conviction."  *Id.* at 269.  As an initial matter, no defendants have been convicted.  Moreover, neither witness testified falsely, and the government had no reason to believe that their testimony was false.

### a.  Terry Brickman

Terry Brickman, a cooperating defendant who previously pleaded guilty and was sentenced for his role in the defendants' scheme, testified.  He testified that Defendant Swiencinski paid him to have prescriptions filled in his name, not based on medical need, but solely for profit.  He further testified that for much of the scheme, he never actually received the creams because Defendant Swiencinski's pharmacies were not licensed to ship the creams to Michigan, where Mr. Brickman lived.  He testified that he only began receiving the creams in late 2016.  When questioned on cross examination by counsel for Defendant Swiencinski whether he had a medical need to get the

prescriptions, Mr. Brickman testified that he did not.  He testified about his orthopedic doctor (a physician he actually saw, as opposed to Vladimir Redko and Christopher Ince).  Specifically, on redirect Brickman testified that there was "absolutely no connection" between his conversations with his orthopedist regarding a wrist ailment, which he recalled as having taken place in "[l]ate '15, 2015 and 2016," Tr. Trans. 11/14/22 at 55:21-56:1, and the fraudulent prescriptions and related payments from Defendant Swiencinski, which began in December 2013.  Tr. Trans. 11/10/22 at 191:1–23; GEX 936 at 1 (Defendant Swiencinski's first check to Mr. Brickman was issued on January 14, 2014, for prescriptions reimbursed in December 2013).

During trial and after Mr. Brickman's testimony, Defendant Swiencinski asked for Mr. Brickman's medical records. The Court inquired whether the government was in possession of these records (it was not), and the Court advised the Defendant to use his Rule 17 subpoena power to get them.  Tr. Trans. 11/10/22 at 287:10-25.

Defendant Swiencinski then subpoenaed Mr. Brickman's medical records and received them on November 29, 2022.  On December 7, 2022, Defendant Swiencinski moved for admission of the medical records with no objection from the government, and the Court allowed their admission.  This Court confirmed that the parties could use the records during final argument, and counsel for Defendant Swiencinski could argue that Mr. Brickman's "testimony was in error or mistaken."  Tr. Trans. 12/7/22 at 293:22–294:6. The records reflect appointments with Mr. Brickman's orthopedic doctor beginning in July 2014, approximately six months *after* Mr. Brickman began receiving payments from Defendant Swiencinski for the fraudulent prescriptions filled in Mr. Brickman's name, and over a year before any of those fraudulent prescriptions were actually shipped to him in Michigan.  Further, there is no evidence in those records that Mr. Brickman's orthopedist was in any way related to the creams at issue in this case.

That Mr. Brickman's memory of the time frame during which he saw his actual doctor may have been incorrect (2015 versus July 2014) was not false testimony and is not material given the lack of connection between his actual medical treatment and the fraud scheme to which he pleaded guilty.   Further, to the extent the medical records were in any way exculpatory—which the government disputes—defense counsel acknowledged that the "false" testimony could be "corrected" by "simply . . . admit[ing] the medical records as an exhibit and allow us to use that as if it had just been admitted in the normal course."   And that is precisely what the Court did.   *See* Tr. Trans. 12/7/22 at 140:14-18.   Mr. Brickman did not testify falsely and any perceived falsity was corrected in the manner proposed by the Defendant.[14]   There was no suppression and no prejudice related to Mr. Brickman's medical records.

Defendant Swiencinski also alleges he was prejudiced by Mr. Brickman's testimony regarding his plea agreement.   Mr. Brickman's plea agreement, the transcripts of his rearraignment and sentencing, and other materials related to Mr. Brickman's plea and sentence were disclosed to the defendants on August 31, 2022.   On direct examination, Mr. Brickman testified about the government's motion filed in advance of his sentencing seeking a downward departure based on his cooperation. When asked whether he was hoping for anything further from the government in exchange for his testimony, Mr. Brickman testified, "I am not. Like I say, I've already been sentenced."   Tr. Trans. 11/10/23 at 83:18.   On cross-examination by Defendant Swiencinski's

