**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

UNITED STATES OF AMERICA,

– v. –

BRIAN SWIENCINSKI,
SCOTT BREIMEISTER,
CHRISTOPHER INCE, M.D.,
RONNIE MCADA, JR.,

*Defendants*.

**No. 4:18-cr-00368**

**BRIAN SWIENCINSKI'S RESPONSE TO THE GOVERNMENT'S APRIL 4, 2023 PRESENTATION ON THE FINDINGS OF ITS SELF-INVESTIGATION**

On April 4, 2023, the government presented to the Court the findings of its self-investigation of the numerous errors that occurred in this case. The government concluded that its discovery violations and other errors were not intentional, that the prosecutor's failures to correct false or misleading testimony was not an issue, and that the government should get a second bite at the apple and retry this case.[1] In direct contradiction to this public presentation of "much ado about nothing," Tr. 4/4/23 at 32:11-14, significant material and prejudicial discovery violations and other misconduct took place before and during trial. Mr. Swiencinski has previously detailed that misconduct—and how it prejudiced him—in filings that he respectfully incorporates herein. *See* Defs.' Omnibus Mot. for Relief, Dkt. 385; Swiencinski's *Ex Parte* Supp. Notice of Govt. Misconduct and Appendix thereto (Dkt. 412).

Despite these prior filings, after the April 4 hearing—in a filing opposing Mr. Swiencinski's motion to dismiss based on outrageous government misconduct—the government

[1] With the Court's blessing, counsel to Defendant Brian Swiencinski reserved the right to file a written response to the government's April 4 presentation, Tr. 4/4/23 at 80:12-15, and accordingly files this response.

went on to criticize Mr. Swiencinski for not presenting specific facts to support any showing of materiality or prejudice. *See* United States' Omnibus Resp. to Defs. Swiencinski, Breimeister, and McAda's Motion to Dismiss, Dkt. 461. As such, Mr. Swiencinski details those facts again here:[2]

- Government witness Brad Madrid was to serve as a memory witness for the prosecution, to give a sworn recount of specific conversations with Mr. Swiencinski from seven years prior. The agent notes from a February 8, 2021, interview of Mr. Madrid revealed that he told the trial prosecutors he was a drug addict at the time in question—addicted to pain pills—and the prosecutors did not reveal this information.[3] *See* 4/4/23 Hrg. Govt. Ex. 204.[4] Even a junior prosecutor would know this is textbook exculpatory information. This fact was never revealed until the government was forced by the Court to reveal it. Despite the government's invocation of the mid-trial disclosures it made as evidence of its good faith, a voluntary disclosure and a forced disclosure are two different things.

- Government witness William Chan committed perjury regarding the materials he reviewed in creating critical exhibits about Mr. Swiencinski that summarized the financial information underlying this case. See, e.g., Trial Tr. 12/6/22 at 143:18-144:11. He also committed perjury (verified by the late-produced metadata) as to the vast extent to which he was working with trial prosecutors and agents in creating the exhibits about Mr. Swiencinski. *See* Trial Tr. 12/6/22 at 175:6-176:2; *cf.* Swiencinski's Appendix, Dkt. 412 at Exhibits 4-6. At no point did the prosecutors seek to clarify or correct this testimony (even when asked directly by this Court, **twice**), and in fact, used these misimpressions as to how the exhibits were created to have the summary exhibits admitted as evidence at trial. *See* Trial Tr. 12/6/22 at 145:20-146:9.

- The prosecution team coached Mr. Chan as to what he should and should not answer if asked about the sources for his summary exhibits. *See* Swiencinski's Appendix to Ex Parte Supp. Notice of Govt. Misconduct, Dkt. 412 at 23 ("Swiencinski Appendix") ("when asked . . . . do not refer to Grace Hinton files"). Coincidentally, these same instructive notes were redacted by the trial prosecutors themselves, so that they were hidden from defense counsel.

---

[2] This list is not exhaustive. For ease of reference, Mr. Swiencinski has attached an Appendix hereto that lists the primary examples of government misconduct, almost all of which were identified for this Court in Mr. Swiencinski's prior filings.

[3] It is commonly accepted in the medical community that opioid use affects short- and long-term memory.

[4] Citations to the April 4, 2023 Government Hearing Exhibits refer to exhibits contained in the voluminous binder the government supplied the Court and defense counsel at the April 4 hearing, which was marked as Composite Exhibit 1.

