IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>– v. –<br><br>BRIAN SWIENCINSKI,<br>SCOTT BREIMEISTER,<br>CHRISTOPHER INCE, M.D.,<br>RONNIE MCADA, JR.,<br><br>    *Defendants*. | No. 4:18-cr-00368 |

**BRIAN SWIENCINSKI'S APPENDIX TO RESPONSE TO THE GOVERNMENT'S APRIL 4, 2023 PRESENTATION ON THE FINDINGS OF ITS SELF-INVESTIGATION**

**WILLIAM CHAN'S TESTIMONY & SUMMARY EXHIBITS**

1. Mr. Chan asked the prosecutor if he should refer to the source where he got the doctors who were allegedly bribed. He is told: "when asked" (under oath), do not refer to [FBI Special Agent] Grace Hinton's files; even though he relied on those files. *See* Trial Tr. 12/7/22 at 22:22-24:18; *see also* Swiencinski's Appendix to *Ex Parte* Supp. Notice of Govt. Misconduct, Dkt. 412 at 23 ("Swiencinski Appendix"). Mr. Chan then reiterated the response he got from the prosecutor and noted it to himself: "Do not reference Grace Hinton. LOL. (don't push the red button)." Swiencinski Appendix, Dkt. 412 at 30. The prosecutors instructed Mr. Chan not to tell the whole truth when asked under oath. Moreover, the prosecutors who instructed Mr. Chan in this way then redacted Mr. Chan's notes so that this critical information was hidden from defense counsel.

2. During his trial testimony, Mr. Chan then went on to misrepresent with whom he worked on the exhibits. *See* Trial Tr. 12/6/22 at 175:6-176:2; *cf.* Swiencinski's Appendix, Dkt. 412 at Exhibits 4-6. We now know from metadata that Mr. Chan was working with the prosecutors and agents. *See* Swiencinski's Supp. Notice of Govt. Misconduct, Dkt. 412 at 7-10. That is uncontroverted. But Mr. Chan testified multiple times that he only worked with one other person—a woman from his company. *See* Trial Tr. 12/6/22 at 175:6-176:2. The prosecutors knew that was not true—as they themselves worked with Mr. Chan on the exhibits—and never said a word.

3. After multiple, post-mistrial requests, the new prosecutors produced Mr. Chan's file and notes in native versions (*i.e.*, Excel and Word). This production contained *hundreds* of documents that Mr. Swiencinski was never privy to. These native notes and Mr. Chan's file were not produced to Mr. Swiencinski after the Court's order during trial to produce

1

all of the un-redacted notes of Mr. Chan. Instead, for a reason unknown to the defense, the government produced a handful of notes that were un-redacted but converted from the native files (Excel and Word) to .pdf. The withheld native Excel files differ considerably from the .pdf versions the government produced during trial, and there are hidden sheets (or tabs) in many of the Excel files that were concealed in the .pdf production. For example, in an Excel file titled "to discuss 11.28.2022.xlsx," the final sheet of the workbook is titled "1. Discussions." *See* Swiencinski's Appendix, Dkt. 412 at Exhibit 1. The information in this tab is not included in the .pdf produced during trial, entitled "11.28.2022.pdf." *See id.* Exhibit 2. Nor is it included in any other version of the .pdfs that the government produced pursuant to the Court's order. Also, in nearly every Excel file there is a hidden sheet titled "RISCIO." *See id.* Exhibit 3. There are additional instances where other sheets were found to be hidden in the native and not produced as a part of the .pdf conversion. This continued pattern of conduct indicates that the trial team hid material evidence relevant to cross-examination, despite the Court's order during trial. And this did not occur in just one of the more-than 20 versions of the excel spreadsheets; it occurred in nearly all of them.

### GOVERNMENT'S EXHIBIT 1 & CLAIMS DATA

1. The claims data in Government's Exhibit 1 ("G-1") is unreliable for several reasons, but the prosecutors nonetheless represented to defense counsel that the data was reliable:

    a. Approximately 24,000 claims (13% of all of the claims in G-1)—totaling approximately $15.5 million—predate the Defendants' ownership of the pharmacies.

    b. There are thousands of prescriptions for which no evidence of fraud was presented, including: Z Packs, cancer drugs, Naproxen, Lidocaine, Evzio (Naloxone), and Metoprol Succinate. Some 97,000 claim lines out of 172,000 on G-1 were labeled as non-compounded drugs.

    c. No evidence was presented that hundreds of prescribers did not see their patients for compounded creams that are listed on G-1.

