IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,

– v. –

BRIAN SWIENCINSKI, ET AL.,

      *Defendants*.

No. 4:18-cr-00368

**BRIAN SWIENCINSKI'S REPLY IN SUPPORT OF OPPOSED MOTION TO DISMISS THE SUPERSEDING INDICTMENT BASED ON OUTRAGEOUS GOVERNMENTAL CONDUCT AND FOR OTHER RELIEF**

The government pays lip service to the seriousness of its obligations and "own[ing] up to its errors in this case." *See* United States' Omnibus Resp. to Defs. Swiencinski, Breimeister, and McAda's Motion to Dismiss, Dkt. 461 at 2. But in responding to the pervasive discovery violations, improper witness coaching, and failure to correct false evidence or testimony, the government repeatedly misses the mark. The same is true for the government's most recent filing opposing Mr. Swiencinski's motion to dismiss the superseding indictment based on government misconduct (Dkt. 439).

In its opposition, the government argues dismissal is a "rare" remedy, and that the appropriate remedy for a *Brady* violation is simply a new trial. But in making this argument, the government ignores that this case does not involve a garden-variety *Brady* violation.

In addition, the government argues—repeatedly—that Mr. Swiencinski has not explained "in all of [his] filings and oral argument on these issues" how the government's misconduct is prejudicial and material to him. Dkt. 461 at 2. This argument is baffling given that Mr. Swiencinski has repeatedly explained, in painstaking detail, why the discovery violations and other misconduct were so critical to his defense. To be clear, Mr. Swiencinski incorporates herein his prior filings

1

detailing the government's misconduct and how it prejudiced him.[1] The government is clearly aware of these arguments, as it responded to them in the instant response (Dkt. 461), and in its presentation to the Court on April 4, 2023, on the findings of its internal investigation. Yesterday, Mr. Swiencinski filed a response to the government's April 4 presentation—in which he again detailed the government's errors, why and how those errors were material and prejudicial to him, and why the government's investigation findings do not show a lack of intentional (or at a minimum, reckless) misconduct. Mr. Swiencinski incorporates that filing here, too. *See* Dkts. 467 & 467-1.

Finally, the government attempts to discount the severity of the errors committed by the government. It goes so far as to argue that in many instances, there was no error at all. In support, the government repeatedly invokes the findings of its self-investigation. But the government's investigation and findings are inadequate and incorrect, and again, Mr. Swiencinski has already filed a response to that effect (Dkt. 467). To the extent the instant opposition raises arguments not addressed in Mr. Swiencinski's response to the government's presentation, he refutes those additional arguments below.

For these reasons and those explained below, Mr. Swiencinski's motion to dismiss the indictment based on government misconduct should be granted.

## I. This Court May Dismiss the Indictment Based on the Pervasive and Egregious Misconduct in this Case.

Government misconduct requires dismissal of an indictment if it is "so outrageous" that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment. *United States v. Mauskar*, 557 F.3d 219, 231-32 (5th Cir. 2009). In addition, the

---

[1] *See* Defs.' Omnibus Mot. for Relief, Dkt. 385; Swiencinski's Ex Parte Supp. Notice of Govt. Misconduct and Appendix thereto (Dkt. 412).

Court may dismiss the indictment under its supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010); *see also United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018) ("[T]his court has expressly declined to foreclose the possibility that governmental ineptitude and carelessness could be so abhorrent as to warrant a dismissal with prejudice"); *United States v. Fulmer*, 722 F.2d 1192, 1196 (5th Cir. 1983) (same). The remedy of dismissal does not require intentional government misconduct— although intentional misconduct is certainly present here. *See id.* Rather, a dismissal with prejudice may be justified by "ineptitude and carelessness" that is "abhorrent," *id.*, or recklessness, *United States v. Bundy*, 968 F.3d 1019, 1038 (9th Cir. 2020).

