Version Date: 06/12/2014

Version Number: 1

Contract Number: NCM221385

1 of 20

**FOIA NOTICE:** This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552(b). Do not disclose outside of the recipient organization of the United States Government.

NO ALTERATIONS TO THIS DOCUMENT SHALL BE BINDING UNLESS INITIALED BY DULY AUTHORIZED REPRESENTATIVES OF PROVIDER AND ESI.

## EXPRESS SCRIPTS, INC. PHARMACY PROVIDER AGREEMENT

**THIS EXPRESS SCRIPTS, INC. PHARMACY PROVIDER AGREEMENT** (the "Agreement") is made and entered into as of this _30_ day of _JUNE_, 20 _14_ by and between Express Scripts, Inc., a Delaware corporation, on behalf of itself and Medco Health Solutions, Inc. (together, "ESI") and ALTERNATIVE MEDICINE AND PHCY, NCPDP # 5900952, a _CORPORATION_ organized under the laws of the state of _TEXAS_ (the "Provider"). As required by the New York State Department of Health, solely with respect to services rendered in the state of New York under this Agreement to any Member of any Prescription Drug Program offered by a Sponsor, as such capitalized terms are herein defined, which is certified as a managed care organization under Article 44 of the New York State Public Health Law, Diversified NY, IPA, Inc. ("IPA"), a corporation and wholly-owned subsidiary of Express Scripts, Inc. (together with IPA, "ESI"), shall be a party to this Agreement.

### RECITALS

**WHEREAS**, ESI administers and manages Prescription Drug Programs for its Sponsors (as defined in Sections 1.5 and 1.9 of this Agreement, respectively), which programs include claims administration, mail service dispensing and other pharmacy benefit management services; and

**WHEREAS**, in order to fulfill its service obligation to its Sponsors, ESI maintains a variety of pharmacy networks; and

**WHEREAS**, Provider currently participates in one or more of ESI's pharmacy networks to provide pharmacy services to eligible Members (as defined in Section 1.3), all in accordance with and subject to the terms and conditions set forth in an existing base pharmacy provider agreement with ESI (the "ESI Agreement") and/or Medco Health Solutions, Inc. (the "Medco Agreement") (collectively, the "Existing Agreements"); and

**WHEREAS**, in accordance with the parties' intentions: (i) this Agreement shall hereby supersede and replace the Existing Agreements; and (ii) the rate sheets attached hereto as **Exhibit A** shall hereby supersede and replace the applicable outdated rate sheet(s) covering the same network(s) or schedule(s) therein (any rate sheet not replaced herein may, at ESI's sole discretion, remain in full force and effect subject to the terms and conditions of this Agreement); all as of the Effective Date (as defined in Section 1.2) of this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ESI and Provider hereby agree as follows:

### TERMS AND CONDITIONS

1.    **DEFINITIONS.** As used in this Agreement, and as set forth in the Provider Manual, each of the following terms (and the plural thereof, when appropriate) shall have the meaning set forth herein, except where the context makes it clear that such meaning is not intended:

    1.1   **"Affiliate"** means, as to either party: (a) any division of a party other than the division(s) with direct responsibility for carrying out the party's obligations under this Agreement, and (b) any corporation or other entity which, directly or indirectly, through one or more intermediaries, controls (i.e., possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract, or otherwise), is controlled by, or is under common control with such party.

    1.2   **"Effective Date"** shall mean the date upon which ESI executes this Agreement as set forth on the signature page of this Agreement.

    1.3   **"Member(s)"** means a subscriber and his or her eligible dependents to which benefits are available pursuant to a Prescription Drug Program.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

**GOVERNMENT EXHIBIT**

**215**

**4:18-CR-368**

DOJ_18CR368-0074705

DOJ_18CR368-0074705-1

Version Date: 06/12/2014            Contract Number: NCM221385

Version Number: 1            2 of 20

1.4     **"Pharmacy"** or **"Pharmacies"** means the pharmacy or pharmacies listed on **Exhibit B**, attached hereto and incorporated herein by this reference, which are owned or operated by Provider, licensed by the appropriate state board of pharmacy and other applicable regulatory authorities, meets the definition of Retail Provider (as defined in Section 1.8) and has been approved by ESI to provide services hereunder. If Provider owns or controls more than one Pharmacy, then Provider shall cause all such Pharmacy(ies) to provide services to Members in accordance with this Agreement and to be bound by and comply with all of the provisions set forth herein and in the Provider Manual. "Provider" and "Pharmacy" are used interchangeably in this Agreement.

1.5     **"Prescription Drug Program"** means any group or individual plan, policy, agreement or other arrangement sponsored or issued by a Sponsor and administered by ESI pursuant to an agreement between the parties, which includes pharmacy services or benefits related to utilization of pharmaceutical products and any Formulary.

1.6     **"Provider Certification"** shall mean the information form completed by Provider (and each of its Pharmacies) prior to the Effective Date of this Agreement and updated by Provider (and its Pharmacies, as applicable) as information therein changes as more specifically described in Section 2.2.b.

1.7     **"Provider Manual"** shall mean the written handbook describing the practices, rules, operational requirements and policies and procedures established by ESI for Provider (and its Pharmacies) regarding their provision of Covered Medications to Members. It shall be the Provider's responsibility to check for any updates to the Provider Manual. The Provider Manual may be revised from time to time by ESI in its sole discretion. Provider's failure to comply with any of the provisions of the Provider Manual shall be considered a breach of this Agreement. ESI's Provider Manual may be obtained at: http://www.express-scripts.com/services/pharmacists/.

1.8     **"Retail Provider"** shall mean a pharmacy that primarily fills and sells prescriptions via a retail, storefront location, is determined by ESI to fulfill an ESI business need with respect to participation in its retail network(s), and meets such other criteria established by ESI from time to time including any specific needs of a population, as determined by ESI in its sole discretion. "Retail Provider" shall not include mail order, specialty, home infusion, dispensing physician, or Internet pharmacies or such other provider types that do not meet ESI's Retail Provider criteria established from time to time.

1.9     **"Sponsor"** means any health maintenance organization (HMO), insurance company, employer or other organization having principal financial responsibility for payment of Covered Medications provided to Members under a Prescription Drug Program for which ESI has directly or indirectly agreed to provide pharmacy benefit management and related services.

2.    **SERVICES AND OBLIGATIONS OF PROVIDER**.

    2.1     **Verification of Eligibility**. Provider shall verify the eligibility of Members utilizing ESI's current online system or other method(s) approved by ESI and set forth in the Provider Manual. ESI shall have the right to reverse any claim submitted by Provider and offset such amount owed against any amount owing to Provider by ESI for any claim improperly submitted by Provider wherein Provider failed to correctly check an individual's eligibility or verify that the prescription was issued in accordance with applicable laws, rules and regulations.

