# PHARMACY NETWORK AGREEMENT

This Pharmacy Network Agreement ("Agreement"), effective as of the noted date set forth by Administrator on the signature page hereto (the "Effective Date") is made and entered into by and between OptumRx, Inc., a California corporation, ("Administrator"), and Omni-One-Med Pharmacy Se *[INSERT COMPANY NAME]*, a TX/ LLC _____ *[INSERT STATE & TYPE OF LEGAL ENTITY (i.e. Delaware Corporation)]*, on behalf of itself and each of its Pharmacies (collectively, "Company"). Administrator and Company may be referred to in this Agreement individually as a "party" and collectively as "parties."

## RECITALS

A.     Administrator has entered or in the future will enter into written agreements with Clients for certain consultative, administrative, network, and/or claims processing services in connection with the operation of that Client's Benefit Plan.

B.     Company owns, operates or manages one or more pharmacies that are duly licensed and qualified to provide Covered Prescription Services to Members of Clients.

C.     Company seeks to provide Covered Prescription Services to Members of Clients using its Pharmacies in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing premises, mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.     <u>Defined Terms</u>. All capitalized terms contained in this Agreement will have the meanings as set forth herein or as defined in an addendum or exhibit to this Agreement.

   1.1     "<u>Administrator's Proprietary Information</u>" shall mean: (i) this Agreement and all documentation now and hereafter related to the performance of this Agreement, including, without limitation, the Formulary and MAC list; (ii) Administrator's methods of doing business, including the Administrator's utilization review and quality assurance procedures and programs; (iii) any and all symbols, logos, trademarks, trade names, service marks, patents, inventions, copyrights, copyrightable material, trade secrets, personnel information, operating manuals, memoranda, work papers, notes, reports, customer or client lists, business information, operational techniques, prospect information, marketing programs, plans, and strategies, operating agreements, financial information and strategies, and computer software and other computer-related materials developed or used in Administrator's business; and (iv) any documents, materials, or items not specifically listed above, which Administrator designates as its proprietary information.

   1.2     "<u>Affiliate</u>" shall mean with respect to any person or entity, any other person or entity which directly or indirectly controls, is controlled by or is under common control with such person or entity.

   1.3     "*<u>Average Wholesale Price</u>" or "*<u>AWP</u>" shall mean and refer to the average wholesale price of a Covered Prescription Service based on the Medi-Span Prescription Pricing Guide (with Supplements) or any other nationally recognized pricing source selected by Administrator (the "Pricing Source"), as updated at least weekly, and as modified in Section 4.7.2 of "Changes to *AWP/AWP", below.

   1.4     "<u>Average Wholesale Price</u>" or "<u>AWP</u>" shall mean the average wholesale price of a Covered Prescription Service based on the Pricing Source, as updated at least weekly, without any adjustments made by any entity other than the Pricing Source.

   1.5     "<u>Benefit Plan</u>" shall mean the benefit provided to Members, including under any Medicaid, MA-PD Plan or Prescription Drug Plan. Benefit Plan coverage shall include, without limitation, any

GOVERNMENT
EXHIBIT
**234**
4:18-CR-368

GX234.001
1

DOJ_18CR368-0064857

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 2 of 63

deductible or coverage gap provided for under such coverage, without regard to any subsidy by any third party of a Member's cost sharing obligations under the applicable Benefit Plan.

1.6   "Brand Name Drug" shall mean a drug marketed under a proprietary and trademark-protected name.

1.7   "Claim" shall mean a Pharmacy's billing or invoice for a single Prescription for Covered Prescription Services dispensed to a Member.

1.8   "Claims Processor" shall mean Administrator or a third party pharmacy claims processor with which Administrator may contract.

1.9   "Clean Claim" shall mean a Claim, prepared in accordance with the standard formats promulgated by the National Council for Prescription Drug Programs, electronic, batch, and on paper, which contains all of the information necessary for processing (including, without limitation, the Member identification number, the Member's name and date of birth, Prescription Drug Product NDC number, drug quantity, days supply, health care provider DEA/NPI number, NCPDP/NPI number, date of service, Submitted Cost Amount and the Usual and Customary Charge).   Claims submitted in non-NCPDP standard format will not be considered a Clean Claim and will be subject to an additional claim processing charge.   A Claim shall not be considered a "Clean Claim" if at Administrator's sole discretion it determines that such Claim is (i) discrepant, false and/or fraudulent, (ii) by an individual not authorized under applicable law or regulation to write or direct the related Prescription, or (iii) with respect to any Benefit Plan that is a "Federal health care program" as defined in 42 U.S.C. 1320a-7b, relates to a Prescription written or directed by an individual who is excluded from participation in any Federal health care program pursuant to applicable federal or state law (individually and collectively, a "Non-Clean Claim"). Administrator's Non-Clean Claim determination shall be applicable regardless of whether Administrator, Client, Member, Company, and/or Pharmacy was aware of the same at the time such Prescription was processed by Pharmacy. Any amounts paid by any Member, Administrator or Client for such Non-Clean Claim shall be subject to recoupment from Pharmacy by Administrator.

1.10   "Client" shall mean any person or entity which has entered into, or in the future enters into, a written agreement with Administrator pursuant to which Administrator provides certain consultative, administrative, and/or claims processing services in connection with the operation of one or more Benefit Plans sponsored, issued or administered by such person or entity and/or that person's or entity's customer.

1.11   "Client's Proprietary Information" shall mean the Client's Benefit Plans and the information contained therein, including without limitation (i) information related to Members, employer groups, and participating providers, (ii) the financial arrangements between Clients and their Members, employer groups, and participating providers (iii) any and all symbols, logos, trademarks, trade names, and service marks developed or used in Client's business, and (iv) any documents, materials, or items not specifically listed above, which Client designates as its proprietary information.

1.12   "Cost-Sharing" or "Cost-Sharing Amounts" shall mean those coinsurance, copays, or other amounts which Company is entitled to collect from a Member for Covered Prescription Services in accordance with the terms and conditions of the Member's Benefit Plan.

1.13   "Covered Prescription Services" shall mean those Prescriptions and other pharmaceutical products, services and supplies dispensed by Company to a Member for which coverage is provided pursuant to the terms and conditions of the Benefit Plan.

1.14   "CMS" shall mean the Centers for Medicare and Medicaid Services, or any successor Government Authority.

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 3 of 63

1.15   "Drug Product" shall mean the Brand Name Drug or Generic Drug which is (i) required under applicable laws and regulations to be dispensed only pursuant to a Prescription and (ii) is approved by the FDA.

1.16   "Formulary" means the entire list of Drug Products, devices, products and/or supplies covered by the applicable Benefit Plan.

1.17   "FDA" shall mean the Federal Food and Drug Administration, or any successor Government Authority.

1.18   "Generic Drug" shall mean and refer to a drug product, whether identified by its chemical, proprietary or non-proprietary name, which is accepted by the FDA as therapeutically equivalent to an originator Drug Product.

1.19   "GLB" means the Financial Modernization Act of 1999 also known as the Gramm-Leach-Bliley Act (codified at 15 USC § 6801 et seq.), together with any rules and regulations from time to time promulgated thereunder, as may be amended, modified, revised or replaced or interpreted by any Governmental Authority or court.

1.20   "Government Authority" shall mean and include, but not limited to the Federal government, any state, county, municipal, or local government or any governmental department, political subdivision, agency, bureau, commission, authority, body or instrumentality or court, that might regulate the activities or operations of either party or parties' Affiliate or Client.

1.21   "HIPAA" shall mean and refer to the Health Insurance Portability and Accountability Act of 1996, and the rules and regulations adopted by HHS pursuant to HIPAA, including the Standards for Privacy of Individually Identifiable Health Information and the Security Standards for the Protection of Electronic Protected Health Information, 45 CFR parts 160 and 164 (subparts A, C, and E) as each may be amended, modified, revised or replaced or interpreted by any Government Authority or court.

1.22   "HHS" means the United States Department of Health and Human Services or any successor Government Authority.

1.23   "MA-PD Plans" shall mean the CMS-approved MA-PD plans sponsored, issued or administered by Clients, as defined at 42 C.F.R. §423.4, and includes, but is not limited to, private fee for service plans and special needs plans as defined in the Medicare Advantage rules and any CMS demonstration programs that provide prescription drug benefits.  For purposes of this Agreement, "MA-PD Plan" also includes any employer-sponsored MA-PD plan referenced in 42 C.F.R. §422.106.

1.24   "Marks" shall mean the name(s), logo(s), and other proprietary symbols and phrases belonging to an entity.

1.25   "Maximum Allowable Cost" or "MAC" shall mean the lists developed by Administrator specifying the maximum unit ingredient cost payable to Company for dispensing any Drug Product included on such lists. Company acknowledges that MAC is subject to periodic review and modification by Administrator.

1.26   "Member" or "Beneficiary" shall mean an individual who is eligible and enrolled to receive coverage through a Benefit Plan from a Client for Covered Prescription Services.

1.27   "<state> Medicare and Medicaid Enrollees (MME) Benefit Plan" shall mean the CMS sponsored [Capitated] Financial Alignment Demonstration Plan providing integrated care benefits for individuals eligible for both the <state> Medicaid program and the Medicare program (Parts A, B, C and D). At such time as this Benefit Plan is no longer a demonstration project and is fully implemented in the state, this definition will be interpreted to refer to the fully implemented plan.

1.28    "NCPDP" shall mean the National Council of Prescription Drug Programs.

1.29    "NPI" shall mean the National Provider Identifier.

1.30    "Pharmacy" or "Pharmacies" shall mean each or all Company's eligible Pharmacy or Pharmacies participating in Administrator's network in accordance with the Agreement, addenda, exhibits, subsequent amendments, etc. and as specified on Exhibit A.

1.31    "Pharmacy Plan Specifications" shall mean information made available by Administrator to assist Company in submitting a claim for Covered Prescription Services.

1.32    "Pharmacy Manual" shall mean the rules, protocols, policies and administrative procedures adopted by Administrator to be adhered to by Company in providing Covered Prescription Services and doing business with Administrator and Client under this Agreement, which is hereby incorporated by reference into this Agreement.

1.33    "POS System" shall mean the online or real time (point-of-sale) telecommunication system used to communicate information including, but not limited to, Covered Prescription Services.

1.34    "Prescription" shall mean and refer to a written or oral order to dispense a Drug Product directed by an appropriately licensed and qualified health care professional in accordance with Federal and/or state law.

1.35    "Prescription Drug Plans" or "PDP Plans" shall mean the CMS-approved Medicare Part D prescription drug coverage offered under a policy, contract or plan that is sponsored, issued or administered by Clients pursuant to a contract with CMS, as defined in 42 C.F.R. §423.4, and includes, but is not limited to, any CMS demonstration programs that provide prescription drug benefits. For purposes of this Agreement, Prescription Drug Plan or PDP Plan also includes any employer-sponsored group prescription drug plans, as defined in 42 C.F.R. §423.454.

1.36    "Prescription Drug Compensation" shall mean the reimbursement, remuneration, compensation, or other payment, as set forth in Section 4.1 provided to Company by Administrator for the provision of Covered Prescription Services to Members.

1.37    "Prescription Drug Contracted Rate" shall have the meaning set forth in the applicable Compensation Exhibit[s] attached to one or more of the addenda to this Agreement.

1.38    "Specialty Drugs" shall mean and include biotechnology products, orphan drugs used to treat rare diseases, typically high-cost drugs, oral or injectable medications, including infusions in any outpatient setting, drug requiring on-going frequent management/monitoring of the patient by clinician or drugs used to treat chronic and potentially life-threatening diseases.

1.39    "Submitted Cost Amount" shall mean the submitted ingredient costs, dispensing fees and all other submitted costs incurred by a Pharmacy for dispensing of a Drug Product, device, product and/or supply.

1.40    "United States Territories" shall mean the U.S. Virgin Islands, Guam, Saipan, Puerto Rico, Northern Mariana Islands, and American Samoa.

1.41    "Usual and Customary Charge" shall mean the price, including all applicable customer discounts, such as special customer, senior citizen and frequent shopper discounts, that a cash paying customer pays Company for Drug Products, devices, products and/or supplies.

2. <u>Duties and Obligations of Administrator</u>.

2.1 <u>Information and Pharmacy Plan Specifications</u>. Administrator shall provide or make available to Company (via POS System) the information Company reasonably needs to dispense Covered Prescription Services and perform its other obligations under this Agreement, including the Pharmacy Plan Specifications, benefit coverage information (such as Cost-Sharing Amounts, deductible limits, covered drugs, benefit exclusions, and days' supply), administrative and utilization review requirements, eligibility information, Formulary information and information regarding the policies and procedures for claims submission and payment. Administrator may add such new information and Pharmacy Plan Specifications or amend, revise, or terminate existing information or Pharmacy Plan Specifications in its sole and absolute discretion upon ten (10) days prior written notice to Company.

2.2 <u>Claims Processing</u>. Administrator will arrange for the processing and payment of Company's claims for Covered Prescription Services dispensed to Members in accordance with Members' Benefit Plan.

2.3 <u>Use of Third Parties</u>. Administrator may contract with third parties for claims processing, eligibility, or other duties or obligations Administrator is required to perform under this Agreement.

3. <u>Duties and Obligations of Company</u>.

3.1 <u>Scope of Obligations</u>. Company represents and warrants to Administrator that it has the legal authority to bind each Pharmacy identified on Exhibit A, which will be utilized by Company, either directly or indirectly, whether through one or more Affiliates or otherwise, to provide Covered Prescription Services to Members. Company represents, warrants, and covenants that all of the obligations of Company hereunder shall also be the obligations of such Pharmacy locations. Company agrees that it shall ensure that all Pharmacy locations which will be utilized by Company, either directly or indirectly, whether through one or more Affiliates or otherwise, to provide Covered Prescription Services to Members, shall comply with all of the requirements of this Agreement, addenda, exhibits, Pharmacy Manual and with all applicable laws and regulations relevant to performance under this Agreement and with Company's and Pharmacies' operations in general.

3.2 <u>Participation in Client's Benefit Plan Network</u>. By executing this Agreement, Company is agreeing to participate in the network for Benefit Plans offered or administered by Clients. Company will provide Covered Prescription Services to Members in a safe, diligent and professional manner, in accordance with applicable laws and regulations, this Agreement, Pharmacy Plan Specifications, Pharmacy Manual and any other applicable documents provided or made available by Administrator.

3.3 <u>Dispense Covered Prescription Services</u>.

3.3.1 <u>Member's Eligibility Status</u>. Prior to dispensing Covered Prescription Services, Company shall verify whether the individual receiving such Covered Prescription Services is an eligible Member. Such verifications shall be performed by Company using the POS System or such other process as identified by Administrator. If Company is unable to confirm a Member's eligibility, then Company shall call Administrator's Pharmacy Help Desk or equivalent pharmacy service department. In the event that Company fails to verify Member eligibility, neither Administrator nor Client shall have any obligation to compensate Company for any Covered Prescription Services dispensed to persons who are not eligible Members at the time such drugs are dispensed.

3.3.2 <u>Formulary and Generic Drug</u>. In the provision of Covered Prescription Services, Company and each Pharmacy location shall use its best efforts, in accordance with all applicable state and federal law, to adhere to and promote the Formulary, except to the

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 6 of 63

extent Company is: (i) prohibited by state law, or (ii) otherwise directed by Administrator through the POS System. If (i) neither the Prescription nor applicable state or federal law prohibit substitution of a generic drug equivalent for the Drug Product, and (ii) Company or the Pharmacy location obtains consent from the Member and the Member's physician, when and if required by applicable state or federal law, then Company shall dispense a generic drug equivalent for the Drug Product to the Member.

3.3.3 <u>Cost-Sharing Amounts</u>. Claims Processor shall communicate to Company (via the POS System) the Cost-Sharing Amounts applicable to Covered Prescription Services. Unless otherwise required under this Agreement, Company shall collect the full Cost-Sharing Amounts (if any) that are applicable to Covered Prescription Services being dispensed to Members. Company agrees that it shall not at any time seek reimbursement for Cost-Sharing Amounts from Administrator or any Client. This Section 3.3.3 shall survive expiration or termination of the Agreement. In the event that the Cost-Sharing Amount is greater than the Prescription Drug Compensation, the Client's liability for such Claim shall be $0.00.

3.4 <u>Specific Pharmacy Requirements</u>.

3.4.1 <u>Eligibility</u>. In order to be eligible to participate as a Pharmacy in Administrator's network, Pharmacy shall not have previously been suspended, terminated or excluded from Administrator's network in the past five (5) years for failing to adhere to the terms of this Agreement or any prior or subsequent agreements with Administrator or Administrator's successor. If any Pharmacy location owned or operated by Company was suspended, terminated or excluded from Administrator's network in the past five (5) years, such Pharmacy location shall not be eligible to provide services under this Agreement, unless otherwise permitted by Administrator in its sole and absolute discretion.

3.4.2 <u>Pharmacies</u>. Unless otherwise provided herein, Company shall provide Administrator with the information specified on Exhibit A attached hereto for each Pharmacy utilized by Company to provide Covered Prescription Services. Company shall promptly notify Administrator in writing of any changes (except for additions or deletions of Pharmacies, as noted below in section 3.4.3) to the information set forth on Exhibit A.

3.4.3 <u>Additions or Deletions of Pharmacies</u>. Company shall provide Administrator with at least thirty (30) days written notice prior to adding a new Pharmacy location for use in providing Covered Prescription Services to Members, which new Pharmacy location shall satisfy and comply with all terms and conditions of this Agreement and subject to Administrator's approval. In the event Company acquires or is acquired by, merges with, or otherwise becomes affiliated with another provider of pharmacy services that is already under contract with Administrator to participate in Administrator's pharmacy network, this Agreement and the other agreement will each remain in effect and will continue to apply as they did prior to the acquisition, merger, or affiliation, unless otherwise agreed to in writing by all Parties to such agreements. Company shall promptly notify Administrator immediately of any actual or pending termination or suspension in the operation of any Pharmacy location identified in Exhibit A.

3.4.4 <u>Administrator's and Client's Approval Required.</u> Administrator and Client, at the sole and absolute discretion of each, shall have the right to immediately limit a Pharmacy's participation in Administrator's pharmacy network for such Client's Benefit Plan. Administrator shall notify Company as soon as reasonably practicable of Client's or Administrator's decision to disapprove a Pharmacy for inclusion in the Client's pharmacy network or decision to suspend, revoke or terminate a Pharmacy from participation in the Client's pharmacy network.

3.4.5 <u>Credentialing.</u> Company represents, warrants, and covenants that Company regularly monitors and provides oversight of the operations at each of its Pharmacies and their

pharmacists and maintains a credentialing program for itself and each of its Pharmacies. Company agrees that Administrator and Administrator's Clients have the right to monitor and oversee Company's credentialing program. Accordingly, upon reasonable advance notice, Company will provide Administrator or Administrator's Clients with on-site access to all records maintained by Company relating to the credentialing of each Pharmacy and all pharmacists which provide Covered Prescription Services to Members or, at Administrator's election, Company shall provide Administrator with copies of such records (including then-current credentialing policies and procedures) and/or certifications of Company's compliance with this Section. Notwithstanding the foregoing, Company acknowledges that Administrator or Administrator's Clients may independently verify licenses, insurance coverage, and any debarment or disciplinary action related to all pharmacists who provide Covered Prescription Services to Members, as such verifications may be required of Administrator's Clients by state or federal laws or otherwise. In addition, Company shall submit the information specified in the credentialing requirements document, which was provided to the Company, to Administrator prior to the execution of the Agreement and, thereafter for each applicable license, no less than thirty (30) days prior to the renewal date for such license so that Administrator and Administrator's Clients may determine whether Company has met Administrator's credentialing requirements.

