## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** (the "Agreement") is executed as of this 1st day of December, 2014, by and between PHARMS, LLC, a Texas limited liability company ("Manager"), and SAFETY & HEALTH TECHNOLOGY, LLC, a Texas limited liability corporation ("Owner").

### RECITALS:

**A.** Owner owns and operates a retail and compounding pharmacy currently located at 4645 Highway 6, Sugar Land TX 77478 (the "Pharmacy"); and

**B.** Owner desires to retain Manager to manage, on an exclusive basis, certain functions of Owner's business, as provided in more detail in Article 3 of this Agreement, and Manager has agreed to accept such duties upon the terms and conditions of this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager hereby covenant and agree as follows:

### ARTICLE 1
### Definitions and Legal Interpretation

**1.1** **Defined Terms.** As used in this Agreement and when delineated by initial capital letter, the following terms shall have the following respective meanings:

**(a)** "Agreement" means this Management Agreement.

**(b)** "Commencement Date" means December 1, 2014.

**(c)** "Cure Period" means, as applicable, (i) a period of thirty (30) days after the date of receipt of written notice of default which does not involve the payment of money or (ii) a period of five (5) business days after the receipt of written notice with respect to a default which involves the payment of money.

**(d)** "Fiscal Year" means each calendar year (January 1 through December 31) during the term of this Agreement. If the Commencement Date does not occur on January 1, the first Fiscal Year hereunder shall commence on the date of the Commencement Date and shall continue until the following December 31.

**(e)** "Management Fee" means the compensation payable to Manager for all services rendered by Manager hereunder, as set forth in Article 5.

**(f)** "Manager Representative" means each individual selected by Manager from time to time to represent Manager in all discussion and negotiations with Owner.

**(g)** "Operating Budget" means a budget of projected revenues and expenses concerning the operation of the Pharmacy.

**(h)** "Operating Expenses" mean the aggregate of those expenditures: (i) incurred by Owner, pursuant to, in the course of, and directly related to the ownership or the Pharmacy; and (ii) incurred by Manager, pursuant to, in the course of, and directly related to providing services

GOVERNMENT
EXHIBIT
**1202**
4:18-CR-368

GX1202.001

Defendant (2)
Exhibit
**82**
No. 4:18-CR-368

DX BREIM 82-1

pursuant to the terms of this Agreement, including, but not limited to: (1) salaries, wages, and other compensation (including payroll taxes) paid by Manager to its employees, whether to those performing the services on-site at the Pharmacy or in Manager's other office location(s); (2) office supplies, postage, printing, and routine office expenses; (3) insurance premiums for insurance policies required to be maintained pursuant to this Agreement; (4) other expenses incurred by Manager as approved by Owner.

    **(i)**    "Owner Representative" means each individual selected by Owner from time to time to represent Owner in all discussions and negotiations with Manager.

    **(j)**    "Parties" means, collectively, Owner and Manager, and a "Party" shall refer to either Owner or Manager, as applicable.

    **(k)**    "Term" means the period of ten (10) years beginning on the Commencement Date.

    **1.2**    **Other Terms and Construction**. All words which are used as defined terms are delineated by initial capital letters and shall have the meaning ascribed in Section 1.1 or in the applicable provisions of this Agreement in which such term is defined. All words not specifically used as defined terms herein shall be construed in conformity with the meanings commonly ascribed thereto, relative to the context in which each is used. All articles, section and subsection headings used are for reference and identification purposes only and are not intended to, and shall not under any circumstances, serve to alter, amend, amplify, vary or limit the express provisions hereof. The word "including" shall be construed as if followed by the phrase "but not limited to" in each instance in which it is used. Any exhibit or schedule to which reference is made in this Agreement and which is attached to this Agreement is incorporated into this Agreement by that reference for all purposes. All rights, powers, and remedies provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable law and are intended to be limited to the extent necessary so that such provisions will not render this Agreement invalid or unenforceable under applicable law. If any provision of this Agreement shall be held invalid, illegal, or unenforceable during the Term, the validity of the other provisions of this Agreement shall in no way be affected thereby. Owner and Manager hereby respectively acknowledge that each such party has substantial experience in the negotiation of business transactions, that this Agreement is the product of extensive negotiations between the Parties and, therefore, no rule of strict construction with respect to the provisions of this Agreement shall be applicable.

## ARTICLE 2
### Retention and Relationship

    **2.1**    **Retention.**    Upon and subject to the terms and conditions set forth in this Agreement, Owner hereby retains and appoints Manager, and Manager hereby accepts such retention and appointment, to exclusively render the limited services specified in Article 3.

    **2.2**    **Relationship of Parties.** The relationship of Manager to Owner is that of an independent contractor; and no other provision contained in this Agreement shall ever be construed to create a partnership, joint venture, or agency relationship between Manager and Owner or as creating a landlord/tenant relationship between Owner and Manager. Manager shall have the right to render similar classes of services for other business entities and persons (regardless of whether they are engaged in the same business as Owner) and may enter into such other business activities as Manager, in its sole discretion, may determine, including other business transactions with Owner which are beyond the scope of this Agreement.

**2.3   Delivery.** During the Term, and in the event Manager reasonably requests so, Owner shall provide Manager with an office and office equipment (including, without limitation, desks, chairs, tables, filing cabinets) for use in the performance of its services under this Agreement at mutually-agreeable rate, which rate shall not be less than the prevailing market rate for those facilities. Upon commencement of this Agreement, the Pharmacy shall be in substantial compliance with all applicable Legal Requirements and Insurance Requirements.   As used in this Agreement, the term "Legal Requirements" shall mean all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations and requirements of all governmental authorities, which now or at any time hereafter may be applicable to the Pharmacy, all federal, state, and local laws, regulations and ordinances pertaining to air and water quality, hazardous materials disposal and other environmental matters; and all laws, codes, and regulations pertaining to health or safety. The term "Insurance Requirements" means all terms of any insurance policy obtained by Owner covering or applicable to the Pharmacy, or personal property located at the Pharmacy; all requirements for the issuing of each such insurance policy; and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other bodies exercising any similar functions) which are applicable to or affect the Pharmacy.

### ARTICLE 3
### Management Duties and Obligations

**3.1   Management Duties.** During the Term hereof, Manager shall provide the following limited services:

**(a)   Bookkeeping.**  Manager shall perform, or shall have a reputable third party to perform, general bookkeeping services for the Pharmacy and shall, in performing its services hereunder, hire and retain at least one or more accounting clerks to assist with such services on a day-to-day basis.

