Case 4:18-cr-00368   Document 605   Filed on 02/02/24 in TXSD   Page 1 of 13

United States Courts
Southern District of Texas
**FILED**

*February 02, 2024*

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| § | |
| **v.** § | **Criminal No. 18-CR-368** |
| § | |
| § | |
| **BRIAN SWIENCINSKI** § | |
| § | |
| **Defendant.** § | |

## SUPERSEDING INFORMATION

The United States Attorney for the Southern District of Texas charges:

### General Allegations

At all times material to this Superseding Information, unless otherwise specified:

### Compounded Drugs

1. Compounded pharmaceuticals were drugs that were combined, mixed, or altered from other drugs by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, physicians' assistants, and nurse practitioners ("prescribers"), to meet the specific needs of individual patients.

2. Although ingredients in compounded medications were generally approved by the United States Food and Drug Administration ("FDA"), the compounded form of those medications were not. That is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

### Health Care Benefit Programs

*Commercial Insurance*

3. Commercial insurance companies provided health care benefits for individuals

enrolled with their plans, often referred to as "members." These private insurance companies were "health care benefit programs" as defined by Title 18, United States Code, Section 24(b), that affected commerce.

4. Commercial insurance companies, employers, and private entities offered drug plans, which were administered and operated by Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.

5. A member of a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

6. Express Scripts, Inc. ("Express Scripts" or "ESI"); Caremark LLC, doing business as ("d/b/a") CVS/Caremark ("CVS/Caremark"); and Prime Therapeutics, LLC were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

*The TRICARE Program*

7. TRICARE was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries." The Defense Health Agency ("DHA"), an agency of DOD, was the military entity responsible for overseeing and administering TRICARE.

8. TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed medical professional.

9. In or around May 2015, the DHA implemented a new screening procedure to ensure that TRICARE-covered compounded drugs were safe, clinically necessary, and cost effective, which resulted in a steep decline in TRICARE's reimbursements for compounded drugs.

10. TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. Once a beneficiary filed a prescription, the pharmacy would collect any applicable copay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to Express Scripts, the PBM that administered TRICARE's prescription drug benefits, which would, in turn, adjudicate the claim and reimburse the pharmacy directly or through a Pharmacy Services Administrative Organization ("PSAO"). To become a network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

11. TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that affected commerce.

*The Medicare Program*

12. The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were 65 years or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

13. Medicare programs covering different types of benefits were separated into different program "parts." Medicare Part D ("Part D") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States.

14. To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies that Medicare approved, often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

15. A pharmacy could participate in Part D by entering into a retail network agreement directly with a plan or with one or more PBMs. A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network. Express Scripts and CVS/Caremark, among others, were Medicare drug plan sponsors.

16. When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan. The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

17. Medicare, through CMS, compensated the Medicare drug plan sponsors. Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans, which was adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases in which a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's monthly fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

18. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that affected commerce.

**Claims Adjudication**

19. Providers, including pharmacies, entered into contractual relationships with PBMs

either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, or PSAOs, which then contracted with PBMs on behalf of providers. Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

20. For prescription drugs, including compounded medications, to be reimbursed, health care benefit programs required that they be dispensed pursuant to a valid prescription and be medically necessary for the treatment of covered illnesses or conditions.

21. Copayments set by the health care benefit programs were the monetary amounts or percentages paid by beneficiaries and members for health care services and items received.

22. Most, if not all, PBMs required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries and members at the time of billing, and specified that copayments could not be systematically waived or reduced, in part because consistent copayment collection was a fraud prevention measure. Specifically, copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little to no value to their treatments.

23. Upon receiving prescriptions and dispensing prescription drugs, pharmacies submitted claims to health care benefit programs or PBMs. Health care benefit programs or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

## Relevant Entities

24. Pharms, LLC ("Pharms"), a Texas Limited Liability Company, was a management company formed in or around June 2013.

25. OmniPlus Healthcare, L.P.; Alternative Medicine and Pharmacy, Inc., d/b/a OmniPlus Pharmacy; Omni-One-Med Pharmacy Services, LLC; Safety and Health Technology,

LLC, d/b/a Accu-Care Pharmacy; Healthy Pharmacy Solutions, Inc.; Kremco Pharmacy, LLC, d/b/a Kremco Pharmacy; and JSW Prosperity, LLC, d/b/a 1 Stop Pharmacy (collectively "the Pharmacies") were licensed pharmacies formed, acquired, or purchased between in or around 2013 and in or around 2016. Many of the Pharmacies were held by holding companies, which were Texas Limited Liability Companies.

### The Defendant and Coconspirators

26. Defendant **BRIAN SWIENCINSKI** ("**SWIENCINSKI**"), a resident of Dallas, Texas, owned Worth Medical. **SWIENCINSKI** and others owned or controlled Pharms, the Pharmacies, and other related business entities located in or around Houston, Texas.