---

[14] The Court also questioned why defense counsel did not subpoena the purportedly exculpatory medical records earlier.  Tr. Trans. 12/7/22 at 141:23-142:2.  To the extent the defense has argued in any *ex parte* filing that the government had an obligation to obtain these medical records for the defense's use, that is incorrect as a matter of law.  *See United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) ("While the Supreme Court in Brady held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case.").

counsel, Mr. Brickman twice affirmed an understanding that if he did not fulfill his obligations to the government, including testifying in this trial, the government could reinstate his prosecution: Q: "And in that plea agreement, is it part of the agreement that if you don't fulfill your obligations to the government – that is, be here – that they can reinstate your prosecution, correct?" A: "As far as I know" . . . Q: "Well, if you didn't, though, they can reinstate your prosecution." A: "Perhaps, sure." *Id.* at 242:17–243:1. Although Mr. Brickman was asked by the government during redirect examination whether he understood that he had already been sentenced and that "the government cannot reinstate your prosecution," counsel for Defendant Swiencinski objected that that was a misstatement of the law in the plea agreement, and the Court sustained the objection before Mr. Brickman answered. Tr. Trans. 11/14/23 at 75:16–20.

Though the defendants argue that this line of questioning raised similar issues to those in *United States v. Dvorin*, 817 F.3d 438 (5th Cir. 2016), the cases are easily distinguished. In *Dvorin*, the witness's plea agreement supplement regarding the witness's cooperation was under seal and not disclosed to the defendant until after trial. As such, the defendant was not able to make use of it during cross-examination of the witness. Here, no evidence was withheld. Rather, over two months before trial, the defendants had Mr. Brickman's plea agreement and related materials and they were able to effectively cross-examine Mr. Brickman regarding them. Given that Mr. Brickman's testimony was consistent with defense counsel's view of the plea agreement, there was no false or misleading testimony to correct. *See United States v. Skilling*, 554 F.3d 529, 575 (5th Cir. 2009) (no suppression where a defendant had the witness's plea agreement and he "could have objected if he felt the government's characterization of [the] plea agreement was inaccurate, or he could have raised this issue on cross-examination"). Here, the Defendant both objected and

28

raised the issue on cross-examination.  He therefore suffered no prejudice, and there was no suppression or false testimony.

**b. PK Software**

Defendant Breimeister has incorrectly claimed in previous argument (again, not in his Motion to Dismiss) that evidence regarding his access to a certain software program used by the pharmacies, the "PK software," was suppressed and that the government allowed false testimony on this topic by Stacey Mayeur.  When asked on cross-examination by counsel for Defendant Breimeister, Ms. Mayeur testified that she had seen Defendant Breimeister access the PK software. Tr. Trans. 11/29/22, at 206:16-20.  Ms. Mayeur also testified on cross-examination that the PK software required training, that she did not know if Defendant Breimeister had been trained on it, and that an assistant to Breimeister would commonly assist Breimeister in searches on PK and another in-house software system.  *Id.* at 205:20-22, 206:12-15, 207:8-13.

The following day, counsel for Defendant Breimeister requested the government make them aware of information in the government's possession that "Breimeister did not have access to the PK system." Tr. Trans. 11/30/22, at 18:7-20  On December 11, 2022, the government sent the following disclosure by email:

| From: | Remis, Aleza (CRM) |
|---|---|
| To: | Cogdell, Dan (EXTERNAL); josh@joshschafferlaw.com |
| Cc: | Ansley, Jeffrey J.; Brent Newton; Fleming, Mary C.; Goodman, Arianna G.; JIm E. Lavine; justo.mendez@gmlaw.com; McCarthy, Brandon N.; mvilla@meadowscollier.com; nnorris@joneswalker.com; rachel.riley@katten.com; samuel.louis@hklaw.com; Helfmeyer, Devon (CRM); Raut, Katherine (CRM); Ahmed, Ridwan (CRM); Williams, Jodi-Kay (CRM) |
| Subject: | US v. Swiencinski - PK |
| Date: | Sunday, December 11, 2022 11:40:00 AM |

All,

Following Ms. Mayeur's testimony, Mr. Cogdell made the following request: "It is our very specific position that testimony is either mistaken or worse, and I'm simply notifying the government that if they come into information that is inconsistent with that, meaning if they come into information that Mr. Breimeister did not have access to the PK system, I believe that's *Brady* right now. I'm just requesting the government make us aware of that if they come into possession of it or if they are in possession of it." Mr. Carr was not asked about this during this testimony, which preceded Stacey Mayeur's. However, based on prior meetings with Mr. Carr from before his testimony, it was our impression that Mr. Carr believed that Mr. Breimeister either did not use or was not able to use PK. Since that time, we have reviewed the Carr memoranda of interview and rough notes, but do not see any memorialization on the specific question of Mr. Carr's perception of Mr. Breimeister's use of PK.