- The October 30, 2022, interview report of key government witness Leonard Carr omitted critical information: that "[Dan] Milosevic [u/i] Rx brought in scripts signed by Redko – occurred over a weekend." *See* 4/4/23 Hrg. Govt. Ex. 214. This statement is contained in the rough notes of the interview, which were produced to defense counsel mid-trial (after Mr. Carr had testified) only after Court ordered the government to produce all interview notes because it had become apparent that critical discovery had been concealed. The omitted statement about Mr. Milosevic explains how unfaxed scripts came to the pharmacy, which was a large issue in the case. T**he government and Dr. Redko repeatedly implicated Mr. Swiencinski in that conduct, and accused him of being responsible for those scripts.** But the government sat silently by and said nothing.

  A critical component of Mr. Swiencinski's defense was that Dan Milosevic committed this crime and fled. Mr. Swiencinski also argued that he relied on physicians, including Dr. Redko, to fulfill their obligations as physicians, and to run their offices in a correct and compliant manner—just like the other 2,900 providers who wrote prescriptions to the pharmacies did. Thus, having this information would have been important for cross-examination, and goes to Mr. Swiencinski's fundamental defense strategy. **And it begs the question, if a discovery violation that affected Dr. Redko and Mr. Swiencinski equally (if not more so for Mr. Swiencinski) warranted dismissal, how does the government proceed in good faith against one, and not the other?**

  Ms. Remis further compounded this issue by filing (and partially prevailing on) an oral motion *in limine* to exclude any mention of Dan Milosevic—**just days after she interviewed Mr. Carr (on October 30, 2022) and directly received the exculpatory information about Dan Milosevic**. *See* Rough Trial Tr. 11/9/22 at 273:21-274:14. Thus, Ms. Remis knew that Mr. Milosevic was responsible for these fraudulent prescriptions, did not tell Mr. Swiencinski, blamed him for them, and then prevented him from asserting a defense that Mr. Milosevic was responsible. She knew the exculpatory information, buried it, and then asked the Court (unknowingly) to help her bury it further via a motion *in limine*. Ms. Remis even objected to the inclusion of any slides in Mr. Swiencinski's opening statement that blamed Mr. Milosevic—even though she had direct knowledge of his involvement. If that is not intentional, what is?

- The July 29, 2022, interview report of Terry Brickman omitted that Mr. Brickman said: "2/3 of the [previous] interview not truthful, inaccurate; towards the end, became honest." 4/4/23 Hrg. Govt. Ex. 201. This statement was made directly to Dino Vergara and the entire trial team: "Aleza [Remis], Devon [Helfmeyer], Katherine [Raut]." *Id.* In short, the government's star, lead-off witness is an admitted liar. Mr. Brickman admitted that he lied repeatedly to the FBI and IRS agents about the facts of this case, but the defense was never told that fact. This exculpatory statement is contained in the agent notes of the interview, **and was told directly to the prosecutors**, but was omitted from the corresponding interview report that was produced to defense counsel. This information would have affected the entire format of Mr. Swiencinski's cross-

examination of Mr. Brickman. It would have been used for impeachment, and it is exculpatory *Brady* evidence.

- Mr. Brickman perjured himself on the stand by testifying that he had no medical conditions and had not seen a doctor for pain (wrist or elbow) in 2014 that would warrant a pain cream. *See* Rough Trial Tr. 11/10/22 at 16:2-3, 37:7-9, 141:16-25. This testimony was in 100% direct contradiction to his medical records. When the prosecutors received the exculpatory information from Mr. Brickman's doctor that directly contradicted Mr. Brickman's testimony, the government said nothing. *See* Trial Tr. 12/7/23 at 139:22-142:15.

  Relatedly, it was Mr. Swiencinski who ultimately subpoenaed Mr. Brickman's medical records mid-trial because the government refused to do so. *See id.* When the Court asked Mr. Swiencinski why the records had not been subpoenaed earlier, counsel to Mr. Swiencinski explained he was not expecting Mr. Brickman to lie about his prior medical conditions. *See id.* Had Mr. Swiencinski known that Mr. Brickman had told prosecutors he lied during the first two-thirds of his prior interviews, Mr. Swiencinski could have anticipated that Mr. Brickman would claim at trial that he was lying when he previously told the government about his medical conditions.

- Mr. Brickman also testified that Mr. Swiencinski was targeting government payors for higher reimbursement, but the agent notes reveal he told the government that Mr. Swiencinski did not want to go after Tricare. 4/4/23 Hrg. Govt. Ex. 201. This information is material impeachment evidence.