    d. The notes for Mr. Carr's November 1, 2022 interview revealed that the "specialty business" was 100% legitimate. *See* 4/4/23 Hrg. Govt. Ex. 215.[1] This accounts for tens of thousands of prescriptions listed on G-1.

    e. G-1 includes claims from the PBM Argus that were never adjudicated.

    f. Just days before the government's summary witness was scheduled to take the stand, defense counsel was informed that the data from PBM Optum was unreliable. *See* 4/4/23 Hrg. Govt. Ex. 312. The government removed the claims from its summary exhibits that were reversed by Optum, totaling approximately $4.6

---

[1] Citations to the April 4, 2023 Government Hearing Exhibits refer to exhibits contained in the voluminous binder the government supplied the Court and defense counsel at the April 4 hearing, which was marked as Composite Exhibit 1.

2

million. *See id.* Yet those claims were included in G-1, which was presented to the jury.

**SUPPRESSED INTERVIEW REPORTS & ROUGH NOTES**

1. **Leonard Carr**

    a. The notes for Mr. Carr's October 30, 2022 interview appear to say "[Dan] Milosevic [u/i] Rx brought in scripts signed by Redko – occurred over a weekend." *See* 4/4/23 Hrg. Govt. Ex. 214. This information was omitted from the corresponding interview report. *Id.* Govt. Ex. 229. This explains how unfaxed scripts came to the pharmacy, which was a large issue in the case. Mr. Swiencinski was repeatedly implicated in that conduct and accused of being responsible for those scripts. A critical component of Mr. Swiencinski's defense was that he relied on physicians, including Dr. Redko, to fulfill their obligations as physicians, and to run their offices in a correct and compliant manner—just like the other 2,900 providers who wrote prescriptions to the pharmacies did. Thus, having this information would have been important for cross-examination, and goes to fundamental defense strategy.

    b. The notes for Mr. Carr's November 1, 2022 interview state: "The specialty business was a 100% legit." *See id.* Govt. Ex. 215. Yet, the agent did not include that favorable information in the 302 that he prepared. *See id.* Govt. Ex. 229. And the government committed a discovery violation by failing to produce the 302 to the defense until several weeks after Mr. Carr testified. *See id.* The government has repeatedly shifted their theory as to the scope of this case, and has asserted at times that all of the drugs filled through the pharmacy were illegitimate. *See, e.g.*, Rough Trial Tr. 11/10/22 at 1:23-24 (government asserting in opening statement, "Over $250 million paid to the pharmacies at the center of this scheme.") On Mr. Carr's direct examination, the government elicited testimony regarding non-compound kits and patches that blackjack dealer, Yardley Pinar, brought to the pharmacy as a potential revenue stream after compound prescriptions were being restricted. *See* Trial Tr. 11/17/22 at 376:10-17. The government tied this into its theory of patient "reharvesting" and how the kits and patches were being offered as an alternative or additional product for patients. *See id.* at 378:13. Mr. Carr's statements as to the purported legitimacy or non-legitimacy of various drugs would have rebutted such allegations, and informed defense strategy. Counsel for Mr. Swiencinski would have crossed Mr. Carr on this statement had counsel been aware of it.

    c. The interview report from Mr. Carr's interview on February 19, 2019 omits the following statement, which is found in the rough interview notes: "if someone need prescription, Scott [Breimeister] would say call Redko." *Compare* 4/4/23 Hrg. Govt. Ex. 226A, *with id.* Govt. Ex. 217. This is consistent with Mr. Swiencinski's defense strategy that he relied on physicians, including Dr. Redko, to do their job and exercise their medical judgment in prescribing compounds. Mr. Swiencinski would have used this statement in cross-examination of Mr. Carr had he been aware of it.

3

2. **Terry Brickman**

   a. Page one of Dino Vergara's notes dated July 29, 2022, states that Terry Brickman said: "2/3 of the [previous] interview not truthful, inaccurate; towards the end, became honest." *Id.* Govt. Ex. 201. This exculpatory statement was not in the corresponding 302 report and was never disclosed to defense counsel. *Id.* Govt. Ex. 224A. Mr. Brickman was the government's star, leadoff witness and this fact was left out of the report and not disclosed. This statement was made directly to the agent and the entire trial team: "Aleza [Remis], Devon [Helfmeyer], Katherine [Raut]." *Id.* Govt. Ex. 201. Having this information most certainly would have affected the entire format of Mr. Swiencinski's cross-examination of Mr. Brickman, and would have been used on cross. It appears to have been intentionally left out of the report as such a statement undercuts the witness's credibility, would have been used for impeachment, and is exculpatory *Brady* evidence.