The government argues that "dismissal of an indictment with prejudice for failures to disclose certain information or *Brady* violations is rare," and "the general remedy for a *Brady* violation is a new trial." Dkt. 461 at 5 n.3, 8 n.5. But the cases the government cites in support of this argument involve garden-variety *Brady* violations. *See id.* at 8 n.5. For example, in *United States v. Scarfo*, the government failed to disclose that one of its witnesses at trial was under investigation. 41 F.4th 136, 227 (3d Cir. 2022). *United States v. Pettiford*, involved the failure to disclose a photograph. 627 F.3d 1223, 1226 (D.C. Cir. 2010). *United States v. Babiar*, involved the failure to disclose that another suspect was using a fake identification bearing the defendant's name. 390 F.3d 598, 600 (8th Cir. 2004).[2]

---

[2] *See also, e.g.*, *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (involving suppression of identification evidence); *United States v. Presser*, 844 F.2d 1275, 1286 (6th Cir. 1988) (addressing an issue other than an alleged *Brady* violation); *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995) (addressing disclosures related to expert testimony under Federal

3

In contrast, this case does not involve a garden-variety *Brady* violation. In fact, it is analogous to *Bundy* and *Chapman*—cases cited by the government where motions to dismiss were granted based on government misconduct. *See* Dkt. 461 at 5 n.3.[3]

*Bundy* involved criminal charges arising out of the defendant's conflict with the Bureau of Land Management over its attempt to impound his cattle for failure to pay federal grazing fees. *Bundy*, 968 F.3d at 1023. Similar to here, the defendant in *Bundy* stumbled mid-trial upon evidence that had been withheld by the government. *Id.* at 1026. That is, the nearby presence of armed government patrols, and the government's video surveillance of his property. *Id.* The defendant argued this information supported his defense theory that he acted in self-defense. *Id.* The defendants moved for dismissal based on this discovery violation, which the district court denied while also ordering the government to turn over any additional evidence related to the surveillance. *Id.* The government then turned 302s that had not been disclosed previously, and "[a]s trial continued, testimony exposed even more withheld documents." *Id.* at 1027. Like here, the government argued that it had acted in good faith. *Id.* at 1028.

The Court ultimately ordered a mistrial, reasoning that the withheld evidence was relevant to intent and "could be useful for impeachment purposes," and the defendants had been deprived "of the opportunity to better tailor their voir-dire strategy and make stronger opening statements." *Id.* at 1028-29. After the mistrial, the district court went on to conclude "the Brady violations were so egregious and prejudicial that the indictment needed to be dismissed with prejudice." *Id.* at

---

Rule of Criminal Procedure 16); *Lindsey v. King*, 769 F.2d 1034, 1043 (5th Cir. 1985) (habeas case involving eyewitness statement that the witness did not see perpetrator's face).

[3] To the government's point that dismissals are rare, it might be that dismissals in cases with egregious facts like in this case are not frequently litigated because those cases are often resolved. Mr. Swiencinski has identified examples of this occurring in his briefing on his pending motion for an evidentiary hearing. *See* Dkt. 424, 440.

1029. Among other things, the court reasoned "the FBI's failure to produce these documents was flagrant prosecutorial misconduct in this case even if the documents themselves were not intentionally withheld [by the U.S. Attorney's Office] from the defense." *Id*. The Ninth Circuit affirmed. *Id.* at 1043-44.

In *United States v. Chapman*, the Ninth Circuit affirmed the dismissal of the indictment after the prosecution had willfully "failed to meet its obligations to disclose over 650 pages of documents to the defense." 524 F.3d 1073, 1078, 1088 (9th Cir. 2008). The discovery in that case consisted of 302s and information about prior convictions of government witnesses that had already testified. *Id.* at 1078-79. The Fifth Circuit has similarly concluded that situations involving abhorrent "ineptitude and careless" may warrant dismissal of the indictment with prejudice. *United States v. Swenson*, 894 F.3d at 683; *see also Mauskar*, 557 F.3d at 231-32 ("Had the government suborned perjury regarding the authenticity of signatures on the forged documents relating to the charges against [defendant], the outcome of this appeal [of the district court's denial of a motion to dismiss] may have been different").