    2.2     Dispensing; Standard of Services; Credentialing and Recredentialing.

       2.2.a     **Generally**. In addition to the provisions of Section 2.7 of the Agreement, Provider shall provide services hereunder, including the dispensing of Covered Medications: (i) under the supervision of a licensed pharmacist; (ii) in accordance with all applicable laws, rules and regulations; (iii) in accordance with the applicable Prescription Drug Program; (iv) in accordance with ESI's online messaging that such Provider or Pharmacy receives from ESI; (v) in accordance with this Agreement, ESI's current policies and procedures, the Provider Manual, and any quality assurance program(s); (vi) the design and Formulary applicable to the specific Prescription Drug Program; (vii) in accordance with the professional standards prevailing in the community at the time such services are rendered; and (viii) not engaging in any conduct that would jeopardize the health, welfare or safety of any Member.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074706

DOJ_18CR368-0074706-2

Version Date: 06/12/2014

Version Number: 1

2.2.b   **Credentialing and Recredentialing**. Provider and its Pharmacies shall be eligible to provide services hereunder, including dispensing Covered Medications, only upon satisfaction of any credentialing/recredentialing and additional requirements imposed by ESI, including the provision of prompt written notice with any updates to the Provider Certification, as further described in the Provider Manual. Failure to provide prompt updated information to the Provider Certification or to comply with Provider's obligations as set forth in Section 7.19 or any other credentialing/recredentialing requirements required by ESI from time to time shall constitute a breach of this Agreement and ESI may terminate Provider in accordance with the provisions of Section 4.2.b or 4.2.c of this Agreement, in ESI's sole discretion. For purposes of this Section 2.2.b, "prompt" and "promptly" shall mean within twenty (20) days of the request for recredentialing or any change in information.

2.3   **Claims Submission and Processing**.

2.3.a   **Submission**. Claims shall be submitted for eligible Members only. Provider shall submit each prescription drug claim to ESI in the most current NCPDP format for processing and payment as set forth in this Agreement and in the Provider Manual.

2.3.b   **Timing Requirements**. Unless otherwise required by applicable law, all electronic claims for prescription drugs must be submitted to ESI within ninety (90) days after the prescription is filled, unless a longer period is allowed by Sponsor (the "Sponsor's Timing"), then in such case, in accordance with the Sponsor's Timing. Provider shall not receive payment for electronic claims submitted after such 90-day period or when applicable, after the Sponsor's Timing. In the event Provider is instructed by ESI to file a paper claim for any reason, such paper claim shall be submitted in accordance with any instructions received from ESI and the guidance set forth in the Provider Manual.

2.3.c   **Reversals for Failure to Pick-Up**. Unless a shorter time period is required by a Sponsor or any law, rule or regulation (and then in accordance with such Sponsor's requirements or law, rule or regulation), any prescription drug claims, for which prescription drugs were approved for payment by ESI and not picked up by the Member, in whole or in part, must be reversed online within thirteen (13) days of submission of the claim by the Pharmacy.

2.4   **Collection of Copayments; Member Hold-Harmless; Violation**.

2.4.a   **Copayments**. Provider shall collect from Members the lesser of the Usual and Customary Retail Price amount or the applicable Copayment indicated by ESI, or when applicable, the full Copayment when indicated by ESI, through its online processing system or if online processing is unavailable, in accordance with the Provider Manual. Copayments may not be waived or discounted and, unless directed by ESI in writing, Provider shall not collect any greater amount or any other taxes, fees, surcharges or compensation from any Member for any Covered Medications or services provided in connection therewith. In no event will ESI be liable for any Copayment.

2.4.b   **Member/Sponsor Hold Harmless**. Except with respect to Copayments, Provider shall look solely to ESI for payment for Covered Medications and other covered services provided to Members pursuant to this Agreement, as further set forth in the Provider Manual.

2.5   **Coupons**. Provider acknowledges that it is the Member's or Provider's responsibility to obtain reimbursement from the responsible party for the amount of any coupon accepted by Provider for a Covered Medication. Provider shall: (a) accurately apply all coupons to a Member's claim, including the Copayment, if applicable; and (b) not seek additional reimbursement from Sponsor or any other insurer when such reimbursement would result in Provider being paid more than its contracted rate hereunder.

2.6   **Non-Discrimination**. Provider shall not refuse to provide services required under any Prescription Drug Program or attempt to disenroll any Member, as further described in the Provider Manual.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074707

DOJ_18CR368-0074707-3

Version Date: 06/12/2014

Version Number: 1

2.7  **Compliance with Agreement; Laws; Licenses and Permits**.  Provider shall, and shall cause its personnel to, be bound by and comply with the provisions of this Agreement and all applicable laws, rules and regulations including, but not limited to, fraud, waste and abuse laws and applicable state boards of pharmacy's, other applicable governmental bodies' laws, rules and regulations, and all required federal, state and local licenses, certificates and permits that are necessary to allow the Provider, the Pharmacy and pharmacist (as applicable) to dispense Covered Medications to Members, and any other certificates or qualifications that may be required by ESI from time to time. Provider shall notify ESI in writing immediately: (i) in the event any individual or vendor providing services, supplies, or medications to Provider is or has been excluded from participation in any Federal or state health care program or government contract, or is otherwise subject to any restriction by the Office of the Inspector General or other state or government agency; and (ii) in the event of any suspension, revocation, restriction, limitation or any other disciplinary action taken against or placed on any such license, certificate or permit or any suspension, restriction, limitation or exclusion from participation in any federal or state health care or other government program. In addition, Provider shall (and shall cause its pharmacists to) provide evidence of such good standing, certification and licensure without charge to ESI, a Sponsor or a designee of ESI or Sponsor within five (5) days of written request by ESI.

2.8  **Compliance with ESI's Quality Assurance Programs (e.g., UR, QA, etc.), Formularies, Sponsor's Prescription Drug Program Requirements and Provider Manual**.  Provider shall cooperate with ESI and participate in any and all utilization review, quality assurance programs, procedures, peer review, credentialing/recredentialing processes, audit systems, each Sponsor's Prescription Drug Program requirements and any complaint resolution procedures established by ESI or required by a Sponsor from time to time.  Without limiting the generality of the foregoing, Provider shall: (a) cooperate with ESI's procedures for utilization review and generic substitution, as set forth from time to time in the Provider Manual; (b) comply with ESI's procedures for calling prescribers to facilitate generic substitution and Formulary compliance, and other programs established by a Sponsor, as set forth from time to time in the Provider Manual; and (c) comply with the Provider Manual.

2.9  **Hours of Service**.  Provider shall provide services hereunder according to the hours of service set forth in Provider's credentialing/recredentialing information and any additional hour requirements established by ESI from time to time.