3.4.6   <u>Company's Compliance Program.</u>  Company represents, warrants, and covenants that Company does and shall maintain a compliance monitoring program pursuant to which the Company, on no less frequently than an annual basis, verifies the licenses, insurance coverage, and any disciplinary actions (including but not limited to any debarment, exclusion, ineligibility, or conviction described in Section 3.4.7 of this Agreement) related to all facilities and personnel utilized by Company to provide Covered Prescription Services to Members. Company agrees to provide updated information relating to such matters to Administrator upon request or within thirty (30) days following a change in any such information (including the addition of a new Pharmacy location) and, in any event, no less frequently than annually.

3.4.7   <u>Debarment.</u>  Company represents, warrants, and covenants that neither the Company nor, to the best of Company's knowledge, any Pharmacy (including pharmacies currently in the network and new pharmacies included in the network after execution of this Agreement) location, pharmacist, subcontractor, or other personnel furnishing (or which will furnish) Covered Prescription Services to Members have been or will be (i) listed as debarred, excluded, or otherwise ineligible for participation in federal health care programs or (ii) convicted of a criminal felony. If at any time Company becomes aware of any violation of this representation and warranty, Company shall notify Administrator immediately in writing and shall prevent such personnel or Pharmacy location from providing Covered Prescription Services to Members. If Company itself becomes debarred, excluded or otherwise ineligible or if Company has not taken the actions required of it in the preceding sentence, the Administrator may immediately terminate this Agreement upon written notice to Company without liability to Administrator or Administrator's Clients or take such other corrective or remedial actions as Administrator reasonably believes is appropriate.

3.4.8   <u>Signature Log.</u>  Company agrees to maintain a signature log at each Pharmacy. As a condition to reimbursement under this Agreement, each signature log will contain the signature of the Member or their authorized agent confirming receipt of the prescription, the Benefit Plan name, Covered Prescription Service number, the date of receipt and any Administrator-required certifications. If Company desires to use an alternative method for documentation of receipt of Covered Prescription Services, Company will provide sufficient information to Administrator for Administrator to determine whether such method will meet Administrator's requirements and Administrator in its sole discretion will provide its approval for use of the alternative method in writing.

GX234.007

DOJ_18CR368-0064863

3.5     Drug Utilization Review.   At all times during the term of this Agreement, Company shall cooperate with, support and remain in compliance with the utilization review, medication therapy and quality assurance programs of Administrator or its Clients.

3.6     Pharmacist Independence.   Company and Administrator acknowledge that the dispensing pharmacist must use independent professional judgment when dispensing Covered Prescription Services and may refuse to dispense any Covered Prescription Service based on the pharmacist's professional judgment.

3.7     Non-Discrimination.   Company shall provide services to Members in the same manner and in accordance with the same standards as Company provides services to its other customers. Company shall not discriminate against any Member in its provision of Covered Prescription Services for any reason, including, but not limited to, race, sex, color, religion, national origin, age, gender, marital status, physical or mental handicap, health status, health insurance coverage, sexual preference or status as a Member.

3.8     Member Claims and Grievances.   Company shall promptly notify Administrator of receipt of any claims, including professional liability claims, filed or asserted by a Member against Company, subcontractor, agent and/or any pharmacist employed or contracted by Company.   Company shall provide as soon as possible information regarding the claim as reasonably requested by Administrator and/or Client.   In addition, Company shall cooperate with Members, Administrator and/or applicable Client in identifying, processing and resolving all Member complaints, grievances and appeals.

3.9     No Unrequested Prescription Transfers.   Company shall not transfer any Prescriptions to another company except upon the express request of a Member, Administrator, or applicable Client.

3.10    No Mail Fulfillment or Solicitation.   Company shall not solicit a Member for mail delivery or deliver any Covered Prescription Services to a Member by mail, except upon the advance written approval of Administrator, which approval may be refused in Administrator's sole discretion.

3.11    No Solicitation to Transfer Prescriptions.   To the fullest extent permitted by applicable laws and regulations, Company shall not solicit any Member to transfer any Prescriptions to any other pharmacy, irrespective of pharmacy type and irrespective of whether such pharmacy is a Company Affiliate.   Solicitation shall mean conduct engaged in by an officer, agent, or employee of Company or any Pharmacy, their respective assignees or successors, or any other person during the term of the Agreement which may be reasonably interpreted as designed to persuade a Member to transfer a Prescription to any pharmacy other than the Pharmacy at which the Prescription is located.   This Section shall not apply if the transfer is due to an addition of a new Pharmacy or the termination or closing of a Pharmacy currently providing services to Members.

3.12    Medicare Supplier Number.   Administrator encourages Company to obtain and maintain for each Pharmacy a Medicare Part B supplier number pursuant to 42 CFR § 424.57.   Company agrees to inform Administrator of the Medicare Part B supplier number assigned to those Pharmacies which have obtained such supplier numbers from CMS for recordkeeping purposes and to identify those Pharmacies as having Medicare Part B supplier numbers in the pharmacy network directories maintained by or on behalf of Administrator's Clients.

3.13    Compliance with Applicable Laws.

      3.13.1   Licenses and Permits.   Company shall obtain and maintain all federal, state and local approvals, licenses, accreditation, permits and certifications (collectively, "Licenses") required to operate as a pharmacy at each location identified on Exhibit A.   Company

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 2:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 9 of 63

will notify Administrator within two (2) days of any suspension, revocation, condition, limitation, qualification or other restriction on any of its Licenses.

3.13.2 <u>Pharmacist and Employee Compliance</u>. Company shall ensure that all pharmacists who are employed or contracted by Company and who dispense Covered Prescription Services to Members are properly credentialed, accredited, licensed to practice and are insured in accordance with this Agreement. Company shall also ensure that all its employees and contractors, including pharmacists, perform their duties in accordance with the applicable standards of professional ethics and practice. Company will notify Administrator within two (2) days of any suspension, revocation, condition, limitation, qualification or other restriction on any pharmacist-in-charge's license.

3.13.3 <u>Compliance with Regulatory Laws Applicable to Administrator's Clients.</u> Company acknowledges and understands that Administrator's Clients may be licensed, authorized under, or subject to, state and federal laws or regulations. Company shall familiarize and train itself and each Pharmacy location regarding any state or federal regulatory laws applicable to the provision of Covered Prescription Services to Members and shall abide by all such applicable laws. Without limiting the generality of the foregoing, if a provision is required to be included in this Agreement by laws or regulations or related guidance applicable to any one or more Clients whose Members are being serviced by the Company, then Administrator may unilaterally amend this Agreement upon no less than thirty (30) days prior written notice to Company to include such provision within this Agreement without any further action by the parties.

3.13.4 <u>General Compliance with Applicable Laws and Regulations</u>. Company shall be responsible for determining and complying with all laws and regulations applicable to the furnishing of the Covered Prescription Services and its performance of this Agreement. If a party's performance as required under this Agreement is prohibited by or in conflict with any applicable laws and regulations, then the party whose performance is owed or required shall be required to perform, but only to the extent permitted by such applicable laws and regulations. Any provisions now or hereafter required to be included in this Agreement by applicable laws and regulations or by any other Government Authority of competent jurisdiction shall be binding upon and enforceable against the parties hereto and be deemed incorporated herein, irrespective of whether or not such laws and regulations are expressly provided for in this Agreement.

3.13.5 <u>Reports</u>. Company shall provide Administrator with any report(s), data or other information which Administrator may reasonably request in a format, via a medium, and at a frequency reasonably determined by Administrator or Administrator's Clients or as otherwise required by applicable laws and regulations. Company shall be responsible for the integrity and accuracy of all data furnished or transmitted by Company to Administrator or Claims Processor, and shall correct all errors in such data within ten (10) business days of being made aware thereof. To the extent such reports, data or other information is required for compliance with applicable laws and regulations, including but not limited to Medicare Laws and Regulations, Company shall certify as to the accuracy and validity of such report, data or other information prior to submission to Administrator. If Company fails to timely comply with providing Administrator with any reports, data or other information required by applicable laws or by any Government Authority, Company shall reimburse Administrator for any penalty, fine, etc. incurred by Administrator or Administrator's Clients.

3.14. <u>Delegation</u>. Company shall not delegate any service, activity or other obligation required of it under the Agreement, as amended, (including the provision of Covered Prescription Services by Company Pharmacies to Plan Members), to an Affiliate or third party, without the prior written consent of Administrator, and when necessary, all applicable Clients, as determined in the sole and absolute discretion of each of them, as may be communicated by Administrator. No consent may be obtained until Administrator has received a fully executed copy of each

agreement between Company and a delegatee that relates to the proposed delegation. Any such agreement must provide that it will terminate (i) completely if Administrator revokes an agreement on the delegation or (ii) as to an affected Client if the Client revokes the delegation. Any such delegation, if consented to (an "Approved Delegation"), shall be performed by the delegate in accordance with the Clients' respective contractual obligations and in accordance with Company's contractual obligations hereunder. Company agrees that any agreements of Company or any Company Pharmacy with respect to an Approved Delegation shall be in writing, signed by the parties to be bound thereby and in compliance with all applicable laws and regulations. In the event that a delegate of Company or a Company Pharmacy fails or is unable (for any reason whatsoever) to perform in a satisfactory manner any services, activities or other obligations which have been sub-delegated pursuant to an Approved Delegation, then Administrator or any affected Client shall have the right to suspend, revoke or terminate such Approved Delegation effective upon the date set forth in a written notice furnished to Company and Company shall continue to be responsible to perform such duties and obligations of the Agreement. Additionally, an affected Client shall have the right to institute corrective action plans or seek other remedies or curative measures respecting the unsatisfactory Approved Delegation consistent with applicable laws and regulations. Any attempted sub-delegation by Company or a Company Pharmacy which is not an Approved Delegation shall be null and void and of no force or effect.

3.15. <u>Compliance with Pharmacy Manual</u>. Company shall comply with the Pharmacy Manual. Any of the rules, policies, administrative procedures and guidelines adopted by Administrator may be distributed in the form of a Pharmacy Manual or in other communications, including, but not limited to a website identified by Administrator. The Pharmacy Manual may change from time to time. Any such changes shall be binding on Company.

4. <u>Compensation</u>.

4.1 <u>Prescription Drug Compensation Amounts</u>. Administrator acting on behalf of such Clients, will process the Prescription Drug Compensation owed to Company for each Covered Prescription Service dispensed to Members based on the rates and under the terms and conditions of the applicable attached Compensation Exhibits. Administrator may modify Prescription Drug Compensation upon sixty (60) days prior notice to Company. Company understands and agrees that Administrator is not responsible for the funding of Claims, is not a guarantor or insurer of the funding for Claims payment, and is not financially responsible or liable in any respect for the payment of Claims.

4.2 <u>Claims Submission</u>.

4.2.1 <u>Covered Prescription Services</u>. Company shall and shall ensure that each Pharmacy (i) verify in real time, through the POS System, whether the original or refill Prescription provided by a Member is for Covered Prescription Services, and (ii) follow any instructions, unless prohibited by state or federal law, communicated by Administrator to Company, including, but not limited to, what, if any, Cost-Sharing Amounts the Company shall collect from the Member.

4.2.2 <u>Claims Submission</u>. In order to receive payment, each Pharmacy must submit a Clean Claim to Claims Processor for each Covered Prescription Service dispensed via the POS system. Company is responsible for the payment of any and all transaction charges or fees associated with the transmission of claims or claim information to Administrator. A Clean Claim must be submitted to Claims Processor within thirty (30) days after the date of service. If any Claim is rejected or if additional information is required for further processing by Administrator or its Claims Processor, Company must resubmit the Claim within sixty (60) days of Company's receipt of such rejected Claim provided that the resubmitted Claim may only be processed and paid if it is a Clean Claim and subject to receipt of payment from the applicable Client. Unless otherwise agreed to in writing by the Administrator, Claims submitted after the time periods set forth in this Section 4.2.2 will not be eligible for payment.

4.2.3 <u>Prohibition on Repackaging and Reimportation</u>. Company shall not submit, and Administrator is not responsible for payment for, (i) claims for Covered Prescription Services that use a National Drug Code ("NDC") for a repackaged drug or (ii) claims for Covered Prescription Services filled using drugs imported or reimported into the United States.

4.3 <u>Claims Processor Charges</u>. Company shall be responsible for paying each of the separate amounts charged by Claims Processor if and when applicable: (i) a per Claim communications charge for on-line electronic claims processing through the POS System; (ii) surcharges for cancelled or reversed Claims performed by Administrator; (iii) a charge if Company requests an evidence of benefit report in any format (electronic or paper); (iv) a charge if Company requests copies of endorsed checks(s); and (v) a per Claim charge for processing Claims that were submitted in a non-NCPDP format (collectively items (i) through (v) shall be referred to as the "Claims Processor Charges"). Each of the Claims Processor Charges is subject to change by Claims Processor. Administrator shall notify Company in writing of any change to the applicable Claims Processor Charges no less than fifteen (15) days prior to implementation of such change. Company agrees that any applicable Claims Processor Charges may be deducted and recouped from any Prescription Drug Compensation due to Company or Pharmacy hereunder.

4.4 <u>Adjustments</u>. At Administrator's option, Administrator may obtain reimbursement for overpayments made to Company either by recouping such amounts against future payments due or by requiring reimbursement of such overpayments from Company, which Company will pay to Administrator within fifteen (15) days of notice thereof.

4.5 <u>Payment in Full</u>. The Prescription Drug Compensation together with any Cost-Sharing Amounts for which Member is responsible under the Benefit Plan is payment in full for any Covered Prescription Service provided by Company to a Member. Company will not seek to recover, and will not accept any payment from Member, Administrator, Client, or any other person or entity, in excess of payment in full as provided in this Section 4.5, regardless of whether such amount is less than Pharmacy's Usual and Customary Charge.

4.6 <u>Hold Harmless</u>. Company agrees that, with the exception of (i) Cost-Sharing Amounts, (ii) reasonable returned check costs, and (iii) reasonable collection costs directly related to subparts (i) or (ii), Company shall not in any event, including, without limitation, non-payment by Administrator or a Client, insolvency of Administrator or a Client, or breach of this Agreement, bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, hold responsible, or otherwise have any recourse against any Member, or any other person (other than the applicable Client) acting on behalf of any Member, or attempt to do any of the foregoing for any Covered Prescription Services provided to any Member pursuant to the Agreement. This Section shall survive termination of the Agreement.

4.7 <u>Changes to *AWP/AWP</u>

4.7.1 Company acknowledges that Administrator shall be entitled to rely on Medi-Span or the publisher of any other nationally recognized Pricing Source selected by Administrator to determine AWP and *AWP for purposes of establishing the pricing under this Agreement. Company further acknowledges that Administrator does not establish AWP, and Administrator shall have no liability to Company arising from the use of the Medi-Span Pricing Guide or information received from any other Pricing Source.

4.7.2 With respect to the term "*Average Wholesale Price" or "*AWP" as used in any exhibit or rate sheet that establishes compensation to Company or a Pharmacy, such "*Average Wholesale Price" or "*AWP" is derived by Administrator's adjusting AWP as follows to account for the September 26, 2009 rollback of AWP implemented by Medi-Span ("AWP Rollback"):

(a)     Administrator shall adjust the Medi-Span AWP Pricing Information for each of the Affected NDCs to reflect the markup factors utilized by Medi-Span immediately prior to the AWP Rollback. "Affected NDCs" shall mean all NDCs with adjusted markup factors by the Pricing Source pursuant to the AWP Rollback.

(b)     New NDCs with markup factors used by the Pricing Source shall be adjusted by Administrator to reflect a markup factor of 1.25. "New NDCs" shall mean those NDCs first issued and listed on the Medi-Span AWP Pricing Information after the effective date of the AWP Rollback.

5.     <u>Term and Termination</u>.

5.1     <u>Term</u>.  The term of this Agreement shall commence on the Effective Date and shall continue thereafter for a period of one (1) year, unless earlier terminated pursuant to the terms of this Agreement.  At the conclusion of the initial term of this Agreement, the term of the Agreement shall automatically extend for additional one (1) year periods, unless (i) earlier terminated pursuant to the provisions of this Section 5 or as permitted elsewhere in this Agreement, or (ii) either party is Insolvent, and in that event, the Term may only be extended in writing by the party that is not Insolvent. The term Insolvent shall mean "Insolvent" as defined in this Section 5.

5.2     <u>Termination</u>.

5.2.1     <u>Termination by Either Party Without Cause</u>.  The parties agree that this Agreement may be terminated, without cause and for a party's convenience: (i) upon forty-five (45) days (or if applicable state law requires a longer advance notice period, such longer period) advance written notice to Company if this Agreement is terminated by Administrator; or (ii) upon one hundred eighty (180) days advance written notice to Administrator if this Agreement is terminated by Company.

5.2.2     <u>Termination by Either Party For Cause</u>.  Except as otherwise provided in Section 5.2.3 below, Company or Administrator may terminate this Agreement for cause, including without limitation for a material breach, upon no less than forty-five (45) days (or if applicable state law requires a longer advance notice period, such longer period) prior written notice to the other party.

5.2.3     <u>Immediate Termination</u>.     Administrator may terminate, suspend or revoke this Agreement immediately upon written notice to Company if (i) Company's or pharmacist's license or permit necessary to perform services under this Agreement is suspended or revoked, (ii) Company or pharmacist violates any federal or state law regarding the compounding, sale, dispensation, storage, packaging or use of any Drug Product, device, products or supplies dispensed to Members, (iii) Administrator reasonably believes that Company or pharmacist is or has been engaged in fraudulent activity in violation of state or federal law; (iv) Company or pharmacist provides substandard, inferior, contaminated, or adulterated drugs to any Member; (v) Company engages in mail fulfillment in violation of Section 3.10 without Administrator's written authorization; (vi) Administrator determines in its sole and absolute discretion that Company or pharmacist has violated Administrator's policies and procedures, including without limitation those included in the Pharmacy Manual in the provision of Covered Prescription Services; (vii) a Client or Governmental Authority directs Administrator to terminate its relationship with Company;  (viii) Company is otherwise non-compliant with the Pharmacy Manual; (ix) Company violates any law or regulation relevant to performance under this Agreement and with the Company's operations in general; (x) Company exceeds the scope of any license to use Administrator's or any Client's intellectual property; or (xi) Company misuses Administrator's or any Client's trade secrets.

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 13 of 63

5.2.4 <u>Termination of Particular Pharmacy</u>.  Administrator and each Client shall be permitted without cause to suspend, revoke, or terminate any Pharmacy location from participating in the pharmacy network selected by the Client for its Benefit Plans. Administrator, on its own initiative, or at the direction of a Client or Government Authority may require that any one or more Pharmacies discontinue providing Covered Prescription Services to a particular Client or under the Agreement in its entirety, subject to any prior notice as may be required under applicable laws and regulations. The termination of this Agreement with respect to less than all Pharmacies by Administrator shall not affect the performance of this Agreement by Company or the other non-terminated Pharmacies.  Also the termination of this Agreement as to any particular Pharmacy shall not prevent the subsequent termination of this Agreement as to any other Pharmacy or of this Agreement in its entirety.