**(b)   Human Resources, Payroll and Benefits Administration.** Manager shall assist Owner with hiring and training of Pharmacy employees, including (i) the determination from time to time of the numbers and qualifications of the employees needed to efficiently operate the Pharmacy, and (ii) the establishment, revision, and administration of wage scales, rates of compensation, employee benefits, rates and conditions of employment, initial and in-service training, staffing schedules, and job and position descriptions with respect to all employees of the Pharmacy, which shall be in accordance with the latest Operating Budget approved by Owner.  In performing its services hereunder, Manager shall make sure that all Pharmacy employees comply with all applicable Legal Requirements relative to those employees.  In addition, Manager shall provide, or shall have a reputable third party to provide, payroll administration services, including, but not limited to, payroll processing, payroll and any other related tax remittance, and health and fringe benefits administration, which cost shall be included within Operating Expenses.

**(c)   Information Technology.**  Manager shall be responsible for (i) the creation of the operating parameters for the Pharmacy and all of the Pharmacy employees' use of the information technology ("IT") systems and networks, including for any and all IT security and data assurance, as may be required by the Health Insurance Portability and Accountability Act of 1996 (commonly known as HIPAA), as amended, (ii) the operating network and all equipment needed to make the IT system work in accordance with an established operating standards of the Pharmacy, (iii) the capacity for operating applications development, storing and securing the electronic information the Pharmacy owns, and providing direct operating assistance in software use and data management to all functional areas of the Pharmacy, and (iv) the design, creation, hosting and maintenance of the Pharmacy's website, which cost shall be included within Operating Expenses.

(d)     **Insurance and Risk Management.**  Manager shall assist and advise Owner with respect to obtaining all insurance policies required to be maintained by the Pharmacy, including, but not limited to, policies covering comprehensive general liability, extended property, druggist, auto, and worker's compensation, which cost shall be included within Operating Expenses.

(e)     **Licensing.**  Manager shall assist the Pharmacy to obtain and maintain all federal, state, and local licenses and permits that are required for the operation of the Pharmacy, the cost of which shall be included within Operating Expenses.

(f)     **Collections Efforts.**  Manager shall, on behalf of Owner, initiate and pursue collection efforts for all accounts receivable that have been overdue, including such accounts receivable for pharmaceutical products and services, insurance reimbursements, and any other revenues due to Owner in connection with the operation of the Pharmacy.  All collections receipts will be delivered to Owner no later than the third (3rd) banking day following the date of receipt by Manager.

(g)     **Marketing.**  Manager shall (i) develop and maintain a marketing plan for Owner in order to promote and increase the sale of the Pharmacy's pharmaceutical products, (ii) identify and maintain a list of legitimate marketing targets, (iii) hire and/or contract a sales force and efficiently assign the areas of marketing and customers to such sales force, and (iv) track and be fully responsible for such sales persons' activities, sales and compensation.

(h)     **Budgeting.**  Manager shall participate in, and assist Owner with, the preparation of an Operating Budget setting forth an estimate of operating revenues and expenses for the next ensuing Fiscal Year, together with the recommendations of Manager, by line item, particularly with respect to any proposed changes or modifications of costs and expenses to be incurred by Manager in providing its services under this Agreement, such as any payroll rates and positions, IT expenses, insurance cost, and all other similar factors expected to differ significantly from those prevailing during the current Fiscal Year.  Owner shall have the final and complete authority with respect to the approval of the Operating Budget and may, in Owner's reasonable discretion, approve, modify, or reject any such Operating Budget, in whole or in part, or reject any item or items proposed by Manager in any such Operating Budget.  Owner and Manager shall use their respective best efforts to finalize the Operating Budget no later than fifteen (15) days prior to the beginning of the Fiscal Year covered by such Operating Budget. In the event that any Fiscal Year shall commence without an approved Operating Budget, Manager shall be entitled to make expenditures, or cause expenditures to be made, for items specified in the approved Operating Budget for the past Fiscal Year, at a rate not in excess of the rate permitted under that prior Operating Budget, without the prior written consent of Owner, unless such expense is necessary to comply with Legal Requirements or Insurance Requirements.  The cost and expenses incurred by Manager in participating and assisting Owner with the preparation of an Operating Budget shall be included within Operating Expenses.

(i)     **Renovation of the New Facility.**  Owner has leased approximately 1,972 net rentable square feet of space, located at 3701 Highway 6, Suite 3745, Sugar Land, Texas 77478 (the "New Facility"), and plans to relocate the Pharmacy business to the New Facility as soon as the renovation of the New Facility has been completed.  In connection therewith, Manager shall be responsible for:

(1)     The monitoring of the renovation of the New Facility by having at least one (1) individual knowledgeable in construction practices to act as the project supervisor who shall also be allowed access to all renovation contracts, including plans, designs, and renovation cost information; and

Pharms LLC - Management Agreement (Safety & Health Technology, LLC) – Page 4

(2)    The administration during the renovation of the New Facility in order to assure that the renovation shall have been completed in accordance with the budget approved by Owner.

(j)    **Additional Duties.**  In addition to the services that are more particularly described in this Article 3, Manager shall cause the implementation of any and all decisions of Owner, upon Owner's reasonable request, and cause such other actions or steps to be taken (not inconsistent with this Agreement) in providing the services hereunder.

(k)    **Duty of Care; Compliance with Law**.  At all times during the Term, Manager shall exercise its best reasonable efforts and do such acts and take such actions as Manager, in its reasonable judgment, deems necessary or advisable for the purpose of performing the services pursuant to this Agreement. Any contractor performing work at or for the Pharmacy at the request of Manager as part of the services Manager is responsible for pursuant to this Agreement will be required to maintain satisfactory insurance, including worker's compensation and insurance against liability for injury to persons and property arising out of all such contractor's work. In performing its duties hereunder, Manager shall comply with all applicable Legal Requirements and Insurance Requirements, including with all applicable federal, state, and local laws prohibiting discrimination in employment that are now in effect or come into effect during the Term. In addition, contemporaneously with entering into this Agreement, the Parties will execute a form of a Business Associate Agreement, attached as Exhibit A hereto, and shall execute any modifications, amendments or addenda thereto as may be required by law.

**3.2**    **Manager's Personnel.**  In the course of performing its services hereunder, Manager shall at all times during the Term retain qualified personnel who will be employed by Manager and may utilize such personnel in such areas as accounting, auditing, budgeting, personnel, contract procurement and negotiation, and IT systems and procedures when considered advisable by Manager in the discharge of its responsibilities under this Agreement. All costs associated with such employees, whether employed onsite at the Pharmacy or within the Manager's office shall be considered Operating Expenses.