27. Scott Breimeister ("Breimeister"), a resident of Houston, Texas, owned or controlled Pharms, the Pharmacies, and other related business entities located in or around Houston, Texas with **SWIENCINSKI** and others.

28. Christopher Ince, M.D. ("Dr. Ince"), a resident of Dallas, Texas was a physician licensed to practice medicine in the State of Texas.

29. Ronnie McAda, Jr. ("McAda"), a resident of Sunnyvale, Texas, was a sales representative.

30. Terry Brickman ("Brickman"), a resident of Birmingham, Michigan, was a sales representative.

31. James Buckingham ("Buckingham"), a resident of North Royalton, Ohio, was a sales representative.

### COUNT ONE
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

32. Paragraphs 1 through 31 of this Superseding Information are realleged and

incorporated by reference as though fully set forth herein.

33. Between in or around 2013 and in or around 2017, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the Defendant,

**BRIAN SWIENCINSKI**,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown, including Scott Breimeister, Christopher Ince, M.D., Ronnie McAda, Jr., Terry Brickman, James Buckingham, and others, to commit certain offenses against the United States, that is:

  a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Defense in its administration and oversight of TRICARE and the United States Department of Health and Human Services in its administration and oversight of Medicare;

  b. to violate Title 42, United States Code, Section 1320a-7b(b)(l)(B), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, service, and item for which payment may be made in whole and in part by a Federal health care program; and

  c. to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, to any person to induce such person to purchase, lease, order, and arrange for and recommend the purchasing, leasing and ordering

of any good, service, and item for which payment may be made in whole and in part by a Federal health care program.

## Purpose of the Conspiracy

34. It was an object and purpose of the scheme for **SWIENCINSKI**, Breimeister, Dr. Ince, McAda, Brickman, Buckingham, and their coconspirators, known and unknown, to unlawfully enrich themselves by, among other things, submitting or causing the submission of false and fraudulent claims to health care benefit programs, that is, TRICARE, Medicare, and other Federal and private health care benefit programs, generally administered by PBMs, for compounded and other drugs that were often medically unnecessary, not provided or not provided as billed, based on an invalid prescriber-patient relationship, induced by kickbacks or bribes, or dispensed in violation of state licensing requirements.

35. It was an object and purpose of the scheme for **SWIENCINSKI**, Breimeister, Dr. Ince, McAda, Brickman, Buckingham, and their coconspirators, known and unknown, to unlawfully enrich themselves by, among other things, paying and receiving kickbacks and bribes in exchange for the referral of beneficiaries for whom the Pharmacies submitted claims to Federal health care benefit programs, including TRICARE and Medicare.

36. It was an object and purpose of the scheme for **SWIENCINSKI**, Breimeister, Dr. Ince, McAda, Brickman, Buckingham, and their coconspirators, known and unknown, to unlawfully enrich themselves by, among other things, (a) concealing material information from health care benefit programs to induce said programs to reimburse fraudulent claims submitted by the Pharmacies and (b) providing materially false information to health care benefit programs in response to audits and investigations.

**Manner and Means of the Conspiracy**

37. The Pharmacies formulated, mixed, and dispensed compounded drugs, "kits," "patches," and other drugs (collectively "compounded and other drugs") not based on individualized patient need, but instead based on formulas designed to maximize reimbursements from Federal and private health care benefit programs.

38. To increase reimbursements, **SWIENCINSKI**, who was himself a sales representative, oversaw a national network of hundreds of other sales representatives, including Brickman, Buckingham, and others who marketed compounded and other drugs.

39. Sales representatives, including **SWIENCINSKI**, Brickman, Buckingham, and others, were financially incentivized through kickbacks and bribes, often disguised as commission payments, that were usually based on the reimbursements from Federal and private health care benefit programs, administered by the PBMs, to the Pharmacies for compounded and other drugs.

40. To further increase reimbursements, **SWIENCINSKI**, Breimeister, and their coconspirators, often directed prescribers to prescribe and sign off on prescriptions for compounded and other drugs that were often medically unnecessary or otherwise not eligible for reimbursement. **SWIENCINSKI** and his coconspirators paid prescribers, including Dr. Ince and others, kickbacks and bribes in exchange for authorizing medically unnecessary prescriptions for compounded and other drugs.

41. Also to increase reimbursements, **SWIENCINSKI**, Brickman, Buckingham, and other employees and sales representatives signed up themselves, their families, and others to receive compounded and other drugs that were often medically unnecessary or not otherwise eligible for reimbursement.

42. Brickman, his family, and the individuals who he signed up for prescriptions

9

primarily resided in Michigan. Buckingham, his family, and the individuals who he signed up for prescriptions resided in Ohio.

43. The prescribers resided in Texas and did not evaluate or treat Brickman, Buckingham, or the individuals who Brickman and Buckingham signed up for prescriptions.