It was our understanding that the Swiencinski team indicated they plan to call him first in their case in chief, though we were just notified they may not. To ensure the defense has no burden to call any witness, we would be amenable—if any of the defendants desire and the court so allows—to recall him in our case-in-chief for the limited purpose of allowing cross on this topic and others related to the recent disclosures. Further, we want to make clear that we do not intend to rely on this aspect of Ms. Mayeur's testimony or refer to it in closing argument, as we do not believe that it is material to the case being presented to the jury.

Defendant Breimeister's request was made a day after Ms. Mayeur was excused, and the government made its disclosure before Defendant Breimeister could have made meaningful use of the information. *See Swenson*, 894 F.3d at 683.

That Ms. Mayeur and Mr. Carr may have had differing understandings of Defendant Breimeister's access to the PK software does not mean Ms. Mayeur testified falsely or that the government had any reason to believe that she did so. The government made the requested disclosure to defense counsel and made clear it believed this fact was immaterial. Further, whether or not Defendant Breimeister had access to PK software is a fact that Defendant Breimeister knows. *See Brown*, 628 F.2d at 473 ("In no way can information known and available to the

30

defendant be said to have been suppressed by the government.").  Defendant Breimeister was not and could not have been prejudiced by the testimony regarding his access to the PK software.

## IV.    Claims Data and GEX 1

While most of the defendants' allegations of "outrageous government misconduct" appear to center on the issues discussed above, they have previously pointed to complications with GEX 1, the summary of PBM claims data, as evidence of the government's alleged misconduct. Specifically, counsel for Defendant McAda has argued that the government knew that parts of the claims data underlying GEX 1 was unreliable and that, in "the face of that knowledge, which we didn't have, asked and we agreed to the pre-admission of that. I can promise you from Mr. McAda, had we known that, that we would not have agreed to do that at the time."  Tr. Trans. 12/12/22 at 41:3–8.  To be clear: the government did not request preadmission of GEX 1 knowing it was not reliable.[15]

It appears that the defendants' complaint was triggered by the government's December 8, 2022, disclosure to the defense of an email from FBI Analyst Grace Hinton that the government made pursuant to its *Jencks* obligations in advance of Ms. Hinton's expected testimony.  The email stated:

---

[15] GEX 1 was an amalgamation of certified business records from five PBMs.  The claims data was provided by those PBMs along with a business records affidavit certifying authenticity, and that data, along with claim glossaries and definitions, PBM contracts, and other materials was produced in discovery on December 21, 2018 (to Defendants Swiencinski, Breimeister, and Redko) and on January 13, 2020 (to Defendants Ince and McAda).  With this information, the defendants had the ability to conduct their own analyses and investigation into the reliability of the claims data.  And it appears at least Defendant Swiencinski may have: he provided notice of an intent to call an expert on pharmacy payments and prescription records.  As this Court described, the issues the defendants raised regarding GEX 1 were "white-noise issues where you're finding out problems, you're pointing those out to defense counsel to give them opportunity to respond in whatever fashion they see fit."  Rough Hrg. Trans. 4/4/23 at 19:20–25.

| From: | Hinton, K. Grace (HO) (FBI) |
| --- | --- |
| To: | Remis, Aleza (CRM) |
| Cc: | Helfmeyer, Devon (CRM); Tamayo, Andrew (CRM) |
| Subject: | RE: Pharms - Loss amounts |
| Date: | Tuesday, August 17, 2021 7:41:00 AM |
| Attachments: | image001.png |

From the Argus analyst (copy of this email is saved on USAfx):

Regarding the claims with negative balances in the Billed Amount column (Pln Tot Pd Amt), those claims have a Claim Status of 'HIS' indicating they are claims that are manually loaded into the database based on historical claim information prior to DST doing business with the plan. Those claims are not based on any transaction or claim adjudication processed by DST and are usually loaded when we begin doing business with a new Health Plan in order for future claims to process correctly. The Billed Amount values on 'HIS' claims may not represent any monies actually paid to the pharmacy and could be considered arbitrary.