- Mr. Brickman testified that he was not hoping for anything from the government in exchange for his testimony against Mr. Swiencinski. *See, e.g.*, Rough Trial Tr. 11/14/22 at 70:17-24.This statement was elicited from Ms. Raut despite it being contradicted by the terms of his plea agreement with the government. Contrary to his testimony, Mr. Brickman had to testify against Mr. Swiencinski to avoid reinstatement of his prosecution.

- The July 29, 2022 interview report of Mr. Brickman also omits that he conceded, in reference to Mr. Swiencinski, that Mr. Brickman "never saw money exchange hands but there was a discussion where [Mr. Swiencinski] said he gave Andrew [sic] McNally something." 4/4/23 Hrg. Govt. Ex. 201. This statement is contained in the rough notes, *id.*, and is materially helpful to Mr. Swiencinski's defense—especially in light of the prosecutors' repeatedly injecting into the case allegations of cash bribes by Mr. Swiencinski. This statement is also relevant to the trial testimony Ms. Raut elicited from Terry Brickman, James Buckingham, and Brad Madrid—that Mr. Swiencinski was involved in a cash bribery scheme in Ohio and elsewhere. This statement undercuts the theory that Mr. Swiencinski was paying cash bribes. It is exculpatory on its face and should have been disclosed to defense counsel.

- The interview report of the June 30, 2022 interview of Stacey Mayeur omits the statement, in relation to Dr. Ince, "did fill in their NPI." *Id.* Govt. Ex. 225. This omission is significant because Mr. Swiencinski was blamed for adding in the NPI

number. The government had information that completely contradicted that, but did not divulge it. Ironically, even Dr. Ince's attorney accused Mr. Swiencinski of adding the NPI number, and the government sat by quietly (including prosecutors who were present at Ms. Mayeur's interview).

Further, the government's fraud figure—alleging that this case involves a $140 million fraud—is incorrect, and Government's Exhibit 1 ("G-1"), which lists the claim data alleged to comprise the Defendants' fraud, is unreliable. The following numbers demonstrate why this is so:

- Approximately 24,000 claims (13% of the 172,000 claims on G-1) predate the Defendant's ownership of the pharmacies.
- G-1 includes thousands of prescriptions for which no evidence of fraud was presented—*e.g.*, prescriptions for Z Packs, cancer drugs, Naproxen, Lidocaine, Evzio (Naloxone), and Metoprol Succinate. Some 97,000 claim lines on G-1 (approximately 56%) were labeled as non-compounded drugs.
- As to the compounded drugs, G-1 lists hundreds of prescribers for those medications. No evidence was presented that those prescribers did not see their patients before prescribing compounded medication.
- The "specialty business" was 100% legitimate. Specialty drugs accounts for tens of thousands of prescriptions on G-1.
- Many claims from the PBM Argus were not even adjudicated. The government knew this (verified by an internal FBI email) and still presented these claims as fraud. The Argus claims are not reliable, but a review of G-1 shows it still included 16,070 Argus claims
- It is now uncontroverted that the Optum claims were unreliable. Despite that fact, the prosecutors still presented them as fraud.

These factual and mathematical certainties result in one inescapable conclusion—there was not a $140 million fraud (and certainly not a quarter-billion-dollar fraud asserted by the governing in its opening statement, Rough Trial Tr. 11/10/22 at 1:23-24). This exaggeration of fraud is not a first for this trial team. On October 4, 2018, in *United States v. Bomer*, No. 4:16-CR-257 (S.D. Tex.), a health care fraud case, Judge Gilmore admonished AUSAs Knutson and Remis about using an exhibit that supposedly represented paid claims, when they were not in fact paid. *See* Dkt. 412 at 27-29 (discussing the *Bomer* case).

The government's allegedly unbiased presentation to this Court on April 4 only highlights the fallacy of trusting the government to investigate itself, and the resulting need for an evidentiary hearing. It is simply not possible for the government to conduct an investigation and present those findings in a neutral, objective manner. Indeed, the government's April 4 presentation of its investigation findings was in parts biased, incomplete, and inaccurate. And that's assuming the investigation itself was sound and the government asked the right questions—issues the Defendants have no way of testing.