   b. Page nine of the handwritten notes dated July 29, 2022 reflect that when asked about Brian Swiencinski, Terry Brickman conceded, "[Brickman] never saw money exchange hands but there was a discussion where [Mr. Swiencinski] said he gave Andrew [sic] McNally something." *Id.* Govt. Ex. 201. This statement is not in the agent's typed report that counsel was given before trial." *Id.* Govt. Ex. 224A. It is materially helpful to Mr. Swiencinski's defense—especially in light of the prosecutor's repeated injection of alleged cash bribes by Mr. Swiencinski and "white enveloping." All three trial prosecutors were present at this interview and the notes were authored by Dino Vergara. It is also relevant to the trial testimony Ms. Raut elicited from Terry Brickman, James Buckingham, and Brad Madrid— that Mr. Swiencinski was involved in a cash bribery scheme in Ohio and elsewhere. This statement that was omitted from the 302 cuts against Mr. Swiencinski paying cash bribes to anyone in this case. It is exculpatory on its face and should have been included in the typed report.

   c. Page nine of the same notes, dated July 29, 2022, appears to say: "Ever have conversations with [Brian Swiencinski] about these people needed these products? [Terry Brickman]: 'does not remember.'" *Id.* Govt. Ex. 201. This statement is not in the corresponding 302 report. *See id.* Ex. 224A. Mr. Brickman implied the basis for his fraud was fabricated symptoms for himself, his wife, and others, and that Mr. Swiencinski was in on it. If Mr. Brickman never had a conversation with Mr. Swiencinski regarding whether patients needed the products, how could Mr. Swiencinski know the symptoms were fabricated? Later, on October 28, 2022, Mr. Brickman changed his account and stated, "Mr. Swiencinski knew that he (Brickman) did not have a medical need for these products." That statement was included in the corresponding 302 report, but the earlier exculpatory statement was excluded. This demonstrates a continuing theme that inculpatory information is included in the interview reports, but exculpatory information is left out repeatedly.

   d. Page eleven of the July 29, 2022 notes reveals that "he [Brian Swiencinski] did not want to go after Tricare." *Id.* Govt. Ex. 201. This statement was not included in the 302. *Id.* Govt. Ex. 224A. It is the opposite of the government's argument about Mr. Swiencinski targeting Tricare because the reimbursements were higher, but it was suppressed.

4

    e.    Per the handwritten notes from an interview on May 24, 2018, Brickman told prosecutors and agents the following, which was not timely disclosed: "Buck [Buckingham] told me to get his kids on it." *Id.* Govt. Ex. 223. At trial, Mr. Brickman testified that it was Mr. Swiencinski's idea to get the families on the medications. *See* Rough Trial Tr. 11/14/2022 at 50:5-9 and 59:10-13; *see also id.* at 59:10-13. In addition, on July 6, 2022 (with all prosecutors and FBI agent Ashely Tucker present) James Buckingham then tells the prosecution team (when asked) that he is "not sure who's idea of getting family too – Buckingham['s] or Brian." Like Brickman, at trial Buckingham definitively testified it was Mr. Swiencinski's idea, even though he is "not sure" in July.

    f.    Further, exculpatory statements on various topics were discovered in the rough notes from Mr. Brickman's July 29, 2022 interview, which were omitted from the interview reports, including:

        i.    "Copays – he at some point – middle . . . Brian said needed to pay them."
        ii.    "Brian was very clear that copays had to be paid for Reme-D."
        iii.    "Brian would say something like Dan would take to see Redko re the scripts."
        iv.    "Use of creams – I did try them."
        v.    "Stuff at end that actually got, I discarded b/c hiding from wife; didn't want this evidence around."
        vi.    When asked if Mr. Swiencinski ever pressured people to get the products, Brickman answered, "No."