Like in *Bundy*, this case involves a series of withheld discovery and other misconduct that is relevant to defense strategy, Mr. Swiencinski's intent, and useful for impeachment. As discussed below and in Mr. Swiencinski's prior briefing incorporated herein, the government's conduct was intentional—or at a minimum reckless—and material and prejudicial to Mr. Swiencinski. In these circumstances, this Court may—and indeed should—dismiss the indictment with prejudice.

## II. The Government's Misconduct was Material and Prejudicial to Mr. Swiencinski.

The government repeatedly argues Mr. Swiencinski's motion to dismiss should be denied because the discovery violations and other misconduct was not material or prejudicial. The government goes so far as to argue that "in all of their filings and oral argument on these issues, the defendants have never explained with the specificity required how any of the disclosures the

5

government made between December 7 and December 13, 2022, were material to them or how the defendants were prejudiced as a result." Dkt. 461 at 2. As discussed above, these issues have been extensively briefed in Mr. Swiencinski's prior filings, which he incorporates herein. *See* Dkts. 385, 412. In a filing yesterday, Mr. Swiencinski again listed the government's misconduct and explained how it was material and prejudicial to him. Dkt. 467.

To remove all doubt, below is a non-exclusive list of the highlights:[4]

- The October 30, 2022, interview report of key government witness Leonard Carr omitted critical information: that "[Dan] Milosevic [u/i] Rx brought in scripts signed by Redko – occurred over a weekend." *See* 4/4/23 Hrg. Govt. Ex. 214.[5] This statement is contained in the rough notes of the interview, which were produced to defense counsel mid-trial after Mr. Carr testified, and only after the Court ordered the government to produce all interview notes because it had become apparent that critical discovery had been concealed. The omitted statement about Mr. Milosevic explains how unfaxed scripts came to the pharmacy, which was a large issue in the case. **The government and Dr. Redko repeatedly implicated Mr. Swiencinski in that conduct, and accused him of being responsible for those scripts.** But the government sat silently by and said nothing.

    A critical component of Mr. Swiencinski's defense was that Dan Milosevic committed this crime and fled. Mr. Swiencinski also argued that he relied on physicians, including Dr. Redko, to fulfill their obligations as physicians, and to run their offices in a correct and compliant manner—just like the other 2,900 providers who wrote prescriptions to the pharmacies did. Thus, having this information would have been important for cross-examination, and goes to Mr. Swiencinski's fundamental defense strategy. **And it begs the question, if a discovery violation that affected Dr. Redko and Mr. Swiencinski equally (if not more so for Mr. Swiencinski) warranted dismissal, how does the government proceed in good faith against one, and not the other?**

    Ms. Remis further compounded this issue by filing (and partially prevailing on) an oral motion *in limine* to limit reference to Dan Milosevic—**just days after she**

---

[4] As to the suppressed 302s, the government argues "defendants have not laid out how these reports were material to them or how they were prejudiced." Dkt. 461 at 16. But that's untrue. As to the August 22, 2022 Stacey Mayeur 302, Mr. Swiencinski respectfully refers the Court page 5 of his Omnibus Motion for Relief (Dkt. 385). *See also* Dkt. 385 at 4, 6 (discussing issues surrounding Mr. Carr's November 1, 2022 302 and notes).

[5] Citations to the April 4, 2023 Government Hearing Exhibits refer to exhibits contained in the voluminous binder the government supplied the Court and defense counsel at the April 4 hearing, which was marked as Composite Exhibit 1.

**interviewed Mr. Carr (on October 30, 2022) and directly received the exculpatory information about Dan Milosevic**. *See* Rough Trial Tr. 11/9/22 at 273:21-274:14. Thus, Ms. Remis knew that Mr. Milosevic was responsible for these fraudulent prescriptions, did not tell Mr. Swiencinski, blamed him for them, and then prevented him from asserting a defense that Mr. Milosevic was responsible. She knew the exculpatory information, buried it, and then asked the Court (unknowingly) to help her bury it further via a motion *in limine*. If that is not intentional, what is?