2.10  **Multiple Pharmacies**.  Provider shall provide ESI with prompt written notice of any changes to Provider's locations set forth in **Exhibit B**, including, additions and deletions, so that ESI may update its records and determine, as applicable, in its sole discretion, whether such location(s) should be added under this Agreement.  Provider shall not undermine Usual and Customary Retail Price or compound pricing in any way, including, but not limited to: (a) owning, operating or affiliating with a non-participating Provider; or (b) separating cash and third-party prescription business. Provider shall not participate in any ESI network if ESI determines in its sole discretion that Provider has taken actions to undermine Usual and Customary Retail Price and/or compound pricing.  Additionally, any right ESI has to offset amounts owing to ESI hereunder against amounts owed to Provider or any Pharmacy may, at ESI's sole discretion, be offset against amounts owed to Provider or any Pharmacy regardless of which location is responsible for the amount owed.

2.11  **Records**.  Provider shall, and shall cause its Pharmacies to, for a period of five (5) years following the Agreement year in which Covered Medications were provided to Members, or, if longer in accordance with applicable law, maintain: (i) all medical, business, financial and administrative records, including, all books, contracts, medical records, and patient care documentation; (ii) original prescriptions; (iii) signature logs (or other evidence approved in writing by ESI); (iv) wholesaler, manufacturer and distributor purchase records; (v) prescriber information; (vi) patient profiles; and (vii) such other records and information relating to Covered Medications provided to Members as may be required by ESI from time to time, as further set forth in the Provider Manual.

2.12  **Audit**.

2.12.a  **Generally**.  Provider agrees that ESI or a third party authorized by ESI may, upon request, inspect, review, audit and reproduce, during Provider's regular business hours and without charge to ESI, any of Provider's medical, business, financial and administrative records, including prescription records, all books, contracts, medical records, and patient care documentation;

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074708

DOJ_18CR368-0074708-4

Version Date: 06/12/2014

Version Number: 1

Contract Number: NCM221385

5 of 20

original prescriptions; signature logs (or other evidence allowed by ESI as set forth in the Provider Manual); wholesaler, manufacturer and distributor purchase records; prescriber information; patient profiles; and such other records and information relating to Covered Medications provided to Members or performance under this Agreement, as may be required by ESI from time to time as further described in the Provider Manual.

2.12.b **Audit Appeals**. The obligations of the Provider and the procedure and guidelines for appealing audit results shall be as set forth in the Provider Manual.

2.13 **Disaster Planning**. Provider agrees that it shall cooperate and coordinate with ESI in implementing any disaster planning efforts undertaken by ESI to ensure that Members receive continuous care, including continued provision of prescription medications together with Covered Medications to Members, in the event of any Force Majeure (as described in Section 7.6 of this Agreement).

2.14 **Counterfeit Reporting**. Provider agrees that it shall cooperate and coordinate with ESI in implementing any counterfeit identification, investigation, tracking and reporting efforts undertaken by ESI. Provider must notify ESI in writing if it becomes aware that any counterfeit drugs have been provided to Members by Provider. Further, Provider represents and warrants (for itself and on behalf of its Pharmacies) that it (and its Pharmacies) purchases prescription drugs and supplies only from reputable wholesalers and/or manufacturers in accordance with the prevailing industry standards.

3. **PAYMENT FOR COVERED MEDICATIONS; PROVIDER CHARGES; INCORRECT PAYMENTS**.

3.1 **Generally**.

3.1.a **Payment for Covered Medications**. For services performed in accordance with the terms and conditions of this Agreement, ESI shall pay Provider the rates as set forth in the applicable rate sheet(s), attached hereto and incorporated herein by this reference, less the applicable Copayment. Except for Copayments, Provider shall look solely to ESI for payment for Covered Medications and other covered services provided to Members pursuant to this Agreement and not to Sponsor. Approved claims for Covered Medications shall be paid in accordance with federal or state law and the Provider Manual. Additional information or rejected or disputed claims must be submitted or resubmitted, as applicable, by Provider within thirty (30) days of the request for additional information, initial rejection or dispute. ESI may deny payment for any claim not submitted within this time period. Further, ESI may refuse to pay any claim or may reverse payment of any claim that is not submitted in accordance with the terms and conditions of this Agreement.

3.1.b **Provider Charges**. Provider (or its Pharmacy(ies), as the case may be) shall be solely responsible for expenses, costs, charges and fees relating to transmitting claims or other online activities or information to ESI or its designee. Further, for every transaction a Provider (or its Pharmacy(ies)) transmits to ESI, ESI shall charge such Provider a service fee of up to an average of $0.20 per transaction. Such service fee shall be immediately due and owing to ESI and ESI shall have the right to deduct such outstanding transaction fees from any amounts payable to Provider. For purposes of this Agreement, "transaction" shall mean each payable claim for reimbursement to Provider for a current Member for Covered Medications.

3.2 **Incorrect Payments**.

3.2.a **Generally**. Any payments made to Provider (or any Pharmacy) in excess of any amount properly determined to be due by ESI may be recovered by ESI from Provider (or any individual Pharmacy). ESI shall notify the Provider (and Pharmacy, if applicable) in writing of such excess payment(s) and shall have the right to either offset the excess payment amount as provided in Section 2.12 (audit) or require immediate reimbursement from Provider.

3.2.b **Remittance Advices**. Provider acknowledges and agrees that it is obligated to review remittance advices received from ESI to verify their accuracy. Provider must notify ESI in writing of any alleged error, miscalculation, or discrepancy (and a detailed basis of such allegation) whether paid, denied, rejected or reversed, within thirty (30) days of the date of each remittance advice if it disputes any information thereon as further described in the Provider Manual. Otherwise, Provider

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074709

DOJ_18CR368-0074709-5

Version Date: 06/12/2014

Version Number: 1

Contract Number: NCM221385

6 of 20

will be deemed to have confirmed the accuracy of the claims processed under such remittance advice and waives any claim it may have for errors, miscalculations or discrepancies if it fails to object within such 30-day period. If Provider does not notify ESI in the manner and time provided herein, then, neither shall ESI have any further responsibility, nor shall Sponsor have any responsibility, with respect to such remittance. Notwithstanding any of the foregoing, in no event shall ESI be responsible for remittance amounts above or beyond the appropriately applied rates, as determined by ESI, that are agreed to by the parties as set forth in the applicable rate sheet.

## 4.   TERM AND TERMINATION.

4.1   **Term**. Unless earlier terminated as provided in Section 4.2 of this Agreement, the term of this Agreement shall begin on the Effective Date and continue for a period of three (3) years (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one (1) year terms (each, a "Renewal Term") unless (i) a party gives at least ninety (90) days prior written notice to the other of such party's intent not to renew this Agreement or (ii) it is earlier terminated as provided in Section 4.2 (the "Initial Term" and any "Renewal Term" shall collectively be referred to herein as the "Term").

4.2   **Termination**.

4.2.a   **Without Cause**. This Agreement may be terminated by ESI without cause upon at least thirty (30) days written notice to Provider (or such longer period as may be required by law), with such termination effective at the end of such notice period.