5.2.5 <u>Termination If Either Party is Insolvent</u>.  Unless agreed to by the other party, this Agreement shall automatically terminate if a party is Insolvent.  Insolvent shall mean, with respect to Company or Administrator, that such party: (A) is unable to pay its debts generally as they become due; (B) makes a voluntary assignment for the benefit of creditors; (C) is declared insolvent in any proceeding; (D) commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself, any of its property, assets or debts under any bankruptcy, insolvency or other similar laws now or hereafter in effect or petitions or applies to any tribunal for the appointment of a receiver, liquidator, custodian or trustee for such party under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, liquidation, or dissolution law of any jurisdiction now or hereafter in effect; (E) is named as a debtor or party in such petition, application, case or proceeding as described herein and it indicates its approval thereof, consents thereto, acquiesces therein or acts in furtherance thereof, or if such petition, application, case or proceeding is not dismissed or stayed for a period of sixty (60) days after it is commenced, or is the subject of any order appointing any such receiver, liquidator, custodian or trustee or approving the petition in any such case or proceeding; (F) ceases conducting substantially all of its operations or (G) the sum of such party's debts (including contingent obligations) exceeds the fair market value of such party's assets, exclusive of any property transferred, concealed, or removed with the intent to hinder, delay or defraud such party's creditors.

5.2.6 <u>Termination and Appeal Process</u>.  Except for non-renewal of the Agreement at the end of a term thereof, Pharmacies that are terminated in accordance with Section 5 of the Agreement will be provided a written notice describing the reason[s] for such termination and an opportunity to request a hearing to appeal such termination.

5.3 <u>Effect of Termination</u>.  Termination of the Agreement for any reason pursuant to Section 5.2 shall not affect the rights and obligations of the parties arising out of any transactions occurring prior to the effective date of such termination.

5.3.1 <u>Compensation After Termination</u>.  After the effective date of termination of this Agreement in its entirety, Administrator shall make an accounting of all monies due hereunder to Company, Administrator, or any Client.  Notwithstanding the foregoing, if Administrator reasonably believes that Company's cooperation is essential to preparation of the accounting and Company's cooperation is not reasonably satisfactory to Administrator, then Administrator shall be excused from this obligation.

5.3.2 <u>Notification of Members</u>.  Company acknowledges the right of Administrator's Clients to inform Client's Members of Company's termination, suspension, or revocation and agrees to cooperate with Administrator and/or Administrator's Clients.

6.   Indemnification.

6.1   Indemnification by Company.  Company shall be solely responsible for and agrees to indemnify, defend and hold harmless Administrator, Clients and their respective Affiliates, shareholders, directors, officers, employees and agents from and against any and all claims, causes of action, obligations, liability, judgments, liens, debts, damages (of every kind and nature), losses, costs, fees and expenses (including reasonable attorneys' fees) (collectively, "Losses") to the extent and proportion that such Losses relate to or arise from: (i) Company's or its officers, directors, partners, members, employees or agents breach or default of any term, condition, representation, warranty, promise or covenant in this Agreement, or (ii) Company's act, omission or performance of its obligations under this Agreement including, but not limited to, the sale, compounding, packaging, storage, dispensing, administration, manufacturing or use of Covered Prescription Services dispensed and/or administered to Members pursuant to this Agreement or failure to timely provide required regulatory reports, data or other information to Administrator.  This provision shall survive the expiration or termination of this Agreement.

6.2   Indemnification by Administrator.  Administrator shall be solely responsible for and agrees to indemnify, defend and hold harmless Company and its Affiliates, Pharmacies, shareholders, directors, officers, employees and agents from and against any and all Losses to the extent and proportion that such Losses relate to or arise from the breach or default of any term, condition, representation, warranty or covenant in this Agreement.  Notwithstanding anything else in this Agreement, in no event shall Administrator be liable to Company, its officers, directors, employees, assigns or Affiliates for any incidental, consequential, punitive or special damages, damages for lost profits, lost data or lost business, cost for procurement of substitute goods, technology or services, or any other indirect damages, even if Administrator has been advised as to the possibility of such damages.

6.3   Notice.  Each party shall provide prompt written notice to the other party upon learning of any occurrence or event that may result in an obligation of the other party under this Section 6, provided that the omission by a party to give notice of a claim as provided in this Section 6.3 shall not relieve the other party of its obligations under this Section 6 except to the extent that (i) the omission results in a failure of actual notice to the other party and (ii) the other party suffers damages as a result of the failure to give notice of the claim.  The other party shall have the right to maintain control of the defense and all negotiations for settlement of any claims or demands under this Section 6; provided, however, the other party shall not settle any claims or demands without the prior written consent of the party giving notice (which shall not be unreasonably withheld).  The party giving notice shall have the right to monitor and participate in any resolution or litigation of any such claim at its own expense, and, if requested, the party giving notice shall provide to the other party all reasonable documents and assistance relating to such claim.  Notwithstanding the foregoing, neither party shall be required to take any action under this Section 6.3 (except for the initial giving of notice) that materially prejudices its rights.

7.   Insurance.

7.1   Professional and General Liability Insurance.  Company shall maintain  professional and general liability insurance in the minimum amounts of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate (or such other amounts as Administrator may agree in writing) to insure against any claim for damages arising in connection with Company's provision of services pursuant to this Agreement.  All insurance will be on an occurrence basis.  Upon request, Company shall provide Administrator with evidence of such insurance coverage.  Company will notify Administrator as soon as possible, but in no event later than fifteen (15) days, after any restriction on or denial, cancellation, modification or termination of Company's general or professional liability insurance.

7.2   Self-Insurance.  Company may self-insure for professional and general liability insurance upon approval by Administrator, in its sole and absolute discretion.  Company shall provide financial statements for the most recently completed fiscal year and any interim financial statements for the current fiscal year, a statement verified by an independent auditor or actuary

that the reserves maintained by Company for its self-insurance is sufficient and adequate and any other information requested by Administrator to determine that Company has sufficient assets or reserves to cover any foreseeable risks or losses which may arise from Company's activities (collectively the "Required Information"). All Required Information provided by Company must be prepared in accordance with generally accepted accounting principles, unless otherwise agreed to in writing by Administrator. If Administrator agrees in its sole and absolute discretion to permit Company to self insure, Administrator shall provide a letter of authorization to Company ("Authorization Letter"). Administrator's authorization shall be subject to a material condition that there shall be no material adverse change to Company and that Company shall abide by any and all terms and conditions in the Authorization Letter. Company shall notify Administrator within ten (10) days of an occurrence of a material adverse change. As used in this paragraph, material adverse change shall include, without limitation: (i) any material adverse change in the business, results of operations, assets, liabilities, or financial condition of Company, as determined from the perspective of a reasonable person in Administrator's position; (ii) any decrease in current assets or increase in current liabilities of Company equal to or greater than five percent from the information relied upon by Administrator in agreeing to Company's decision to self insure; (iii) any decrease in total assets or increase in total liabilities of Company equal to or greater than ten percent from the information relied upon by Administrator in agreeing to Company's decision to self insure; (iv) Company being Insolvent as defined in Paragraph 5; or (v) the entry of any judgment or an aggregate of judgments against Company in excess of $100,000. Under no circumstances shall Administrator's authorization last for more than one year from the date of the Authorization Letter. If Company desires to renew its self insurance authorization, not later than sixty (60) days prior to expiration of current authorization, Company shall provide to Administrator the Required Information in this section 7.2. No such renewal shall be effective without a subsequent Authorization Letter.

Administrator shall have the right to terminate this Agreement upon written notice to Company following the occurrence of any material adverse change. In addition to maintaining its self-insurance, Company shall assure that all pharmacists and other health care professionals employed by or under contract with Company to render Covered Prescription Services to Members procure and maintain adequate professional liability and malpractice insurance, unless they are also covered by Company's self-insurance.

8. Medical Records and Confidential Information.

8.1 Medical Records. For the purposes of this Section, "PHI" shall have the meaning ascribed to it at 45 CFR §164.501 as such section from time to time may be amended, modified, revised or replaced or interpreted by any Government Authority or court. Company agrees to comply with all laws and regulations issued by any Government Authority pertaining to the confidentiality, privacy, data security, data accuracy and completeness and/or transmission of personal, health, enrollment, financial and consumer information and/or medical records (including prescription records) of actual or prospective Members, including, but not limited, to the confidentiality and security provisions at 42 CFR § 423.136. Company understands and agrees that any PHI or other personal information accessed by or disclosed to it or created by it during the course of performing this Agreement must be maintained in strictest confidence and safeguarded from disclosures which are unauthorized and impermissible under applicable laws and regulations. Company agrees not to disclose (except to Administrator, Client, the applicable Member), use or exploit any PHI, other personal information or Client Data for any purpose or under any circumstance, except (i) as absolutely necessary to perform its obligations under this Agreement and (ii) in compliance with all laws and regulations regarding the confidentiality, privacy, data security and/or transmission of such information including, but not limited to, HIPAA and the GLB. Company further agrees to require all of its personnel and to contractually require all of its contractors to fully abide by the provisions of this Section 8.1

8.2 Proprietary and Confidential Information. Company acknowledges that as a result of this Agreement, Company and its employees and agents may have access to Administrator's Proprietary Information and Client's Proprietary Information. Company shall, and shall ensure that its employees and agents, hold such confidential and proprietary information in confidence

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 16 of 63

and not disclose such information to any person or entity, including an Affiliate, parent, or subsidiary of Company, without the prior written consent of Administrator or Client; provided, however, that the foregoing shall not apply to information which (i) is generally available to the public, (ii) becomes available on a non-confidential basis from a source other than Company or its affiliates or agents, which source was not itself bound by a confidentiality agreement, or (iii) is required to be disclosed by law or pursuant to court order.  Company acknowledges and agrees that Administrator and/or Client shall be entitled to injunctive relief to prevent a breach or threatened breach of the provisions of this Section 8.2, in addition to all remedies that may be available.   Administrator's and Client's Proprietary Information shall not be (a) used by Company or its personnel or contractors other than for the furtherance of providing Covered Prescription Services or performing this Agreement; (b) sold, assigned, leased, or disclosed to third parties by the Company without Administrator's or Client's written consent; or (c) commercially exploited by or on behalf of Company or its employees, agents, or contractors. Upon the expiration or other termination of this Agreement, for any reason whatsoever, Company shall immediately return to Administrator or destroy with written certification of the same any and all of Administrator's Proprietary Information and any and all of Client's Proprietary Information in Company's possession, including all copies, duplications, and replicas thereof.  This Section 8.2 shall survive expiration or termination of the Agreement.

8.3     Use of Names and Marks.  For the purposes of this Agreement, "Marks" shall mean the name(s), logo(s), and other proprietary symbols and phrases belonging to or licensed by an entity.  Company agrees that Administrator can use Company's name in a provider directory and may use the Company Marks currently existing or later established, and the name, address, and telephone number of Company in any promotional or advertising brochures, marketing information, or benefit information packages, and in media announcements, press releases, and other public announcements in connection with the services available to Members or in connection with this Agreement.  Company may not list or reference Administrator or Clients or use any Marks of Administrator or Client currently existing or later established in any promotional or advertising brochures, media announcements, or otherwise publicly identify Administrator or Clients or refer to the existence or terms of this Agreement in any public announcement, press release, promotional or other material without the prior written approval of Administrator or Clients as appropriate.

9.     Records and Audits.

9.1     Records and Data.  Company shall keep and maintain in accordance with prudent business practices, accurate, complete and timely books, records and accounts of all transactions (including medical records and personal information), data, files (including prescription files), drug purchase invoices, signature logs and documentation (collectively, "Records") relating to the provision of Covered Prescription Services to Members,   in accordance with applicable state and federal law, pharmacy board requirements, industry and Client standards, and this Agreement, including the Pharmacy Manual.  Company shall retain such Records for a period of up to five (5) years after the date the Covered Prescription Service is dispensed or for the period required by applicable law or as required by an ongoing audit or investigation by Administrator, Client or Government Authority, whichever is longer.  Company shall maintain reasonable safeguards against the destruction, loss, alteration, or unauthorized disclosure of data in possession, under the control of Company or its personnel or contractors, including, but not limited to Administrator's and Client's Proprietary Information and PHI.

9.2     Access to Records and Audits.  During the term of the Agreement and for a period of five (5) years thereafter, Administrator or its designee shall have the right, upon reasonable notice and at reasonable times, to access, inspect, review, audit (including on-site and desktop audits) and make copies of the Records ("Administrator Audit").  In addition to the foregoing, Company shall honor and accommodate all audit requests by Government Authority ("Governmental Audit"). Company shall pay all costs incurred by Company in connection with its provision of information for purposes of a Governmental Audit.

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 17 of 63

9.3     Payment for Audit.  Administrator shall pay for prescription reproduction/copying and applicable travel costs associated with an Administrator Audit or Client or an external auditor who is conducting the audit on Administrator's or Client's behalf.  Company shall pay all reasonable out-of-pocket costs associated with its providing information necessary for any Governmental Audit and Administrator Audit.  In the event that an audit discovers any error by Company or its Pharmacies or discrepancy in the amount to be charged or paid to Administrator, Company shall reimburse Administrator the full amount of any amounts charged to Administrator in error.  At Administrator's option, Administrator may obtain reimbursement for such discovered amounts either by recouping against future payments due Company or by requiring reimbursement of such overpayments from Company, which Company will pay to Administrator within fifteen (15) days notice thereof. Administrator shall reimburse Company the full amount of any amounts incurred and paid by Company to Administrator in error, as applicable.  In the event that any error or discrepancy in the amount charged to Administrator is material, as determined by Administrator, in its sole and absolute discretion, Company shall pay Administrator all reasonable costs incurred in connection with the audit, including any out-of-pocket costs and expenses incurred by Administrator to uncover and correct the error or discrepancy. This Section 9 shall survive expiration or termination of the Agreement and if Company or its Pharmacies cease conducting business.

10.     Dispute Resolution.

10.1    Other than with respect to issues giving rise to immediate termination under Section 5.2.3 hereof or non-renewal under Section 5 hereof, the parties will work in good faith as set forth in Section 10.2 to resolve any and all issues and/or disputes between them (hereinafter referred to as a "Dispute") including, but not limited to all questions of arbitrability, the existence, validity, scope, interpretation, or termination of the Agreement or any term thereof prior to the inception of any litigation or arbitration.

10.2    In the event a Dispute arises, the party asserting the Dispute shall provide written notice to the other party identifying the nature and scope of the Dispute to the other party sufficient for a reasonable person to be apprised thereof.  If the parties are unable to resolve the Dispute within thirty days after such notice is provided, then either party may request in writing a meeting or telephone conference to resolve the Dispute.  At any such meeting or telephone conference, both parties shall have present its President, Vice President, Chief Financial Officer or Chief Operating Officer.   Either party may commence a Dispute Resolution in accordance with the rest of this Section 10 (or litigation if both parties waive arbitration) only if a representative of the party seeking to commence such litigation or arbitration certifies in writing that one of  the following is true: (i) the Dispute was not resolved after faithfully following the procedures set forth above in this Section 10.2 ; or (ii) the other Party to the dispute did not fully comply with the procedures set forth  above in this Section 10.2.

10.3    If the party asserting the Dispute has satisfied the requirements of Section 10.2 hereof, it shall thereafter be submitted to binding arbitration before a panel of three arbitrators in accordance with the Commercial Dispute Procedures of the American Arbitration Association, as they may be amended from time to time (see http://www.adr.org).  All arbitrators must have at least ten (10) years of legal experience in the area of healthcare law.

10.4    Any arbitration proceeding under this Agreement shall be conducted in Los Angeles County or Orange County, California.  Unless otherwise agreed to in writing by the parties, the party wishing to pursue the Dispute must initiate the arbitration within one year after the date on which notice of the Dispute was given or shall be deemed to have waived its right to pursue the Dispute in any forum.

10.5    The arbitrators may construe or interpret, but shall not vary or ignore the terms of this Agreement and shall be bound by controlling law.  The arbitrator(s) will decide if any inconsistency exists between the rules of the applicable arbitral forum and the arbitration provisions contained herein.  If such inconsistency exists, the arbitration provisions contained herein will control and supersede such rules.

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 18 of 63

10.6 Each party hereby consents to a documentary hearing for all arbitration claims, by submitting the dispute to the arbitrator(s) by written briefs and affidavits, along with relevant documents. However, arbitration claims will be submitted by way of an oral hearing, if any party requests an oral hearing within forty (40) days after service of the claim, and that party remits the appropriate deposit for fees and arbitrator compensation within ten (10) days of making the request.

10.7 Discovery permitted in any arbitration proceeding commenced hereunder is limited as follows. No later than forty (40) days after the filing and service of a claim for arbitration, the parties will exchange detailed statements setting forth the facts supporting the claim(s) and all defenses to be raised during the arbitration, and a list of all exhibits and witnesses. In the event any party requests an oral hearing, no later than twenty-one (21) days prior to the oral hearing, the parties will exchange a final list of all exhibits and all witnesses, including any designation of any expert witness(es) together with a summary of their testimony; a copy of all documents to be introduced at the hearing. Notwithstanding the foregoing, in the event of the designation of any expert witness(es), the following will occur: (a) all information and documents relied upon by the expert witness(es) will be delivered to the opposing party; (b) the opposing party will be permitted to depose the expert witness(es); (c) the opposing party will be permitted to designate rebuttal expert witness(es); and (d) the arbitration hearing will be continued to the earliest possible date that enables the foregoing limited discovery to be accomplished.

10.8 The arbitrators will have no authority to award punitive, exemplary, indirect, special damages or any other damages not measured by the prevailing party's actual damages and may not, in any event, make any ruling, finding, or award that does not conform to the terms and conditions of the Agreement.

10.9 The parties expressly intend that any dispute relating to the business relationship between them be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with the Dispute. The parties agree that any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to their intent and would require immediate judicial review of such ruling.

10.10 If the Dispute pertains to a matter which is generally administered by certain Administrator procedures, such as a quality improvement plan, the policies and procedures set forth in that plan must be fully exhausted by Company before Company may invoke any right to arbitration under this Section 10.

10.11 The decision of the arbitrator(s) on the points in Dispute will be binding, and judgment on the award may be entered in any court having jurisdiction thereof. The parties acknowledge that because this Agreement affects interstate commerce the Federal Arbitration Act applies.

10.12 In the event that any portion of this Article or any part of this Agreement is deemed to be unlawful, invalid, or unenforceable, such unlawfulness, invalidity, or unenforceability shall not serve to invalidate any other part of this Section or this Agreement. IN THE EVENT ANY COURT DETERMINES THAT THIS ARBITRATION PROCEEDING IS NOT BINDING OR OTHERWISE ALLOWS LITIGATION INVOLVING A DISPUTE TO PROCEED, THE PARTIES HEREBY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN, OR WITH RESPECT TO, SUCH LITIGATION. SUCH LITIGATION WOULD INSTEAD PROCEED WITH THE JUDGE AS THE FINDER OF FACT.

10.13 This Article 10 shall survive any termination of this Agreement.

11. <u>General Terms</u>.

11.1 <u>Entire Agreement</u>. This Agreement (including the Pharmacy Manual, Pharmacy Plan Specifications, the Commercial Addendum, the Medicaid Addendum, the Medicare Part D

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 19 of 63

Addendum, and all other addenda, exhibits and schedules attached hereto) constitutes the final entire agreement between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements, representations or understandings between the parties with respect to the subject matter hereof. The Pharmacy Manual and all such addenda, exhibits and schedules, as the same may be amended from time to time, are incorporated herein by reference and made a part hereof.