**3.3**    **Transactions with Affiliates.**  Manager shall not enter into any agreement or arrangement for the furnishing to the Pharmacy of any goods, services, or space to any Affiliate of Manager unless Owner has approved such agreement of arrangement after full disclosure of that party's relationship or affiliation with Manager. As used in this agreement, the term "Affiliate" shall mean any person or entity which is related to or affiliated with Manager, and shall include (i) any "Owning Entity" (as defined below), (ii) and "Owned Entity" (as defined below), (iii) any person or entity owning more than five percent (5%) of the issued and outstanding stock or other ownership interest in an Owning Entity and/or Owned Entity, or (iv) any agent, officer, director, employee, partner, joint venture, or shareholder (or any member of the family of any agent, officer, director, employee, partner, joint venture, or shareholder) of Manager, any Owning Entity, any Owned Entity, or any entity described in clause (iii) above. As used herein, the term "Owning Entity" shall mean a person or entity owning, directly or indirectly, more than five percent (5%) of the issued and outstanding stock of or ownership interest in Manager. As used herein, the term "Owned Entity" shall mean an entity of which more than five percent (5%) of the issued and outstanding stock, or more than five percent (5%) ownership interest, as applicable, is owned, directly or indirectly, by Manager or an Owning Entity of Manager.

**3.4**    **Value.**  Manager shall use its best efforts not to expend more than the fair and reasonable market value at the time and place of delivery of performance or of any goods purchased or services engaged to be included within the Operating Expenses, and Manager shall make reasonable inquiries with respect thereto. The price, compensation, or other consideration paid for any goods or services to be included within Operating Expenses shall not exceed the amount ordinarily paid for goods and services within the area in which the Pharmacy is located and shall not exceed expenditures

DX BREIM 82-5

authorized pursuant to an Operating Budget which has been approved in writing by Owner.  When taking bids, issuing purchase orders, or otherwise arranging for any goods or services, Manager shall act at all times in the best interest of Owner and shall be under a duty to secure for and credit to Owner the best price obtainable from parties selected to submit bids or to whom purchase orders are submitted (unless otherwise approved in writing by Owner), and any rebates, discounts, or commissions obtained with respect to such purchases or other transactions shall be for the benefit of Owner.

   **3.5** **Limitation on Authority.** Notwithstanding any provision in this Agreement seemingly to the contrary, Manager shall not, without the prior written approval of Owner, which shall be in Owner's sole discretion, create any obligation to any third party, expressly or implicitly, on behalf of Owner or the Pharmacy.  The limitation set forth in the preceding sentence shall be in addition to all other restrictions on the authority of Manager set forth in this Agreement.

### ARTICLE 4
### Term and Termination

   **4.1** **Term.**  The rights and obligations of Manager and Owner shall commence as of the Commencement Date of this Agreement and shall terminate at midnight on the last day of the Term, unless sooner terminated pursuant to the provisions of this Article 4.  The Term may be extended by mutual agreement of the Parties in which case, and unless agreed otherwise in writing, all terms and provisions of this Agreement shall be applicable during any such extended Term.

   **4.2** **Termination.**

  **(a)** **By Mutual Agreement**.  Prior to the expiration of the Term, the Parties may terminate this Agreement at any time, with or without cause, by mutual agreement.

  **(b)** **Termination by Owner.**  Owner may terminate this Agreement as a result of Manager's default by providing Manager with a thirty (30) days prior written notice.  Manager shall be in default in the event that:

   **(i)** Manager shall fail to keep, observe, or perform any duties or obligations of Manager specified in this Agreement and shall fail to remedy such conditions within the applicable Cure Period; or

   **(ii)** Manager shall voluntarily apply for or consent to the appointment of a receiver, trustee, or liquidator of Manager, or of all or a substantial part of its assets, file a voluntary petition in bankruptcy or admit in writing its inability to pay its respective debts as same become due, make a general assignment for the benefit of creditors or avail itself of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager a bankrupt or insolvent or appointing a receiver, trustee, or liquidator for Manager and such order, judgment or decree shall continue unstayed and in effect for a period of ninety (90) days.  In the event that any material default by Manager shall occur, Owner may, at its option and in addition to any other remedy available to Owner at law or in equity, terminate this Agreement by delivering to Manager thirty (30) days written notice of the decision of Owner to terminate this Agreement.

  **(c)** **Termination by Manager.**  Manager shall have the right to terminate this Agreement, in its sole discretion, by delivery of thirty (30) days advance written notice to Owner in the event that Owner shall default with respect to any material provision of this Agreement and such default is not cured within the applicable Cure Period.

**4.3      Effect of Termination.**  Upon a termination of this Agreement, Manager shall be paid, as soon thereafter as is practicable, that portion of the Management Fee applicable to the period up to and through the date of termination; and Manager shall deliver the Pharmacy, all books, records and other documents and information with regard to the services provided under this Agreement which are in the possession of Manager.  Upon the payment of all sums due to a Party by the other Party when and as is provided herein and the performance by each Party of its obligations accrued to the date of termination, including indemnification by Manager and Owner under the provisions of Section 6.1 hereof, neither Party shall have any further obligation to the other Party hereunder, provided, however, that no such termination shall relieve any Party with respect to any obligation or liability accrued to the date of termination and provided further that this Agreement shall not be deemed to be terminated until full compliance by the Parties with the provisions of this Section 4.3.

**4.4      Cumulative Rights.**  No right or remedy herein conferred upon or reserved to Owner or Manager is intended to be exclusive of any other right or remedy provided for herein or available to that Party at law or in equity, and each and every right and remedy shall be cumulative in addition to any other right or remedy given hereunder or now or hereafter legally existing upon the terms of an event of default hereunder.

**4.5      No Waiver.**  The failure of either Party to insist at any time upon the strict observance or performance of any of the provisions of this Agreement or to exercise any right or remedy as provided in this Agreement shall not impair any such right or remedy or be construed as a waiver or relinquishment thereof. Every right and remedy for which provision is made in this Agreement may be exercised from time to time as often as it may be deemed expedient by that Party, in its sole discretion.

### ARTICLE 5
### Compensation; Expenses

**5.1      Management Fee.**  As compensation for the services rendered by Manager hereunder, Owner shall pay Manager a Management Fee equal to seventy-five percent (75%) of the gross revenues of the Pharmacy. Such Management Fee shall be paid monthly in arrears, by a wire or check payable to Manager, on or before the twentieth (20th) day of each month during the Term hereof, commencing in the month following the month in which the Commencement Date occurs and ending in the month following the month of the termination hereof.

**5.2      Reimbursement of Expenses.**  During and throughout the Term of this Agreement, Owner shall reimburse Manager the amount of any and all Operating Expenses incurred by Manager in the performance of this Agreement.