44. The Pharmacies submitted claims electronically to Federal and private health care benefit programs, generally through PBMs, seeking reimbursement for the compounded and other drugs they purportedly dispensed. Those health care benefit programs, including the PBMs, in turn, reimbursed the Pharmacies' claims in reliance on representations that the drugs dispensed were medically necessary, provided as billed, based on valid prescriptions and prescriber-patient relationships, not induced by kickbacks or bribes, and dispensed in accordance with state licensing requirements.

45. **SWIENCINSKI** paid sales representatives, including Brickman and Buckingham, a percentage of the reimbursements that Federal and private health care benefit programs paid for the compounded and other drugs attributable to their purported sales efforts.

46. The Pharmacies sometimes mailed the compounded and other drugs to recipients who resided in states in which the Pharmacies or the prescribers were not properly licensed, including Michigan and Ohio. To further the conspiracy and conceal its existence, the Pharmacies, with **SWIENCINSKI**'s knowledge and at his direction, employed fraudulent shipping practices, including by using his home address as a false recipient address for individuals Brickman and Buckingham signed up for prescriptions who resided in Michigan and Ohio.

47. The Pharmacies submitted claims electronically to government and private health care benefit programs, generally through PBMs, seeking reimbursement for the compounded and other drugs they purportedly dispensed. Those health care benefit programs, including the PBMs,

in turn, reimbursed the Pharmacies' claims in reliance on representations that the drugs dispensed were medically necessary, provided as billed, based on valid prescriptions and prescriber-patient relationships, not induced by kickbacks or bribes, dispensed in accordance with state licensing requirements.

48.     **SWIENCINKSI** paid Brickman, Buckingham, and others unlawful kickbacks and bribes out of the reimbursements the Pharmacies received for fraudulent prescriptions.

49.     The PBMs occasionally audited or investigated the Pharmacies, the prescribers, and the recipients who had purportedly been prescribed compounded or other drugs.  At various times, **SWIENCINSKI**, Breimeister, Buckingham, and others conspired to and did provide false information in response to these audits and investigations to further the conspiracy and conceal its existence.

50.     Between in or around October 2013 and in or around October 2017, Federal and private health care benefit programs paid the Pharmacies, generally through the PBMs, approximately $5.2 million for compounded and other drugs that were purportedly dispensed to the individuals residing in Michigan and Ohio.  The proceeds of these claims were disbursed to **SWIENCINSKI**, his coconspirators, and others.  Between in or around 2013 and in or around 2017, **SWIENCINSKI** was paid at least $5.2 million from his ownership interest in Pharms and the Pharmacies, and commissions, salary, and bonuses he received from his participation in the conspiracy.

### Overt Acts

51.     In furtherance of the conspiracy, and to accomplish its object and purpose, **SWIENCINSKI** and his coconspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas and elsewhere, the following overt acts:

a. On or about February 27, 2015, Buckingham forwarded to **SWIENCINSKI** a questionnaire that Express Scripts sent to Buckingham's wife regarding prescriptions purportedly received from Omni-One-Med.

b. On or about February 27, 2015, **SWIENCINSKI** forwarded the same questionnaire to Breimeister.

c. On or about March 2, 2015, Breimeister forwarded the same questionnaire to the prescribing physician on the claims under review, requesting advice on how the patients should respond to Express Scripts.

d. Breimeister instructed Buckingham on how to respond. Buckingham, in turn, falsely notified Express Scripts that his wife and children: paid copays for the compounded drugs they purportedly received from Omni-One-Med; obtained the prescriptions by mail in Dallas; and received treatment from the prescriber. The questionnaire was signed and dated on or about March 2, 2015.

e. In or about July 2016, in response to an audit by Express Scripts, SWIENCINSKI asked Buckingham to provide proof that he paid copayments. On or about July 6, 2016, Buckingham prepared a check falsely backdated to December 1, 2014, to provide to Express Scripts to make it appear as though he paid copays for his prescriptions at the time he received the prescriptions. Buckingham sent a scan of the check to SWIENCINSKI via e-mail. On July 8, 2016, SWIENCINSKI sent Buckingham a text message directing him to send the fake check to an address used by one of his business entities.

f. Between in or around April 2013 and in or around October 2016, SWIENCINSKI paid Brickman approximately $290,000 in commission payments.

g. Between in or around March 2014 and in or around January 2015, SWIENCINSKI paid Buckingham approximately $414,050 in commission payments.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

52. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant **BRIAN SWIENCINSKI** that, upon conviction of Count One, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

### Money Judgment and Substitute Assets

53. Defendant **BRIAN SWIENCINSKI** is notified that upon conviction, a money judgment may be imposed against the defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendant up to the amount of the money judgment.

ALAMDAR S. HAMDANI
United States Attorney

GLENN S. LEON
Chief
Fraud Section
U.S. Department of Justice


NICHOLAS K. PEONE
KELLY M. WARNER
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
Telephone: (202) 923-7818
E-mail: nicholas.peone@usdoj.gov