I had inquired about the HIS claims as there were some claim lines with negative balances (some individual lines around -$900k).

But it is not true that the defendants did not have the information detailed above relating to the Argus "HIS claims," which, they argue, would have caused them not to agree to preadmission of GEX 1. Rather, on December 23, 2021, almost a year before trial, the government produced an email from Argus (later called DST) containing verbatim the information regarding those claims[16]:

---

[16] Although counsel for Defendant McAda argued that the e-mail was produced "in some giant data dump," a review of the production from December 23, 2021, shows that the production contained four categories of information (each listed on a short cover letter), including "Reports and Records – Pot[ential] Witnesses," and within that folder, the first file was a PDF called "Argus – HIS claims + compound." This email was not produced in a data dump. Indeed, the government endeavored throughout discovery, to provide the defendants materials in an organized way. This further demonstrates the government's intent to provide complete discovery, and its good faith in carrying out its duties.

**Hinton, K. Grace (HO) (FBI)**

| | |
|---|---|
| From: | Taylor, Jaron K███████████████████ |
| Sent: | Friday, April 5, 2019 2:16 PM |
| To: | Hinton, K. G. (HO) (FBI) |
| Subject: | RE: #d-crypt Claim Info Glossary |

Grace,

Regarding the claims with negative balances in the Billed Amount column (Pln Tot Pd Amt), those claims have a Claim Status of 'HIS' indicating they are claims that are manually loaded into the database based on historical claim information prior to DST doing business with the plan. Those claims are not based on any transaction or claim adjudication processed by DST and are usually loaded when we begin doing business with a new Health Plan in order for future claims to process correctly. The Billed Amount values on 'HIS' claims may not represent any monies actually paid to the pharmacy and could be considered arbitrary.

Jaron Taylor, CPhT, CFE
DST Pharmacy Solutions
Pharmacy Network Analyst

SS&C Technologies Inc.   |   1300 Washington Street, Kansas City, Missouri 64105
t: (816) 435-2227   f: (816) 843-6415
████████████████   |   www.ssctech.com

As is evident, Ms. Hinton's email simply copied and pasted what Mr. Taylor had written in his April 5, 2019, email.  Accordingly, the defendants were privy to the same information as the government with respect to the Argus claims, and therefore no information was suppressed prior to the government's preadmission of GEX 1.[17]

---

[17] The government also notified the defendants during trial that it asked Ms. Hinton to remove Optum claims from the summary charts based on a concern about the reliability of those claims, which reflected as "paid" some claims that were also reflected in the data as "reversed."  When this issue was discovered during final preparation for Ms. Hinton's testimony, the government immediately took action to remedy the issue, and between December 4 and December 12, 2022, kept the defendants abreast of the government's decision making on the issue.  The removal of these claims did not materially impact GEX 1.  In fact, the government notified the defendants on December 5, 2022, that the overall difference after removing the Optum claims was $4.6 million. Further, few, if any, of the individuals whose claims were the focus of testimony—the "VIPs" and the testifying witnesses—had Argus or Optum claims.

## <u>CONCLUSION</u>

Defendants Swiencinski, Breimeister, and McAda seek dismissal of the superseding indictment with prejudice based on unsupported allegations of outrageous government misconduct.  While the government regrets the errors that occurred and the mid-trial disclosures that led this Court to declare a mistrial, the government by no means engaged in misconduct or acted with bad faith or nefarious intent.  No evidence was ultimately suppressed, and no showing of materiality or actual prejudice has been made based on the mid-trial disclosures.  Because this Court has already meted out sufficient remedies, including through the declaration of a mistrial, the government respectfully requests that this Court DENY the defendants' Motions to Dismiss.

Respectfully submitted,

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

By:      */s/ Alexander Kramer*
        Alexander J. Kramer
        Assistant Chief
        Allan J. Medina
        Senior Deputy Chief
        Fraud Section, Criminal Division
        U.S. Department of Justice
        1000 Louisiana, Suite 2300
        Houston, Texas 77002
        (202) 768-1919
        Alexander.Kramer@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed through ECF on April 12, 2023.

_/s/ Alexander Kramer_
Alexander J. Kramer