As discussed below, examination of the government's explanations for specific instances of misconduct demonstrates the inherent bias and inadequacy of the investigation and findings. Moreover, the government's presentation was pure advocacy. The government began its presentation to the Court by attempting to explain what it had done right. *See* Tr. 4/4/23 at 11-19. And the government ended its presentation by talking about the supposed virtues of the prosecutors. *Id.* at 53. The government confronted the heart of the misconduct—including the late-disclosed interview reports, the discrepancies between rough interview notes and the interview reports, the issues involving William Chan, and the issues with the claims data—only after being pushed to do so by the Court. *See, e.g.*, *id.* at 19-21, 22:19-24:3. Then, at every turn, the government viewed its investigation findings and credibility determinations in the light most favorable to itself.

Adding to the lack of objectivity, the prosecutors designated to investigate the trial team (Allan Medina and Alexander Kramer of the Department of Justice Fraud Unit) supervise and are colleagues of the trial team. A recent filing by Defendant Scott Breimeister in this case, Dkt. 459, reported that Mr. Kramer and Katherine Raut, a member of the trial team Mr. Kamer was investigating, are co-counsel for the United States in a pending case: *United States v. Merlo*

*Hidalgo*, *et al.*, No. 1:22-cr-20311 (S.D. Fla.). This statement is not a slight to the efforts of Messrs. Medina and Kramer. There is little doubt that Messrs. Medina and Kramer truly believe they are objective. But it is not possible to be fully objective given their closeness to the trial prosecutors. And that lack of objectivity is highlighted by the actual evidence here (that we know of). The examples above and attached hereto in the Appendix, when taken in their totality, reveal that it is absurd to concluded that no misconduct happened here and that the issues the Defendants have discovered are simply a mistake, after mistake, after mistake, . . . after mistake.

As the Defendants have briefed previously, there is ample precedent for holding an evidentiary hearing in these circumstances. *See* Defs.' Supp. to the Joint Mot. for an Evid. Hrg., Dkt. 424; Defs.' Reply in Support of Supp. to the Joint Mot. for an Evid. Hrg. Dkt. 440. A hearing here would allow the Court to ensure the right questions are asked, and enable the Court to make fact findings and credibility determinations as a truly neutral fact finder.

An examination of the government's comments on April 4 as to four categories of misconduct demonstrate the foregoing points:

***a. William Chan***

As to its presentation on the issues involving government witness William Chan, the government seemed to obfuscate the actual issues. The government first represented that Mr. Chan was "never instructed to lie." Tr. 22:7-9. "[W]e confronted him on that specific question," the government reported, "and he gave us a very clear answer." *Id.* But what question did the government ask of Mr. Chan? It is unsurprising that prosecutors or other members of the trial team did not literally instruct Mr. Chan to lie. But in its investigation, did the government explore nuanced issues of whether the trial team led Mr. Chan down a path of providing false or misleading testimony? Did the government explore whether Mr. Chan's testimony was unduly influenced by his admittedly extensive contact with the prosecution team?

At best, the government's response is incomplete. **Mr. Chan himself admitted that prosecutors instructed him not to refer to Grace Hinton or her "file" during his testimony,** *see* Trial Tr. 12/7/22 at 22:22-24:18—an instruction that made such an impression on Mr. Chan that he referred to it as **"not push[ing] the red button,"** *id.* at 26:23-27:1. In addition, Mr. Chan and the prosecutors failed to mention that **he had worked closely with the prosecutors in compiling the summary exhibits**, and **that he had reviewed and relied documents other than those listed as sources** on the summary exhibits. *See* Trial Tr. 12/6/22 at 175:6-176:2; *cf.* Swiencinski's Appendix, Dkt. 412 at Exhibits 4-6. In its April 4 presentation, the government did not acknowledge any of this until pushed to do so by the Court. *See* Tr. 4/4/23 at 22:19-27:1, 28:22-30:13. And even then, the government maintained that the **prosecutors somehow had no obligation to correct Mr. Chan's false or misleading testimony.** *Id.* at 34:2-7.

This is just one example of the prosecutors' failure to jump to their feet and correct false testimony, as they also failed to correct testimony by Terry Brickman and Leonard Carr. By way of example, the government had exculpatory information about Terry Brickman's medical conditions, which contradicted his trial testimony that the compound medications he received were not medically necessary. The government never sought to correct Mr. Brickman's testimony. (Other examples related to Mr. Brickman and Mr. Carr are discussed below.)

The government made other representations as to Mr. Chan that are equally obtuse. As to Mr. Chan's failure to fully disclose the sources for his summary charts, the government responded it was not aware of any rule requiring "actual sourcing on the document itself." *Id.* at 22:10-18. But as the Court pointed out, that is beside the point: "[T]here might not have been a specific requirement that he do that [identify sources on the summary charts], but he did." *Id.* at 22:23-24.