**3.**    **Stacey Mayeur**

    a.    Notes underlying Stacey Mayeur's June 30, 2022 interview include additional details about what she and her team would write on prescriptions. The 302 states that "Carr and Breimeister instructed them to just write it [where the cream should be applied] in manually somewhere on the script." But page 4 of the notes includes the additional detail that "they would call the doctor or the patient to ask where to put it as instructed by Leo [Carr]." *Id.* Govt. Ex. 225. This information is relevant to refuting the government's theory that the prescriptions were fraudulent because they were not medically necessary or written pursuant to a valid doctor-patient relationship.

    b.    Page 6 of the notes underlying Ms. Mayeur's June 30, 2022 interview states, in relation to Dr. Ince, "did fill in their NPI." *Id.* Govt. Ex. 225. This was omitted from the typed report, which is significant because Mr. Swiencinski was then blamed for adding in the NPI number. The government had information that completely contradicted that, but did not divulge it. Ironically, even Dr. Ince's attorney accused Mr. Swiencinski of adding the NPI number, and the government sat by quietly (including prosecutors who were present at Ms. Mayeur's interview).

    c.    The Government suppressed a 302 of an August 22, 2022 interview with Ms. Mayeur, which contains a section on doctor attestations. *Id.* Govt. Ex. 227. Counsel for Swiencinski inquired about this topic on cross-examination without the benefit of having notes on whether Ms. Mayeur had ever discussed attestations with the government.

5

Case 4:18-cr-00368   Document 467-1   Filed on 04/18/23 in TXSD   Page 6 of 8

    d.    The suppressed 302 from August 22, 2022 states Ms. Mayeur was told to tell patients co-pays would not go to collections. *Id.* But Page 12 of the underlying notes state Ms. Mayeur "was not told to tell patient it would not go to collections. Instructed to try to collect co-pays." This is critical information given the government's focus on co-pay collection practices as indicia of fraud, and the discrepancies further undermine the government's credibility.

    e.    In the suppressed 302, Ms. Mayeur stated that the pharmacist-in-charge, Raghu Chintalapally, decided to make larger batches of compound creams in bulk. *Id.* Had the Government disclosed this information, counsel for Mr. Siwiencinski would have elicited it on cross examination to demonstrate that a licensed pharmacist made the clinical decision to produce compound medications in bulk. This was consistent with his defense that he relied on others (especially those with medical or pharmacy licenses) to do their jobs. At trial, the Government emphasized this conduct as an act in furtherance of a conspiracy, including by introducing a photograph that Ms. Mayeur took of pharmacy technicians making compound medication in bulk.

    f.    In the suppressed 302, Ms. Mayeur stated that "Carr was [her] buddy and was really good to her" and that she "hopes that Carr would not get into trouble." *Id.* Had this information been disclosed, counsel for Mr. Swiencinski would have used it to impeach Ms. Mayeur's bias and motive to protect her friends at the expense of Mr. Swiencinski.

**4. <u>Brad Madrid</u>**

    a.    In the government's handwritten notes of its interview with Brad Madrid on February 8, 2021, he stated that he received hydrocodone prescriptions for himself, that he had a "pill addiction," and that he had been sober "a couple years" (as of 2021). *See* 4/4/23 Hrg. Govt. Ex. 204. The 302 from the corresponding interview omits that information entirely. *Id.* Govt. Ex. 203. It is favorable impeachment evidence that undermines his credibility and memory about anything from the relevant time period.

    b.    In the handwritten notes of the interview of February 8, 2021, Mr. Madrid stated that the intake department at the pharmacy would call the doctor's office if the prescription was missing information. *Id.* Govt. Ex. 204. This contradicts the government's theory that the pharmacy would fraudulently fill in missing information. The corresponding 302 omits this favorable information. *Id.* Govt. Ex. 203.

    c.    In the handwritten notes of the interview of February 8, 2021, Mr. Madrid stated that Mr. Chintalapally had pharmacists make compounds in bulk. *Id.* Govt. Ex. 204. The corresponding 302 states that the "pharmacies" made compounds in bulk and omitted that Mr. Chintalapally—the pharmacist in charge—made this decision. Id. Govt. Ex. 203. This difference is material because the government implied at trial that the bulk prescriptions were indicia of unauthorized or fraudulent prescriptions.

    d.    In the handwritten notes of the interview of February 8, 2021, Mr. Madrid stated that he does not know if the Omni One Med share program ever ended. *Id.* Govt.