- Government witness William Chan committed perjury regarding the materials he reviewed in creating critical exhibits about Mr. Swiencinski that summarized the financial information underlying this case. *See, e.g.*, Trial Tr. 12/6/22 at 143:18-144:11. He also committed perjury (verified by the late-produced metadata) as to the vast extent to which he was working with trial prosecutors and agents in creating the exhibits about Mr. Swiencinski. *See* Trial Tr. 12/6/22 at 175:6-176:2; *cf.* Swiencinski's Appendix, Dkt. 412 at Exhibits 4-6. At no point did the prosecutors seek to clarify or correct this testimony (even when asked directly by this Court, **twice**), and in fact, used these misimpressions as to how the exhibits were created to have the summary exhibits admitted as evidence at trial. *See* Trial Tr. 12/6/22 at 145:20-146:9.

- The prosecution team coached Mr. Chan as to what he should and should not answer if asked about the sources for his summary exhibits. *See* Swiencinski's Appendix to *Ex Parte* Supp. Notice of Govt. Misconduct, Dkt. 412 at 23 ("when asked . . . . do not refer to Grace Hinton files"). Coincidentally, these same instructive notes were redacted by the trial prosecutors themselves, so that they were hidden from defense counsel.

- Government witness Brad Madrid was to serve as a memory witness for the prosecution, to give a sworn recount of specific conversations with Mr. Swiencinski from seven years prior. The agent notes from a February 8, 2021, interview of Mr. Madrid revealed that he told the trial prosecutors he was a drug addict at the time in question—addicted to pain pills—and the prosecutors did not reveal this information.[6] *See* 4/4/23 Hrg. Govt. Ex. 204. Even a junior prosecutor would know this is textbook exculpatory information. This fact was never revealed until the government was forced by the Court to reveal it. Despite the government's invocation of the mid-trial disclosures it made as evidence of its good faith, a voluntary disclosure and a forced disclosure are two different things.

- The July 29, 2022, interview report of Terry Brickman omitted that Mr. Brickman said: "2/3 of the [previous] interview not truthful, inaccurate; towards the end, became honest." 4/4/23 Hrg. Govt. Ex. 201. This statement was made directly to Dino Vergara and the entire trial team: "Aleza [Remis], Devon [Helfmeyer], Katherine [Raut]." *Id.* In short, the government's star, lead-off witness is an admitted liar. Mr. Brickman

---

[6] It is commonly accepted in the medical community that opioid use affects short- and long-term memory.

admitted that he lied repeatedly to the FBI and IRS agents about the facts of this case, but the defense was never told that fact. This exculpatory statement is contained in the agent notes of the interview, **and was told directly to the prosecutors**, but was omitted from the corresponding interview report that was produced to defense counsel. This information would have affected the entire format of Mr. Swiencinski's cross-examination of Mr. Brickman. It would have been used for impeachment, and it is exculpatory *Brady* evidence.

- Mr. Brickman perjured himself on the stand by testifying that he had no medical conditions and had not seen a doctor for pain (wrist or elbow) in 2014 that would warrant a pain cream. *See* Rough Trial Tr. 11/10/22 at 16:2-3, 37:7-9, 141:16-25. This testimony directly contradicted his medical records. When the prosecutors received the exculpatory information from Mr. Brickman's doctor, they said nothing. *See* Trial Tr. 12/7/23 at 139:22-142:15.

    Relatedly, it was Mr. Swiencinski who ultimately subpoenaed Mr. Brickman's medical records mid-trial because the government refused to do so. *See id.* When the Court asked Mr. Swiencinski why the records had not been subpoenaed earlier, counsel to Mr. Swiencinski explained he was not expecting Mr. Brickman to lie about his prior medical conditions. *See id.* Had Mr. Swiencinski known that Mr. Brickman had told prosecutors he lied during the first two-thirds of his prior interviews, Mr. Swiencinski could have anticipated that Mr. Brickman would claim at trial that he was lying when he previously told the government about his medical conditions.