4.2.b   **Breach**. In the event a party defaults in the performance of any of its obligations under this Agreement (the "Defaulting Party"), the other party (the "Non-Defaulting Party") may give written notice to the Defaulting Party of such breach. If the Defaulting Party has not cured such breach to the reasonable satisfaction of the Non-Defaulting Party within thirty (30) days after it receives such notice, then the Non-Defaulting Party shall have the right to immediately terminate the Agreement as of the expiration of the 30-day cure period. In addition to all other rights, ESI shall have the right to: (i) suspend any and all obligations of ESI hereunder and in connection with this Agreement; (ii) impose investigation and handling fees as further described in the Provider Manual; and/or (iii) offset against any amounts owed to Provider under this Agreement or under any other agreement between ESI and Provider, which are owing or required to be paid by Provider to ESI. These rights and remedies are in addition to any and all other rights that exist or are available or may exist or be available to ESI pursuant to this Agreement, at law or in equity.

4.2.c   **Immediate Termination**. Notwithstanding the provisions contained in Section 4.2.b, ESI shall have the right to immediately terminate this Agreement upon written notice to Provider in the event that: (i) Provider ceases to be licensed by the appropriate licensing authority; (ii) Provider submits a fraudulent prescription drug claim or any information in support thereof; (iii) Provider is insolvent, goes into receivership or bankruptcy or any other action is taken on behalf of its creditors; (iv) Provider fails to comply with the claims submission and processing requirements as set forth in Section 2.3 or fails to comply with Section 2.4 of this Agreement or any of ESI's policies and procedures including, but not limited to, the Provider Manual and/or quality assurance and/or utilization review procedures; (v) no longer meets credentialing requirements; (vi) ESI determines that the Provider is dispensing Covered Medications in violation of any applicable law, rule and/or regulation; (vii) Provider is excluded from participating in any federal or state health care program; (viii) Provider fails to maintain insurance as required by Section 6.1 of this Agreement; (ix) Provider has not submitted a claim to ESI for ninety (90) calendar days; (x) Provider (or any Pharmacy) fails to comply with any audit or investigative request, including the provision of information, made by ESI or any Sponsor or their designee, within the time period stated in such request; (xi) a determination is made by ESI that Provider (or any Pharmacy) failed to document purchases of prescriptions drugs sufficient to support its claims for reimbursement to ESI; or (xii) ESI determines that Provider's continued performance of services poses a risk to the health, welfare or safety of any Member.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074710

DOJ_18CR368-0074710-6

Version Date: 06/12/2014

Version Number: 1

4.2.d    **Sponsor Prescription Drug Programs**.  Provider acknowledges and agrees that Sponsors may not utilize Provider and/or all or any Pharmacies in a network for their respective Prescription Drug Programs. Accordingly, without terminating this entire Agreement, ESI may terminate Provider (or any Pharmacy) from participating in any Sponsor's Prescription Drug Program in accordance with Sponsor's timing.

4.2.e    **Specific Pharmacies**. ESI may terminate any Pharmacy's participation under this Agreement in accordance with Section 4.2 subsections (a) through (d), without terminating Provider or the entire Agreement.

4.2.f    **Network Termination**.  With respect to Provider's participation in any network (as evidenced by an executed rate exhibit), Provider's or any Pharmacy's participation in a specific network (and therefore, the specific rate sheet) may be terminated by ESI pursuant to and in accordance with Section 4.2 subsections (a) through (d) without terminating the entire Agreement or Provider's or a Pharmacy's participation in any other network.

4.2.g    **Closure of Networks**.  Notwithstanding any notice requirements of Section 4.2, in the event an ESI client ceases to utilize ESI, a client-specific network is terminated or ESI terminates (ceases operation of) an entire network, the notice requirement to Provider will be waived.

4.2.h    **Effect of Termination**.

    4.2.h.1    In the event of termination of this Agreement or any rate sheet for any reason, in addition to all other rights and remedies ESI may have under this Agreement, at law or in equity, ESI shall have the right to offset from any amounts owing to Provider any amounts which Provider may owe to ESI.

    4.2.h.2    Upon the expiration or termination of this Agreement or any rate sheet, for any reason or no reason, this Agreement will remain in effect for purposes of those obligations and rights arising prior to the effective date of such expiration or termination.  In addition, upon expiration or termination of this Agreement or any rate sheet for any reason or no reason (with the exception of Immediate Termination pursuant to Section 4.2.c), and upon ESI's request, Provider shall (i) continue to provide Covered Medications to Members during the longer of a one hundred and twenty (120) day period following the date of such termination or expiration or such other period as may be required by federal or state laws, regulations, standards or requirements applicable to a Sponsor (the "Continuation Period"), and, if further requested by ESI, Provider shall (ii) continue to assist in the transition of Members to another provider, (iii) continue to comply with and abide by all the terms and conditions of this Agreement including any applicable rate sheet, and (iv) sign any extensions to this Agreement necessary in order to allow ESI, Sponsor, and/or Provider to comply with all applicable laws, rules and regulations. During the Continuation Period, Provider will be compensated in accordance with the current Agreement, including any applicable rate sheet that existed just prior to expiration or termination of this Agreement or the applicable rate sheet and shall accept such compensation as payment in full.

4.2.i    **Notice**.  In the event of termination of this Agreement or any rate sheet for any reason, ESI may notify Sponsors and their Members regarding such termination.

5.    **CONFIDENTIALITY**.

    5.1    **Generally**.  Provider acknowledges and agrees that in the performance of services hereunder, Provider will comply with the Confidentiality provisions set forth in the Provider Manual and as set forth in this Agreement.

    5.2    **RESERVED**.

    5.3    **HIPAA**.  ESI shall and Provider shall comply with all federal and state laws, rules, and regulations regarding the confidentiality of patient information, including, but not limited to, compliance with the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"), and the Health Information Technology for Economic and Clinical Health Act, as amended ("HITECH Act"), including all applicable rules, regulations,

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074711

DOJ_18CR368-0074711-7

and official guidance promulgated in connection with HIPAA and the HITECH Act, by the U.S. Department of Health and Human Services or otherwise.

5.4 **Remedies**. Provider acknowledges and agrees that any breach of Section 5 of this Agreement would cause ESI immediate and irreparable injury or loss that cannot be fully remedied by monetary damages. Accordingly, if Provider fails to abide by the terms and conditions set forth in Section 5 of this Agreement, ESI shall be entitled to specific performance, including immediate issuance of a temporary restraining order or preliminary injunction enforcing the terms of this Agreement, and to judgment for damages (including reasonable attorneys' fees and costs) caused by the breach, and to all other legal and equitable remedies available to ESI.

6. **LIABILITY INSURANCE; INDEMNIFICATION AND LIABILITY**.