11.2 <u>Amendment</u>. Except as otherwise provided elsewhere in the Agreement, this Agreement (including the addenda, exhibits and schedules attached hereto) may only be amended as follows:

(a) Administrator may unilaterally amend this Agreement by providing thirty (30) days prior written notice to Company in order to comply with changes in applicable law and/or regulatory requirements, which shall become effective at the end of the thirty (30) day notice period or a shorter notice period if necessary to comply with changes in applicable law and/or regulation.

(b) Administrator may also amend this Agreement by providing thirty (30) days prior written notice to Company. If Company does not object to such amendment in writing within such thirty (30) day notice period, Company shall be deemed to have accepted the proposed amendment effective as of the date of Administrator's written notice. In the event Company objects within the thirty (30) day notice period by providing written notice to Administrator, the parties shall confer and use good faith best efforts to reach agreement. If such agreement cannot be reached, either party may terminate in accordance with Section 5.2.1.

(c) This Agreement also may be amended or modified pursuant to a dated written instrument executed by Administrator and Company.

11.3 <u>Waivers</u>. The failure of any party to insist in any one or more instances upon performance of any terms or conditions of this Agreement shall not be construed as a waiver of future performance of any such term, covenant or condition, and the obligations of such party with respect thereto shall continue in full force and effect.

11.4 <u>Notices</u>. All notices, requests, consents, demands and other communications hereunder (collectively, "Notices") shall be in writing, addressed to the receiving party's address (or, at Administrator's sole option and solely for Notices sent by Administrator, Company's facsimile number or email address) as set forth below or to such other address (or, at Administrator's sole option and solely for Notices sent by Administrator, facsimile number or email address) as a party may designate by providing notice pursuant to this section, and either (i) delivered by hand, (ii) sent by a nationally recognized overnight courier, (iii) sent by registered or certified mail, return receipt requested, postage prepaid, (iv) solely with respect to Notices sent by Administrator, sent by facsimile transmission, or (v) solely with respect to Notices sent by Administrator, sent by email:

> If to Administrator:
> OptumRx, Inc.
> 17900 Von Karman Ave.
> Mail Stop CA016-0200
> Irvine, California 92614
> Attention: Senior Vice President, Network Relations

> If to Company:
> Company: _Omni-One-Med Pharmacy S_____
>
> Street Address: _17310 W. Grand Parkway S. STE._____
>
> _____
>
> City, State ZIP _Sugar Land, TX 77479_____

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 20 of 63

Attention: Oliver Anosike

Phone: (   ) 832-554-5008

Fax: (   ) 832-554-8009

Email: omnionemedpharmacy@gmail.com

All Notices shall be deemed to have been given either (i) if by hand, at the time of actual delivery thereof to the receiving party at such party's address, as provided above, (ii) if sent by overnight courier, on the next business day following the day such Notice is delivered to the courier service, (iii) if sent by registered or certified mail, on the fifth (5th) business day following the day such mailing is made, or (iv) solely with respect to Notices sent by Administrator, upon the date reflected on a facsimile confirmation from the transmitting facsimile machine (v) solely with respect to Notices sent by Administrator, on the date sent unless Administrator receives an auto-responder notice that the message was not delivered.

11.5   Assignment. This Agreement may not be assigned, delegated or transferred by either party without the prior written consent of the other party, except that this Agreement may be assigned by Administrator to any of Administrator's Affiliates upon thirty (30) days written notice to Company.

11.6   Relationship of the Parties. The sole relationship between the parties to this Agreement is that of independent contractors. This Agreement does not create a joint venture, partnership, agency, employment or other relationship between the parties.

11.7   Professional Pharmacy Judgment. It is understood and agreed that the operation and maintenance of the Company Pharmacies and their respective facilities, equipment and the provision of all Covered Prescription Services shall be solely and exclusively under the control and supervision of Company. All decisions respecting the provision of Covered Prescription Services are rendered solely by a Company Pharmacy and their respective duly authorized personnel, and not by Administrator or any Client. Company is solely responsible for all Covered Prescription Services provided to Members by the Company Pharmacies. It is expressly understood that the relationship between a Member and a Company Pharmacy shall be subject to the rules, limitations, and privileges incident to the pharmacist-patient relationship.

11.8   Utilization of Company Pharmacies. Nothing in this Agreement shall be construed to require Administrator or any Client to assign or refer any minimum or maximum number of Members to a Company Pharmacy.

11.9   Force Majeure. In the event that any party is prevented from performing or is unable to perform any of its obligations under this Agreement due to any act of God, fire, casualty, flood, earthquake, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, material unavailability, or any other cause beyond the reasonable control of, but not the fault of the party invoking this section, and if such party has been unable to avoid or overcome its effects through the exercise of commercially reasonable efforts, such party shall give prompt written notice to the other party, its performance shall be excused, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences.

11.10   Binding Effect; Third Party Beneficiaries. The statements, representations, warranties, covenants and agreements in this Agreement shall be binding on the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement shall be construed to create any rights or obligations except among the parties hereto; no person or entity shall be regarded as a third party beneficiary of this Agreement.

11.11 <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of California, without giving effect to the conflict of law principles thereof.

11.12 <u>Severable Provisions; Headings</u>. The provisions of this Agreement are severable. The invalidity or unenforceability of any term or provision in any jurisdiction shall be construed and enforced as if it has been narrowly drawn so as not to be invalid, illegal, or unenforceable to the extent possible and shall in no way affect the validity or enforceability of any other terms or provisions in that jurisdiction, or of this entire Agreement in that jurisdiction. The headings of paragraphs in this Agreement are for convenience and reference only and are not intended to, and shall not define or limit the scope of the provisions to which they relate.

11.13 <u>340(B) Certification</u>. Company hereby certifies that as of the Effective Date hereof that Company **is not** eligible to distribute Drug Products under the Public Health Service Act, Section 340(B). To the extent that Company, during the term or any renewal term of this Agreement, becomes eligible to distribute Drug Products under the Public Health Service Act, Section 340(B) program, Company shall immediately provide Administrator with written notice of such eligibility. The parties acknowledge and agree that Administrator shall be entitled to modify the rates, fees and other reimbursements offered to Company hereunder, upon Administrator's written notice to Company, to the extent that Company becomes eligible to distribute Drug Products under the Public Health Service Act, Section 340(B) program. Failure of Company to notify Administrator of its 340(B) eligibility as stated above shall constitute a material breach of this Agreement.

11.14 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

11.15 <u>Network Participation</u>. Notwithstanding anything to the contrary in this Agreement, no Pharmacy shall be entitled to participate in any network unless and until an applicable Compensation Exhibit has been signed both by Administrator and by Company on Pharmacy's behalf.


**THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY**

☒ Commercial Addendum
☒ Medicaid Addendum
☒ Medicare Part D Addendum

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their authorized representatives as of the executed dates written below.

Omni-One-Med Pharmacy Services, LLC

_____
[INSERT COMPANY NAME]

Chain Code or NCPDP/NPI # _5907449,_____

By: _Oliver Anosike (May 21, 2013)_____
    (signature)

Name: _Oliver Anosike_____
(print name)

Title: _Manager/PIC_____

Date: _____May 21, 2013_____

OptumRx, Inc.

Elie Bahou

Elie Bahou, PharmD, M.B.A
Senior Vice President
By: _____Network Relations_____
    (signature)

Name: _Elie M. Bahou Pharm.D, M.B.A._

Title: _Senior Vice President, Network Relations_

Execution Date: _____MAY 3 1 2013_____

Effective Date: _____MAY 3 1 2013_____

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

## EXHIBIT A

### LIST OF COMPANY PHARMACIES

- Independent Pharmacies: Insert name and location of the Pharmacy location (one location) performing services under this Agreement.
- Chain Pharmacies: Insert name and location of each Company Pharmacy (multiple locations) performing services under this Agreement.

|     | Pharmacy Name | Pharmacy Location | NCPDP/NPI No. |
|-----|---------------|-------------------|---------------|
| 1.  | Omni-One-Med Pharma | 17310 W. Grand Parkway ! | 5907449 |
| 2.  |               |                   |               |
| 3.  |               |                   |               |
| 4.  |               |                   |               |
| 5.  |               |                   |               |
| 6.  |               |                   |               |
| 7.  |               |                   |               |
| 8.  |               |                   |               |
| 9.  |               |                   |               |
| 10. |               |                   |               |
| 11. |               |                   |               |
| 12. |               |                   |               |
| 13. |               |                   |               |
| 14. |               |                   |               |
| 15. |               |                   |               |
| 16. |               |                   |               |
| 17. |               |                   |               |
| 18. |               |                   |               |
| 19. |               |                   |               |
| 20. |               |                   |               |

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

## COMMERCIAL ADDENDUM

The Pharmacy Network Agreement to which this Commercial Addendum ("Commercial Addendum") is attached is hereby supplemented through this Commercial Addendum to, among other things, ensure that Pharmacy will dispense Covered Prescription Services to eligible enrollees of those Clients who offer commercial prescription drug Benefit Plans ("Commercial Plans") in accordance with the terms and conditions of the Pharmacy Network Agreement and this Commercial Addendum.

1       Applicability to Covered Prescription Services.   This Commercial Addendum applies solely to the Covered Prescription Services provided by Pharmacy to eligible Members of Administrator's Clients' Commercial Plans.

2.      Pharmacy Network Agreement Conflicts.   Except as specifically amended below, the terms and conditions of the Pharmacy Network Agreement remain the same. If there is a conflict between the Pharmacy Network Agreement and this Commercial Addendum, the terms and conditions of this Commercial Addendum will control. In the event of a conflict between the Pharmacy Network Agreement and all amendments and addenda thereto and applicable laws and regulations, such laws and regulations shall prevail.

3.      Definitions.  Except as defined herein, all capitalized terms used in this Commercial Addendum will have the same meanings as set forth in the Pharmacy Network Agreement.

4.      Duties and Obligations of Company. Company agrees to and is bound by all Company obligations set forth in this Commercial Addendum.  Company represents and warrants that it has the authority to enter into this Commercial Addendum as the agent for, and on behalf of, each pharmacy, pharmacy chain and/or pharmacy location identified on Exhibit A of the Pharmacy Network Agreement.  Company further represents and warrants that each pharmacy, pharmacy chain, and/or pharmacy location identified on Exhibit A of the Pharmacy Network Agreement has agreed to be bound by and comply with all of the terms and conditions of this Commercial Addendum.

5.      Compensation.  In addition to the terms and conditions in Article 4 of the Pharmacy Network Agreement, Company and each Pharmacy shall accept the Prescription Drug Compensation specified on the applicable Compensation Exhibit to this Commercial Addendum less any applicable Cost Sharing Amount as payment in full for the provision of all Covered Prescription Services to Plan Members.  One or more Compensation Exhibits may be added hereto at any time or from time to time upon the execution of such Compensation Exhibit(s) by Administrator and Company and the effectiveness thereof.

6.      Incorporation of Other Legal Requirements.  In addition to any State Exhibit attached hereto ("State Regulatory Requirements"), any provisions now or hereafter required to be included in this Commercial Addendum by applicable laws and regulations or any other Government Authority of competent jurisdiction over the subject matter hereof, any Client, Administrator, Company, the Pharmacies or their respective operations, shall be binding upon and enforceable against the parties hereto and deemed incorporated herein, irrespective of whether or not such provisions are expressly set forth in this Commercial Addendum.

**END OF COMMERCIAL ADDENDUM**

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

## STATE EXHIBIT

## COLORADO

The following State Exhibit sets forth certain state regulatory requirements that will apply only in the state of Colorado.

1. Material Change

A.      A Material Change to the Agreement shall occur only if Administrator provides to Company a written notice entitled "Notice of Material Change to Contract" containing the proposed change at least ninety (90) days prior to the effective date of such change ("Notice").  Company shall have fifteen (15) days from receipt of the Notice to provide to Administrator in writing any objection to the Material Change.  If the parties do not resolve such objection to the Material Change, either party may terminate the Agreement by providing written notice to the other party, which such termination shall be effective no less than sixty (60) days prior to the effective date of the Material Change.  If Company does not object to the Material Change, as described in this Section 1, the Material Change shall be effective as specified in the Notice.  When a Material Change is a new category of coverage and Company objects, such new coverage shall not be effective as to Company and such objection shall not be a basis for Company to terminate the Agreement.

For purposes of this Section 1, a Material Change shall mean a change to the Agreement that decreases the Company's payment or compensation, changes the administrative procedures in a way that may reasonably be expected to significantly increase the Company's administrative expense, replaces the maximum allowable cost ("MAC") list used with a new and different MAC list by a Company for reimbursement of generic prescription drug claims, or adds a new category of coverage.  A Material Change does not include:

        i.   A decrease in payment or compensation resulting solely from a change in a published fee schedule upon which the payment or compensation is based and the date of applicability is clearly identified in the Agreement;

        ii.  A decrease in payment or compensation resulting from a change in the fee schedule based on average wholesale price or MAC specified in the Agreement;

        iii. A decrease in payment or compensation that was anticipated under the terms of the Agreement, if the amount and date of applicability of the decrease is clearly identified in the Agreement;

        iv.  An administrative change that may significantly increase the Company's administrative expense, the specific applicability of which is clearly identified in the Agreement;

        v.   Changes to an existing prior authorization, precertification, notification, or referral program that do not substantially increase the Company's administrative expense;

        vi.  Changes to an edit program or to specific edits, however, Company shall be provided notice of the changes and the notice shall include information sufficient for the Company to determine the effect of the change.

B.      If a change to the Agreement is administrative only and is not a Material Change, the change shall be effective upon at least fifteen (15) days notice to the Company.  All other notices shall be provided pursuant to the Agreement.

2.  Termination by Either Party Without Cause.  The parties agree that the Agreement may be terminated, without cause and for a party's convenience: (i) upon ninety (90) days advance written notice to Company if this Agreement is terminated by Administrator; or (ii) upon one hundred eighty (180) days advance written notice to Administrator if this Agreement is terminated by Company.

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

# STATE EXHIBIT

# NEW YORK

The following State Exhibit sets forth certain state regulatory requirements that will apply only in the state of New York.

A. <u>DEFINITIONS FOR PURPOSES OF THIS EXHIBIT</u>

"Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer, or which do provide or offer, a comprehensive health services plan.

"Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of arranging by contract for the delivery or provision of health services by individuals, entities and facilities licensed or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment, by which arrangements such health care providers and suppliers will provide their services in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

"Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of health care services which are licensed, registered and/or certified as required by applicable federal and state law.

B. <u>GENERAL TERMS AND CONDITIONS</u>

1.  This Agreement is subject to the approval of the New York State Department of Health and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by the Department of Health for approval or, alternatively, to terminate this Agreement if so directed by the Department of Health, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403(6) (e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

2.  Any material amendment to this Agreement is subject to the prior approval of the Department of Health, and any such amendment shall be submitted for approval at least 30 days, or ninety (90) days if the amendment adds or materially changes a risk sharing arrangement that is subject to Department of Health review, in advance of anticipated execution. To the extent the MCO provides and arranges for the provision of comprehensive health care services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH or New York City, as may be required by the Medicaid managed care contract between the MCO and DOH (or New York City) and/or the Family Health Plus contract between the MCO and DOH.

3.  Assignment of an agreement between an MCO and (1) an IPA, (2) institutional network provider, or (3) medical group provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement between an IPA and (1) an institutional provider or (2) medical group provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.

4.  The Provider agrees, or if the Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, or DOH or SID guidelines or policies and (b) has provided to the Provider at least thirty (30) days in advance of implementation, including but not limited to:

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

- quality improvement/management;

- utilization management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data;

- member grievances; and

- provider credentialing.

5. The Provider or, if the Agreement is between the MCO and an IPA, or between an IPA and an IPA, the IPA agrees, and shall require its providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.

6. If the Provider is a primary care practitioner, the Provider agrees to provide for twenty-four (24) hour coverage and back up coverage when the Provider is unavailable. The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

7. The MCO or IPA which is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA's own acts or omissions, by indemnification or otherwise, to a provider.

8. Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007 and Chapter 237 of the Laws of 2009 with all amendments thereto.

9. To the extent the MCO enrolls individuals covered by the Medical Assistance and/or Family Health Plus programs, this Agreement incorporates the pertinent MCO obligations under the Medicaid managed care contract between the MCO and DOH (or New York City) and/or the Family Health Plus contract between the MCO and DOH as if set forth fully herein, including:

    a. the MCO will monitor the performance of the Provider or IPA under the Agreement, and will terminate the Agreement and/or impose other sanctions, if the Provider's or IPA's performance does not satisfy standards set forth in the Medicaid managed care and/or Family Health Plus contracts;

    b. the Provider or IPA agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH (or between the MCO and New York City) and/or the Family Health Plus contract between the MCO and DOH, and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA's performance; and

    c. The Provider or IPA agrees to be bound by the confidentiality requirements set forth in the Medicaid managed care contract between the MCO and DOH (or between the MCO and New York City) and/or the Family Health Plus contract between the MCO and DOH.

    d. The MCO and the Provider or IPA agree that a woman's enrollment in the MCO's Medicaid managed care or Family Health Plus product is sufficient to provide services to her newborn, unless the newborn is excluded from enrollment in Medicaid managed care or the MCO does not offer a Medicaid managed care product in the mother's county of fiscal responsibility.

    e. The MCO shall not impose obligations and duties on the Provider or IPA that are inconsistent with the Medicaid managed care and/or Family Health Plus contracts, or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

f.   The Provider or IPA agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

g.   The Provider or IPA agrees , pursuant to 31 U.S.C. § 1352 and CFR Part 93, that no Federally appropriated funds have been paid or will be paid to any person by or on behalf of the MCO for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the award of any Federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement. The Provider or IPA agrees to complete and submit the "Certification Regarding Lobbying," Appendix attached hereto and incorporated herein, if this Agreement exceeds $100,000.

If any funds other than Federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any Federal Contract, the making of any Federal grant, the making of any Federal loan, the entering of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA shall complete and submit Standard Form LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

h.   The Provider agrees to disclose to MCO on an ongoing basis, any managing employee that has been convicted of a misdemeanor or felony related to the person's involvement in any program under Medicare, Medicaid or a Title XX services program (Block grant programs)

i.   The Provider agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE) and excluded individuals posted by the OMIG on its Website.

10.  The parties to this Agreement agree to comply with all applicable requirements of the Federal Americans with Disabilities Act.

11.  The Provider agrees, or if the Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act; the HIV confidentiality requirements of Article 27F of the Public Health Law and Mental Hygiene Law § 33.13.

C.  PAYMENT / RISK ARRANGEMENTS

1.   Enrollee Non-liability. Provider agrees that in no event, including, but not limited to, nonpayment by the MCO or IPA, insolvency of the MCO or IPA, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract or Family Health Plus contract and this Agreement, for the period covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, he/she/it will not bill the New York State Department of Health or the City of New York for Covered Services within the Medicaid Managed Care Benefit Package as set forth in the Agreement between the MCO and the New York State Department of Health. In the case of Family Health Plus, Provider agrees that, during the time an enrollee is enrolled in the MCO, he/she/it will not bill the New York State Department of Health for Covered Services within the Family Health Plus Package, as set forth in the Agreement between the MCO and the New York State Department of Health. This provision shall not prohibit the provider, unless the MCO is a managed long term care plan designated as a Program of All-Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for-service basis to a covered person provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 29 of 63

liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason, and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

2. <u>Coordination of Benefits (COB)</u>. To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the provider. However, with respect to enrollees eligible for medical assistance, or participating in Child Health Plus or Family Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third party payers, and amounts thereof, and the MCO shall maintain or have immediate access to records concerning collection of COB proceeds.