### ARTICLE 6
### Indemnification and Personal Obligation

**6.1      Indemnification.**  Manager hereby indemnifies and agrees to hold Owner harmless from all liabilities, obligations, damages, penalties, claims, costs, charges, and expenses (including, without limitation, reasonable attorneys' fees and costs of investigation) which may be imposed upon or incurred by or asserted against Owner or Owner's employees by third parties relating to bodily injury or property damage and resulting from Manager's breach of this Agreement, Manager's performance of services hereunder, or any act or event of dishonesty, willful misconduct, or gross negligence of Manager, or any of its agents or employees, in connection with the services provided by Manager under this Agreement. Owner hereby indemnifies and agrees to hold Manager harmless from all liabilities, obligations, damages, penalties, claims, costs, charges, and expenses (including, without

limitation, reasonable attorneys' fees and costs of investigation) which may be imposed upon or incurred by or asserted against Manager or Manager's employees, agents or contractors by third parties relating to bodily injury or property damage resulting from the willful misconduct of Owner or its employees or the breach by Owner of its obligations under this Agreement. In the event that any action or proceeding is brought against an indemnified Party by reason of any such claim, the indemnifying Party shall, upon receipt of notice from the indemnified Party, and at the indemnifying Party's sole cost and expense, retain competent legal counsel and resist or defend any such action or proceeding. Each Party will immediately notify the other Party of all losses or claims for which that Party will seek indemnity from the other Party under this Agreement. The indemnified Party shall not incur any cost or expense with respect to any such claim without the approval of the indemnifying Party and will cooperate with the indemnifying Party in the investigation, defense, and settlement of any such claim. The provisions of this Section 6.1 shall survive the expiration or termination of this Agreement.

  **6.2** **Insurance.** At all times during the Term of this Agreement, Manager shall obtain and maintain a separate comprehensive general liability policy, in such amounts as Owner and Manager shall agree, and worker's compensation insurance, in such amounts as required by law. The cost of any such insurance shall be an Operating Expense.

## ARTICLE 7
## General Provisions

  **7.1** **Representatives.** Owner shall designate an individual or individuals to serve as the Owner Representative in any dealing with Manager under the terms of this Agreement. Manager shall designate an individual or individuals to serve as the Manager Representative in any dealing with Owner under the terms of this Agreement. For purposes of this Agreement, the term "Representative" shall mean, as applicable, the Owner Representative or the Manager Representative. Whenever the approval or consent or other action of the other Party is required hereunder, such approval, consent, or action shall be binding on that Party if specified in writing and executed by that Party's Representative. Any Representative may be changed at the sole discretion of the appointing Party, at any time, by delivering written notice to Manager with respect thereto, however, the Parties shall have the right to rely upon any consent, approval, or instruction of the prior Representative until the other Party has actually received written notice of such changes.

  **7.2** **Notices.** Any notice, demand, consent, approval, request, or other communication required or permitted to be given under this Agreement shall be in writing and shall be delivered by (a) certified mail, postage prepaid, return receipt requested, (b) facsimile, or (c) expedited delivery service with proof of delivery, in each instance addressed to Owner or Manager, as applicable, at the address for each specified below, with a copy to each then current Representative. Any such communication transmitted by facsimile or personal delivery shall be deemed to have been delivered as of the date actually received by the addressee. Any such communication transmitted by registered or certified mail shall be deemed to have been given on the date on which such notice was deposited in a receptacle maintained by the United States Postal Service for such purpose and shall be deemed to have been received on the second (2nd) business day thereafter. Either Owner or Manager may, by ten (10) days' prior written notice to the other in accordance with this Section 7.2, designate a different address or different addresses to which communication is intended for that Party are to be delivered. The initial addresses for notices to each Party are as follows:

    To Owner:   Healthy Pharmacy Solutions, Inc.
           8021 Research Forest Dr
           Spring TX 77382
           Fax No.: (   )

<u>To Manager:</u>        PHARMS, LLC
                        4916 Main Street, Suite 110
                        Houston, Texas 77002
                        Fax No.: (   )

**7.3     Binding Effect.** The covenants and provision contained in this Agreement shall apply to, be binding upon, and inure to the benefit of the successors and assigns of the respective Parties hereto. The term "successors and assigns" is used herein in its broadest possible context and includes, without limitation, any person or entity succeeding to any interest in this Agreement or in the Pharmacy.

**7.4     Time of Performance.** Time shall be of the essence of this Agreement. If the date for performance of any obligation or delivery of any notice shall fall on a weekend or holiday, performance thereof shall be extended to the next business day.

**7.5     Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original and each such counterpart shall, together with all other such counterparts, constitute but one and the same agreement.

**7.6     Unavoidable Delays.** The time within which either Party shall be required to perform any act under this Agreement, other than the payment of money, shall be extended for a period of time equal to the number of days during which performances of that act is delayed due to an Unavoidable Delay. The term "<u>Unavoidable Delay</u>" means a delay due to strike, lockout, or other labor or industrial disturbance (whether on the part of an employee of either Party or otherwise, civil disturbance, act of public enemy, riot sabotage, or embargo; fire, storm, or other casualty or act of God; or any cause whatsoever beyond the reasonable control of the Party claiming an Unavoidable Delay, whether or not similar to any of the causes stated above. However, for the purposes for this definition, Owner's lack of funds or inability to obtain the funds required of Owner under this Agreement shall not be deemed to be a cause beyond the control of Owner with respect to Owner's initial obligations under this Agreement.

**7.7     Consents and Approvals.** Unless explicitly provided otherwise, in each circumstance under this Agreement in which the prior consent or approval or either Party is required before the other Party is authorized to take any particular type of action, the decision of whether to grant or deny such consent or approval shall not be unreasonably withheld or delayed, and each Party shall act in good faith with respect to matters in this Agreement which require approval, consent, or mutual agreement.

**7.8     Successors and Assigns.** Owner's rights under this Agreement may be assigned or encumbered by Owner without the consent of Manager. However, Manager shall not assign or encumber its rights under this Agreement unless Owner approves such assignment or encumbrance in writing in Owner's sole discretion. Nothing in the foregoing sentence or in this Section 7.8 shall prohibit or limit Manager's ability to delegate its obligations and duties hereunder to one or more employees, agents or independent contractors. Subject to the restrictions on transfers and encumbrances set forth herein, this Agreement shall inure to the benefit of and be binding upon the Parties and on their respective legal representatives, successors, and assigns.

**7.9     Status Reports.** Recognizing that each Party may find it necessary from time to time to establish and verify to third parties (such as accountants, banks, mortgages, or the like) the then current status of performance under this Agreement, each Party agrees, upon the written request of the other Party made from time to time by written notice, to furnish promptly a written statement on the status

Pharms LLC - Management Agreement (Safety & Health Technology, LLC) – Page 9

DX BREIM 82-9

of any matter pertaining to this Agreement to the best of the knowledge and belief of the Party making such statement.

**7.10   Governing Law; Venue**. This Agreement, and all claims and causes of action (whether in contract or tort) that may be based upon, arise out of, or relate to, this Agreement, or the negotiation, execution or performance of this Agreement (including any claims or cause of action based upon, arising out of, or related to, any representation or warranty made in, or in connection with, this Agreement or as an inducement to enter into this Agreement), shall be governed and construed according to the internal laws of the State of Texas excluding its conflicts of law provisions.  This Agreement is binding on the parties hereto and their respective legal representatives, heirs, successors and assigns.  In connection with any action brought pursuant to, or arising out of, this Agreement, the parties hereto irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the State District Court located in Harris County, Texas.