And when he did—in connection with discussions with prosecutors—it created a knowing misimpression for the jury and for defense counsel.

The government's incomplete responses, resort to technical responses that do not address the issues head on, and ultimate conclusion that the issue with Mr. Chan's testimony amount to "much ado about nothing," *id.* at 32:11-14, all demonstrate that the government's self-investigation is biased and inadequate.

***b. Inconsistencies Between Interview Reports and Interview Notes.***

As the Court well knows, a major issue revealed during trial was the material inconsistencies between the interview reports and the underlying rough interview notes. In responding to these issues, the government emphasized that the prosecutors bear no responsibility because they did not compare the interview reports to the notes, and "had no reason to believe the information that was in the report[s] was not accurate." *Id.* at 35:16-18. That is a red herring—**the prosecutors attended the interviews in question**. **They never attempted to disclose or correct critical information omitted from the interview reports, even when it came up during trial.**[5]

For example, Mr. Swiencinski was directly accused of producing false Dr. Redko prescriptions. But the government knew that Mr. Carr saw Dan Milosevic come into the office with these false scripts. This information is contained in the rough notes from Mr. Carr's October 30, 2022 interview, which lead trial prosecutor Aleza Remis attended. *See* 4/4/23 Hrg. Govt. Ex. 214. The government buried this information by omitting it from the interview report produced to

[5] The government has repeatedly argued there is no policy or practice that requires the government to review agent rough notes as a matter of course. Again, the Department of Justice misses the point. The prosecutors were there! This is not a mere failure to compare notes. It the prosecutors' failure to reveal the exculpatory information the witnesses told them directly. The government's argument about "note comparison" is a red herring and irrelevant. The issue is who was in the room hearing the exculpatory information? The answer is the prosecutors, who said nothing prior to, during, or after their witnesses' trial testimony.

Mr. Swiencinski, and then stood silently by while those accusations were made at trial (by the prosecutors and by Dr. Redko's counsel). This suppressed evidence was so important that the Department of Justice dismissed the superseding indictment against Dr. Redko in the middle of trial. How is this suppressed evidence not equally exculpatory for Mr. Swiencinski?

Moreover, the government asked this very Court via a motion *in limine* to bar the Defendants from blaming Dan Milosevic. That fact is incredible—the government buried the exculpatory evidence and then asked this Court to (unknowingly) bury it as well. The Court granted the government's request in part. Had the Court known the full story, it likely would not have granted this motion *in limine*.

In short, the government blamed Mr. Swiencinski for false scripts involving Dr. Redko, allowed counsel for Dr. Redko to blame Mr. Swiencinski as well, and then filed a motion to prevent Mr. Swiencinski from even mentioning Dan Milosevic. All the while, the government had evidence to the contrary, of which the lead trial prosecutor had personal knowledge.

As another example, the notes for Mr. Carr's November 1, 2022 interview—again, a few days before trial—state, "The specialty business was a 100% legit." Ms. Remis and Ms. Raut attended that interview. Contrary to Mr. Carr's prior statement, the government pursued a theory at trial that all of the drugs filled through the pharmacies were illegitimate. Yet the prosecutors assigned to investigate these issues still hide behind the excuse that the trial team did not know of the inconsistences between the notes and interview reports. How is that possible? The government never provides an answer.

As to why inconsistencies occurred in the first place, the government's April 4 presentation attributed the inconsistencies to mere mistakes or memory issues. The government did so even while acknowledging the existence of highly unusual practices like Dino Vergara's creating "two

sets" of notes. Tr. 4/3/23 at 37:16. Moreover, **the inconsistencies and errors overwhelmingly favored the government**. In investigating these issues, the government without fail credits the explanations that favor itself, even when those explanations are highly suspicious on their face or do not tell the full story. At best, the issues presented require credibility determinations. There is no reason why those determinations should be left to the prosecutors assigned to investigate their own colleagues.

***c. Late-Disclosed Interview Reports***

With respect to the late production of interview reports, the government's presentation was equally biased. The government began by attempting to minimize the issue, noting that only 9 out of more than 250 reports were not timely produced. *Id.* at 34:21-24. Also, the government attempted to blame the problems in part on personnel turnover and leave taken by some individuals, including Aleza Remis. *Id.* at 44:2-14. But the government never explained how turnover and leave actually contributed to the late-disclosed reports or other issues. Respectfully, what does maternity leave have to do with burying or failing to disclose exculpatory information from Leo Carr, Terry Brickman, Stacey Mayeur, Brad Madrid, and others—information directly told to the prosecutors before and during trial? The government stated that it was not making excuses, but this explanation was exactly that—a vague, unavailing, and irrelevant excuse.