6

  Ex. 204. The corresponding 302 omits this information. *Id.* Govt. Ex. 203. This information impeaches Mr. Madrid's knowledge about that program, as the evidence demonstrates that the program ended in June of 2015, one year before Mr. Madrid stopped working at the pharmacy.

 e. In the handwritten notes of the interview of February 8, 2021, Mr. Madrid stated that the CVS audit was not related to Dr. Kennedy. *Id.* Govt. Ex. 204. The corresponding 302 omits this information. *Id.* Govt. Ex. 203. This information impeaches Mr. Madrid's knowledge about the issues at the pharmacies, as the evidence demonstrates that the audit was related to Dr. Kennedy.

 f. The 302 from the interview of February 8, 2021, asserts that Mr. Madrid stated that sales representatives could not receive payments on their own prescriptions or their family prescriptions. *Id.* However, the handwritten notes from that interview do not contain any statement to that effect. *Id.* Govt. Ex. 204.

 g. In the handwritten notes from Mr. Madrid's interview of March 4, 2021, he stated that the pharmacies conducted a compliance training session for Chad Southard and Weston Black's sales representatives and instructed them that they could not receive payments on their own prescriptions or their family prescriptions, which was a "punch in the gut" to Mr. Madrid. *Id.* The corresponding 302 does not mention any of this information. *Id.* Govt. Ex. 203.

 h. According to the handwritten notes from Mr. Madrid's interview of October 17, 2022, he stated that the pharmacy would call the doctor and the patient before refilling a prescription for the "reharvest" program. *Id.* Govt. Ex. 204. The corresponding 302 omits this information. *Id.* Govt. Ex. 203.

5. **Emilie Agosto Santiago**

 a. On or about April 17, 2018, Emilie Agosto Santiago was interviewed by Derek Harmon and Patricia Garcia. The government's typed 302 stated, "The pain cream did *not* help her." However, the agent's handwritten notes stated, "RX did help her." The agent's handwritten notes indicate the typed 302 contained false information on a material issue relevant to claims by the government that these medications were not effective.

6. **Leslie Luttrell**

 a. In the handwritten notes of Leslie Luttrell's interview of August 23, 2018, the agent noted that she likely committed the crime of a "1001" violation for lying in her initial interview with agents. That information was not in the corresponding 302.

7. **Erik Underwood**

 a. In the handwritten notes of Eric Underwood's interview of August 11, 2022, the prosecutors asked him to "tell us what you learned from your meetings with other attorneys." If that question referenced Mr. Underwood's meeting with Samy Khalil, counsel for Pharms, and Josh Schaffer, counsel for Scott Breimeister, when Mr. Underwood was working with the Joint Defense Agreement in 2017 and also was working as a cooperating government informant, then this note reflects that the

7

      prosecutors misled the Court when they stated that they had not asked Mr. Underwood to divulge those privileged communications.

    b. In the handwritten notes of Mr. Underwood's interview of November 2, 2022, he stated that he could not recall a specific instance where a selection of medication was made without a TIA on file for a doctor (which authorizes the pharmacy to change the medication). That information is not in the corresponding 302 for that interview.

    c. In the same handwritten notes, Mr. Underwood stated that Mr. Breimeister told the pharmacy staff that he had cleared the company's business practices with his lawyers related to receiving federal pay prescriptions. That information is not in the corresponding 302 for that interview.

## OTHER ISSUES

1. The government elicited testimony from Mr. Brickman that he was not receiving anything for his testimony. *See, e.g.*, Rough Trial Tr. 11/14/22 at 70:17-24. At best, this was misleading because Mr. Brickman was required to testify for the government (under his plea agreement) to avoid reinstatement of prosecution for offenses that carry exposure of up to 20 years' imprisonment.

2. The government elicited false testimony that Mr. Brickman was receiving creams for which he had no medical necessity. *See* Rough Trial Tr. 11/10/22 at 16:2-3, 37:7-9. On cross-examination, Mr. Brickman falsely denied having elbow or wrist injuries in 2014, which was around the time he received the vast majority of the creams at issue. *See id.* at 141:16-25. Mr. Brickman's medical records show that he sought and received treatment for wrist injuries in 2014, and the medical notes reference that topical creams may assist with Mr. Brickman's wrist pain. *See* Swiencinski Trial Ex. 760. Mr. Brickman's medical records also reveal that he sought treatment for elbow pain in mid-2015, which had been occurring for one year. *See id.*

3. During trial, the government and Dr. Ince pursued a theory that prescriptions faxed from the Ashton (the apartment building where both Mr. Swiencinski and Dr. Ince lived) had been forged by Mr. Swiencinski. The government sat silently by while Dr. Ince pursued his forgery theory. But this theory cannot be true because Mr. Swiencinski—who traveled very frequently—was not in town the prescriptions in question were faxed from the Ashton. The government had information in its possession detailing Mr. Swiencinski's travels, and should have known that the theory the government and Dr. Ince were pursuing was false. Yet the government allowed this damaging and false theory to be put before the jury.