- Mr. Brickman also testified that Mr. Swiencinski was targeting government payors for higher reimbursement, but the agent notes reveal he told the government that Mr. Swiencinski did not want to go after Tricare. 4/4/23 Hrg. Govt. Ex. 201. This information is material impeachment evidence.

- Mr. Brickman testified that he was not hoping for anything from the government in exchange for his testimony against Mr. Swiencinski. *See, e.g.*, Rough Trial Tr. 11/14/22 at 70:17-24. This statement was elicited from Ms. Raut despite it being contradicted by the terms of his plea agreement with the government. Contrary to his testimony, Mr. Brickman had to testify against Mr. Swiencinski to avoid reinstatement of his prosecution.

- The July 29, 2022 interview report of Mr. Brickman also omits that he conceded, in reference to Mr. Swiencinski, that Mr. Brickman "never saw money exchange hands but there was a discussion where [Mr. Swiencinski] said he gave Andrew [sic] McNally something." 4/4/23 Hrg. Govt. Ex. 201. This statement is contained in the rough notes, *id.*, and is materially helpful to Mr. Swiencinski's defense—especially in light of the prosecutors' repeatedly injecting into the case allegations of cash bribes by Mr. Swiencinski. This statement undercuts the theory that Mr. Swiencinski was paying cash bribes. It is exculpatory on its face and should have been disclosed to defense counsel.

8

- The interview report of the June 30, 2022 interview of Stacey Mayeur omits the statement, in relation to Dr. Ince, "did fill in their NPI." *Id.* Govt. Ex. 225. This omission is significant because Mr. Swiencinski was blamed for adding in the NPI number. The government had information that completely contradicted that, but did not divulge it. Ironically, even Dr. Ince's attorney accused Mr. Swiencinski of adding the NPI number, and the government sat by quietly (including prosecutors who were present at Ms. Mayeur's interview).

Thus, the government's misconduct was material and prejudicial. The government even acknowledges in its opposition, "The Court reasoned that had the late-disclosed information been turned over sooner, as to witnesses who had already testified, the defense might have cross-examined those witnesses differently or perhaps would have objected to different exhibits that came in through those witnesses." Dkt. 461 at 3-4.

As to the suppressed information in the late-disclosed 302s and inconsistent rough notes, the government cherry-picks examples to argue the Defendants were in possession of other information that was consistent with the suppressed information. But with one exception, none of the government's examples address the suppressed information that Mr. Swiencinski has identified as problematic. *See id.* at 22-24. The one exception is the August 22, 2022 interview of Stacey Mayeur. As the government notes, the 302 states that Ms. Mayeur "was not told to tell patient it would not go to collections. Instructed to try to collect co-pays," while the 302 states that Pharms told Ms. Mayeur to tell patients that co-pays would not go to collections. The government argues it is absolved of this discrepancy because Ms. Mayeur had said two years prior to the August 2022 interview that the pharmacy would do collections *when audited*. Dkt. 461 at 23. That is a very different statement than the statement omitted from the 302—that she was instructed to try to collect co-pays, and was *not* told to tell patients the co-pay would not go to collections. The omitted statement is exculpatory, while the statement the government points to two years prior is inculpatory.

The government also argues that any prejudice can be cured by a retrial. But a retrial cannot cure the prejudice because, after Mr. Swiencinski's enduring five weeks of trial, the government

9

now has access Mr. Swiencinski's trial strategy. It has listened to his opening statement, is privy to Mr. Swiencinski's defense strategy, and knows his strategy for cross-examining the government's witnesses. The government should not be permitted to use that insight, gained through its own misconduct, to better hone its case next time around. As the *Bundy* court noted, "retrying the case would only advantage the government by allowing [it] to strengthen [its] witnesses' testimony based on the knowledge gained from the information provided by the defense and revealed thus far." *Bundy*, 968 F.3d at 1029; *see also id.* at 1044; *see also Chapman*, 524 F.3d at 1080 (affirming dismissal of the indictment, where district court had reasoned in part that the government should not be permitted 'to try out its case identifying any problem area[s] and then correct those problems in a retrial.").