6.1 **Liability Insurance**. Provider shall obtain and maintain, and shall cause the Pharmacies to obtain and maintain, in full force and effect and throughout the Term of this Agreement, such policies of general liability, professional liability and other insurance of the types and amounts as are reasonably and customarily carried by pharmacies with respect to their operations, as further set forth in the Provider Certification and the Provider Manual. Upon ESI's request, Provider shall provide ESI with evidence of such insurance coverage satisfactory to ESI. If the insurance purchased to satisfy the requirements of this Section 6.1 is "claims made", then Provider shall purchase an extended period of indemnity ("tail" coverage) so that ESI is protected from any and all claims brought against ESI for a period of not less than three (3) years subsequent to the date of termination of this Agreement.

6.2 **Indemnification**. Provider shall indemnify and hold harmless ESI and its shareholders, officers, directors, employees, agents and affiliates from and against any and all claims, liabilities, losses, damages, costs, and expenses (including, without limitation, expert and professional fees and attorneys' fees) arising out of: (a) any breach by Provider of this Agreement; (b) the sale, compounding, dispensing, manufacturing, consultation or use of any prescription drug or any service provided by a Provider pursuant to this Agreement; (c) failure of Provider to act in accordance with generally accepted pharmacy practice or any applicable law, rules or regulation; or (d) any actual or alleged malpractice, misconduct, act (or failure to act) or responsibility of Provider related to dispensing and providing Covered Medications.

7. **MISCELLANEOUS PROVISIONS**.

7.1 **Contacting Sponsors, Members or Media**. Provider hereby agrees (and shall cause its affiliates, employees, independent contractors, shareholders, members, officers, directors and agents to agree) that it shall not engage in any conduct or communications, including, but not limited to, contacting any media or any Sponsor and/or a Sponsor's Members or other party without the prior consent of ESI. Notwithstanding the foregoing, Provider may contact Sponsor's Members for the sole purpose of carrying out generally accepted pharmacy practice (e.g., informing a Sponsor's Member that a prescription is ready for pick up). Further, Provider acknowledges and agrees that any breach of this Section 7.1 by Provider (or any affiliate, employee, independent contractor, shareholder, member, officer, director or agent) would cause ESI immediate and irreparable injury or loss that cannot be fully remedied by monetary damages. Accordingly, in the event of a breach of this Section 7.1 by Provider (or any affiliate, employee, independent contractor, shareholder, member, officer, director or agent), ESI shall be entitled to specific performance, including immediate issuance of a temporary restraining order or preliminary injunction enforcing the terms of this Agreement, and to judgment for damages (including reasonable attorneys' fees and costs) caused by the breach, and to all other legal and equitable remedies available to ESI.

7.2 **Notice**. Except as otherwise provided in this Agreement, any notice required to be given pursuant to the terms and conditions of this Agreement shall be in writing and: (a) delivered in person, evidenced by a signed receipt; (b) deposited in the United States mail, certified or registered, return receipt requested (or other similar method of delivery with a nationally recognized carrier (e.g., FedEx, UPS)); (c) delivered by facsimile, evidenced by a transmission receipt; or (d) delivered by email transmission to the email address listed below, as evidenced by a copy of the successful email transmission displaying such email address, to ESI or the Provider at the address set forth below or (e) to the last address or fax number or email address subsequently reported in writing to the respective party:

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074712

DOJ_18CR368-0074712-8

Version Date: 06/12/2014                                                                                    Contract Number: NCM221385
Version Number: 1                                                                                                                          9 of 20

*If to ESI:*               The street address and/or email address as set forth in the Notices section
                           of the Provider Manual.

*If to Provider:*          The street address, fax number or email address as set forth in Provider's
                           Credentialing Application, and/or the following:

                           ~~Alternative Medicine and Pharmacy, Inc. D/b/a Omniplus Pharmacy~~
                           ~~4916 Main St., #120~~
                           ~~Houston, TX 77002~~
                           Attention: ~~Branko Milosevic, VP of Operations~~
                           Email: ~~Branko @ omniplushealthcare.com~~

Notice will be deemed received on (f) the date of delivery if the notice is personally delivered, sent via certified or registered mail, return receipt requested (or other similar method of delivery with a nationally recognized carrier), sent via facsimile or email transmission, or (g) the third business day after the date of mailing of the notice is mailed by United States mail. Notwithstanding the foregoing, ESI may give notice to Provider (or any Pharmacy) via its online claims system or in any remittance advice.

7.3   **Entire Agreement**. This Agreement, including its exhibits, appendices, Provider Certification, Provider Manual, and any requirements of a Sponsor's Prescription Drug Program communicated to Provider constitutes the entire agreement of the parties with respect to the subject matter herein and, upon execution by the parties, supersedes all prior oral or written agreements between the parties with respect to the subject matter hereof. With the exceptions of federal, state and/or Sponsor-specific requirements as set forth in the appendices of the Provider Manual, in the event of any conflict between the terms and conditions of this Agreement and the Provider Manual, the terms of this Agreement shall prevail. Notwithstanding the foregoing sentence, solely with respect to services rendered in the state of New York under this Agreement to any Member of any Prescription Drug Program offered by a Sponsor that is certified as a managed care organization under Article 44 of the New York State Public Health Law, in the event of any conflict between the terms and conditions of this Agreement and the Provider Manual, the terms of this Agreement shall prevail.

7.4   **Amendment**. Unless prohibited or modified by existing law, ESI may amend any term, part or provision of this Agreement, including without limitation, any exhibits, requirements for participation, schedules, amendments, or addenda (including an amendment required due to a change in law, rule or regulation), by giving written notice to Provider at least ten (10) calendar days prior to the Effective Date of the amendment ("Notice Period"). Provider shall be deemed to have accepted such amendment in the event it fails to provide written notice of its objection to ESI prior to the expiration of the Notice Period. If Provider continues to submit claims after the effective date of any proposed amendment, then such amendment will be deemed approved and accepted by Provider as if Provider had given its express written consent thereto, and such amendment shall automatically become a part of this Agreement. In the event Provider rejects such amendment in accordance herewith, then Provider may terminate this Agreement by giving written notice of such election to ESI on or before the expiration of the Notice Period, and such termination shall be effective ninety (90) days from the expiration of the Notice Period. In the event Provider rejects such amendment but does not terminate this Agreement on or before the expiration of the Notice Period, then the amendment will be deemed approved and accepted by Provider as if Provider had given its express written consent thereto, and such amendment shall automatically become a part of this Agreement and take effect as of the expiration of the Notice Period. Notwithstanding the foregoing, and only to the extent a signature is required or requested by ESI, the parties acknowledge and agree that any contract document, including, but not limited to, rate exhibits, schedules, letters of agreement, etc., proposed by ESI and executed by Provider hereafter shall automatically become incorporated into this Agreement without the necessity of a formal amendment.