3. If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law § 4406-c(5-c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a negative impact on the aggregate level of payment to provider. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology or payment policy indexing scheme.

4. The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR § 422.208, and 42 CFR § 422.210 into any contracts between the contracting entity (provider, IPA, hospital, etc.) and other persons/entities for the provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an enrollee.

5. The parties agree that a claim for home health care services following an inpatient hospital stay cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided before a member's inpatient hospital discharge, consistent with Public Health Law § 4903.

D. <u>RECORDS ACCESS</u>

1. Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the MCO (and IPA if applicable), for purposes including preauthorization, concurrent review, quality assurance, and Provider claims processing, payment, member qualification for other government programs including, but not limited to, newborn eligibility for Supplemental Security Income, and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA if applicable) expressly acknowledges that he/she/it shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

2. When such records pertain to Medicaid or Family Health Plus reimbursable services the Provider agrees to disclose the nature and extent of services provided and to furnish records to DOH and/or the United

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 30 of 63

States Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

3. The parties agree that medical records shall be retained for a period of six (6) years after the date of service, and in the case of a minor, for three (3) years after majority or six (6) years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4. The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA or to third parties. If the Agreement is between an MCO and an IPA, or between an IPA and an IPA, the IPA agrees to require the providers with which it contracts to agree as provided above. If the Agreement is between an IPA and a provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

E. <u>TERMINATION AND TRANSITION</u>

1. Termination or non-renewal of an agreement between an MCO and an IPA, institutional network provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination, by the MCO may be effected on less than 45 days notice provided the MCO demonstrates to DOH's satisfaction prior to termination that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

2. If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional 60 days notice of its decision to not renew this Agreement.

3. If this Agreement is between an MCO and an IPA, and the Agreement does not provide for automatic assignment of the IPA's Provider contracts to the MCO upon termination of the MCO/IPA contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA's providers agree, that the IPA providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever first occurs. This provision shall survive termination of this Agreement regardless of the reason for the termination.

4. <u>Continuation of Treatment</u>. The Provider agrees that in the event of MCO or IPA insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract, Medicaid Managed Care contract, or Family Health Plus contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. For purposes of this clause, the term "provider" shall include the IPA and the IPA's contracted providers if this Agreement is between the MCO and an IPA. This provision shall survive termination of this Agreement.

5. Notwithstanding any other provision herein, to the extent that the Provider is providing health care services to enrollees under the Medicaid Program and/or Family Health Plus, the MCO or IPA retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

Case 4:18-cr-00368  Document 533-39  Filed on 07/22/23 in TXSD  Page 31 of 63

6.  In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA agrees to require all participating providers of its network to assist in the orderly transfer of enrollees to another provider.

F . <u>ARBITRATION</u>

1.  To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation, and copies of all decisions

G . <u>IPA-SPECIFIC PROVISIONS</u>

1.  Any reference to IPA quality assurance (QA) activities within this Agreement is limited to the IPA's analysis of utilization patterns and quality of care on its own behalf and as a service to its contract providers.

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 32 of 63

## STATE EXHIBIT

## NORTH CAROLINA

The following State Exhibit sets forth certain state regulatory requirements that will apply only in the state of North Carolina.

1.   <u>Claims Submission and Prompt Payment</u>.  In order to receive payment, each Pharmacy must submit a Clean Claim to Claims Processor for each Covered Prescription Service dispensed via the POS system. Company is responsible for the payment of any and all transaction charges or fees associated with the transmission of claims or claim information to Administrator.  A Clean Claim must be submitted to Claims Processor within one hundred eighty (180) days after the date of service.  If any Claim is rejected or if additional information is required for further processing by Administrator or its Claims Processor, Company must resubmit the Claim within sixty (60) days of Company's receipt of such rejected Claim provided that the resubmitted Claim may only be processed and paid if it is a Clean Claim and subject to receipt of payment from the applicable Client.  Unless otherwise agreed to by the Administrator or Client, Claims submitted after the time periods set forth in this Section will not be eligible for payment.  Administrator will promptly pay Clean Claims in accordance with the Agreement and North Carolina General Statute 58-3-225.

2.   <u>Pharmacy Administrative Duties and Records</u>.  Pharmacy shall assure that administrative duties will be transitioned and that records will also be transitioned and readily available upon termination of the Agreement or insolvency, pursuant to Title 11 of the North Carolina Administrative Code Section 20.0202(5).

3.   <u>Credentialing Verification and Sanction Program Compliance</u>.   Pharmacy shall comply with Administrator's and Client's credential verification and sanctions program, as applicable and pursuant to Title 11 of the North Carolina Administrative Code Section 20.0202(16).  In addition, Pharmacy shall maintain licensure, accreditation and credentials sufficient to meet Administrator's credential verification program requirements and to notify Administrator of subsequent changes in status of any information relating to Pharmacy's professional credentials, as applicable and pursuant to Title 11 of the North Carolina Administrative Code Section 20.0202(6).

4.   <u>Pharmacy Professional and Ethical Responsibility</u>.  Notwithstanding the requirements of Pharmacy to comply with Administrator's and Client's applicable credential verification, sanctions, utilization management and quality management programs, such compliance shall not override the professional or ethical responsibility of Pharmacy or interfere with the Pharmacy's ability to provide information or assistance to customers.

5.   <u>Assignment</u>.  Pharmacy's duties and obligations under the Agreement shall not be assigned, delegated or transferred without the prior written consent of Administrator.  Administrator will notify the Pharmacy, in writing, of any duties or obligations that are to be delegated or transferred before the delegation or transfer.

6.   <u>Member Eligibility Verification</u>.  Administrator shall provide via the POS System the ability to verify Member eligibility, based on Administrator's current information prior to rendering Covered Prescription Services.

7.   <u>Data and Information to Pharmacy</u>.  Administrator will make available to Pharmacy information on benefit exclusions; administrative and utilization management requirements; and credential verification, quality assessment and provider sanction programs, as applicable.  Notification of changes in such requirements will be provided by Administrator in a manner to allow Pharmacy to timely comply with such changes.

8.   <u>Member Records</u>.  Pharmacy shall maintain the confidentiality of Member's medical records, personal information and other health records as required by law,  pursuant to Title 11 of the North Carolina Administrative Code Section 20.0202(11)(a).

9.   <u>Member Billing</u>.  To the extent applicable, when Covered Prescription Services are delivered on a prepaid basis under G.S. 58, Article 67, Pharmacy shall not bill any Member for Covered Prescription Services, except for specified Cost Sharing Amounts.  However, Pharmacy and Member may agree to continue non-

Covered Prescription Services at the Member's own expense, as long as the Pharmacy has notified the Member in advance that the Administrator may not cover or continue to cover specific services and the Member chooses to receive the service. Pharmacy will not collect Cost Sharing Amounts for non-Covered Prescription Services.

10.     Prompt Claim Payments.

A.     As applicable, Administrator shall pay claims and provide Pharmacy notices in accordance with Title 11 NCGS Section 58-3-225, including Administrator shall within 30 calendar days after receipt of a claim, send by electronic or paper mail to the claimant: (1) Payment of the claim; (2) Notice of denial of the claim; (3) Notice that the proof of loss is inadequate or incomplete; (4) Notice that the claim is not submitted on the form required by the Benefit Plan, by the Agreement or by applicable law; (5) Notice that coordination of benefits information is needed in order to pay the claim; and (6) Notice that the claim is pending based on nonpayment of fees or premiums.

B.     If Administrator requests additional information from Pharmacy, including the information in subsection 10(A) above, and Administrator does not receive such information within ninety (90) days of such request, Administrator shall deny the claim and send the notice of denial to the claimant in accordance with subsection (c) of Title 11 NCGS Section 58-3-225. However, and as noted in the notice to claimant, Administrator will reopen claim if the requested information is submitted to Administrator within one (1) year after the date of the denial notice closing the claim.

C.     Benefit Plan claim payments that are not made in accordance with Title 11 NCGS Section 58-3-225(c) shall bear interest at the annual percentage rate of eighteen percent (18%) beginning on the date following the day on which the claim should have been paid. However, such interest does not apply to claims for non-Covered Prescription Services nor to Cost Sharing Amounts.

D.     Pharmacy shall submit claims within 180 days after the date of the provision of Covered Prescription Services to Member, except as allowed by Title 11 NCGS Section 58-3-225(f).

E.     If a claim for which the claimant is a Pharmacy has not been paid or denied within sixty (60) days after receipt of the initial claim, Administrator shall send a claim status report to Member. However, the claims status report is not required during the time Administrator is awaiting information requested under subsection (B) of this Section 10. The report shall indicate that the claim is under review and Administrator is communicating with Pharmacy to resolve the matter. While a claim remains unresolved, Administrator shall send a claim status report to the Member with a copy to Pharmacy thirty (30) days after the previous report was sent.

F.     Administrator may recover overpayments made to Pharmacy by making demands for refunds and by offsetting future payments in accordance with Title 11 NCGS Section 58-3-225(h), including providing at least a thirty (30) calendar days prior written notice to the Pharmacy before offsetting future payments or recovering overpayments.

G.     Administrator shall maintain written or electronic records of its activities under and in accordance with Title 11 NCGS Section 58-3-225, including, records of when each claim was received, paid, denied, or pended, and Administrator's review and handling of each claim.

11.     Amendments. Any proposed amendments to the Agreement shall be in accordance with NCGS 58-50-271 to the Pharmacy Notice contact noted in the Agreement and shall be dated, labeled "Amendment", signed by Administrator and include an effective date for the proposed amendment.

12.     Policies and Procedures. Administrator shall provide a copy of its applicable policies and procedures, including the Pharmacy Benefit Manual to Pharmacy prior to execution of a new or amended agreement and annually to all participating pharmacies.

13.     North Carolina Governing Law. The governing law for purposes of this Agreement with Pharmacy shall be the laws of North Carolina.

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

## MEDICAID ADDENDUM

The Pharmacy Network Agreement to which this Medicaid Addendum ("Medicaid Addendum") is attached is hereby supplemented through this Medicaid Addendum to, among other things, ensure that Pharmacy will dispense Covered Prescription Services to eligible enrollees of those Clients who offer Medicaid prescription drug Benefit Plans ("Medicaid Plans") in accordance with the terms and conditions of the Pharmacy Network Agreement and this Medicaid Addendum.

1.  <u>Applicability to Covered Medicaid Prescription Services</u>. This Medicaid Addendum applies solely to the Covered Medicaid Prescription Services provided by Company to eligible Members of Administrator's Clients' Medicaid Plans.

2.  <u>Pharmacy Network Agreement Conflicts</u>. Except as specifically amended below, the terms and conditions of the Pharmacy Network Agreement remain the same. If there is a conflict between the Pharmacy Network Agreement and this Medicaid Addendum, the terms and conditions of this Medicaid Addendum will control. In the event of a conflict between the Pharmacy Network Agreement and all amendments and addenda thereto and applicable Medicaid laws and regulations, such Medicaid laws and regulations shall prevail.

3.  <u>Definitions</u>. Except as defined herein, all capitalized terms used in this Medicaid Addendum will have the same meanings as set forth in the Pharmacy Network Agreement.

4.  <u>Duties and Obligations of Company</u>. Company agrees to and is bound by all Company obligations set forth in this Medicaid Addendum. Company represents and warrants that it has the authority to enter into this Medicaid Addendum as the agent for, and on behalf of, each pharmacy, pharmacy chain and/or pharmacy location identified on Exhibit A of the Pharmacy Network Agreement. Company further represents and warrants that each pharmacy, pharmacy chain and/or pharmacy location identified on Exhibit A of the Pharmacy Network Agreement has agreed to be bound by and comply with all of the terms and conditions of this Medicaid Addendum.

5.  <u>Incorporation of Certain Terms into Pharmacy Network Agreement Definitions</u>. For the purpose of determining the rights and responsibilities of each party with regards to the administration of a Medicaid pharmacy network, Article 1 – <u>Defined Terms</u> of the Pharmacy Network Agreement is hereby amended to include:

    (a)   "<u>Covered Medicaid Prescription Service</u>" within the definition of "Covered Prescription Services"; and

    (b)   "<u>Medicaid Prescription Drug Compensation</u>" within the definition of "Prescription Drug Compensation".

6.  <u>Compensation</u>. In addition to the terms and conditions in Article 4 of the Pharmacy Network Agreement, Company and each Company Pharmacy shall accept the Medicaid Prescription Drug Compensation specified on the applicable Compensation Exhibit to this Medicaid Addendum and as applicable to the particular Client Benefit Plan less any applicable Cost Sharing Amount as payment in full for the provision of all Covered Medicaid Prescription Services to Members. One or more Compensation Exhibits may be added hereto at any time or from time to time upon the execution of such Compensation Exhibit(s) by Administrator and Company and the effectiveness thereof.

7.  <u>Incorporation of Other Legal Requirements</u>. Particular states have certain Medicaid regulatory requirements, including specific provisions to be included in all Client subcontractor agreements ("State Medicaid Regulatory Requirements"). Such State Medicaid Regulatory Requirements are contained in a state specific appendix set forth in the Pharmacy Manual ("State Appendix"). Company shall comply with all applicable requirements in each applicable State Appendix, as determined solely by Administrator. Any provisions now or hereafter required to be included in this Medicaid Addendum by applicable Medicaid laws and regulations or any other Government Authority of competent jurisdiction over the subject matter hereof, any Client, Administrator, Company, the Company Pharmacies or their respective operations, shall be binding upon and enforceable against the parties hereto and deemed incorporated herein, irrespective of whether or not such provisions are expressly set forth in this Medicaid Addendum or in the State Appendix. Administrator may unilaterally amend this Medicaid Addendum or the State Appendix, by providing thirty (30) days prior written notice to Company in order to comply with changes in applicable law and/or regulatory requirements, which shall become effective at the end of the thirty (30) day notice period or a shorter notice period if necessary to comply with changes in applicable law and/or regulation.

**END OF MEDICAID ADDENDUM**

## STATE EXHIBIT AND COMPENSATION EXHIBIT TO THE MEDICAID ADDENDUM

## KANSAS

The following State of Kansas Exhibit and Compensation Exhibit to the Medicaid Addendum ("SKSM Exhibit") sets forth certain state regulatory requirements and compensation terms that apply only to Covered Prescription Services dispensed to State of Kansas Medicaid Members effective January 1, 2013.

1.  <u>Network Applicability</u>. This SKSM Exhibit is strictly limited and only applicable to the Compensation Exhibit to the Medicaid Addendum used by the UnitedHealthcare Community Plan of Kansas ("UCPKS") for Medicaid Covered Prescription Services dispensed to UCPKS Members.  Therefore, this SKSM Exhibit does not, in any manner, support any Client commercial Benefit Plans or Medicare Part D Benefit Plans. Only those Pharmacies that have a valid Kansas Medicaid ID may provide UCPKS Medicaid Covered Prescription Services.

2.  <u>Prescription Drug Compensation</u>. All UCPKS Medicaid Covered Prescription Services shall have the Prescription Drug Compensation described in the current Compensation Exhibit to the Medicaid Addendum (as may be amended from time to time) between Administrator and Company, with the exception of the applicable dispensing fee, described in Section 3 of this SKSM Exhibit.

3.  <u>Dispensing Fee</u>. Notwithstanding the dispensing fee currently within the Compensation Exhibit to the Medicaid Addendum, the UCPKS Benefit Plan dispensing fee for Brand Name Drugs and Generic Drugs that are Covered Prescription Services shall be

## STATE EXHIBIT AND COMPENSATION EXHIBIT TO THE MEDICAID ADDENDUM

### NEW MEXICO

The following State of New Mexico Exhibit and Compensation Exhibit to the Medicaid Addendum ("SNMM Exhibit") sets forth certain state regulatory requirements and compensation terms that apply only to Covered Prescription Services dispensed to State of New Mexico Medicaid Fee for Service Members.

1.  <u>Network Applicability</u>. This SNMM Exhibit is strictly limited and only applicable to the Compensation Exhibit to the Medicaid Addendum used by OptumHealth New Mexico Medicaid Fee for Service ("OHNMFFS") for Medicaid Covered Prescription Services dispensed to OHNMFFS Members. Therefore, this SNMM Exhibit does not, in any manner, support any non-OHNMFFS benefit plans, including other Client Medicaid, commercial or Medicare Part D Benefit Plans. Only those Pharmacies that have a valid New Mexico Medicaid ID may provide OHNMFFS Medicaid Covered Prescription Services.

2.  <u>Prescription Drug Compensation</u>. All OHNMFFS Medicaid Covered Prescription Services shall have the Prescription Drug Compensation described in the current Compensation Exhibit to the Medicaid Addendum (as may be amended from time to time) between Administrator and Company, with the exception of the applicable dispensing fee, described in Section 3 of this SNMM Exhibit.

3.  <u>Dispensing Fee.</u> Notwithstanding the dispensing fee currently within the Compensation Exhibit to the Medicaid Addendum, the OHNMFFS Benefit Plan dispensing fee for Brand Name Drugs and Generic Drugs that are Covered Prescription Services shall be [        ]

## MEDICARE PART D ADDENDUM

The Pharmacy Network Agreement to which this Medicare Part D Addendum ("Part D Addendum") is attached is hereby supplemented through this Part D Addendum to, among other things, ensure that Pharmacy will dispense Covered Prescription Services to eligible enrollees of those Clients who have been approved by CMS to offer prescription drug benefits under Medicare Part D either as a PDP Plan or MA-PD Plan (collectively the "Part D Plans") in accordance with the terms and conditions of the Pharmacy Network Agreement and this Part D Addendum.

1    Effect of Part D Addendum.

   1.1    <u>Applicability to Covered Part D Prescription Drugs</u>.  This Part D Addendum applies solely to the services provided by Company to Medicare Drug Plan Members of Administrator's Part D Clients.

   1.2    <u>Pharmacy Network Agreement Conflicts</u>.   Except as specifically amended below, the terms and conditions of the Pharmacy Network Agreement remain the same. If there is a conflict between the Pharmacy Network Agreement and the Part D Addendum, the terms and conditions of this Part D Addendum will control. In the event of a conflict between the Pharmacy Network Agreement and all amendments and addenda thereto and Medicare Laws and Regulations, such Medicare Laws and Regulations shall prevail.

   1.3    <u>Incorporation of Certain Terms into Pharmacy Network Agreement Definitions</u>.  For the purpose of determining the rights and responsibilities of each party with regards to the administration of a Part D pharmacy network, Article 1 – <u>Defined Terms</u> of the Pharmacy Network Agreement is hereby amended to include:

   (a)    "<u>Covered Part D Prescription Drug</u>" within the definition of "Covered Prescription Services";
   (b)    "<u>Part D Benefit Plan</u>" within the definition of "Benefit Plan";
   (c)    "<u>Part D Client</u>" within the definition of "Client";
   (d)    "<u>Part D Formulary</u>" within the definition of "Formulary;"
   (e)    "<u>Part D Prescription Drug Compensation</u>" within the definition of "Prescription Drug Compensation";
   (f)    "<u>Medicare Drug Plan Member</u>" within the definition of "Member"; and
   (g)    "<u>Home Infusion Pharmacy</u>", "<u>I/T/U Pharmacy</u>", "<u>LTC Pharmacy</u>", "<u>Safety Net Pharmacy</u>" and "<u>State-Owned Pharmacy</u>" within the definition of "Pharmacy".