**7.11   Entire Agreement.** This Agreement supersedes and cancels any and all previous statements, negotiations, arrangements, brochures, agreements, and understanding, if any, between the Parties with respect to the subject matter of this Agreement.

*[Signature Page Follows]*

GX1202.010

DX BREIM 82-10

**IN WITNESS WHEREOF,** the parties have executed this Agreement, as of the day and year first written above.

**OWNER:**
**SAFETY & HEALTH TECHNOLOGY, LLC,**
**a Texas Limited Liability Company**

By: _____

Name: Peter Herbit

Title: Member

**MANAGER:**
**PHARMS, LLC,**
**a Texas limited liability company**

By: _____

Name: Scott Breimeister

Title: Member

GX1202.011

DX BREIM 82-11

## **EXHIBHIT A**

Business Associate Agreement

DX BREIM 82-12

## BUSINESS ASSOCIATE AGREEMENT

**THIS BUSINESS ASSOCIATE AGREEMENT** ("BA Agreement") is made effective as of December 1, 2014 ("Effective Date") by and between SAFETY & HEALTH TECHNOLOGY, LLC, a Texas corporation ("Covered Entity"), and PHARMS, LLC, a Texas limited liability company ("Business Associate"). Covered Entity and Business Associate may be referred to in this BA Agreement as a "Party" individually and as "Parties" collectively.

### RECITALS

WHEREAS, Business Associate now and in the future may have relationships with Covered Entity in which Business Associate is entrusted with confidential, individually identifiable patient information ("Protected Health Information" or "PHI"), which Business Associate may access, create, and use in providing services or products to Covered Entity and which is otherwise protected by state or federal law;

WHEREAS, both Parties desire to meet their obligations to protect PHI under: (i) the Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule") and the Security Standards ("Security Rule") published by the U.S. Department of Health and Human Services ("DHHS") at 45 CFR parts 160 through 164 under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); (ii) the additional Privacy and Security Rule requirements pursuant to Subtitle D of the Health Information Technology for Economic and Clinical Health Act ("HITECH"), as amended from time to time; and (iii) the final Omnibus Rule implementing additional Privacy and Security Rule requirements pursuant to HITECH ("Omnibus Rule"), which requires compliance on or before September 23, 2013, and as may be further amended from time to time;

WHEREAS, both Parties further desire to meet their obligations to protect PHI under additional privacy and security requirements adopted by the Texas Legislature, which apply equally to business associates as "covered entities" under Texas law and may be more restrictive than those required under HIPAA and HITECH;

WHEREAS, both Parties desire to make technical and procedural arrangements to assure that their business relationships meet each of these various statutory or regulatory requirements; and

WHEREAS, both Parties desire to set forth the terms and conditions pursuant to which PHI that is provided by, or created or received by, Business Associate on behalf of Covered Entity will be handled between themselves and third parties.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  Definitions. Regulatory citations in this BA Agreement are to the United States Code of Federal Regulations ("CFR"), as promulgated, interpreted, and amended from time to time by DHHS, for so long as such regulations are in effect. Unless otherwise specified in this BA Agreement, all terms

1

not otherwise defined shall have the meaning established for purposes of parts 160 through 164 of Title 45 of the CFR, as amended from time to time.

2.      Permitted Uses and Disclosures of PHI

2.1.    Services.   Covered Entity and Business Associate have a business relationship whereby Business Associate will provide CRNA services ("Services") to Covered Entity that may involve the use or disclosure of PHI.  The Services will be provided to Covered Entity under that certain Management Agreement, dated as of the same date hereof (the "Service Agreement"), that specify the Services to be provided by Business Associate to or on behalf of Covered Entity.

2.2.    Use of PHI.   As specified in this BA Agreement, Business Associate may use or disclose PHI created or received from or on behalf of Covered Entity necessary to perform its obligations to Covered Entity under the Service Agreements; provided, however, that all other uses not authorized by this BA Agreement, the applicable Service Agreement, or other written instructions from the Covered Entity, are prohibited.  Moreover, Business Associate may disclose PHI for the purposes authorized by this BA Agreement only: (i) to its employees, subcontractors, and agents in accordance with Section 3.1(h) below; (ii) as directed by Covered Entity; or (iii) as otherwise permitted by the terms of this BA Agreement, including, but not limited to, Section 2.3(a) and Section 2.4(b) below.

2.3.    Data Analysis.   Business Associate may: (a) with prior written notice to Covered Entity, use, analyze, and disclose the PHI in its possession for the public health activities and purposes set forth at 45 CFR § 164.512(b); and (b) aggregate the PHI in its possession with the PHI of other customers and covered entities that Business Associate has in its possession through its capacity as a business associate to such other entities, provided that the purpose of such aggregation is to provide Covered Entity with data analyses relating to the Health Care Operations of Covered Entity.  Periodically, Business Associate shall notify Covered Entity of opportunities for such analyses, and provided that Covered Entity does not decline to participate, Business Associate shall promptly furnish the results of such analysis to Covered Entity.  Covered Entity may also propose analyses that would be useful for its purposes, and to the extent reasonable and permissible by law and its agreements with other covered entities, Business Associate shall attempt to prepare such analyses.

2.4.    Business Activities of Business Associate.   Unless otherwise limited in this BA Agreement, Business Associate may:

        (a)      Use the PHI in its possession for its proper management and administration and to fulfill any present or future legal responsibilities of Business Associate;

        (b)      Disclose the PHI in its possession to third parties for the purpose of its proper management and administration or to fulfill any present or future legal responsibilities of the Business Associate, provided that: (i) the disclosures are required by law; (ii) the disclosures do not require an authorization or "opportunity to agree"; or (iii) Business Associate has reasonable written assurances from the third party receiving the PHI that such party will hold and maintain the PHI confidentially, only use the disclosed PHI as required by law or for the purposes of the disclosure, and notify Business Associate if the third party becomes aware that the confidentiality of the PHI has been breached; and

2

(c)     De-identify any and all PHI provided that Business Associate implements de-identification criteria in accord the Privacy Rule and further provided that Business Associate provides to Covered Entity the documentation required by 45 CFR § 164.514(b), which may be in the form of a written assurance from the Business Associate. De-identified information does not constitute PHI and is not subject to the terms of this BA Agreement; provided, however, absent prior written authorization from Covered Entity, such de-identified information shall not include business, proprietary, or other information about Covered Entity.