***d. Government Exhibit 1 & Claims Data***

As to the issues with the claims data, the government responded by employing a double standard. The government started its April 4 presentation by attempting to answer whether "the government put in front of the Court Government Exhibit 1 knowing that it was not reliable based on [a] Hinton e-mail calling into question information contained therein[.]" *Id.* at 11:10-13. The government asserted that "the answer is no" because the data came from PBMs who produced the data along with business records certifications. *Id.* at 11:14. Further, the government attempted to

shift the blame to the Defendants, asserting the Defendants should have been aware of the issues with the claims data because the government had produced the underlying data, and an email from Analyst Grace Hinton identifying issues with the Argus claims, in advance of trial.

The government's response is in parts nonresponsive, very misleading, and inaccurate. The business records certifications are unrelated to the issue at hand and a red herring (much like the maternity leave excuse for the suppression of exculpatory information). The certifications represent only that the record of claims data is made contemporaneously with the underlying event, that the records were kept in the course of the PBM's regularly conducted activity, and that the records were made as a regular practice of that activity. But the issue is that the government presented unreliable data to the jury because the government failed to reconcile the claims data with their theory of fraud. A business records certification from a PBM does not absolve the government of that responsibility.

Rather than taking responsibility for the reliability of its own data, the government blames the defendants for not catching the errors. At the April 4 hearing, the government stated the Argus claims data—and an email identifying issues with that data—was produced pretrial. As an initial matter, if this information was sufficient to put the defendants on notice that the data was unreliable, then the government was certainly on notice as well. And the government should have answered "yes" to whether the government knew Exhibit 1 "was not reliable based on [the] Hinton e-mail calling into question information contained therein." But again, the government invokes a double standard that places the blame on the Defendants, while absolving itself of all responsibility.

In any event, the government produced the half-redacted email from Analyst Hinton, on which the government hangs it hat, years after it produced the claims data to the Defendants. The

significance of the email is extremely difficult to understand out of context, and it was produced long before G-1 was created. There is no reasonable way for the Defendants to know that this email somehow relates to the reliability of G-1. **Plain and simple, the government was told by its own analysts that claims *were not fraud*, and they presented it as fraud anyway!**

Further, the government's response does nothing to address the other issues as to G-1, including the inclusion of Optum claims **that had been reversed, the inclusion of claims that predate the relevant time period in this case, and the inclusion of specialty drugs** even though Leo Carr had represented—not disclosed to the defense until mid-trial—that those claims were entirely legitimate.

* * *

In short, the government's one-sided presentation on April 4 was biased, inadequate, misleading, and incorrect. Mr. Swiencinski respectfully submits that now more than ever, an evidentiary hearing is required to ensure justice is done in this case.[6]

## CONCLUSION

Mr. Swiencinski requests that the Court order an evidentiary hearing as to the misconduct that occurred in this case.

Dated: April 18, 2023

Respectfully submitted,

*/s/ Brandon McCarthy*
Brandon McCarthy (Bar No. 24027486)
Rachel M. Riley ( Bar No. 24093044)
KATTEN MUCHIN ROSENMAN LLP
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
(214) 765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com

Michael A. Villa, Jr. (Bar No. 24051475)
MEADOWS, COLLIER, REED,
COUSINS, CROUCH & UNGERMAN, LLP
901 Main Street, Suite 370
Dallas, TX 75202
(214) 744-2700
mvilla@meadowscollier.com

[6] Mr. Swiencinski reiterates his reasoned belief that misconduct also occurred before the grand jury. His pending motion to inspect grand jury materials, which has been fully briefed, provides further detail. *See* Dkts. 427, 445, 454.

Scottie D. Allen (admitted *pro hac vice*)
THE ALLEN LAW FIRM
4144 N. Central Expressway
Suite 650
Dallas, TX 75204
(214) 824-7711
scottiedallen@scottiedallenlaw.com

Mary C. Fleming (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2900 K Street NW, North Tower - Suite 200
Washington, DC 20007
(202) 625-3754
mary.fleming@katten.com

***Attorneys for Brian Swiencinski***

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing Response to the Government's April 4, 2023 Presentation on the Findings of Its Self-Investigation, to be served on all counsel of record by filing it with the Clerk on April 18, 2023, using the Court's CM/ECF System.

*/s/ Brandon McCarthy*
Brandon McCarthy