### III. The Government Makes Numerous Excuses for Its Failings.

The government argues its misconduct was not intentional, not in bad faith, or not misconduct at all. In addition to the points made in his prior filings incorporated herein, three points are worth emphasizing.

First, the government's arguments and investigation findings leave many questions unanswered. Why did Ms. Remis not only fail to disclose that Dan Milosevic had brought Dr. Redko scripts into the pharmacy on a weekend (information told directly to her), but also invite this Court to limit Mr. Swiencinski's ability to reference Mr. Milosevic at trial? *See* Rough Trial Tr. 11/9/22 at 273:21-274:14. Why did the government fail to disclose the November 1, 2022 interview with Leo Carr (where he said the specialty business was 100% legitimate) when defense counsel (and the Court) inquired repeatedly as to whether all relevant interview reports for Leo Carr had been disclosed? Trial Tr. 11/17/22 at 458:22-461:10. Why did the government misrepresent to the Court—twice—the source of its summary exhibit? The questions go on, and the government hasn't adequately answered them.

10

Second, and relatedly, the prosecutors were at the interviews of the witnesses. The government repeatedly asserts that the trial team was not required to compare the notes and 302s, and thus were unaware of discrepancies between certain interview memoranda and the related rough notes. Dkt. 461 at 3. *But the prosecutors were there.* In *Bundy*, the court found that the prosecution had acted willfully in withholding a 302, "irrespective of the agency responsible," because "the prosecution team had direct knowledge" of the information contained therein. *Bundy*, 968 F.3d at 1040. The same is true here.

Third, the government credits itself for disclosing some of the suppressed information "in time to put it to effective use at trial." Dkt. 361 at 13. But much of the suppressed information was revealed after Mr. Swiencinski had given his opening statement, established his defense strategy, and after witnesses had already testified. Moreover, this in no way shows good faith by the government. This information was revealed only because the Court or defense counsel unearthed it—not the prosecutors. Absent Court intervention, the discovery, false testimony, and other issues would not have been disclosed by the government.

The government addresses certain instances of misconduct, in an attempt to show a lack of misconduct or bad faith. Many of these points are rebutted in Mr. Swiencinski's prior filings, and to avoid redundancy, he briefly responds to the government's unique points as to Mr. Chan and Mr. Carr.

As to Mr. Chan, the government denies that he provided false testimony as to the source of his information because the night before he testified, the defendants were provided with documents that suggesting Mr. Chan had relied on documents other than those explicitly listed on Government Exhibit 36. But the point is that Mr. Chan did not disclose that information in his testimony, creating a misimpression in the mind of counsel to Mr. Swiencinski (and seemingly,

11

the Court). And rather than correct that false testimony, the prosecutor confirmed it when asked by the Court. Trial Tr. 12/6/22 at 146:2-8 ("THE COURT: . . . He may have picked the individuals from other exhibits, but the underlying information is from the bank records? MS RAUT: Yes, Your Honor."). Further, the government cites Mr. Chan's fuller explanation of what he actually relied on, which was elicited on cross-examination. Dkt. 461 at 11. But this occurred only after counsel for Mr. Swiencinski had pressed Mr. Chan on other inaccuracies in his testimony from the day before.

As to Mr. Carr, the government argues it is absolved of suppressing Mr. Carr's statement that the specialty business was 100% legitimate because counsel to Mr. Breimeister elicited on cross-examination that the noncompound business—including specialty drugs—were legitimate. The government argues it was "*the defense* that brought up specialty drugs at trial, not the government." Dkt. 461 at 19. That's not correct. In opening statement, Ms. Remis argued *twice* that "[o]ver $250 million [was] paid to the pharmacies at the center of this scheme." Rough Trial Tr. 11/10/22 at 1:23-24; *see also id.* at 13:5-6. This figure includes both specialty drugs and noncompound drugs. Indeed, Government Exhibit 1—arguably the most frequently referenced exhibit in the entire trial—included noncompound and specialty drugs. Perhaps the government did not explicitly raise the issue of specialty drugs, but they put misinformation concerning the specialty drugs before the jury. The government apparently intended to lump noncompound and specialty drugs into the scope of the fraud. And now, they claim information rebutting the government's theory as to the scope of fraud is somehow immaterial. The government further argues this evidence underlying its fraud numbers was so immaterial that "the government offered to stipulate that the specialty drugs were legitimately dispensed and that the Court so instruct the jury." *Id.* at 19. The government omits that it made this offer only after it got caught.