7.5   **Assignment**. No part of this Agreement may be assigned by Provider without ESI's prior written consent. Provider acknowledges and agrees that ESI, without consent of Provider, may assign all or any part of this Agreement and/or ESI's rights, privileges or duties under this Agreement.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074713
DOJ_18CR368-0074713-9

Version Date: 06/12/2014

Version Number: 1

Contract Number: NCM221385

10 of 20

7.6 **Force Majeure**.  Any party's delay in, or failure of, performance under this Agreement shall be excused where such delay or failure is the result of causes that are beyond the reasonable control of the affected party, including acts of God (e.g., nature, fire, flood, etc.), terrorism, war, civil disturbance, court order, governmental intervention, epidemic, pandemic, failures or fluctuations in electrical power, heat, light, air conditioning, computer, software, communications, transmission or mechanical failure, work stoppage, delays or failure to act, or other catastrophe beyond a party's reasonable control.  In such an event, the parties will use commercially reasonable efforts to resume performance as soon as reasonably possible under the circumstances giving rise to the party's failure to perform.  Both ESI and Provider will use joint communication and resources to assist the other party in the event of a Force Majeure.

7.7 **Headings**.  The article and section headings contained in this Agreement are for convenience only and will in no manner be construed as part of this Agreement.

7.8 **Governing Law**.  This Agreement shall be construed and governed in all respects according to the internal laws in the State of Missouri, without regard to conflict of law principles.  Notwithstanding the foregoing sentence, solely with respect to services rendered in the state of New York under this Agreement to any Member of any Prescription Drug Program offered by a Sponsor that is certified as a managed care organization under Article 44 of the New York State Public Health Law, this Agreement shall be construed and governed in all respects according to the internal laws in the State of New York, without regard to conflict of law principles.

7.9 **Waiver**.  No waiver of a breach of any covenant or condition shall be construed to be a waiver of any subsequent breach.  No act, delay, or omission done, suffered, or permitted by the parties shall be deemed to exhaust or impair any right, remedy, or power of the parties hereunder.

7.10 **Severability**.  Should any provision of this Agreement be held or ruled unenforceable or ineffective under the law, such a ruling will in no way affect the validity or enforceability of any other clause or provision contained herein.

7.11 **Non-Competition**.  Provider agrees during the Term of this Agreement and for a period of one (1) year thereafter it will not use any of the information it obtains pursuant to this Agreement or as a result of providing services hereunder, to its benefit or for the benefit of any of its affiliates or Pharmacies, including to solicit any of the Sponsors for which Provider provided services to Members of such Sponsors during the Term of this Agreement.

7.12 **Dispute Resolution**.  Except as provided herein, prior to either party taking any legal action in connection with this Agreement, both parties agree to meet in good faith to resolve any claim or controversy ("Claim"), whether under federal or state statutory or common law, brought by either ESI or the Provider against the other, or against the employee, members, agents or assigns of the other, arising from or relating in any way to the interpretation or performance of this Agreement.  The aggrieved party shall notify the other party of its Claim providing sufficient detail to permit the other party to respond.  The parties agree to meet and confer in good faith to resolve any Claims that may arise under this Agreement for a period of not less than thirty (30) days.  In the event the parties cannot resolve any Claims pursuant to Good Faith Discussions and the minimum 30-day period has been met, then the aggrieved party may end discussions with the other party by providing written notice to the other party of its intent to cease discussions.  Thereafter, the parties may proceed to litigation.  Good Faith Discussion and the 30-day notice period do not apply to Claims by either party solely seeking immediate injunctive relief.  All litigation between the parties arising out of or related in any way to the interpretation or performance of the Agreement shall be litigated in the U.S. District Court for the Eastern District of Missouri, or, as to those lawsuits to which the Federal Court lacks jurisdiction, before a court located in St. Louis County, Missouri.  The parties agree that Claims shall not be consolidated or coordinated in any action with the Claim of any other individual or entity.  No Claim or other dispute may be litigated on a coordinated, class, mass, or consolidated basis.  No Claim may be brought as a private attorney general.

7.13 **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and together will constitute one and the same Agreement.  Facsimile execution and delivery of this Agreement is legal, valid and binding execution and delivery for all purposes.

7.14 **Incorporation of Recitals**.  The recitals are hereby incorporated into and made a part of this Agreement.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074714

DOJ_18CR368-0074714-10

Version Date: 06/12/2014                                                    Contract Number: NCM221385

Version Number: 1

7.15   **Survival**.  Notwithstanding anything herein to the contrary, all provisions intended to survive the expiration or termination of this Agreement, including the Provider Manual, shall survive such expiration or termination for any reason.

7.16   **Incorporation of NY Standard Clauses**.  As required by the New York State Department of Health, solely with respect to services rendered in the state of New York under this Agreement to any Member of any Prescription Drug Program offered by a Sponsor that is certified as a managed care organization under Article 44 of the New York Public Health Law, the New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts ("NY Standard Clauses"), as set forth in Appendix 1, shall be and are expressly incorporated and adopted herein by reference.  Solely with respect to the same services, to the extent of any inconsistency between the NY Standard Clauses and other provisions of this Agreement, the provision of the NY Standard Clauses shall control, except to the extent applicable law requires otherwise and/or to the extent a provision of this Agreement exceeds the minimum requirements of the NY Standard Clauses.

7.17   **Applicability of this Agreement**.  In the event of any conflict between this Agreement and the terms and conditions of an ESI provider agreement entered into on Provider's behalf by a pharmacy services administration organization or group purchasing organization that Provider has authorized to act as its "Agent of Pharmacy" (the "Agent"), then Agent's ESI provider agreement shall be the governing agreement only for the duration of Provider's contractual relationship with such Agent; that is, the governing terms and conditions applicable to Provider's participation in ESI's networks shall revert to this Agreement at such time as ESI receives and processes either one of the following relationship updates: (i) the agreement between Provider and Agent terminates or expires; or (ii) the agreement between ESI and Agent terminates or expires.

7.18   **Transition**.  The parties agree that Medco Health Solutions, Inc. and its subsidiaries (collectively, "MHS") shall be a party to this Agreement.  Any pharmacy agreement including all amendments, schedules and the Provider Manual in effect between MHS and Provider as of the Effective Date (collectively, the "MHS Pharmacy Agreement") shall remain in effect with respect to each MHS Sponsor covered under the MHS Pharmacy Agreement as of the Effective Date until such time as ESI transitions such MHS Sponsor to this Agreement and/or one or more of the rate sheets generally known as Exhibit A, which shall be determined in a commercially reasonable manner by ESI in its sole discretion.  Upon transition of a MHS Sponsor to this Agreement, the MHS Pharmacy Agreement shall no longer apply with respect to such transitioned MHS Sponsor.  ESI shall have the right to utilize a MHS adjudication system to administer this Agreement.