2.    <u>Definitions</u>.  All capitalized terms used in this Part D Addendum will have the same meanings as set forth in the Pharmacy Network Agreement.  For the purposes of this Part D Addendum, the following additional terms shall have the meanings set forth below:

   2.1    "<u>340B Participating Provider</u>" shall mean a "covered entity" as defined in Section 340B(a)(4) of the Public Health Service Act [42 U.S.C. § 256b(a)(4)] that has enrolled in the 340B Drug Pricing Program;

   2.2    "<u>Covered Part D Prescription Drug</u>" shall have the same meaning as the term "Covered Part D Drug" under 42 CFR § 423.100, as amended from time to time.

   2.3    "<u>Federally Qualified Health Center</u>" or "<u>FQHC</u>" shall have the same meaning as the term "federally qualified health center" under §1905(l)(2)(B) of the Social Security Act as well as any implementing regulations;

   2.4    "<u>Dispensary</u>" shall mean a clinic where Prescriptions are dispensed by a prescribing physician or other practitioner.

   2.5    "<u>Home Infusion Pharmacy</u>" shall mean a Pharmacy-based, decentralized patient care organization with expertise in USP 797-compliant sterile compounding that provides care to patients with acute or chronic conditions generally pertaining to parenteral administration of drugs, biologics and nutritional formulae administered through catheters and/or needles in home and alternate sites.

   2.6    "<u>Indian Tribe, Tribal Organization or Urban Indian Organization Pharmacy</u>" ("<u>I/T/U Pharmacy</u>") shall have the same meaning as the term "I/T/U Pharmacy" under 42 CFR § 423.100, as amended from time to time.

GX234.037
26

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

2.7    "LTC Pharmacy" shall have the same meaning as the term "long term care network pharmacy" under 42 CFR § 423.100, as amended from time to time.

2.8    "Medicare Drug Plan Member" shall mean a Medicare Eligible who is enrolled in a MA-PD or a PDP Plan offered by a Client.

2.9    "Medicare Eligible" shall mean a Medicare beneficiary that satisfies the definition of a "Part D Eligible Individual" as this term is defined under 42 CFR § 423.4, as amended from time to time, and who is a Member under a Client's Part D Plan.

2.10   "Medicare Laws and Regulations" shall mean and include: (i) the MMA, the Social Security Act, Part C of Title XVIII of the Social Security Act, and Part D of Title XVIII of the Social Security Act as amended from time to time; (ii) any regulations adopted, promulgated, applied, followed, or imposed by any Government Authority or court with respect to Medicare or any successor government program; and (iii) any and all guidelines, bulletins, manuals, instructions, requirements, policies, standards or directives adopted and issued from time to time by CMS.

2.11   "Medicare Part D" shall mean the Medicare Prescription Drug Benefit program authorized by Part D of Title XVIII of the Social Security Act, as amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. L. 108-173, and implementing regulations in Parts 403, 411, 417, 422 and 423 of Title 42, Code of Federal Regulations, as amended from time to time.

2.12   "National Health Service Corps Provider" shall have the same meaning as the term "national health service corps provider" under in §331(a) of the Public Health Service Act [42 U.S.C. §254d(a)];

2.13   "Part D Cost-Sharing" or "Part D Cost-Sharing Amounts" shall mean those coinsurance, co-pays, deductibles or other amounts which may be collected by Company from a Medicare Drug Plan Member for Covered Part D Prescription Drugs in accordance with the terms and conditions of the Medicare Drug Plan Member's Part D Benefit Plan.

2.14   "Part D Drug" shall be the drug covered by the Part D Plan.

2.15   "Part D Formulary" shall have the same meaning as the term "Formulary" under 42 CFR §423.4, as amended from time to time.

2.16   "Part D Plan" shall have the same meaning as the term "Part D Plan" in 42 CFR § 423.4, as amended from time to time.

2.17   "Part D Client" shall mean a Plan Sponsor that has contracted with CMS to provide a Part D Plan and who meets the definition of "Plan Sponsor" under 42 CFR § 423.4, as amended from time to time.

2.18   "Rural Health Clinic" or "RHC" shall have the same meaning as "rural health clinic" under §1861(a)(2) of the Social Security Act;

2.19   "Safety Net Pharmacy" shall mean a Pharmacy or Dispensary that is owned or operated by one of the following entities: FQHC, 340 B Participating Provider, free-standing site that utilizes National Health Service Corps Providers, Rural Health Clinic (RHC), or other Safety-Net Provider.

2.20   "Safety-Net Provider" shall mean a provider that by mandate or mission organizes and delivers a significant level of healthcare and other health-related services to the uninsured, Medicaid, and other vulnerable populations.

2.21   "Specialty Pharmacy" shall mean a Pharmacy that distributes Specialty Drugs.

3.    Duties and Obligations of Administrator.  In addition to the obligations and duties identified in Article 2 of the Pharmacy Network Agreement, the following obligations also apply to Covered Part D Prescription Drugs provided to Medicare Drug Plan Members.

3.1   Notification of Changes to Part D Formulary.  Administrator shall notify Company in writing upon notice of changes to a Part D Client's Part D Formulary upon receipt of such notification.  Such notice will be provided in accordance with the Part D Client's obligations under 42 CFR § 423.120.

3.2   Maintain Pharmacy Listing.  Administrator shall maintain a listing of the Company Pharmacies and other pharmacies participating in the Part D Plans of its Clients in a manner consistent with Administrator's and the Clients' respective obligations under the Medicare Laws and Regulations and as required pursuant to Administrator's obligations to each Client.  Administrator shall notify Company as soon as reasonably practicable of a Client's decision to remove a Company Pharmacy for inclusion in Client's pharmacy network or decision to suspend, revoke or terminate a Company Pharmacy's participation in its pharmacy network.

4.   Duties and Obligations of Company.  Company agrees to and is bound by all Company obligations set forth in this Part D Addendum, including, but not limited to, the obligations set forth in this Section 4 and in each exhibit or other attachment to this Part D Addendum.  Company represents and warrants that it has the authority to enter into this Part D Addendum as the agent for, and on behalf of, each Pharmacy identified on Exhibit A of the Pharmacy Network Agreement.  Company further represents and warrants that each Pharmacy identified on Exhibit A of the Pharmacy Network Agreement has agreed to be bound by and comply with all of the terms and conditions of this Part D Addendum (including, but not limited to, each exhibit or other attachment to this Part D Addendum).  In addition to the obligations and duties identified in Article 3 of the Pharmacy Network Agreement, the following obligations also apply to Covered Part D Prescription Drugs provided to Medicare Drug Plan Members.

4.1   Prices for Equivalent Drugs.  In accordance with the Part D Client's responsibilities under 42 CFR § 423.132, Company shall ensure that after the Covered Part D Prescription Drug is dispensed at each Pharmacy, Company or Pharmacy will inform all Medicare Drug Plan Members of any differential between the price of a Covered Part D Prescription Drug and the price of the lowest-priced generic Covered Part D Prescription Drug that is therapeutically equivalent or bioequivalent and available at that particular Pharmacy.  If Company operates a LTC Pharmacy, then the LTC Pharmacy shall either provide this information at the point of sale or to Administrator for inclusion in the Part D Client's explanation of benefits.  The requirements in this Section 4.1 shall not apply to any I/T/U Pharmacy, a Pharmacy located in any of the U.S. territories, and any other situation where CMS has deemed compliance to this requirement impossible or impractical.

4.2   Medication Therapy Management Program.  Company shall, and shall ensure that the Company Pharmacies shall, cooperate with Administrator to implement a medication therapy management program which is (i) designed to ensure that Covered Part D Prescription Drugs dispensed to certain "targeted beneficiaries" (as defined at 42 CFR § 423.153(d)(2)) are appropriately used to optimize therapeutic outcomes through improved medication use and (ii) designed to reduce the risk of adverse events, including adverse drug interactions, for such targeted beneficiaries.

4.3   Electronic Prescription Program.  Company shall, and shall ensure that the Company Pharmacies, cooperate in supporting the Administrator's and the Clients' compliance with electronic prescription standards relating to the provision of Covered Part D Prescription Drugs to Medicare Drug Plan Members once final electronic prescription standards have been developed and finalized by CMS.  Company agrees and shall ensure that the Company Pharmacies comply with any electronic prescription standards which may be adopted by HHS or CMS which are applicable to pharmacies.

4.4   Notices Regarding Coverage Determinations and Exceptions.  In accordance with the Part D Client's obligations under 42 CFR § 423.562, Company shall ensure that each Pharmacy either distributes to Medicare Drug Plan Members, posts prominently notices advising Medicare Drug Plan Members to contact the applicable Part D Client (or its designee) to obtain a coverage determination or to request an exception if such Member disagrees with information provided by a pharmacist at a Pharmacy relating to the availability of Covered Part D Prescription Drugs.

4.5   Requirements Applicable to Specific Pharmacies.  In addition to the terms and conditions provided for under this Part D Addendum, certain additional terms and conditions shall apply to the following types of Pharmacies: I/T/U Pharmacies, Safety Net Pharmacies, Specialty Pharmacies, Home Infusion Pharmacies, and LTC Pharmacies.  If Company's pharmacy network contains one or more of these types of Pharmacies, Company shall review and comply with the respective Exhibit to this Part D Addendum for such Pharmacy's obligations under the Pharmacy Network Agreement and this Part D Addendum.

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 40 of 63

4.6    <u>Steering.</u>  Unless otherwise permitted under Medicare Part D, Company shall not, and shall ensure that its Pharmacies shall not direct, urge, or attempt to persuade individuals to enroll in specific Part D Plans.

4.7    <u>Transition of New Enrollees</u>.  Company and each Pharmacy shall comply with each Part D Client's transition policies, as each may be amended from time to time.  Unless otherwise specified in the Pharmacy Network Agreement or the Medicare Laws and Regulations, a Part D Client's transition policies shall not apply to drugs which are not Part D Drugs.

4.8    <u>Member Hold Harmless</u>.

     (a)    <u>No Billing of Medicare Drug Plan Members</u>.  Company agrees that, with the exception of (i) Part D Cost-Sharing Amounts which are permitted by the Clients' respective Part D Benefit Plan, (ii) returned check costs, and (iii) collection costs, neither Company nor any Company Pharmacy shall in any event, including, without limitation, non-payment by Administrator or a Client, insolvency of Administrator or a Client, or breach of the Part D Addendum, bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, hold responsible, or otherwise have any recourse against any Medicare Drug Plan Member, or any other Person (other than the applicable Client) acting on behalf of any Medicare Drug Plan Member, or attempt to do any of the foregoing for any Covered Part D Prescription Drugs or Covered Part D Prescription Drugs provided to any Medicare Drug Plan Member pursuant to the Part D Addendum.  In addition, Company shall not balance bill the Member for the cost of any non-Part D ingredient of a Part D Compound. Company agrees that neither Company nor any Company Pharmacy shall maintain any action at law or equity against a Medicare Drug Plan Member to collect sums owed to Company or a Company Pharmacy pursuant to the Agreement, as modified by this Part D Addendum.  Upon notice of any such action, any Client may suspend, revoke or terminate Company or any Company Pharmacy from participation in Client's pharmacy network immediately upon the giving of written notice to Company.  In addition, upon notice of any such action, Administrator may terminate the Agreement (as modified by this Part D Addendum) immediately upon the giving of written notice to Company and take all other appropriate action consistent with the terms of the Agreement (as modified by this Part D Addendum) to eliminate such charges, including, without limitation, requiring Company or a Company Pharmacy to return all sums collected from Medicare Drug Plan Members or their representatives.

     (b)    <u>Survival; Supersedes Contrary Agreements</u>.  The obligations of Company and the Company Pharmacies under this Section 4.8 shall survive the termination of the Part D Addendum with respect to Covered Part D Prescription Drugs provided during or after the term of the Part D Addendum, regardless of the cause giving rise to such termination, and this Section 4.8 shall be construed to be for the benefit of Medicare Drug Plan Members.  This Section 4.8 supersedes any oral or written contrary agreement now existing or hereafter entered into between Company or any Company Pharmacy, and any Medicare Drug Plan Member or any Person acting on behalf of any Medicare Drug Plan Member.

4.9    <u>Vaccine Administration.</u>     To the extent allowed by applicable law, Company may provide and administer vaccines that are Covered Part D Prescription Drugs when and where it is safe to dispense and administer such vaccines in a Company pharmacy ("Covered Part D Vaccines").

     (a)    Representations and Warranties.  In addition to the terms and conditions of the Agreement, Company represents and warrants that it, Company pharmacies, pharmacists, and any other personnel of Company or Company pharmacies that will administer Covered Part D Vaccines:

         (i)    has taken measures to ensure compliance with all applicable federal, state, and local laws and that it shall comply with all standards, licensing and other requirements pertaining to the sale, distribution, prescribing, dispensing, and administration of any vaccine, including by injection, as established by any applicable government body, such as the Board of Pharmacy or other authorized entity which regulates such practices in the State in which Company does business; and

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 41 of 63

        (ii)    has required and shall ensure that its pharmacists and other personnel have received applicable and proper certification, training and educational requirements mandated by any federal, state or local governmental body, agency, or as further required by Administrator or Clients pertaining to administration of any vaccines.

      (b)    <u>Vaccine Administration Fees.</u>  If applicable, the administrative fee payment to Company for the administration of Covered Part D Vaccines is specified on the Retail Pharmacy Network Compensation Exhibit attached to this Part D Addendum.

5.    <u>Compensation.</u>  In addition to the terms and conditions in Article 4 of the Pharmacy Network Agreement, Company and each Company Pharmacy shall accept the Part D Prescription Drug Compensation specified on the applicable Compensation Exhibit to this Part D Addendum less any applicable Part D Cost Sharing Amount as payment in full for the provision of all Covered Part D Prescription Drugs to Medicare Drug Plan Members.  One or more Compensation Exhibits may be added hereto at any time or from time to time upon the execution of such Compensation Exhibit(s) by Administrator and Company and the effectiveness thereof.  Administrator will issue, mail or otherwise transmit payment with respect to all Clean Claims submitted by Company Pharmacy (other than pharmacies that dispense drugs by mail order only or are located in or contract with a long term care facility) within fourteen (14) days of receipt of an electronically submitted Clean Claim or within thirty (30) days of receipt of a Clean Claim submitted otherwise.

    5.1    <u>Cost of Drugs Updates.</u>  When applicable, Administrator shall update the standard for reimbursement of Pharmacy when based on the cost of the Covered Part D Prescription Drug not less frequently than once every seven (7) days, beginning with an initial update on January 1 of each year to accurately reflect the market price of acquiring the Covered Part D Prescription Drug in accordance with 42 CFR § 423.505.

    5.2    <u>Extending Negotiated Prices When Benefits Are Not Payable.</u>  In accordance with the requirements of the Medicare Laws and Regulations, including the requirements under 42 CFR § 423.104, Company shall ensure each Pharmacy extends Part D Prescription Drug Compensation to all Medicare Drug Plan Members purchasing Covered Part D Prescription Drugs even if no benefits are payable to or on behalf of the Medicare Drug Plan Members for the Covered Part D Prescription Drug due to the applicability of any Part D Cost-Sharing Amount as determined by the Client's applicable Part D Benefit Plan. Company, in such situations, shall ensure that each Pharmacy shall collect no more than the Part D Prescription Drug Compensation from the Medicare Drug Plan Member.

    5.3    <u>Clean Claim Submission.</u>  Company shall submit a Clean Claim to Administrator whenever a respective Member's ID Card is presented or on file at Company or its Company Pharmacies for the Covered Prescription Service provided to Member, unless the Member expressly requests that a particular claim not be submitted to Administrator.

6.    <u>Compliance and Other Regulatory Requirements</u>

    6.1    <u>Compliance with Law.</u>  Company agrees that it and each Pharmacy shall familiarize itself and be responsible for determining, training and complying with all laws and regulations, including but not limited to, the laws, regulations and CMS instructions applicable to Medicare Part D, Covered Part D Prescription Drugs, Medicare Drug Plan Members and Company's performance under the terms and conditions of the Part D Addendum and other any other addenda.

    6.2    <u>Cooperation with Administrator and Part D Client</u>.  Company shall ensure that each Pharmacy cooperates with Administrator and Part D Clients in the performance of Part D Client's obligations under Medicare Part D.  Company further agrees that all services performed by Company and each Company Pharmacy shall be consistent with and shall comply with the contractual obligations imposed upon the Part D Client by CMS.  Company agrees that Pharmacies shall at all times dispense Covered Part D Prescription Drugs to Medicare Drug Plan Members and furnish Covered Part D Prescription Drugs in a manner that permits the Part D Client to comply with Medicare Laws and Regulations.

    6.3    <u>Business Integrity.</u>  Company agrees to be bound by the provisions set forth at 2 CFR Part 376.  In addition to the foregoing, Company represents and warrants that neither Company, nor any Pharmacy, pharmacist or other personnel furnishing Covered Part D Prescription Drugs to Medicare

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 42 of 63

Drug Plan Members have been or will be (i) listed as debarred, excluded, or otherwise ineligible for participation in federal health care programs or (ii) convicted of a criminal felony. If at any time Company becomes aware of any violation of this representation and warranty, Company agrees to notify Administrator in writing immediately. In the event that any Pharmacy or Pharmacy personnel become debarred or ineligible for participation in a federal health care program or convicted of a criminal felony, then Company shall immediately remove it or personnel from Administrator's and Part D Client's pharmacy network and prohibit it or personnel from furnishing any Covered Part D Prescription Drugs to Medicare Drug Plan Members. If Company itself becomes debarred or ineligible or if Company has not taken the actions required of it in the preceding sentence (if and when applicable), then Administrator may terminate the Pharmacy Network Agreement and any addenda or amendments thereto immediately upon written notice to Company without liability to Administrator or any Part D Client, or take such other corrective or remedial action as warranted under the circumstances. In addition, Company and Company Pharmacies shall: (a) obtain certifications from its pharmacists, managers, officers and directors responsible for the administration or delivery of Covered Part D Prescription Drugs to sign a conflict of interest statement, attestation, or certification at the time of hire and annually thereafter certifying that the pharmacist, manager, officer or director is free from any conflict of interest in administering or delivering Part D benefits; and (b) adopt and follow a code of conduct that reflects a commitment to detecting, preventing and correcting fraud, waste and abuse in the administration or delivery of Covered Part D Prescription Drugs.

6.4  <u>Accuracy of Claims and Other Data.</u>  Company acknowledges Part D Clients are obligated to comply with reporting requirements which include, but are not limited to, reporting requirements set forth in applicable Medicare Laws and Regulations relating to claims, encounter data, other health care costs, and the health of Medicare Drug Plan Members. Company acknowledges that Claims information which is submitted by Company to Administrator will be used by Part D Clients to seek reimbursement from CMS. Company certifies that such Claims information and other data submitted by Company to Administrator is accurate and true.