3.      Responsibilities of the Parties With Respect to PHI.

3.1.    Responsibilities of the Business Associate.  With regard to its use or disclosure of PHI, the Business Associate shall:

(a)     Use or disclose the minimum amount of PHI necessary as permitted or required by this BA Agreement or as otherwise required by law to accomplish the intended purpose of such use or disclosure;

(b)     To the extent Business Associate carries out one or more of Covered Entity's obligations under the Privacy Rule, comply with the same Privacy Rule requirements that apply to Covered Entity;

(c)     Develop and maintain a comprehensive written health information privacy and security program that implements: (i) appropriate policies, procedures, and protections as required by the Privacy Rule for the privacy of PHI; (ii) appropriate Administrative, Physical, and Technical  Safeguards (collectively, the "Safeguards") that reasonably protect PHI, including electronic PHI ("e-PHI"), as required by the Security Rule and amended from time to time; and (iii) appropriate policies, procedures, and protections to implement and document such Safeguards;

(d)     To the extent feasible, use commercially reasonable efforts to secure PHI through technology standards that render such PHI unusable, unreadable, and indecipherable to individuals unauthorized to acquire or otherwise have access to such PHI in accordance with guidance promulgated by DHHS or issued by the National Institute for Standards and Technology ("NIST") concerning the protection of identifiable data such as PHI;

(e)     Report to the designated Privacy Officer of Covered Entity, in writing, any use or disclosure of PHI that is not permitted or required by this BA Agreement of which Business Associate becomes aware within 5 business days of Business Associate's discovery of such unauthorized use or disclosure;

(f)     Establish procedures for mitigating, to the greatest extent possible, any harmful effects from any improper use or disclosure of PHI that Business Associate knows of and reports to Covered Entity as referenced in Section 3.1(d) above;

(g)     Report to the designated Security Officer of Covered Entity, in writing, any breach in the security, confidentiality, integrity, or availability of e-PHI that Business Associate creates, receives,

3

DX BREIM 82-15

maintains, or transmits on behalf of Covered Entity of which Business Associate becomes aware within 5 business days of Business Associate's discovery of such security breach;

(h)     Establish procedures for mitigating, to the greatest extent possible, any harmful effects from any improper breach to the security, confidentiality, integrity, or availability of e-PHI that Business Associate knows of and reports to Covered Entity as referenced in Section 3.1(f) above;

(i)     In accordance with Section 3.3 of this BA Agreement, notify the Privacy and Security Officer of Covered Entity no later than 5 days after the first day on which Business Associate knows, or through exercise of reasonable diligence would have known, of any breach of Unsecured PHI (as defined by HITECH) accessed, maintained, retained, modified, recorded, stored, destroyed, or otherwise, held, used, or disclosed by Business Associate;

(j)     Require all its subcontractors and agents that receive, use, or have access to PHI under this BA Agreement, to sign a written agreement that:

(i)     Binds such subcontractors and agents to the same restrictions and conditions that apply to Business Associate pursuant to this BA Agreement as to the use or disclosure of PHI or the security, confidentiality, integrity, and availability of PHI;

(ii)    Requires such subcontractors and agents to provide adequate safeguards against improper use or disclosure or breach of security related to e-PHI;

(iii)   Contains reasonable assurances from such subcontractors and agents that the PHI they hold or maintain will remain confidential as provided in this BA Agreement and only disclosed as provided in this BA Agreement or required by law for the purposes for which it was disclosed to the respective subcontractor or agent; and

(iv)    Obligates such subcontractors and agents to immediately notify Business Associate of any breaches of the confidentiality of PHI, including any security breach of Unsecured PHI, to the extent the respective subcontractor or agent obtains knowledge of such a breach.

(k)     Make available all records, books, agreements, policies, and procedures relating to the use or disclosure of PHI to the Secretary of DHHS for purposes of determining compliance with the Privacy Rule, Security Rule, or Omnibus Rule;

(l)     Upon written request, make available within 5 business days information necessary for Covered Entity to make an accounting of disclosures of an individual's PHI or to make or incorporate an amendment to an individual's PHI, as applicable;

(m)     As of the Effective Date, comply with the HITECH Standards, each as may be applicable to the Services provided by Business Associate to Covered Entity pursuant to this BA Agreement, including, but not limited to: (i) the prohibition of the sale of PHI without authorization, unless an exemption is available under HIPAA or HITECH; (ii) the prohibition on receiving

4

remuneration (directly or indirectly from individuals) for certain communications that fall within the exceptions to the definition of marketing, unless permitted by this BA Agreement and HITECH; and (iii) the requirements regarding accounting of certain disclosures of PHI maintained in an electronic health record under HITECH;

(n)    Not: (i) sell PHI in such a way as to violate Section 181.153 of the Texas Health and Safety Code ("H&S Code"), as amended from time to time; (ii) use PHI in such a manner as to violate Section 181.152 of the H&S Code, or (iii) attempt to re-identify any information in violation of Section 181.151 of the H&S Code, regardless of whether such action is on behalf of or permitted by Covered Entity; and

(o)    Subject to Section 5.5 below, return to Covered Entity or destroy, within 60 days of the termination of this BA Agreement, the PHI in its possession and retain no copies (which for purposes of this BA Agreement shall mean segregable databases, files, or recording media identifiable to Covered Entity that are used by Business Associate in providing Services on behalf of Covered Entity).

3.2.    Responsibilities of the Covered Entity. With regard to the use or disclosure of PHI by Business Associate, Covered Entity shall:

(a)    Obtain any consent or authorization that may be required by HIPAA or applicable state law, prior to furnishing Business Associate the PHI pertaining to an individual

(b)    Notify Business Associate of any changes or limitations in Covered Entity's notice of privacy practices to the extent that such change or limitation may affect Business Associate's use or disclosure of PHI;

(c)    Notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his PHI, to the extent such changes may affect Business Associate's use or disclosure of PHI; and

(d)    Notify Business Associate of any restriction on the use or disclosure of an individual's PHI that Covered Entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent such restriction may affect Business Associate's use or disclosure of PHI.

3.3.    Responsibilities of the Parties with Respect to Breach Notification. Covered Entity and Business Associate will comply with HITECH and any implementing regulations regarding breach notification, as such regulations may be in effect from time to time (collectively, the "Breach Notification Rules").

(a)    Except as provided by 45 CFR § 164.412, Business Association will give Covered Entity notice of any breach of Unsecured PHI without unreasonable delay and in no event later than the earlier of the maximum time allowable under applicable law or 5 business days after Business Associate discovered such breach. For purposes of reporting a breach to Covered Entity, the discovery of such a breach will be deemed to occur as of the first day on which Business Associate knows or, by exercising reasonable diligence, should have known of such breach. Business Associate will be deemed to have

5

knowledge of such a breach if it is known, or by exercising reasonable diligence should have been known, by any person (other than the person committing the breach) who is an employee, director, officer, or other agent of Business Associate.

(b)    More specifically and for purposes of this BA Agreement, a "breach" is an unauthorized acquisition, access, use, or disclosure of Unsecured PHI, which compromises the security or privacy of the PHI.  A breach compromises the privacy or security of the PHI if it poses a significant risk of financial, reputational, or other harm to the individual whose PHI was compromised.