\* \* \*

In conclusion, Mr. Swiencinski makes a few final points. The government wrongly asserts that his motion "contains no argument at all pertaining to dismissal based on alleged misconduct, other than requesting an opportunity to supplement." Dkt. 461 at 7. But the government ignores that "[as] the basis for [his] motion, Mr. Swiencinski adopt[ed] the factual recitation and legal arguments made in Mr. Breimeister's motion requesting the same relief." Dkt. 439 at 2 (citing Breimeister's motion at Dkt. 428). The government also ignores that Mr. Swiencinski requested an opportunity to supplement because he believes the instant motion is premature, and properly made only after the Court rules on his motion for an evidentiary hearing.

In fact, Mr. Swiencinski filed the instant motion to dismiss primarily because the government had argued that his motion for an evidentiary hearing was not ripe unless a motion to dismiss was pending. *See* Dkt. 432. Mr. Swiencinski noted his belief that this is incorrect and puts the cart before the horse, but joined Mr. Breimeister's motion to dismiss to ensure preservation of his right to make such a motion—and to obtain the requested relief of an evidentiary hearing. In fact, the government's opposition to the motion to dismiss exploits Mr. Swiencinski's informational advantage. The government repeatedly invokes its investigation findings as to its good faith, and without a hearing, there is little Mr. Swiencinski can do to rebut the hearsay on which the government heavily relies.

As discussed in his response to the government's April 4 presentation (Dkt. 467), Mr. Swiencinski still believes the proper procedure is for the Court to rule on his motion for a hearing, hold a hearing, and then allow the parties to brief motions for relief. And the government's April 4 presentation only emphasizes the need for a hearing in this case.

## CONCLUSION

Mr. Swiencinski requests that the Court grant his motion by dismissing the superseding indictment with prejudice, alternatively dismissing the superseding indictment without prejudice, or in the alternative, ordering the other relief requested in his motion.

Dated: April 19, 2023

Respectfully submitted,

/s/ Brandon McCarthy

| | |
|---|---|
| Michael A. Villa, Jr.<br>Texas Bar No. 24051475<br>MEADOWS, COLLIER, REED,<br>COUSINS, CROUCH & UNGERMAN, LLP<br>901 Main Street, Suite 370<br>Dallas, TX 75202<br>(214) 744-2700<br>mvilla@meadowscollier.com<br><br>Scottie D. Allen (admitted *pro hac vice*)<br>THE ALLEN LAW FIRM<br>4144 N. Central Expressway<br>Suite 650<br>Dallas, TX 75204<br>(214) 824-7711<br>scottiedallen@scottiedallenlaw.com | Brandon McCarthy (admitted *pro hac vice*)<br>Texas Bar No. 24027486<br>Rachel M. Riley<br>Texas Bar No. 24093044<br>KATTEN MUCHIN ROSENMAN LLP<br>2121 N. Pearl Street, Suite 1100<br>Dallas, TX 75201<br>(214) 765-3600<br>brandon.mccarthy@katten.com<br>rachel.riley@katten.com<br><br>Mary C. Fleming (admitted *pro hac vice*)<br>KATTEN MUCHIN ROSENMAN LLP<br>2900 K Street NW, North Tower - Suite 200<br>Washington, DC 20007<br>(202) 625-3754<br>mary.fleming@katten.com |

***Attorneys for Brian Swiencinski***

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Reply in Support of Opposed Motion to Dismiss the Superseding Indictment Based on Outrageous Governmental Misconduct, and for Other Relief, to be served on all counsel of record by filing it with the Clerk on April 19, 2023, using the Court's CM/ECF System.

/s/ Brandon McCarthy
Brandon McCarthy