7.19   **Representations and Warranties of Provider**.  Provider represents and warrants to ESI that:  (i) it currently is, and shall remain, in good standing and has obtained all required federal, state and local licenses, certificates and permits necessary for each Pharmacy and pharmacist (as applicable) to provide services pursuant to this Agreement and has not had its or its pharmacist's (as applicable) license suspended, revoked, restricted, limited or otherwise disciplined; (ii) it is not precluded from providing services to Members; (iii) it has not been and is currently not suspended, restricted, limited or excluded from participating in any federal or state health care or other government program; (iv) Pharmacy must notify ESI immediately in the event of any suspension, revocation, restriction, limitation or any other disciplinary action taken against or placed on any such license, certificate or permit; and (v) the Pharmacy has the appropriate level of insurance coverage as required pursuant to the Agreement.

7.20   **Authority to Enter into Agreement; Legal Agreement**.  Each party represents and warrants to the other that: (a) it has all requisite corporate power and authority to enter into this Agreement and perform all obligations required to be performed by such party under this Agreement; (b) neither its execution and delivery of this Agreement nor the performance of its obligations by such party under this Agreement will conflict with, or result in a breach of any covenant or agreement between it and any third party; and (c) this Agreement together with its Exhibits (as applicable) represents its legal, valid and binding obligation.

7.21   **Authority to Sign**. By signing this Agreement, the individual represents and warrants that such individual has the authority to so bind the entity for which it is signing this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074715
DOJ_18CR368-0074715-11

Version Date: 06/12/2014

Version Number: 1

**IN WITNESS WHEREOF**, the parties have executed and entered into this Agreement as of the date set forth below.

<u>**ACCEPTED**</u>:

**ALTERNATIVE MEDICINE AND PHCY**

Signature: _Dejan B...._

Printed Name: _DEJAN MILOSEVIC_

Title: _PRESIDENT_

Date: _June 30, 2014_

NCPDP Number: 5900952

**EXPRESS SCRIPTS, INC**



Sig: _Wendy L. Barnes_

Wendy L. Barnes, Vice President

Provider Strategy and Contracting

Date: 7/18/2014


_Wendy L. Barnes_

Wendy L. Barnes, Vice President

Provider Strategy and Contracting

Date: 7/18/2014

Contract No.: NCM221385

**NCM221385**

[barcode]

Please Return **Entire Document** to:

**NetworkCredentialing@express-scripts.com or 800.899.1601 (Fax)**

**FOIA NOTICE:** This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552(b). Do not disclose outside of the recipient organization of the United States Government.

NO ALTERATIONS TO THIS DOCUMENT SHALL BE BINDING UNLESS INITIALED BY DULY AUTHORIZED REPRESENTATIVES OF PROVIDER AND ESI.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074716

DOJ_18CR368-0074716-12

Version Date: 06/12/2014

Version Number: 1

**EXHIBIT A**

**NETWORK RATE EXHIBITS**

No new rate sheets are being added as of the Effective Date of this Agreement.  Provider should contact its PSAO, or "Agent of Pharmacy", for any inquiries regarding or to request copies of the network rate sheets entered into on Provider's behalf by Provider's PSAO, which rate sheets shall be made a part of this Agreement by this reference, and shall remain in effect subject to the provisions of Section 7.17.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

Version Date: 06/12/2014

Version Number: 1

Contract Number: NCM221385

14 of 20

## EXHIBIT B

## PHARMACIES

The following is a list of Provider's Pharmacies covered by this Agreement (if a location is not listed, then such location is not contracted to participate and will not receive reimbursement from ESI):

| Legal Name & any "doing business as" name | Street Address | Phone Number | NCPDP # | NPI # | Hours of Service |
|---|---|---|---|---|---|
| Omnirus Pharmacy | 4916 Main St, #100 Houston TX 77002 | (713) 874-0300 | 5900952 | 1518274281 | 8am – 7pm (Mon – Fri) 9am – 3pm (Sat) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074718

DOJ_18CR368-0074718-14

Version Date: 06/12/2014

Version Number: 1

## APPENDIX 1

### New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "the Agreement" or "this Agreement") the parties agree to be bound by the following clauses which are hereby made a part of the Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA, or between an IPA and an IPA, such clauses must be included in IPA contracts with providers, and providers must agree to such clauses.

1. **DEFINITIONS FOR PURPOSES OF THIS APPENDIX.**

   1.1 **"Managed Care Organization"** or **"MCO"** shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer, or which do provide or offer, a comprehensive health services plan.

   1.2 **"Independent Practice Association"** or **"IPA"** shall mean an entity formed for the limited purpose of arranging by contract for the delivery or provision of health services by individuals, entities and facilities licensed or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment, by which arrangements such health care providers and suppliers will provide their services in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

   1.3 **"Provider"** shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of health care services which are licensed, registered and/or certified as required by applicable federal and state law.

2. **GENERAL TERMS AND CONDITIONS.**

   2.1 This Agreement is subject to the approval of the New York State Department of Health and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by the Department of Health for approval or, alternatively, to terminate this Agreement if so directed by the Department of Health, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403(6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

   2.2 Any material amendment to this Agreement is subject to the prior approval of the Department of Health, and any such amendment shall be submitted for approval at least thirty (30) days, or ninety (90) days if the amendment adds or materially changes a risk sharing arrangement that is subject to Department of Health review, in advance of anticipated execution. To the extent the MCO provides and arranges for the provision of comprehensive health care services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH or New York City, as may be required by the Medicaid managed care contract between the MCO and DOH (or New York City) and/or the Family Health Plus contract between the MCO and DOH.

   2.3 Assignment of an agreement between an MCO and (1) an IPA, (2) institutional network provider, or (3) medical group provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement between an IPA and (1) an institutional provider or (2) medical group provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.

   2.4 The Provider agrees, or if the Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, or DOH or SID guidelines or policies and (b) has provided to the Provider at least thirty (30) days in advance of implementation, including but not limited to:

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074719

DOJ_18CR368-0074719-15

| | | |
|---|---|---|
| 2.4.a | quality improvement/management; | |
| 2.4.b | utilization management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data; | |
| 2.4.c | member grievances; and | |
| 2.4.d | provider credentialing. | |

2.5 The Provider or, if the Agreement is between the MCO and an IPA, or between an IPA and an IPA, the IPA agrees, and shall require its providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.

2.6 If the Provider is a primary care practitioner, the Provider agrees to provide for twenty-four (24) hour coverage and back up coverage when the Provider is unavailable. The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

2.7 The MCO or IPA which is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA's own acts or omissions, by indemnification or otherwise, to a provider.

2.8 Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007 and Chapter 237 of the Laws of 2009 with all amendments thereto.

2.9 To the extent the MCO enrolls individuals covered by the Medical Assistance, and/or Family Health Plus programs, this Agreement incorporates the pertinent MCO obligations under the Medicaid managed care contract between the MCO and DOH (or New York City) and/or the Family Health Plus contract between the MCO and DOH as if set forth fully herein, including:

2.9.a the MCO will monitor the performance of the Provider or IPA under the Agreement, and will terminate the Agreement and/or impose other sanctions, if the Provider's or IPA's performance does not satisfy standards set forth in the Medicaid managed care and/or Family Health Plus contracts;

2.9.b the Provider or IPA agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH (or between the MCO and New York City) and/or the Family Health Plus contract between the MCO and DOH, and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA's performance; and

2.9.c The Provider or IPA agrees to be bound by the confidentiality requirements set forth in the Medicaid managed care contract between the MCO and DOH (or between the MCO and New York City) and/or the Family Health Plus contract between the MCO and DOH.