6.5  <u>Equal Opportunity Employer.</u>  Administrator and Part D Clients are equal opportunity employers. As such, the provisions of Executive Order 11246, as amended (Equal Opportunity/Affirmative Action), 38 USC § 4212, as amended, (Vietnam Era Veterans Readjustment Act), and Section 503 of Rehabilitation Act of 1973, as amended (Handicapped Regulations), together with the implementing regulations (found at 41 CFR §§ 60-1, 60-2, 41 CFR § 60-250, and 41 CFR § 60-741, respectively), rules guidelines and standards as from time to time are promulgated thereunder by applicable Governmental Authorities, are incorporated by reference into this Part D Addendum, and Company, on behalf of itself and the Company locations agrees to abide by the foregoing provisions that, as a contractor of these equal opportunity employers, are applicable to Company and the Company locations.

6.6  <u>Other Confidentiality, Security and Accuracy Requirements</u>.  Company agrees that Company and the Company Pharmacies shall comply with all applicable laws, regulations and standards regarding the confidentiality, privacy, data security and/or transmission of personal, health or enrollment information and/or medical records (including prescription records) of the Medicare Drug Plan Members, including, but not limited to, the confidentiality, data security and data accuracy requirements established under applicable Medicare Laws and Regulations. Except as permitted or required under applicable laws and regulations (including HIPAA), neither Company nor any Company Pharmacy shall disclose, divulge, use or commercially or otherwise exploit any personal or medical information of a Medicare Drug Plan Member for any purpose or under any circumstance, even if such information has been de-identified, and shall comply with all state and federal laws and regulations in safeguarding such information.

6.7  <u>Federal Policies; Flow Down Provisions</u>.  Because Company and the Company Pharmacies are furnishing Covered Part D Prescription Drugs to Medicare Drug Plan Members which are the subject of a contract between the applicable Part D Client and CMS, the following obligations are imposed upon Company and the Company Pharmacies, with which Company shall, and shall ensure that the Company Pharmacies, comply: Title VI of the Civil Rights Act of 1964, as amended (42 USC § 2000d *et seq.*); Sections 503 and 504 of the Rehabilitation Act of 1973, as amended (29 USC §§ 793 and 794); Title IX of the Education Amendments of 1972, as amended (20 USC § 1681 *et seq.*); Section 654 of the Omnibus Budget Reconciliation Act of 1981, as amended (41 USC § 9849); the Americans with Disabilities Act (42 USC § 12101 *et seq.*); and the Age Discrimination Act of 1975, as amended (42 USC § 6101 *et seq.*); the Vietnam Era Veterans Readjustment Assistant Act (38 USC §

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368   Document 533-39   Filed on 07/22/23 in TXSD   Page 43 of 63

4212); together with all applicable implementing regulations, rules guidelines and standards as from time to time are promulgated thereunder by applicable Government Authorities.

6.8    <u>Fraud Waste and Abuse Compliance Training, Education and Communication</u>. Company shall comply with applicable fraud, waste and abuse training, education and provide to Administrator certification of its compliance; and have effective lines of communication with Administrator, as may be further described in the Pharmacy Manual.

7.    <u>Records and Audits</u>

7.1    <u>Maintenance of Records</u>.  Company shall, and shall ensure that it and each of its Company Pharmacies, keep and maintain, in accordance with prudent business practices, accurate, complete, and timely books, records, and accounts of all transactions regarding the furnishing of Covered Part D Prescription Drugs to Medicare Drug Plan Members.  Company and its Pharmacies shall retain such books and records during the term of the Pharmacy Network Agreement and for a period of at least ten (10) years after the termination of the Pharmacy Network Agreement in its entirety or for such longer period of time as required by an ongoing audit or investigation by Administrator, Part D Client, Government Authority or other person.  The provisions of this Section 7.1 shall survive the expiration or earlier termination of the Pharmacy Network Agreement, this Part D Addendum, or any other addenda or amendments attached thereto, for any reason whatsoever.

7.2    <u>Audit</u>.  In accordance with the requirements under 42 CFR Section  423.505(i) and 423.505(i)(2), Company shall, and shall ensure that its Pharmacies directly permit Government Authorities, Administrator, Part D Clients or their designees to have the right to inspect, evaluate, and audit the facilities, offices, equipment, and make copies and receive books, records, contracts, documents, papers, and accounts relating to the Company's (and each Pharmacy's) performance of the Pharmacy Network Agreement, and any other addenda or amendment, including the dispensing of Covered Part D Prescription Drugs to Medicare Drug Plan Members, the transactions reflecting such services and/or CMS's respective contracts with Part D Clients.  The right of Government Authorities, Administrator, Part D Clients or their designees to inspect, evaluate, audit receive and make copies of any of the foregoing types of information shall exist during the term of the Pharmacy Network Agreement and for a period of ten (10) years after the termination of the Pharmacy Network Agreement in its entirety and for such longer period of time as required to complete an on-going audit or investigation.  The provisions of this Section 7 shall survive the expiration or earlier termination of the Pharmacy Network Agreement, this Part D Addendum, or any other addenda or amendments attached thereto, and if Company or its Pharmacies cease conducting business.

8.    <u>Miscellaneous</u>

8.1    <u>Delegation</u>.  Company shall not delegate any service, activity or other obligation required under the Agreement, as modified by this Part D Addendum (including the provision of Covered Part D Prescription Drugs by Company Pharmacies to Medicare Drug Plan Members), to an Affiliate or third party, without the prior written consent of Administrator and all applicable Clients, as may be communicated by Administrator.  Any such delegation, if consented to (an "Approved Delegation"), shall be performed by the delegate in accordance with the Clients' respective contractual obligations to CMS and in accordance with Company's contractual obligations hereunder.  Company agrees that any agreements of Company or any Company Pharmacy with respect to an Approved Delegation shall be in writing, signed by the parties to be bound thereby and in compliance with all applicable Medicare Laws and Regulations.  In the event that a delegate of Company or a Company Pharmacy fails or is unable (for any reason whatsoever) to perform in a satisfactory manner any services, activities or other obligations which have been sub-delegated pursuant to an Approved Delegation, then Administrator, any affected Client or CMS shall have the right to suspend, revoke or terminate such Approved Delegation effective upon the date set forth in a written notice furnished to Company.  Additionally, an affected Client or CMS shall have the right to institute corrective action plans or seek other remedies or curative measures respecting the unsatisfactory Approved Delegation consistent with applicable Medicare Laws and Regulations.  Any attempted sub-delegation by Company or a Company Pharmacy which is not an Approved Delegation shall be null and void and of no force or effect.

8.2    <u>Monitoring</u>.  Without affecting the obligations, duties and responsibilities of the Parties under the Pharmacy Network Agreement (as modified by this Part D Addendum) or the Parties' allocation of responsibilities and risks hereunder, Company acknowledges and understands that the Clients are

responsible to CMS for the arrangement of Covered Part D Prescription Drugs to Medicare Drug Plan Members. In view of the foregoing, Company shall permit each Client, directly or through Administrator or its other representatives, to monitor the provision of Covered Part D Prescription Drugs to Medicare Drug Plan Members and to evaluate and audit the Company Pharmacies' performance thereof on an on-going basis, in any manner that the Clients or Administrator deem appropriate for compliance with the Clients' obligations to CMS. The rights specifically reserved for the Clients under this Section 8.2 shall not relieve Company or any Company Pharmacy from its obligations under the Pharmacy Network Agreement, as hereby amended.

8.3     <u>Amendments</u>. Without limiting in any way the generality of Section 3.13.3 of the Pharmacy Network Agreement, if CMS issues requirements, including, but not limited to the dispensing of Covered Prescription Services by long term care pharmacies to Members in long term care facilities in no greater than a specified number of days' increments (i.e. "short cycle dispensing"), Administrator may unilaterally and immediately or at a later date as determined solely by Administrator amend the Pharmacy Network Agreement (including but not limited to this Part D Addendum) by sending a notice amendment to Company revising the applicable language of the Pharmacy Network Agreement (including but not limited to this Part D Addendum), including but not limited to the respective dispensing fee.

**END OF MEDICARE PART D ADDENDUM**

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

## RETAIL PHARMACY NETWORK COMPENSATION EXHIBIT TO THE MEDICARE PART D ADDENDUM TO THE PHARMACY NETWORK AGREEMENT

## MPD2 NETWORK

This Retail Pharmacy Network Compensation Exhibit for the MPD2 NETWORK ("MPD2 Network Exhibit") amends the Medicare Part D Addendum to the Pharmacy Network Agreement ("Agreement"), and is made and entered into by Administrator and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the MPD2 Network, Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1. **NETWORK APPLICABILITY**. The MPD2 Network is strictly limited and only applicable to Clients' applicable Benefit Plans for the Medicare Part D Addendum. Therefore, the MPD2 Network does not, in any manner, support any commercial Benefit Plans or Medicaid Benefit Plans.

2. **MEDICARE PART D RETAIL PRESCRIPTION DRUG COMPENSATION**. Medicare Part D Retail Prescription Drug Compensation for the MPD2 Network shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate" or "Extended Day Supply Prescription Drug Contracted Rate" (as applicable).

**MEDICARE PART D RETAIL MPD2 NETWORK EXTENDED DAY SUPPLY NETWORK OPT-OUT**

If Company does **NOT** want to participate in the Medicare Part D Retail MPD2 Network Extended Day Supply Network, Company must initial and date below. As a result, by Company completing the following, it is choosing to **NOT** participate in any Client's Medicare Part D Retail MPD2 Network Extended Day Supply Network.

COMPANY ELECTS **NOT** TO PARTICIPATE IN THE MEDICARE PART D MPD2 NETWORK EXTENDED DAY SUPPLY NETWORK

_____(INITIAL)      _____ (DATE)

3. **MEDICARE PART D VACCINE FEE**. The Vaccine Administration Fee for the administration of Covered Part D Vaccines to Members in the MPD2 Network, as described in Section 4.9 of the Medicare Part D Addendum, shall be _____ per dose.

4. **TERM AND TERMINATION**. In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this MPD2 Network Exhibit.

**4.1** <u>Term</u>. Following the Effective Date of this MPD2 Network Exhibit as noted on the signature page hereto, the term of this MPD2 Network Exhibit shall continue through the term established in the Agreement.

**4.2** <u>Termination of this MPD2 Network Exhibit</u>. Termination of this MPD2 Network Exhibit shall not automatically result in a termination of the Medicare Part D Addendum or the Agreement.

**5.** **EFFECT OF THIS EXHIBIT AMENDMENT.** This MPD2 Network Exhibit amendment will only remain in effect so long as the Agreement remains in full force and effect by and between Administrator and Company. In the event of any conflict between the terms set forth in this MPD2 Network Exhibit amendment and the terms of the Agreement, the terms set forth in this MPD2 Network Exhibit shall supersede and control. Except as otherwise amended by this MPD2 Network Exhibit, all other terms and conditions of the Agreement shall remain in full force and effect. Capitalized terms used in this MPD2 Network Exhibit shall have the meaning ascribed to them in the Agreement unless otherwise defined herein.

IN WITNESS WHEREOF, the parties have caused this MPD2 Network Exhibit to be executed by their authorized representatives as of the date written below.

Company:

    Omni-One-Med Pharmacy

*[INSERT COMPANY NAME]*

Chain Code(s)/NCPDP # 5907449/

By: Oliver Anosike (May 21, 2013)
    (signature)

Name: Oliver Anosike
    (print name)

Title: Manager/PIC

Date: May 21, 2013

Administrator:

OptumRx, Inc.

    Elie Bahou

    Elie Bahou, PharmD, M.B.A
    Senior Vice President
By:    Network Relations
    (signature)

Name: Elie M. Bahou Pharm.D, M.B.A.

Title: Senior Vice President, Network Relations

Execution Date: MAY 3 1 2013

Effective Date: MAY 3 1 2013

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

## N1 NETWORK and N1-P NETWORK COMPENSATION EXHIBIT
## TO THE COMMERCIAL ADDENDUM AND THE MEDICAID ADDENDUM TO THE
## PHARMACY NETWORK AGREEMENT

This N1 Network and N1-P Network Compensation Exhibit ("N1/N1-P Exhibit") amends the Commercial Addendum and the Medicaid Addendum to the Pharmacy Network Agreement ("Agreement") and is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the N1 Network and N1-P Network, Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1. **NETWORK APPLICABILITY**. The N1 Network and N1-P Network are strictly limited and only applicable to Clients' applicable Benefit Plans for the respective Commercial Addendum and Medicaid Addendum. Therefore, the N1 Network and N1-P Network do not, in any manner, support any Client Medicare Part D Benefit Plans.

2. **PRESCRIPTION DRUG COMPENSATION**. The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate" or "Extended Day Supply Prescription Drug Contracted Rate" (as applicable).

### N1 NETWORK AND N1-P NETWORK EXTENDED DAY SUPPLY NETWORK OPT-OUT

If Company does **NOT** want to participate in the N1 Network and N1-P Network Extended Day Supply Network, Company must initial and date below. As a result, by Company completing the following, it is choosing to **NOT** participate in any Client's N1 Network and N1-P Network Extended Day Supply Network.

COMPANY ELECTS **NOT** TO PARTICIPATE IN THE N1 NETWORK AND N1-P NETWORK EXTENDED DAY SUPPLY NETWORK

_____ (INITIAL)       _____ (DATE)

**3.** **TERM AND TERMINATION**. In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this N1/N1-P Exhibit.

    **3.1** Term. Following the Effective Date of this N1/N1-P Exhibit, as noted on the signature page hereto, the term of this N1/N1-P Exhibit shall continue through the term established in the Agreement.

    **3.2** Termination of this N1/N1-P Exhibit. Termination of this N1/N1-P Exhibit shall not automatically result in a termination of the Agreement, the Commercial Addendum or the Medicaid Addendum.

**4.** **EFFECT OF THIS EXHIBIT AMENDMENT.** This N1/N1-P Exhibit amendment will only remain in effect so long as the Agreement remains in full force and effect by and between Administrator and Company. In the event of any conflict between the terms set forth in this N1/N1-P Exhibit amendment and the terms of the Agreement, the terms set forth in this N1/N1-P Exhibit shall supersede and control. Except as otherwise amended by this N1/N1-P Exhibit, all other terms and conditions of the Agreement shall remain in full force and effect. Capitalized terms used in this N1/N1-P Exhibit shall have the meaning ascribed to them in the Agreement unless otherwise defined herein.

IN WITNESS WHEREOF, the parties have caused this N1/N1-P Exhibit to be executed by their authorized representatives as of the date written below.

Company:

    Omni-One-Med Pharmacy
_____
[INSERT COMPANY NAME]

Chain Code/NCPDP # __5907449__

By: _____
    (signature)

Name: __Oliver Anosike__
    (print name)

Title: __Manager/PIC__

Date: __May 21, 2013__

Administrator:

OptumRx, Inc.    *Elie Bahou*

    Elie Bahou, PharmD, M.B.A
    Senior Vice President
By: _____Network Relations_____
    (signature)

Name: Elie M. Bahou Pharm.D., M.B.A.

Title: Senior Vice President, Network Relations

Execution Date: _____**MAY 3 1 2013**_____

Effective Date: _____MAY 3 1 2013_____

## OPTIMA NETWORK COMPENSATION EXHIBIT TO THE COMMERCIAL ADDENDUM AND THE MEDICAID ADDENDUM TO THE PHARMACY NETWORK AGREEMENT

This Optima Network Compensation Exhibit ("Optima Exhibit") amends the Commercial Addendum and the Medicaid Addendum to the Pharmacy Network Agreement ("Agreement"), and is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the Optima Network, Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1.  **NETWORK APPLICABILITY**.  The Optima Network is strictly limited and only applicable to Clients' applicable Benefit Plans for the respective Commercial Addendum and Medicaid Addendum. Therefore the Optima Network does not, in any manner, support any Client Medicare Part D Benefit Plans.

2.  **PRESCRIPTION DRUG COMPENSATION**.  The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate" or "Extended Day Supply Prescription Drug Contracted Rate" (as applicable).

### OPTIMA NETWORK EXTENDED DAY SUPPLY NETWORK OPT-OUT

If Company does **NOT** want to participate in the Optima Network Extended Day Supply Network, Company must initial and date below.  As a result, by Company completing the following, it is choosing to **NOT** participate in any Client's Optima Network Extended Day Supply Network.

COMPANY ELECTS **NOT** TO PARTICIPATE IN THE OPTIMA NETWORK EXTENDED DAY SUPPLY NETWORK

_____ (INITIAL)       _____(DATE)

3.  **TERM AND TERMINATION**.  In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this Optima Exhibit.

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 50 of 63

**3.1** <u>Term</u>. Following the Effective Date of this Optima Exhibit, as noted on the signature page hereto, the term of this Optima Exhibit shall continue through the term established in the Agreement.

**3.2** <u>Termination of this Optima Exhibit.</u> This Optima Exhibit may be terminated in accordance with the same notice requirements of the Pharmacy Network Agreement. Termination of this Optima Exhibit shall not automatically result in a termination of the Agreement, the Commercial Addendum or the Medicaid Addendum.

**4.** **EFFECT OF THIS EXHIBIT AMENDMENT.** This Optima Exhibit amendment will only remain in effect so long as the Agreement remains in full force and effect by and between Administrator and Company. In the event of any conflict between the terms set forth in this Optima Exhibit amendment and the terms of the Agreement, the terms set forth in this Optima Exhibit shall supersede and control. Except as otherwise amended by this Optima Exhibit, all other terms and conditions of the Agreement shall remain in full force and effect. Capitalized terms used in this Optima Exhibit shall have the meaning ascribed to them in the Agreement unless otherwise defined herein.

IN WITNESS WHEREOF, the parties have caused this Optima Exhibit to be executed by their authorized representatives as of the date written below.

Company:

Omni-One-Med Pharmacy

*[INSERT COMPANY NAME]*

Chain Code/NCPDP # ___5907449___

By: _Oliver Anosike (May 21, 2013)___
(signature)

Name: __Oliver Anosike__
(print name)

Title: __Manager/PIC__

Date: __May 21, 2013__

Administrator:

OptumRx, Inc.

_Elie Bahou_

By: _____
Elie Bahou, PharmD, M.B.A
Senior Vice President
(signature) Network Relations

Name: Elie M. Bahou Pharm.D, M.B.A.

Title: Senior Vice President, Network Relations

Execution Date: __MAY 3 1 2013__

Effective Date: __MAY 3 1 2013__

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY
AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE
SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 51 of 63

## RXS NATIONAL NETWORK COMPENSATION EXHIBIT TO THE COMMERCIAL ADDENDUM AND THE MEDICAID ADDENDUM

This RxS National Network Compensation Exhibit to the Commercial Addendum and the Medicaid Addendum ("RxS National Exhibit"), effective as of the noted date set forth by Administrator on the signature page hereto (the "RxS National Exhibit Effective Date"), is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In exchange for participation in the RxS National Network, Company agrees to the following Prescription Drug Compensation, and any other applicable requirements, as indicated below.

1.  **NETWORK APPLICABILITY**.  The RxS National Network is strictly limited and only applicable to Clients' applicable Commercial and Medicaid Benefit Plans. The RxS National Network does not, in any manner, support any Medicare Part D Benefit Plans.

2.  **PRESCRIPTION DRUG COMPENSATION**.  The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate".

3.  **TERM AND TERMINATION**.  In addition to the terms and conditions in Article 5 of the Pharmacy Network Agreement, the following terms also apply to the term and termination of this RxS National Exhibit to the Commercial Addendum and Medicaid Addendum.