(c)    Upon discovery and within the time limits set forth in this Section 3.3, Business Associate shall notify Covered Entity of a breach of Unsecured PHI with sufficient information to allow compliance with the Breach Notification Rule.  Such notice will be written in plain language and will include, to the extent possible or available, the following:

(i)    the identification and contact information of all individuals whose Unsecured PHI has been, or is reasonably believed by Business Associate to have been, accessed, acquired, or disclosed during the breach;

(ii)    a brief description of what happened, including the date of the breach and the date of the discovery of the breach;

(iii)    a description of the types of Unsecured PHI that were involved in the breach;

(iv)    any steps that individuals who were subjects of the breach should take to protect themselves from potential harm that may result from the breach;

(v)    a brief description of what Business Associate is doing to investigate the breach, to mitigate the harm to affected individuals, and to protect against further breaches; and

(vi)    contact procedures for affected individuals to ask questions or learn additional information, including a toll-free telephone number, an email address, a website, or postal address.

(d)    Notwithstanding the provisions of this Section 3.3 and if a law enforcement official states to Business Associate that notification of a breach would impede a criminal investigation or cause damage to national security, then: (i) the notification shall be delayed for the time period specified by the official if the official's statement is in writing and specifies the time for which a delay is required; or (ii) if the official's statement is made orally, Business Associate shall document the oral statement, including the identity of the official making the statement, and delay the breach notification for no longer than 30 days from the date of the oral statement, unless the official submits a written statement during that time period.

(e)    The Party responsible for the breach of Unsecured PHI shall be responsible for payment of all actual costs associated with the breach, including, but not limited to, costs of notifying

6

affected individuals, credit monitoring (where applicable), and other efforts to mitigate the harm to affected individuals.

3.4.     Responsibilities of the Parties with Respect to Designated Record Sets. This Section 3.4 applies only if, in the course of performing the Services, Business Associate and Covered Entity agree that Business Associate will maintain Designated Records Sets containing PHI. As such:

(a)     Business Associate shall: (i) at the request of, and in the time and manner designated by Covered Entity, provide access to the PHI to Covered Entity, or the individual to whom such PHI relates, or his or her authorized representative, in order to satisfy a request by such individual under HIPAA; and (ii) at the request of, and in the time and manner designated by Covered Entity, make any amendment(s) to the PHI that Covered Entity directs.

(b)     Covered Entity shall: (i) notify Business Associate, in writing, of any PHI that Covered Entity seeks to make available to an individual pursuant to HIPAA and will cooperate with Business Associate as to the time, manner, and form in which Business Associate shall provide such access; and (ii) notify Business Associate, in writing, of any amendment(s) to the PHI in the possession of Business Associate that Covered Entity believes is necessary because of its belief that the PHI that is the subject of the amendment(s) has been or could be relied upon by Business Associate or others to the detriment of the individual who is the subject of the PHI.

4.     Representations and Warranties of the Parties. Each Party represents and warrants to the other Party:

4.1.     Workforce Informed of BA Agreement Terms. All of the Parties employees, agents, representatives, and members of its respective workforce, whose services may be used to fulfill obligations under this BA Agreement are or shall be appropriately informed of the applicable terms of this BA Agreement and are under legal obligation to each Party, respectively, by contract or otherwise, sufficient to enable each Party to fully comply with all applicable provisions of this BA Agreement.

4.2.     Reasonable Cooperation among Parties. Each Party will reasonably cooperate with the other Party in the performance of the mutual obligations under this BA Agreement.

4.3.     Prepared to Comply with HIPAA Requirements. Each Party is prepared to comply with those provisions of this BA Agreement required by 45 CFR part 164 on or before: (i) April 14, 2003 (Privacy Rule), and April 20, 2005 (Security Rule), for those Service Agreements in effect on such dates; (ii) February 17, 2010 (HITECH), for those Service Agreements in effect on such date; (iii) September 23, 2013 (Omnibus Rule), for those Service Agreements in effect on or after such date; or (iv) the Effective Date, if no Service Agreements were in effect prior to the Effective Date.

5.     Term and Termination.

5.1.     Term. This BA Agreement shall become effective on the Effective Date and shall continue in effect unless terminated as provided in this Article 5. In addition, certain provisions and requirements of

7

this BA Agreement shall survive the expiration or termination of this BA Agreement in accordance with Section 6.6 below.

5.2.    Termination by Covered Entity.    Covered Entity may immediately terminate this BA Agreement and any related Service Agreements if Covered Entity makes the determination that the Business Associate has breached a material term of this BA Agreement. Alternatively, Covered Entity may choose to: (i) provide the Business Associate with 7-days' prior written notice of the existence of an alleged material breach; and (ii) afford the Business Associate an opportunity to cure said alleged material breach upon mutually agreeable terms. Nonetheless, in the event that mutually agreeable terms cannot be achieved within 30 days, Business Associate must cure said breach to the satisfaction of Covered Entity within 60 days. Failure to cure in the manner set forth in this Section 5.2 shall be grounds for the immediate termination of this BA Agreement and any related Service Agreements.

5.3.    Termination by Business Associate.    Business Associate may immediately terminate this BA Agreement and any related Service Agreements if Business Associate makes the determination that Covered Entity has breached a material term of this BA Agreement. Alternatively, Business Associate may choose to: (i) provide Covered Entity with 7-days' prior written notice of the existence of an alleged material breach; and (ii) afford Covered Entity an opportunity to cure said alleged material breach upon mutually agreeable terms. Nonetheless, in the event that mutually agreeable terms cannot be achieved within 30 days, Covered Entity must cure said breach to the satisfaction of Business Associate within 60 days. Failure to cure in the manner set forth in this Section 5.3 shall be grounds for the immediate termination of this BA Agreement.

5.4.    Automatic Termination.    This BA Agreement will automatically terminate without any further action of the Parties upon the termination or expiration of all Service Agreement(s) between Covered Entity and Business Associate for whatever reason.

5.5.    Effect of Termination.    Upon the termination of this BA Agreement pursuant to this Article 5, Business Associate shall return or destroy within 60 days all PHI, including e-PHI, identifiable to Covered Entity, including such information in possession of Business Associate's subcontractors, if it is feasible to do so. If return or destruction of said PHI is not feasible, the Business Associate shall notify the Covered Entity in writing, and said notification shall include: (i) a statement that Business Associate has determined that it is not feasible to return or destroy the PHI in its possession; and (ii) the specific reasons for such determination. In the event Business Associate determines that the return or destruction of said PHI is not feasible and has provided proper written verification to Covered Entity of such determination, Business Associate shall extend any and all protections, limitations, and restrictions contained in this BA Agreement to Business Associate's use or disclosure of any PHI retained after the termination of this BA Agreement, and to limit any further uses or disclosures to the purposes that make the return or destruction of the PHI infeasible.