2.9.d The MCO and the Provider or IPA agree that a woman's enrollment in the MCO's Medicaid managed care or Family Health Plus product is sufficient to provide services to her newborn, unless the newborn is excluded from enrollment in Medicaid managed care or the MCO does not offer a Medicaid managed care product in the mother's county of fiscal responsibility.

2.9.e The MCO shall not impose obligations and duties on the Provider or IPA that are inconsistent with the Medicaid managed care and/or Family Health Plus contracts, or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

2.9.f The Provider or IPA agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

2.9.g   The Provider or IPA agrees , pursuant to 31 U.S.C.§1352 and CFR Part 93, that no Federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the award of any Federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement. The Provider or IPA agrees to complete and submit the "Certification Regarding Lobbying", in accordance with New York State Department of Health Rules and Regulations, if this Agreement exceeds $100,000. If any funds other than Federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any Federal Contract, the making of any Federal grant, the making of any Federal loan, the entering of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA shall complete and submit Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

2.9.h   The Provider agrees to disclose to MCO on an ongoing basis, any managing employee that has been convicted of a misdemeanor or felony related to the person's involvement in any program under Medicare, Medicaid or a Title XX services program (Block grant programs).

2.9.i   The Provider agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE) and excluded individuals posted by the OMIG on its Website.

2.9.j   The Provider agrees to disclose to MCO complete ownership, control, and relationship information.

2.9.k   Provider agrees to obtain for MCO ownership information from any subcontractor with whom the provider has had a business transaction totaling more than $25,000, during the 12 month period ending on the date of the request made by SDOH, OMIG or DHHS. The information requested shall be provided to MCO within 35 days of such request.

2.10   The parties to this Agreement agree to comply with all applicable requirements of the Federal Americans with Disabilities Act.

2.11   The Provider agrees, or if the Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act; the HIV confidentiality requirements of Article 27-F of the Public Health Law and Mental Hygiene Law§33.13.

## 3.   **PAYMENT; RISK ARRANGEMENTS**.

3.1   Enrollee Non-liability. Provider agrees that in no event, including, but not limited to, nonpayment by the MCO or IPA, insolvency of the MCO or IPA, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract or Family Health Plus contract and this Agreement, for the period covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, he/she/it will not bill the New York State Department of Health or the City of New York for Covered Services within the Medicaid Managed Care Benefit Package as set forth in the Agreement between the MCO and the New York State Department of Health. In the case of Family Health Plus, Provider agrees that, during the time an enrollee is enrolled in the MCO, he/she/it will not bill the New York State Department of Health for Covered Services within the Family Health Plus Benefit Package, as set forth in the Agreement between the MCO and the New York State Department of Health. This provision shall not prohibit the provider, unless the MCO is a managed long term care plan designated as a Program of All-Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for-service basis to a covered

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074721

DOJ_18CR368-0074721-17

Version Date: 06/12/2014

Version Number: 1

Contract Number: NCM221385

18 of 20

person provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason, and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

3.2 Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the provider. However, with respect to enrollees eligible for medical assistance, or participating in Child Health Plus or Family Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third-party payers, and amounts thereof, and the MCO shall maintain or have immediate access to records concerning collection of COB proceeds.

3.3 If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law §4406-c(5-c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology or payment policy indexing scheme.

3.4 The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR §422.208, and 42 CFR § 422.210 into any contracts between the contracting provider (provider, IPA, hospital, etc.) and other persons/entities for the provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an enrollee.

3.5 The parties agree that a claim for home health care services following an inpatient hospital stay cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided before a member's inpatient hospital discharge, consistent with Public Health Law §4903.

4. **RECORDS; ACCESS.**

4.1 Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the MCO (and IPA if applicable), for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements (QARR)), payment processing, and qualification for government programs, including but not limited to newborn eligibility for Supplemental Security Income (SSI) and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA if applicable) expressly acknowledges that he/she/it shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

4.2 When such records pertain to Medicaid or Family Health Plus reimbursable services the Provider agrees to disclose the nature and extent of services provided and to furnish records to DOH and/or the United States

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074722

DOJ_18CR368-0074722-18

Version Date: 06/12/2014

Version Number: 1

Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

4.3   The parties agree that medical records shall be retained for a period of six (6) years after the date of service, and in the case of a minor, for three (3) years after majority or six (6) years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4.4   The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA or to third parties. If the Agreement is between an MCO and an IPA, or between an IPA and an IPA, the IPA agrees to require the providers with which it contracts to agree as provided above. If the Agreement is between an IPA and a provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

5.   **TERMINATION AND TRANSITION.**

5.1   Termination or non-renewal of an agreement between an MCO and an IPA, institutional network provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination, by the MCO may be effected on less than 45 days notice provided the MCO demonstrates to DOH's satisfaction prior to termination that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

5.2   If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional 60 days notice of its decision to not renew this Agreement.

5.3   If this Agreement is between an MCO and an IPA, and the Agreement does not provide for automatic assignment of the IPA's Provider contracts to the MCO upon termination of the MCO/IPA contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA's providers agree, that the IPA providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever first occurs. This provision shall survive termination of this Agreement regardless of the reason for the termination.

5.4   Continuation of Treatment. The Provider agrees that in the event of MCO or IPA insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract, Medicaid Managed Care contract, or Family Health Plus contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. For purposes of this clause, the term "provider" shall include the IPA and the IPA's contracted providers if this Agreement is between the MCO and an IPA. This provision shall survive termination of this Agreement.

5.5   Notwithstanding any other provision herein, to the extent that the Provider is providing health care services to enrollees under the Medicaid Program and/or Family Health Plus, the MCO or IPA retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.

DOJ_18CR368-0074723

DOJ_18CR368-0074723-19

Version Date: 06/12/2014

Version Number: 1

5.6   In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA agrees to require all participating providers of its network to assist in the orderly transfer of enrollees to another provider.

6.   **ARBITRATION**.

6.1   To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation, and copies of all decisions.

7.   **IPA-SPECIFIC PROVISIONS**.

7.1   Any reference to IPA quality assurance (QA) activities within this Agreement is limited to the IPA's analysis of utilization patterns and quality of care on its own behalf and as a service to its contract providers.

**[END OF APPENDIX 1]**

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION PROTECTED FROM PUBLIC DISCLOSURE UNDER 5 U.S.C. § 552 (b).

PLEASE READ THE FULL "FOIA NOTICE" ON THE SIGNATURE PAGE AND/OR THE FIRST PAGE OF THIS DOCUMENT.