    3.1  Term. Following the RxS National Exhibit Effective Date, the term of this RxS National Exhibit shall continue through the term established in the Pharmacy Network Agreement.

    3.2  Termination of this RxS National Exhibit. This RxS National Exhibit may be terminated in accordance with the same notice requirements under Section 5.2 of the Pharmacy Network Agreement. Termination of this RxS National Exhibit shall not automatically result in a termination of the Pharmacy Network Agreement, the Commercial Addendum or the Medicaid Addendum.

4.  **GENERAL TERMS AND CONDITIONS**.  Company understands and agrees that all of the terms and conditions established in the Pharmacy Network Agreement, the Commercial Addendum (solely for Commercial Benefit Plans) and the Medicaid Addendum (solely for Medicaid Benefit Plans) shall apply to Covered Prescription Services provided hereunder and are hereby incorporated herein by reference. The Pharmacy Network Agreement, the Commercial Addendum (solely for Commercial Benefit Plans), the Medicaid Addendum (solely for Medicaid Benefit Plans) and this RxS National Exhibit constitute the entire agreement between the parties with respect to the subject matter of this RxS National Exhibit, and supersede any and all other agreements, writings, and understandings.

IN WITNESS WHEREOF, the parties have caused this RxS National Exhibit to be executed by their
authorized representatives as of the date written below.

Company:
    Omni-One-Med Pharmacy
_____
*[INSERT COMPANY NAME]*

Chain Code/NCPDP #   5907449/
_____

By: _Oliver Anosike (May 21, 2013)_____
    (signature)

Name: _Oliver Anosike_____
     (print name)  Manager/PIC
Title: _____

Date: _May 21, 2013_____

Administrator:

OptumRx, Inc.

              *Elie Bahou*

              Elie Bahou, PharmD, M.B.A
              Senior Vice President
By: _____  Network Relations
    (signature)

Name: _Elie M. Bahou Pharm.D, M.B.A._

Title: _Senior Vice President, Network Relations_

Execution Date: _____MAY 3 1 2013____

Effective Date: _____MAY 3 1 2013____

## RXS DISCOUNT NETWORK COMPENSATION EXHIBIT TO THE COMMERCIAL ADDENDUM

This RxS Discount Network Compensation Exhibit to the Commercial Addendum ("RxS Discount Exhibit"), effective as of the noted date set forth by Administrator on the signature page hereto (the "RxS Discount Exhibit Effective Date"), is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In exchange for participation in the RxS Discount Network, Company agrees to the following Prescription Drug Compensation, and any other applicable requirements, as indicated below.

1.  **NETWORK APPLICABILITY**. The RxS Discount Network is strictly limited and only applicable to Clients' applicable Commercial Benefit Plans. The RxS Discount Network does not, in any manner, support any Medicaid or Medicare Part D Benefit Plans.

2.  **PRESCRIPTION DRUG COMPENSATION**. The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate".

3.  **TERM AND TERMINATION**. In addition to the terms and conditions in Article 5 of the Pharmacy Network Agreement, the following terms also apply to the term and termination of this RxS Discount Exhibit to the Commercial Addendum.

    3.1  Term. Following the RxS Discount Exhibit Effective Date, the term of this RxS Discount Exhibit shall continue through the term established in the Pharmacy Network Agreement.

    3.2  Termination of this RxS Discount Exhibit. This RxS Discount Exhibit may be terminated in accordance with the same notice requirements under Section 5.2 of the Pharmacy Network Agreement. Termination of this RxS Discount Exhibit shall not automatically result in a termination of the Pharmacy Network Agreement or the Commercial Addendum.

4.  **GENERAL TERMS AND CONDITIONS**. Company understands and agrees that all of the terms and conditions established in the Pharmacy Network Agreement and the Commercial Addendum shall apply to Covered Prescription Services provided hereunder and are hereby incorporated herein by reference. The Pharmacy Network Agreement, the Commercial Addendum, and this RxS Discount Exhibit constitute the entire agreement between the parties with respect to the subject matter of this RxS Discount Exhibit, and supersede any and all other agreements, writings, and understandings.

1

GX234.053

DOJ_18CR368-0064909

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 54 of 63

IN WITNESS WHEREOF, the parties have caused this RxS Discount Exhibit to be executed by their authorized representatives as of the date written below.

Company:

Omni-One-Med Pharmacy

_[INSERT COMPANY NAME]_

Chain Code(s)/NCPDP # ___5907449,___

By: _Oliver Anosike (May 21, 2013)_
     (signature)

Name: _Oliver Anosike_
     (print name)

Title: _Manager/PIC_

Date: _May 21, 2013_

Administrator:

OptumRx, Inc.

_Elie Bahou_

Elie Bahou, PharmD, M.B.A
Senior Vice President
Network Relations

By: _____
     (signature)

Name: _Elie M. Bahou Pharm.D, M.B.A._

Title: _Senior Vice President, Network Relations_

Execution Date: MAY 3 1 2013 _____

Effective Date: _____ MAY 3 1 2013

### OPTUMRX N2 BROAD NETWORK COMPENSATION EXHIBIT
### TO THE COMMERCIAL ADDENDUM AND THE MEDICAID ADDENDUM TO THE
### PHARMACY NETWORK AGREEMENT

This OptumRX N2 Broad Network Compensation Exhibit ("N2 Exhibit") amends the Commercial Addendum and the Medicaid Addendum to the Pharmacy Network Agreement ("Agreement") and is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the OptumRX N2 Broad Network ("N2 Network"), Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1. **NETWORK APPLICABILITY**. The N2 Network is strictly limited and only applicable to Clients' applicable Benefit Plans for the respective Commercial Addendum and Medicaid Addendum. Therefore, the N2 Network does not, in any manner, support any Client Medicare Part D Benefit Plans.

2. **PRESCRIPTION DRUG COMPENSATION**. The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate".

3. **TERM AND TERMINATION**. In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this N2 Exhibit.

    3.1    Term. Following the Effective Date of this N2 Exhibit, as noted on the signature page hereto, the term of this N2 Exhibit shall continue through the term established in the Agreement.

   3.2   Termination of this N2 Exhibit.  Termination of this N2 Exhibit shall not automatically
         result in a termination of the Agreement, the Commercial Addendum or the Medicaid
         Addendum.

4.   **GENERAL TERMS AND CONDITIONS**.  Except as amended by this N2 Exhibit,  Company
     understands and agrees that all of the terms and conditions established in the Agreement,
     the Commercial Addendum (solely for such applicable Benefit Plans) and the Medicaid
     Addendum (solely for such applicable Benefit Plans) shall apply to Covered Prescription
     Services provided hereunder and are hereby incorporated herein by reference. The
     Agreement, the Commercial Addendum, the Medicaid Addendum and this N2 Exhibit
     constitute the entire agreement between the parties with respect to the subject matter of this
     N2 Exhibit, and supersede any and all other prior and/or contemporaneous agreements,
     writings, and understandings.

IN WITNESS WHEREOF, the parties have caused this N2 Exhibit to be executed by their authorized
representatives as of the date written below.

Company:

   Omni-One-Med Pharmacy
_____
*[INSERT COMPANY NAME]*

Chain Code/NCPDP # 5907449/

By: _Oliver Anosike (May 21, 2013)_
      (signature)

Name: Oliver Anosike
         (print name)
Title: _____ Manager/PIC

Date: __May 21, 2013_____

Administrator:

OptumRx, Inc.

           *Elie Bahou*

By: _____
      (signature)

      Elie Bahou, PharmD, M.B.A
      Senior Vice President
      Network Relations

Name: Elie M. Bahou Pharm.D., M.B.A.

Title: Senior Vice President, Network Relations

Execution Date: _____
                              MAY 3 1 2013
Effective Date: _____
                              MAY 3 1 2013

## OPTUMRX EDS2 ("EDS2") NETWORK COMPENSATION EXHIBIT TO THE COMMERCIAL ADDENDUM AND THE MEDICAID ADDENDUM TO THE PHARMACY NETWORK AGREEMENT

This OptumRx EDS2 ("EDS2") Network Compensation Exhibit ("EDS2 Exhibit") amends the Commercial Addendum and the Medicaid Addendum to the Pharmacy Network Agreement ("Agreement") and is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the EDS2 Network, Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1. **NETWORK APPLICABILITY**. The EDS2 Network is strictly limited and only applicable to Clients' applicable Benefit Plans for the respective Commercial Addendum and Medicaid Addendum. Therefore, the EDS2 Network does not, in any manner, support any Client Medicare Part D Benefit Plans.

2. **PRESCRIPTION DRUG COMPENSATION**. The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Extended Day Supply Prescription Drug Contracted Rate".

3. **TERM AND TERMINATION**. In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this EDS2 Exhibit.

   3.1   Term. Following the Effective Date of this EDS2 Exhibit, as noted on the signature page hereto, the term of this EDS2 Exhibit shall continue through the term established in the Agreement.

**3.2** <u>Termination of this EDS2 Exhibit.</u> Termination of this EDS2 Exhibit shall not automatically result in a termination of the Agreement, the Commercial Addendum or the Medicaid Addendum.

**4.** **GENERAL TERMS AND CONDITIONS**. Except as amended by this EDS2 Exhibit, Company understands and agrees that all of the terms and conditions established in the Agreement, the Commercial Addendum (solely for such applicable Benefit Plans) and the Medicaid Addendum (solely for such Benefit Plans) shall apply to Covered Prescription Services provided hereunder and are hereby incorporated herein by reference. The Agreement, the Commercial Addendum, the Medicaid Addendum, and this EDS2 Exhibit constitute the entire agreement between the parties with respect to the subject matter of this EDS2 Exhibit, and supersede any and all other prior and/or contemporaneous agreements, writings, and understandings.

IN WITNESS WHEREOF, the parties have caused this EDS2 Exhibit to be executed by their authorized representatives as of the date written below.

Company:

Omni-One-Med Pharmacy

_[INSERT COMPANY NAME]_

Chain Code/NCPDP # ___5907449___

By: _Oliver Anosike (May 21, 2013)_
     (signature)

Name: _Oliver Anosike_
      (print name)

Title: ___Manager/PIC___

Date: ___May 21, 2013___

Administrator:

OptumRx, Inc.

_Elie Bahou_

By: _____
    (signature)    Elie Bahou, PharmD, M.B.A
                   Senior Vice President
                   Network Relations

Name: _Elie M. Bahou Pharm.D, M.B.A._

Title: _Senior Vice President, Network Relations_
                                   MAY 3 1 2013

Execution Date: _____
                      MAY 3 1 2013

Effective Date: _____

OPTUMRx CONFIDENTIAL MATERIAL: CONTAINS HIGHLY SENSITIVE PROPRIETARY AND/OR TRADE SECRET INFORMATION; PUBLIC DISCLOSURE WILL CAUSE SIGNIFICANT COMPETITIVE INJURY AND DISRUPTION

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 59 of 63

## OPTUMRX Z1 BROAD NETWORK COMPENSATION EXHIBIT TO THE COMMERCIAL ADDENDUM TO THE PHARMACY NETWORK AGREEMENT

This OptumRX Z1 Broad Network Compensation Exhibit ("Z1 Exhibit") amends the Commercial Addendum to the Pharmacy Network Agreement ("Agreement") and is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the OptumRX Z1 Broad Network ("Z1 Network"), Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1.  **NETWORK APPLICABILITY**. The Z1 Network is strictly limited and only applicable to Clients' applicable Benefit Plans for the respective Commercial Addendum. Therefore, the Z1 Network does not, in any manner, support any Client Medicaid Benefit Plans or Medicare Part D Benefit Plans.

2.  **PRESCRIPTION DRUG COMPENSATION**. The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Prescription Drug Contracted Rate".

3.  **TERM AND TERMINATION**. In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this Z1 Exhibit.

    3.1  Term. Following the Effective Date of this Z1 Exhibit, as noted on the signature page hereto, the term of this Z1 Exhibit shall continue through the term established in the Agreement.

    3.2  Termination of this Z1 Exhibit. Termination of this Z1 Exhibit shall not automatically result in a termination of the Agreement or the Commercial Addendum.

4.  **GENERAL TERMS AND CONDITIONS**. Except as amended by this Z1 Exhibit, Company understands and agrees that all of the terms and conditions established in the Agreement

and the Commercial Addendum (solely for such applicable Benefit Plans) shall apply to Covered Prescription Services provided hereunder and are hereby incorporated herein by reference.  The Agreement, the Commercial Addendum, and this Z1 Exhibit constitute the entire agreement between the parties with respect to the subject matter of this Z1 Exhibit, and supersede any and all other prior and/or contemporaneous agreements, writings, and understandings.

5.    **ZERO BALANCE PRICING LOGIC.**    When the Prescription Drug Contracted Rate listed above for a particular Covered Prescription Service is less than the applicable copayment, Company's compensation in full for the provision of such Covered Prescription Service shall be the lesser of: (i) the applicable copayment or (ii) the Pharmacy's applicable Usual and Customary Charge.  The preceding sentence shall apply only to flat or fixed-dollar-amount copayments.

IN WITNESS WHEREOF, the parties have caused this Z1 Exhibit to be executed by their authorized representatives as of the date written below.

Company:

Omni-One-Med Pharmacy S

*[INSERT COMPANY NAME]*

Chain Code/NCPDP # ____5907449_____

By: _Oliver Anosike (May 21, 2013)_____
     (signature)

Name: _Oliver Anosike_____
       (print name)

Title: _____Manager/PIC_____

Date: _____May 21, 2013_____

Administrator:

OptumRx, Inc.

_Elie Bahou_

By: _____
     (signature)   Elie Bahou, PharmD, M.B.A
                   Senior Vice President
                   Network Relations

Name: Elie M. Bahou Pharm.D, M.B.A.

Title: Senior Vice President, Network Relations

Execution Date: _____MAY 3 1 2013_____

Effective Date: _____MAY 3 1 2013__

## OPTUMRX EDS1 ("EDS1") NETWORK COMPENSATION EXHIBIT TO THE COMMERCIAL ADDENDUM TO THE PHARMACY NETWORK AGREEMENT

This OptumRx EDS1 ("EDS1") Network Compensation Exhibit ("EDS1 Exhibit") amends the Commercial Addendum to the Pharmacy Network Agreement ("Agreement") and is made and entered into by Administrator, and the undersigned Company, on behalf of itself and each of its Pharmacies. In consideration of Company participating and providing Covered Prescription Services in the EDS1 Network, Administrator agrees to pay Company the following Prescription Drug Compensation, subject to the other terms and conditions below.

1.  **NETWORK APPLICABILITY**. The EDS1 Network is strictly limited and only applicable to Clients' applicable Benefit Plans for the respective Commercial Addendum. Therefore, the EDS1 Network does not, in any manner, support any Client Medicaid or Medicare Part D Benefit Plans.

2.  **PRESCRIPTION DRUG COMPENSATION**. The Prescription Drug Compensation shall equal: the lesser of (i) Company's Usual and Customary Charge or (ii) the Submitted Cost Amount or (iii) the contracted rate defined in the chart below as "Extended Day Supply Prescription Drug Contracted Rate".

3.  **TERM AND TERMINATION**. In addition to the terms and conditions of the Agreement, the following terms also apply to the term and termination of this EDS1 Exhibit.

    3.1  Term. Following the Effective Date of this EDS1 Exhibit, as noted on the signature page hereto, the term of this EDS1 Exhibit shall continue through the term established in the Agreement.

    3.2  Termination of this EDS1 Exhibit. Termination of this EDS1 Exhibit shall not automatically result in a termination of the Agreement or the Commercial Addendum.

4.  **GENERAL TERMS AND CONDITIONS**.  Except as amended by this EDS1 Exhibit, Company understands and agrees that all of the terms and conditions established in the Agreement and the Commercial Addendum (solely for such applicable Benefit Plans) shall apply to Covered Prescription Services provided hereunder and are hereby incorporated herein by reference.  The Agreement, the Commercial Addendum,  and this EDS1 Exhibit constitute the entire agreement between the parties with respect to the subject matter of this EDS1 Exhibit, and supersede any and all other prior and/or contemporaneous agreements, writings, and understandings.

5.  **ZERO-BALANCE PRICING LOGIC**.   When the Prescription Drug Contracted Rate listed above for a particular Covered Prescription Service is less than the applicable copayment, Company's compensation in full for the provision of such Covered Prescription Service shall be the lesser of: (i) the applicable copayment or (ii) the Pharmacy's applicable Usual and Customary Charge.  The preceding sentence shall apply only to flat or fixed-dollar-amount copayments.

IN WITNESS WHEREOF, the parties have caused this EDS1 Exhibit to be executed by their authorized representatives as of the date written below.

Company:

Omni-One-Med Pharmacy
_____
*[INSERT COMPANY NAME]*

Chain Code/NCPDP #  5907449

By: _____
Oliver Anosike (May 21, 2013)
      (signature)

Name:  Oliver Anosike
_____
      (print name)

Title: _____
       Manager/PIC

Date:  May 21, 2013
_____

Administrator:

OptumRx, Inc.

Elie Bahou

By: _____
      Elie Bahou, PharmD, M.B.A
      Senior Vice President
      (signature) Network Relations

Name: Elie M. Bahou Pharm.D, M.B.A.

Title: Senior Vice President, Network Relations

Execution Date: ___ MAY 3 1 2013

Effective Date: ___ MAY 3 1 2013

Case 4:18-cr-00368 Document 533-39 Filed on 07/22/23 in TXSD Page 63 of 63



Re:  Reinstatement of Published Medi-Span Average Wholesale Price ("AWP")
for select Networks as part of the new Pharmacy Network Agreement

As you are aware, in 2009 OptumRx implemented an adjusted AWP component within the Prescription Drug Compensation it reimburses pharmacies for providing Covered Prescription Services pursuant to the particular Prescription Drug Services Agreement by and between the pharmacy and OptumRx. This implementation of adjusted AWP was to maintain the parties' relative economic positions as a direct result of the March 29, 2009 First Data Bank and Medi-Span AWP class action settlements that rolled back the AWP on approximately 5,000 drugs (the "Settlements"). Although FDB and Medi-Span initially announced their intent to discontinue publishing AWP within two (2) years after the Settlements, Medi-Span recently indicated it will continue to publish AWP for the foreseeable future.

As a result of the above and in response to industry demand, OptumRx will begin the process to discontinue utilizing an adjusted AWP and will implement an unadjusted AWP as published by Medi-span for select networks.  Therefore, effective October 1, 2011, OptumRx will begin using the unadjusted AWP as published by Medi-Span for its clients using select networks, including the commercial N1 Network ("N1-P Network").  Not all OptumRx networks will be adjudicating using the unadjusted AWP as published by Medi-Span.  We expect all new networks with an effective date on or after October 1, 2011 to use the unadjusted AWP as published by Medi-Span.

The N1-P published AWP Network Prescription Drug Compensation terms and the legacy adjusted AWP N1 Network Prescription Drug Compensation will continue to maintain the parties' relative economic positions.

In the enclosed Pharmacy Network Agreement, the term "*Average Wholesale Price" or "*AWP" will refer to the "adjusted" AWP per Section 4.7.2 of the Pharmacy Network Agreement.  Whereas the term, "Average Wholesale Price" or "AWP" will refer to the unadjusted AWP as published by Medi-Span.

OptumRx expects the transition to adjudicating all claims using the unadjusted AWP as published by Medi-Span to occur over the next several years as clients migrate from the adjusted AWP to these new unadjusted AWP networks.

Rev.1.24.13