6.    Miscellaneous.

6.1.    Rights of Proprietary Information.    Covered Entity retains any and all rights to the proprietary information, confidential information, and PHI it discloses to Business Associate.

8

6.2.    Nature of Agreement; Independent Contractors.  Nothing in this BA Agreement shall be construed to create an employer-employee relationship or partnership, joint venture, or other joint business relationship between the Parties or any of their affiliates.  Business Associate is an independent contractor, and not an agent, of Covered Entity.  This BA Agreement does not express or imply any commitment to purchase or sell goods or services.

6.3.    ENTIRE AGREEMENT.   THIS BA AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO THE PARTIES' COMPLIANCE WITH FEDERAL OR STATE HEALTH INFORMATION CONFIDENTIALITY LAWS AND REGULATIONS, AS WELL AS THE PARTIES' OBLIGATIONS UNDER THE BUSINESS ASSOCIATE PROVISIONS OF HIPAA AND HITECH.  THIS BA AGREEMENT SUPERSEDES ALL PRIOR OR CONTEMPORANEOUS WRITTEN OR ORAL MEMORANDA, ARRANGEMENTS, CONTRACTS, OR UNDERSTANDINGS BETWEEN THE PARTIES RELATING TO THE PARTIES' COMPLIANCE WITH FEDERAL OR STATE HEALTH INFORMATION CONFIDENTIALITY LAWS AND REGULATIONS AND THE PARTIES' HEALTH INFORMATION CONFIDENTIALITY AND SECURITY OBLIGATIONS UNDER 45 CFR PARTS 160 THROUGH 164 OR APPLICABLE STATE LAW.

6.4.    Change of Law.  Covered Entity shall notify Business Associate within 90 days of any amendment to any provision of HIPAA or HITECH, or their implementing regulations, which materially alters either Party's obligations under this BA Agreement.  Upon provision of such notice by Covered Entity to Business Associate, the Parties shall negotiate in good faith mutually acceptable and appropriate amendment(s) to this BA Agreement to give effect to such revised obligations; provided, however, that if the Parties are unable to agree on mutually acceptable amendment(s) within 60 days of the relevant change of law, either Party may terminate this BA Agreement consistent with Sections 5.5 and 6.6 herein.

6.5.    Construction of Terms.  The terms of this BA Agreement shall be construed in light of any interpretation or guidance on HIPAA, HITECH, the Privacy Rule, the Security Rule, or the Omnibus Rule issued by DHHS from time to time.  Furthermore, any ambiguity in this BA Agreement shall be resolved to permit Covered Entity to comply with the applicable Rule.

6.6.    GOVERNING LAW.  IN THE EVENT THE LAWS OF THE STATE OF TEXAS PROVIDE MORE STRINGENT PROTECTION OF PHI THAN HIPAA OR IN THE EVENT OF A STATE LAW DISPUTE BETWEEN THE PARTIES, THE INTERPRETATION AND ENFORCEMENT OF THIS BA AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.  EXCLUSIVE VENUE FOR A CAUSE OF ACTION FOR SUCH A STATE LAW DISPUTE SHALL BE IN A COURT OF COMPETENT JURISDICTION IN COUNTY, TEXAS.

6.7.    Survival.  This Section 6.6 shall survive termination of this BA Agreement for any reason. Further, the respective rights and obligations of Business Associate and Covered Entity under the provisions of Sections 3.1, 3.2, 3.3, and 5.5 above, solely with respect to PHI Business Associate retains in accordance with Section 5.5 above, shall survive the expiration or termination of this BA Agreement for so long as such PHI is retained by Business Associate.

9

DX BREIM 82-21

6.8.     Amendment: Waiver.  This BA Agreement may not be modified, nor shall any provision of this BA Agreement be waived or amended, except in a writing duly signed by authorized representatives of the Parties.  A waiver with respect to one event shall not be construed as continuing or as a bar to or waiver of any right or remedy as to subsequent events.

6.9.     Assignment of Rights and Delegation of Duties.  This BA Agreement is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns.  However, neither Party may assign any of its rights or delegate any of its obligations under this BA Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  Notwithstanding any provisions herein to the contrary, Covered Entity retains the right to assign or delegate any of its rights or obligations in this BA Agreement to any of its wholly owned subsidiaries, affiliates, or successor companies.  Assignments made in violation of this Section 6.8 shall be null and void.

6.10.    Equitable Relief.  Any use, disclosure, or breach of privacy or security of PHI by Business Associate in violation of this BA Agreement will cause Covered Entity irreparable harm, the amount of which may be difficult to ascertain.  Business Associate therefore acknowledges and agrees that Covered Entity shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining Business Associate from any such further use, disclosure, or breach, and for such other relief as Covered Entity shall deem appropriate.  Such rights are in addition to any other remedies available to Covered Entity at law or in equity.

6.11.    Severability.  The provisions of this BA Agreement are severable, and if any provision of this BA Agreement shall be held or declared to be illegal, invalid, or unenforceable, the remainder of this BA Agreement shall continue in full force and effect as though such illegal, invalid, or unenforceable provision had not been contained in this BA Agreement.

6.12.    No Third Party Beneficiaries.  Nothing in this BA Agreement is intended to confer on any person other than the Parties, or their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this BA Agreement.  Nothing in this BA Agreement shall be considered or construed as conferring any right or benefit on a person not party to this BA Agreement nor imposing any obligations on either Party hereto to persons not a party to this BA Agreement.

6.13.    Notices.  Any notices to be given hereunder to a Party shall be made via U.S. Mail or express courier to the appropriate Party as follows:

COVERED ENTITY:                             BUSINESS ASSOCIATE:

Healthy Pharmacy Solutions, Inc.            Pharms, LLC
8021 Research Forest Dr.,                    4916 Main Street, #110
Spring, Texas 7738                           Houston, Texas 77002
Fax No.: (___) _____                     Fax No.: (___) _____

Each Party may change its address and that of its representative for notice by the giving of notice thereof in the manner herein provided.

10

GX1202.022

6.14.    Counterparts; Facsimiles.  This BA Agreement may be executed in any number of counterparts, each of which shall be deemed an original.  Facsimile copies hereof shall be deemed to be originals.

6.15.    Disputes.  If any controversy, dispute, or claim arises between the Parties with respect to this BA Agreement, the Parties shall make good faith efforts to resolve such matters informally.

*[Signature Page Follows]*

11

DX BREIM 82-23

IN WITNESS WHEREOF, each of the undersigned has caused this BA Agreement to be duly executed in its name and on its behalf effective as of the Effective Date.

COVERED ENTITY:                                    BUSINESS ASSOCIATE:

SAFETY & HEALTH TECHNOLOGY, LLC          PHARMS, LLC

By: _____                        By: _____

Name: _____PETER HERBST_____              Name: ___Scott Breimeister___

Title: _____Member_____                            Title: ___Manager___

12

GX1202.024